# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| Elite Health Centers Inc., | ) | |
| Elite Chiropractic, P.C., | ) | |
| Elite Rehabilitation, Inc., | ) | **PLAINTIFF DEMANDS** |
| Midwest Medical Associates, Inc., | ) | **TRIAL BY JURY** |
| Pure Rehabilitation, Inc., | ) | |
| Derek L Bittner D.C., P.C., | ) | |
| Mark A. Radom, | ) | |
| Derek Lawrence Bittner, D.C., | ) | |
| Ryan Matthew Lukowski, D.C., | ) | |
| Michael P. Draplin, D.C., | ) | |
| Noel H. Upfall, D.O., | ) | |
| Mark J. Juska, M.D., | ) | |
| Superior Diagnostic, Inc., | ) | |
| Chintan Desai, M.D., | ) | |
| Michael J. Paley, M.D., | ) | |
| Dearborn Center for Physical Therapy, LLC, | ) | |
| Michigan Center for Physical Therapy, Inc., and | ) | |
| Jayson Rosett, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

Plaintiff State Farm Mutual Automobile Insurance Company ("State Farm Mutual"), for its Complaint against Elite Health Centers Inc. ("Elite Health"), Elite Chiropractic, P.C. ("Elite Chiro"), Elite Rehabilitation, Inc. ("Elite Rehab"),

Midwest Medical Associates, Inc. ("Midwest Medical"), Pure Rehabilitation, Inc. ("Pure Rehab"), Derek L Bittner D.C., P.C. ("Bittner, P.C.")[1], Mark A. Radom ("Radom"), Derek Lawrence Bittner, D.C. ("Bittner"), Ryan Matthew Lukowski, D.C. ("Lukowski"), Michael P. Draplin, D.C. ("Draplin"), Noel H. Upfall, D.O. ("Upfall"), Mark J. Juska, M.D. ("Juska"), Superior Diagnostic, Inc. ("Superior"), Chintan Desai, M.D. ("Desai"), Michael J. Paley, M.D. ("Paley"), Dearborn Center for Physical Therapy, LLC ("Dearborn Center"), Michigan Center for Physical Therapy, Inc. ("Michigan Center"), and Jayson Rosett ("Rosett"), alleges as follows:

## I.    NATURE OF THE ACTION

1.    This action involves a fraud scheme designed to obtain money from State Farm Mutual by submitting, or causing to be submitted, bills and supporting documentation for services that are purportedly rendered to individuals ("patients") who have been in automobile accidents and are eligible for personal injury protection benefits ("No-Fault Benefits") under State Farm Mutual policies when, in fact, the services are either not rendered or are not medically necessary.  At the center of the scheme are Bittner (a chiropractor) and Radom (a layperson), who, together, created, own, and control several entities that:  (a) submit bills and

---

[1] Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, and Elite Rehab are collectively referred to herein as the "Elite Entities."

supporting documentation to State Farm Mutual for services purportedly rendered to patients at four locations in and around Detroit, including chiropractic, physical therapy, and medical services, that, in fact, either are not performed or are not medically necessary because they are performed to exploit the patients' No-Fault Benefits and not to benefit the patients; (b) prescribe and refer patients to two locations owned and controlled by Rosett (a layperson) for physical therapy services that are either not performed or are not medically necessary because they are similarly performed to exploit the patients' No-Fault Benefits and not to benefit the patients; and (c) refer State Farm Mutual insureds to receive medically unnecessary MRIs from Horizon Imaging, LLC ("Horizon"), an entity with which Radom has a financial relationship and which operates an MRI unit in a tractor-trailer that sits in a parking lot, and from Superior, another MRI facility in which both Bittner and Radom have a financial interest.

2.      To facilitate the scheme and to circumvent Michigan laws limiting the circumstances under which chiropractors and laypersons may own and control entities providing professional services, including physical therapy and medicine, or refer patients to other entities in which they have a financial interest, Bittner and Radom also fraudulently incorporated several of the Defendant entities as non-profit corporations and attempted to conceal their respective interests and roles in those entities.

3.     The individual physicians and chiropractors who are defendants are essential to the scheme because they falsely purport to legitimately examine, diagnose, and either order or provide medically necessary services tailored to the unique needs of each patient when, in fact, the examinations and diagnoses are designed to support a predetermined protocol of chiropractic, physical therapy, medical, and MRI services that either are not performed or are not medically necessary because they are designed to exploit the patients' No-Fault Benefits and not to benefit the patients.

4.     The bills and related documentation that Defendants submitted, or caused to be submitted, to State Farm Mutual were fraudulent because they falsely represented that: (a) patients were legitimately examined to determine the true nature and extent of their complaints and injuries, when they were not; (b) patients were legitimately diagnosed with, among other things, sprains and strains of the cervical, thoracic, and/or lumbar regions of the spine, when they were not; (c) each patient's injury was a result of the auto accident, when Defendants did not legitimately reach such a conclusion; and (d) patients were prescribed and received services that were medically necessary when in fact the services were provided pursuant to a fraudulent predetermined treatment protocol (the "Predetermined Protocol"), not because they were medically necessary and tailored to the unique needs of each patient.

5.     Pursuant to the Predetermined Protocol, Defendants: (a) fail to perform legitimate chiropractic examinations to determine the true nature and extent of patients' injuries; (b) report nearly identical chiropractic examination findings for patients; (c) diagnose patients with subluxations, as well as myositis and strains to multiple regions of the spine; (d) implement the same chiropractic treatment plan, which consists of a combination of chiropractic manipulations, traction, hot packs, wobble-board, and head-weighting exercises, and sometimes manual therapy and/or massage, regardless of the unique needs of each patient; (e) refer patients for unnecessary MRIs to Horizon, in which Radom has a financial interest and for which he handles "business development," and Superior, in which both Bittner and Radom have financial interests; (f) refer patients to doctors, including Upfall and Juska, who purport to examine patients at Elite Health and its successor, Midwest Medical, do not perform legitimate medical examinations, and prescribe medically unnecessary physical therapy that is rendered concurrently with chiropractic treatment at Elite Rehab and its successor, Pure Rehab, or to either Dearborn Center for Physical Therapy, LLC or Michigan Center for Physical Therapy, Inc. (collectively the "Rosett PT Entities"); (g) provide medically unnecessary physical therapy concurrently with chiropractic services, which are often duplicative; (h) purport to treat patients for as long as possible, until patients elect to stop treatment on their own, or until State Farm Mutual communicates that

it will not pay for further treatment; and (i) submit bills and supporting documentation that are fraudulent to State Farm Mutual to obtain No-Fault Benefits to which they know they are not entitled under MCL § 500.3107.

6.     As a result of the Predetermined Protocol:   (a) patients are not legitimately examined, diagnosed, and appropriately treated for conditions they may have had; (b) patients are subjected to the Predetermined Protocol of treatment for conditions that they may not have had; and (c) the fraudulent bills and related documentation are used to inflate the value of uninsured motorist claims ("UM Claims") against State Farm Mutual and bodily injury claims ("BI Claims") against at-fault drivers ("At-Fault Drivers").

7.     Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm Mutual, State Farm Mutual did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before this Complaint was filed.  Each bill and its supporting documentation, when viewed in isolation, does not reveal its fraudulent nature.  Only when the bills and supporting documentation are viewed together as a whole do the patterns emerge revealing the fraudulent nature of all the bills and supporting documentation.

8.     Defendants' scheme began at least in or about 2011 and has continued uninterrupted since that time.  As a direct and proximate result of the scheme, State

Farm Mutual has incurred actual damages of at least $1 million in No-Fault Benefits paid to Defendants.

9.     This action asserts common law claims for fraud and unjust enrichment to recover actual damages of at least $1 million paid to the Defendants. This action also seeks a declaratory judgment that State Farm Mutual is not liable for any pending bills or bills submitted during the pendency of this action by Defendants based upon the conduct described herein.  State Farm Mutual has not been reimbursed by the Michigan Assigned Claims Plan, the Michigan Catastrophic Claims Association, or any other source for any of the claims at issue in this case.

## II.    ALLEGATIONS COMMON TO ALL COUNTS

### A.    Bittner And Radom Own And/Or Control The Elite Entities

#### 1.    From 2000 Through Early 2011, Bittner Billed Only For Chiropractic Services Through Bittner, P.C.

10.     In October 2000, Bittner opened his own chiropractic practice, Bittner, P.C..  From October 2000 through early 2011, Bittner, P.C. submitted bills to State Farm Mutual for chiropractic services that were provided primarily by Bittner and, to a lesser extent, his wife.  Until early 2011, Bittner, P.C. billed, on average, approximately $12,000 per year to State Farm Mutual for chiropractic services.

11.     Because Bittner, P.C. is a for-profit professional corporation owned by a chiropractor, it is only permitted to render chiropractic services.  *See* MCL 450.224(3).   Specifically, MCL 450.224(3) provides that "if a professional corporation renders a professional service that is included within the public health code, 1978 PA 368, MCL 333.1101 to 333.25211," which includes chiropractic, physical therapy, and medical services, "then all shareholders of the corporation must be licensed or legally authorized in this state to render ***the same*** professional service."   (Emphasis added).   This law prevents, among other things: (a) a professional corporation owned by a chiropractor from rendering medical or physical therapy services; and (b) a professional corporation that provides chiropractic, medical, or physical therapy services from being co-owned by a chiropractor and/or a layperson not licensed to provide that same service.  *See* Mich. Atty. Gen. Op. #7151 (March 9, 2004) ("[A] chiropractor may not organize a professional service corporation with [a] physician for the purpose of providing medical and chiropractic services").

### 2.     Bittner And Radom Formed The Elite Entities In 2011, Including Two Fraudulently Incorporated Non-Profits

12.     In the summer 2011, Bittner joined with Radom, a layperson, to launch the fraud scheme.  Their first step was to fraudulently incorporate Elite Health and Elite Rehab as non-profit corporations under the Michigan Non-Profit Corporation Act (the "Non-Profit Act") to circumvent legal restrictions set forth in

MCL 450.224(3) that prohibit: (a) professional corporations owned by chiropractors from employing and profiting from services provided by physicians or other professionals who are licensed to provide services beyond the scope of chiropractic medicine; and (b) laypersons from co-owning professional corporations with chiropractors. This allowed Bittner and Radom to unlawfully expand, control, and profit not only from medically unnecessary chiropractic services, but also from unnecessary and lucrative physical therapy and medical services.

13.    Specifically, the Non-Profit Act allows lawful non-profit corporations to provide services through employed physicians, chiropractors, and physical therapists, even where the owner is not licensed to render the same professional services. *See* Mich. Attorney General Op. #6770 (September 17, 1993). Thus, a lawful non-profit corporation owned by a chiropractor and a layperson can provide chiropractic, medical, and physical therapy services. *See id.* To qualify as a lawful non-profit corporation under the Non-Profit Act, a corporation must be "incorporated to carry out any lawful purpose or purposes not involving pecuniary profit or gain for its directors, officers, shareholders, or members." *See* MCL 450.2108. As described next, Bittner and Radom did not incorporate Elite Health and Elite Rehab – and subsequently Midwest Medical and Pure Rehab – for any

purpose other than "pecuniary profit or gain for its directors, officers, shareholders, or members."  *Id*.

14.     On June 15, 2011, Bittner incorporated Elite Health as a Michigan non-profit corporation.  Ex. 6.  Bittner identified the directors of this entity as Bittner, Radom, and Dr. Stig Arenson, and the officers as Bittner, Radom and Bittner's wife, Ryan Bittner.  *Id*.  Less than three months later, on September 1, 2011, Bittner incorporated Elite Rehab as a Michigan non-profit corporation.  Ex. 7.  He identified the directors as Radom, Ryan Bittner, and Radom's wife, Amy Radom, and the officers as Bittner, Radom, and Ryan Bittner.  *Id*.  In the Articles of Incorporation for both entities, Bittner described their purpose as "[t]o provide health care services to the community it serves and to the extent that financial circumstances permit, provide charity care to persons in need."  Exs. 6 and 7.

15.     On August 31, 2011, Bittner incorporated Elite Chiro as a Michigan for-profit professional corporation, with Bittner as the sole officer and shareholder.

16.     Since the Elite Entities were formed, Bittner and Radom have used Elite Chiro, along with Bittner, P.C., to bill for and profit from fraudulent chiropractic services, to refer patients for unnecessary MRIs at either Horizon or Superior, and to steer patients to Elite Health for medical evaluations.  They have used Elite Health to: (a) bill for and profit from fraudulent medical services from which neither could lawfully profit absent their designation of Elite Health as a

lawful non-profit corporation; and (b) exert control over doctors at Elite Health who (i) write predetermined physical therapy prescriptions for patients to receive physical therapy at Elite Rehab and its successor, Pure Rehab, as well as at the Rosett PT Entities, with which the Defendants have cross-referral relationships, and (ii) refer patients for unnecessary MRIs at Horizon and Superior. Finally, Bittner and Radom have used Elite Rehab to bill for and profit from fraudulent physical therapy services from which, again, neither could profit lawfully absent the designation of Elite Rehab as a lawful non-profit corporation.

17. Elite Health and Elite Rehab are not lawful non-profit corporations. Rather, they were organized to circumvent the restrictions on the ownership of multi-disciplinary clinics by chiropractors, like Bittner, and laypersons, like Radom. Moreover, contrary to the Non-Profit Act, Elite Health and Elite Rehab were created to promote financial gains for Bittner and Radom. Indeed, in stark contrast to Bittner, P.C.'s pre-2011 average yearly billings to State Farm Mutual of $12,000, the Elite Entities' billings to State Farm Mutual skyrocketed from more than $325,000 in 2011, to almost $850,000 in 2012, and to more than $1 million in 2013.

### 3. Bittner And Radom Own And/Or Control Elite Chiro And Direct Chiropractors At Elite Chiro To Steer Patients To Elite Health, Horizon, And Superior

18. Bittner and Radom own and/or control Elite Chiro.

19.    Bittner has testified that he is the sole owner of Elite Chiro, and corporate filings with the Michigan Department of Licensing & Regulatory Affairs ("DLRA") represent that, at all times, Bittner has been the resident agent and sole officer and shareholder of this entity.

20.    However, defendant Lukowski, a chiropractor who worked for Elite Chiro from December 2011 through February 2013, testified in a March 6, 2014 deposition that he reported to both Bittner and Radom as his "bosses," and that he understood Radom to be "a partner or something."   Furthermore, Lukowski testified in depositions on January 16, 2014 and August 14, 2014 that, in approximately February 2013, he was fired from Elite Chiro by both Bittner and Radom for not being "committed."

21.    Moreover, defendant Draplin, a chiropractor who began working for Elite Chiro in 2013, testified in a March 11, 2014 deposition that he "know[s] that" Elite Chiro is a "branch of Elite Health," where Radom was listed in corporate filings as a director.   In addition, both Draplin and Richard Jeffrey Stanley, D.C., have testified in multiple depositions that they were actually employees of Elite Health and Midwest Medical.   Nevertheless, Elite Chiro billed State Farm Mutual for their services.   When Draplin was asked in a December 22, 2014 deposition who hired him at Midwest Medical, his attorney instructed him not to answer. Similarly, on September 24, 2014, a massage therapist whose services were billed

2:16-cv-13040-SJM-DRG   Doc # 1   Filed 08/22/16   Pg 13 of 116   Pg ID 13

by Elite Chiro testified that she "work[s] under the chiropractor," but that she was employed by Midwest Medical, formerly Elite Health. Draplin also testified in a June 3, 2014 deposition that at the Detroit location where he worked, the "front desk person" worked for all of the Elite Entities jointly, confirming that the Elite Entities, including Elite Chiro, are jointly owned and/or controlled.

22.     Bittner and Radom direct chiropractors who work at Elite Chiro (the "Elite Chiropractors") [2] to steer patients to (a) Elite Health where patients receive unnecessary physical therapy prescriptions and/or referrals to specialists who work at Elite, and either (b) Horizon, a mobile MRI truck located in a parking lot, in which Radom has a financial interest and for which he handles "business development," for unnecessary MRIs, or (c) Superior, which is owned by Bittner and Radom through Midwest Medical. For example, Lukowski testified in a March 13, 2014 deposition that both Radom and Bittner instructed him to refer patients to defendant Upfall, a doctor of osteopathy at Elite Health, "if [Radom or Bittner] felt that [the patient] needed it." Lukowski also testified that Bittner directed him to send patients to Horizon for MRIs. Indeed, when the Elite Chiropractors referred patients for MRIs, they did so on pre-printed forms supplied by Horizon with Horizon's name and address on the letterhead.

_____

[2] The Elite Chiropractors include Defendants Bittner, Lukowski, and Draplin, as well as Bittner's sister, Nicole Bittner, D.C., Bernard Hughey, D.C., and Richard Jeffrey Stanley, D.C., who similarly purported to examine, diagnose, and treat patients at Bittner PC and Elite Chiro.

23.     One patient, ME, testified in a September 23, 2014 deposition that Draplin actually referred him for physical therapy at Elite Rehab, explaining that "Dr. Draplin is the one that said you need to see physical therapy after you see me."

> **4.     Bittner And Radom Recruit Doctors To Work For Elite Health And Direct Them To Steer Patients To Elite Rehab, Pure Rehab, And The Rosett PT Entities, To Other Doctors At Elite Health, And For Unnecessary MRIs At Horizon And Superior**

24.     Bittner and Radom own and/or control Elite Health.

25.     On February 5, 2013, Bittner testified under oath in a deposition that he is not an owner of or affiliated with Elite Health.  However, as set forth above, Bittner organized Elite Health and both Bittner and Radom, along with Bittner's wife, were officers and/or directors of this entity.  Moreover, Peter Grain, M.D. ("Grain"), a neurologist who worked at Elite Health from January 2013 to at least July 2013, testified in a July 26, 2013 deposition that he believes that both Bittner and possibly Radom, the "business manager," own Elite Health, and that Bittner signed the checks he received from Elite Health.  Moreover, on November 18, 2013, Grain testified that Bittner "kind of runs Elite [Health]," and on August 8, 2014, he testified that the individuals he deals with at Elite Health and Midwest Medical are Bittner and Radom.  Similarly, on March 26, 2013, Upfall, who worked at Elite Health from 2011 through February 2014, testified in a deposition

that he "assume[s] Dr. Bittner" owns Elite Health.  And, on July 28, 2014, defendant Juska, who began working at Elite Health in late 2013 as both a pain management doctor and physical medicine and rehabilitation doctor, testified in a deposition that Bittner "has some managerial relationship" at Elite Health.

26.    Bittner and Radom were both responsible for soliciting and contracting with doctors to work at Elite Health so that Bittner and Radom could unlawfully profit from their medical services.  For example, Grain testified in a July 26, 2013 deposition that both Bittner and Radom approached him and "asked . . . if [he] was interested in seeing no-fault auto patients," and he subsequently signed a contract with Elite Health pursuant to which he is "paid a percentage of [his] billing."  In a June 9, 2014 deposition, Upfall testified that Bittner hired him to work at Elite Health as an independent contractor "to see [Elite's] patients," whom "[Elite] signed up for me to see at their office."

27.    The testimony of Dr. Reese James ("James"), an osteopathic doctor who provided pain management services for patients of Elite Health from approximately 2011 through at least September 2013, underscores not only Radom's unlawful ownership and control of Elite Health, but also establishes that the agreement between Elite Health and James constitutes an unlawful kickback arrangement.  Specifically, James testified in an August 22, 2013 deposition that he entered into an agreement with Elite Health after someone named "Mark" [Radom]

called him, asked what services he provided, and started sending him patients. James further testified that Radom was his only "contact" at Elite Health, and it was his understanding that Radom was the "office manager" or "practice manager."

28.    Pursuant to the agreement that James reached with Radom, James does not actually work at any of the Elite Entities' locations, but rather provides pain management services to Elite Health's patients at his own office and at surgery centers.  James subsequently sends Radom "a list of what [he] did" so Elite Health can prepare and submit the bills for his services.  James testified that Elite Health pays him 40% "of what they collect," and keeps 60% of the collections for itself as consideration for "finding the patient."  James conceded under oath that, pursuant to this arrangement, Elite Health was "taking fees just for referring a patient."  James explained that "I don't have anything to do if I don't have a patient," and "[t]hat's a big part, the patient . . . [I]f somebody is a good referral source for you to see patients . . . [i]t's a lot easier than beating people's doors down and stuff."

29.    The arrangement between James and Elite Health, pursuant to which Elite Health is paid for "finding the patient" for James, is unlawful pursuant to MCL § 750.428, which provides that "[a]ny physician or surgeon who divides fees with, or promises to pay part of his or her fee to, or pays a commission to any other

16

physician or surgeon or person who consults with or sends patients for treatment or operation is guilty of a misdemeanor punishable by up to six months in prison or a fine of not more than $750." *See also* MCL §333.16221(D) (II) ("Dividing fees for referral of patients or accepting kickbacks on medical . . . services constitute unethical business practices that may result in disciplinary proceedings," and noting, "[t]his provision applies to physicians and other health professionals").

30.     Bittner and Radom also direct the doctors employed by and/or associated with Elite Health (the "Elite Doctors"), including Defendants Upfall and Juska, to steer patients to Elite Rehab and its successor, Pure Rehab, which they own and/or control, to the Rosett PT Entities, with which Defendants have cross-referral relationships, to other Elite Doctors, and to Horizon and Superior for unnecessary MRIs.

31.     For example, in multiple depositions – including on July 8, 2013, July 22, 2013, August 5, 2013, December 23, 2013, March 17, 2014, June 9, 2014, August 5, 2014, and August 11, 2014 – Upfall described his role at Elite Health as a "gatekeeper," who was on hand to "make referrals" or make an "introduction" to specialists, including physical therapists, pain management doctors, neurologists, and orthopedists. According to Upfall's testimony from a March 17, 2014 deposition, he "[n]ever took over anybody's care" at Elite Health. Indeed, Upfall did not even consider the patients he saw at Elite Health to be his own, testifying in

17

a June 9, 2014 deposition that "I wouldn't even say they were my patients."  Upfall

testified in the March 17, 2014 deposition that Elite provided him with an assistant

on the days he worked there, and the assistant handled the referrals:  "[I] would say

refer them to a neurologist and [Elite] would do that.  I would say send them to an

orthopedic surgeon, and they would send them."  Upfall was paid 65% of what

Elite Health collected for his services and Elite Health kept the remaining 35%.

32.    In a March 11, 2014 deposition, Draplin testified that Juska was "like

Dr. Upfall" who has office space at the Detroit location of Elite Entities, and in a

December 22, 2014 deposition, testified that the only "pain doctors" to whom he

refers the Elite Entities' patients are Upfall and Juska.  Draplin also testified in a

June 3, 2014 deposition that he received a directive from "the clinic" to refer

patients to Juska.  In a September 3, 2015 deposition, Juska testified that: (a) he

was actually employed by Michigan Sports and Spine Center, P.C. ("Michigan

Sports"); (b) his "boss" is Jeff S. Pierce, D.O. ("Pierce"), who is the president and

resident agent of Michigan Sports; (c) Pierce arranged for Juska to work at Elite

Health; (d) there is a "relationship or agreement" between Elite Health and

Michigan Sports; (e) he is paid by Michigan Sports, not Elite Health; and (f) Elite

Health and Michigan Sports each received a certain percentage of the collections

for Juska's work at Elite Health, and Juska got 50% of Michigan Sports'

collections.

33.    Grain testified in a July 26, 2013 deposition that when he prescribes physical therapy to Elite Health's patients, they are directed to Elite Rehab for physical therapy, but when he prescribes physical therapy to patients of his own personal medical practice, he has never referred them to Elite Rehab for any treatment.  He also testified that he only refers Elite patients to "doctors at Elite," and does not refer any patients of his own medical practice to these doctors.

34.    With regard to MRIs, Grain testified at the same deposition that when he refers Elite Health's patients for MRIs, he refers them to Horizon "[be]cause that's who they use."  As with the Elite Chiropractors, when the Elite Doctors refer patients for MRIs, they do so on pre-printed forms with Horizon's name and address on the letterhead.

### 5.    Bittner And Radom Own And/Or Control Elite Rehab Which, At Their Direction, Receives Patient Referrals From Elite Health

35.    Bittner and Radom own and/or control Elite Rehab.

36.    Bittner has attempted to conceal his and Radom's ownership and/or control of Elite Rehab, testifying in a November 8, 2012 deposition that "there is no owner" because it is a "non-profit," and in a July 25, 2013 deposition that he is not the owner of or affiliated with Elite Rehab and has "no idea" who owns it. When asked during the November 8, 2012 deposition who "manages" or "runs" Elite Rehab, Bittner's attorney instructed him not to answer the question.  When

asked during a February 5, 2013 deposition whether it was "just coincidental" that Elite Rehab and Elite Chiro share space in two locations, Bittner testified: "I guess."

37.    However, as set forth above, Bittner organized Elite Rehab and both Bittner and Radom, along with Bittner's wife and Radom's wife, were officers and/or directors of this entity.  Moreover, contrary to Bittner's testimony that the Elite Entities are not related, a sign-in sheet for the Detroit location of Elite Chiro submitted to State Farm Mutual is on letterhead for "Elite Health Centers, Chiropractic – Medical – Physical Therapy."  *See* Ex. 8.   Likewise, Elite Chiropractors, including Bittner and Lukowski, have signed disability certificates for patients on letterhead for "Elite Health Centers."  *See* Ex. 9.  In addition, as referenced above, at the Detroit office – one of the locations where physical therapy was provided – the "front desk person" worked for all of the Elite Entities.

38.    Patient testimony also supports joint ownership and/or control of Elite Rehab and the other Elite Entities.  For example, patient DB testified in an August 6, 2013 deposition that she did not know there was any difference between Elite Chiro and Elite Rehab because: (a) the "physical therapist and chiropractors work out of the same place"; and (b) "[t]here's no . . . dividing wall between physical therapy and chiropractic; it's just all in the same office."  Indeed, a physical therapist who worked at Elite Rehab, Gaurav Mitra, testified in a July 23,

2013 deposition that "[m]ostly my patients are from Dr. Upfall," and that he sends

all physical therapy notes to Dr. Upfall.

### 6.   Bittner And Radom Attempt To Conceal Their Ownership And Control Of Elite Health And Elite Rehab

39.   The Michigan Public Health Code prohibits self-referrals by licensed

health care professionals.  Specifically, the Michigan Public Health Code prohibits

a licensee, including a chiropractor, from "requir[ing] . . . that an individual

purchase or secure a . . . treatment, procedure, or service from another person,

place, facility, or business in which the licensee has a financial interest."  *See* MCL

§ 333.16221(e)(iv)(A); *see also* MCL 333.16221(e)(iii) (prohibiting "[p]romotion

for personal gain of an unnecessary drug, device, treatment, procedure, or

service"); MCL 333.16221(h) (prohibiting "[a] violation, or aiding or abetting in a

violation, of this article or of a rule promulgated under this article").

40.   Thus, under Michigan law, a chiropractor may not require that his or

her patients receive physical therapy or other medical services from a business in

which the chiropractor has a financial interest.  The policy rationale behind this

prohibition on self-referrals is that health care services should be guided solely by

the patient's legitimate medical needs, and licensed health care professionals

should not recommend services based on personal financial gain, rather than

medical necessity.  By prohibiting licensees from requiring their patients to receive

treatment from businesses in which the licensee has a financial interest, the

Michigan Public Health Code seeks to reduce medically unnecessary services based on financial motives as opposed to patient needs and eliminate financial factors that may interfere with a provider's independent medical judgment.

41.    Bittner violated Michigan's prohibition on self-referrals when Elite Chiro patients were referred to Elite Health, Midwest Medical, Elite Rehab, Pure Rehab, and, as described below, Superior.  Accordingly, as described next, Bittner took steps to conceal his ownership of these entities.

42.    Specifically, on February 5, 2013, Bittner was deposed about his relationship to Elite Health and Elite Rehab, both of which shared locations and the "Elite" name with his chiropractic practice, Elite Chiro.  Bittner falsely denied that he owned or was affiliated with Elite Health or Elite Rehab.

43.    Less than two weeks later, apparently in response to increased scrutiny into the ownership of these entities, Bittner and Radom began taking steps to conceal their ownership and control of Elite Health and Elite Rehab.

44.    First, on approximately February 13, 2013, Defendants ceased submitting physical therapy bills and documentation to State Farm Mutual under the name Elite Rehab and began billing State Farm Mutual for physical therapy under names that did not include the word "Elite," namely Rehabilitation of Sterling Heights and Rehabilitation of Detroit.

45.     Second, in June and July 2013, Defendants filed five Certificates of Assumed Name for Elite Health to transact business under names that did not include the word "Elite," including Rehabilitation of Sterling Heights and Rehabilitation of Detroit (which they were already using for physical therapy), as well as Pain Specialists of Michigan, Prime Neurosurgery Group, and Pioneer Neurology Group.  At that time, the director of Elite Health was identified as Todd Franklin, who also owns Plaintiff Investment Funding, LLC,[3] a company that provides "pre-settlement funding" to plaintiffs by purchasing an interest in the proceeds of the plaintiff's litigation.  The Defendants subsequently began to phase out their use of the name Elite Health, replacing it in most instances with: (a) Pain Specialists of Michigan for medical exams; (c) Prime Neurosurgery Group for surgery consultations; and (d) Pioneer Neurology Group for neurological consultations.

46.     Third, approximately five months later, on December 5, 2013, Defendants filed a document with the DLRA, which changed the officers and directors of Elite Health from Bittner, Radom, and Radom's wife, to a group of nominee officers and directors.  Specifically:  (a) the president was identified as George Ingham, who is Bittner's father-in-law; (b) the secretary and treasurer were

---

[3] Plaintiff Investment Funding, LLC operates out of the former office of one particular personal injury attorney (the "PI Attorney") who, as set forth below, represents a significant number of Elite Entities' patients.

identified as Brenda Sher, whom Bittner has testified was his "officer manager"; and (c) the directors included Todd Franklin, Lowell S. Friedman (a criminal defense and family law attorney), and Matt Fishburn (a high school physical education teacher).

47.     The same day, December 5, 2013, Defendants filed a document with the DLRA that changed the officers and directors of Elite Rehab from Bittner, Radom, and both of their wives to the same group of nominee officers and directors as Elite Health.

48.     Fourth, in March 2014, the Defendants incorporated two new purportedly non-profit entities – Midwest Medical and Pure Rehab – to replace Elite Health and Elite Rehab, respectively.  Midwest Medical and Pure Rehab appear to have been formed by the Defendants in March 2014 in direct response to a February 2014 deposition of Bittner.  During this deposition, Bittner was deposed about Elite Rehab and Elite Health and, again testified falsely that he was not an owner of or affiliated with those entities.

49.     Thus, in an attempt to disassociate Bittner's own chiropractic clinic, Elite Chiro, from the provision of physical therapy and medical services, and to conceal Bittner and Radom's ownership and control of those entities, the new entities do not use the word "Elite" in their names.  Similarly, the new entities do

not identify Bittner, Radom, or their wives as officers, directors, incorporators, or resident agents in corporate filings.

50.    However, the connection between Midwest Medical and Pure Rehab, on the one hand, and the other Elite Entities, on the other hand, is established by the following:  (a) Midwest Medical and Pure Rehab operate out of the same locations as the Elite Entities; (b) Midwest Medical and Pure Rehab employ the same physical therapists, physicians, and staff as the other Elite Entities; and (c) Midwest Medical and Pure Rehab use the same Predetermined Protocol and fraudulent documentation as the other Elite Entities.  Moreover, according to their Articles of Incorporation, the resident agent and incorporator of both Midwest Medical and Pure Rehab is Jennifer Sabo, an employee of the Elite Entities who was described as the "physical therapy coordinator."  Exs. 10 and 11.  And, for both new entities, the address of the registered office is Elite's Sterling Heights location, 13927 Plumbrook, Sterling Heights, Michigan.  *Id*.  Juska confirmed in a July 28, 2014 deposition that Elite Health, which then billed his services out of the assumed named Pain Specialists of Michigan, "switched" and changed its name to Midwest Medical and the Pain Specialists of Michigan name was no longer being used.  On August 28, 2014, Grain also confirmed in a deposition that Midwest Medical used to be known as Elite Health.

51.     After forming Midwest Medical and Pure Rehab, the Defendants ceased submitting bills for physical therapy and medical services under the assumed names for Elite Health and began billing: (a) for physical therapy through Pure Rehab, using a new tax identification number ("TIN"); and (b) for medical services through Midwest Medical, using another new TIN.

52.     Bittner and Radom have used Midwest Medical and Pure Rehab for the same purposes and in the same manner as Elite Health and Elite Rehab, respectively.  Thus, for the same reasons as Elite Health and Elite Rehab, Midwest Medical and Pure Rehab are not lawful non-profit corporations.

### 7.     In March 2014, Bittner And Radom Fraudulently Incorporate Superior As Another Non-Profit To Profit From MRI Services

53.     In March 2014, around the same time that the Defendants incorporated Midwest Medical and Pure Rehab, Bittner and Radom fraudulently incorporated Superior as a non-profit corporation.  This allowed Bittner and Radom to unlawfully control and profit from MRI services.

54.     Specifically, on March 19, 2014, the Articles of Incorporation for Superior were submitted to the DLRA.  Ex. 12.  Although Bittner and Radom are not identified in the corporate filings to conceal their ownership and control of Superior, their connection to this entity is established by the following:  (a) the Articles of Incorporation for Pure Rehab, Midwest Medical, and Superior were

faxed to the DLRA on the same day – March 19, 2014 – by the same attorney, at 5:29 p.m., 5:34 p.m., and 5:32 p.m., respectively; (b) the resident agent and incorporator of all three entities is Jennifer Sabo, an employee of the Elite Entities who was described as the "physical therapy coordinator"; (c) the registered office address for all three entities was listed on the Articles of Incorporation as 13927 Plumbrook, Sterling Heights, which is the Elite Entities' principal place of business; (d) Superior's billing address is also 13927 Plumbrook, Sterling Heights; (e) Midwest Medical has billed State Farm Mutual for MRI services using Superior's TIN; (f) Midwest Medical has billed State Farm Mutual for office visits and chiropractic services using Superior's TIN; (g) Superior's Certificate of Need application, filed with the Michigan Department of Health and Human Services, lists the owner of Superior as Midwest Medical; and (h) on March 20, 2015, Radom sent a letter to the Michigan Department of Health and Human Services, stating that he "represent[s]" Superior and requesting "to have our Authorized Agent be changed."

55.    Since Superior was formed, Bittner and Radom have unlawfully used Superior to bill for and profit from fraudulent MRI services.

56.    As set forth above, the Michigan Public Health Code prohibits self-referrals by licensed health care professionals.  *See* MCL § 333.16221(e)(iv)(A) (prohibiting a licensee, including a chiropractor, from "requir[ing] . . . that an

individual purchase or secure a . . . treatment, procedure, or service from another person, place, facility, or business in which the licensee has a financial interest"); *see also* MCL 333.16221(e)(iii) (prohibiting "[p]romotion for personal gain of an unnecessary drug, device, treatment, procedure, or service"); MCL 333.16221(h) (prohibiting "[a] violation, or aiding or abetting in a violation, of this article or of a rule promulgated under this article").

57.     Thus, under Michigan law, a chiropractor may not require that his or her patients receive MRIs from a business in which the chiropractor has a financial interest.  *See also* ¶ 39 above.

58.     Bittner violated Michigan's prohibition on self-referrals when patients of Elite Chiro, Elite Health, Midwest Medical, Elite Rehab, and Pure Rehab were referred to Superior.

59.     Moreover, Superior is not a lawful non-profit corporation.  Rather, it was organized to circumvent the restrictions on the joint ownership of an MRI facility by a layperson, like Radom, and a chiropractor, like Bittner.  Indeed, contrary to the Non-Profit Act, Superior was created to promote financial gains for Bittner and Radom.  For example, Superior's certificate of need application states that Superior would provide MRI services for $675, but it regularly bills State Farm Mutual more than $5,000 for one MRI.  In just over nine months, Superior has billed State Farm Mutual more than $250,000 for only 25 patients on Exhibit 5.

### 8.   Bittner And Radom Direct Doctors At Elite Health To Refer Patients For Physical Therapy At The Rosett PT Entities

60.     Bittner and Radom also direct staff at Elite Health to refer patients for medically unnecessary physical therapy at the Rosett PT Entities, which are owned and controlled by Jay Rosett, an individual with a personal connection to Radom. Specifically, patients who receive chiropractic treatment at the Riverview and Westland locations of Elite Chiro and who are prescribed physical therapy by Elite Doctors are often sent to the Rosett PT Entities for physical therapy.  A physical therapist who worked for one of the Rosett PT Entities, Michigan Center, from 2010 through September 2014, testified that he was familiar with Elite because it referred patients to Michigan Center, and that about 50% of his patients were Elite referrals.  Indeed, KH – a patient of Elite Chiro and the Rosett PT Entities – testified in a February 20, 2013 deposition that she was told by Elite that she could not receive therapy at Elite Rehab even though it was close to her home.  The patient knew that "inside Elite is a physical therapy place too," and was told that "if that's where [Elite] set you up at [the Rosett PT Entities], that's where you got to go."  Another patient, JM, testified in a February 28, 2014 deposition that another Rosett PT Entity, Dearborn Center, was simply another location for Elite.

61.     In addition, Elite Doctors prescribe physical therapy at the Rosett PT Entities for some patients who are not treated at Elite Chiro.

62.     As set forth below, the physical therapy prescribed by Elite Doctors and rendered at the Rosett PT Entities is medically unnecessary and fraudulent.

**B.     First-Party Claims for Payment Under the Michigan No-Fault Act**

63.     Under the Michigan No-Fault Act, automobile insurers are required to pay No-Fault Benefits, including "allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation," when those benefits are causally connected to an "accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle" (hereinafter, "No-Fault Benefits").  MCL §§500.3105, 3107(1)(a).

**C.     Tort Claims For Non-Economic Loss**

64.     Individuals who are not at fault for the accidents underlying their claims may also potentially recover: (a) non-economic losses, such as for pain and suffering, from At-Fault Drivers through a BI Claim, only in limited situations, including if the individual has suffered serious impairment of body function, *see* MCL §500.3135; or (b) if recovery under the BI Claim is insufficient, from the patient's own insurance company through a UM Claim.

65.     An individual has suffered serious impairment of body function when his general ability to conduct the course of his normal life has been affected as a result of his injury.   A determination of whether this has occurred requires an

analysis of the totality of the circumstances, including: (a) the nature and extent of the impairment; (b) the type and length of treatment required; (c) the duration of the impairment; (d) the extent of any residual impairment; (e) the prognosis for eventual recovery; and (f) whether there is "objective manifestation" of the injury.

### D.     The Apparent Cross-Referral Relationships With Personal Injury Attorneys

66.     Because the success of Defendants' scheme depends on their access to a high volume of patients who have been in auto accidents, another aspect of their scheme is to develop and maintain apparent cross-referral relationships with personal injury attorneys who represent patients in connection with BI Claims and UM Claims and who are referral sources for Defendants.  Specifically, the personal injury attorneys are motivated to refer patients to the Defendants because the personal injury attorneys can rely upon the Predetermined Protocol to:   (a) establish an "objective manifestation" of serious impairment of body function, which is required to satisfy the threshold for bringing tort liability claims for non-economic loss on behalf of the patients and their other clients; and (b) inflate the value of the BI Claims and UM Claims.  This, in turn, increases the amounts of the contingency fees available to the personal injury attorneys through the BI Claims and UM Claims.  At the same time, Defendants are motivated to refer patients to the personal injury attorneys and provide them with bills and reports to induce more patient referrals from the personal injury attorneys.

67.     To illustrate, more than 85% of the Elite Entities' patients in Exhibits 1 and 2 were represented by an attorney, with the vast majority represented by a particular personal injury attorney (the "PI Attorney").  In addition, approximately 90% of patients who had more than ten dates of services at the Elite Entities were represented by an attorney, almost 70% of whom were represented by the PI Attorney.

68.     Indeed, one doctor who worked for Elite Health and now works for its successor, Midwest Medical, testified in a September 18, 2014 deposition that at Elite, he sees "a lot" of patients represented by the PI Attorney.  In fact, he explained that he treats so many of that attorney's clients that "When I first started working for Midwest Medical, I had dinner with [the PI Attorney] just as an introduction . . . to introduce me to him.  A lot of patients are represented by that law firm."

## E.     Legitimate Treatment Of Patients With Subluxations, Strains, And Sprains

69.     When an individual has been in a motor vehicle accident and complains of neck or back pain, a licensed professional must obtain a history and perform a legitimate examination to arrive at a legitimate diagnosis.  Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design a legitimate treatment plan that is tailored to the unique circumstances of each patient.  During the course of treatment, plans should be

modified based upon the unique circumstances of each patient. As set forth herein, these basic principles were not followed by Defendants.

70.     Sprains and strains involve injuries to ligaments, muscles, and/or tendons. With a sprain, an individual's ligaments, the connective tissues that join the bones together, are overstretched or torn. A strain occurs when a muscle and/or tendon is overstretched or torn. Treatment plans for individuals with strains and sprains may involve no treatment and/or medicines at all because many of these kinds of injuries heal within weeks without any intervention, or may include a combination of medicines and passive and active modalities.

71.     The term subluxation refers to the displacement of bones that form a joint. Subluxations can occur in one or more of four major areas of the spine: the sacrum (pelvic) vertebrae, the lumbar (torso) vertebrae, the thoracic (middle) vertebrae, or the cervical (neck) vertebrae. Chiropractic treatment plans for individuals with subluxations often include chiropractic manipulation to reduce the subluxation and mobilize the joint.

72.     Passive modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities including hot and cold packs, ultrasound, diathermy, traction, manual therapy, and massage. Active modalities require patients to affirmatively participate in their treatment, and include many different kinds of stretching and strengthening exercises.

73.     Passive modalities are performed to reduce pain and to facilitate active modalities, which are performed to promote the healing of strains and sprains.  In legitimate treatment plans, it is important to use passive modalities to the extent necessary to reduce pain and to facilitate active modalities, and to introduce active modalities as soon as practicable to promote healing of strains and sprains.

74.     While one or more passive modalities may be appropriate on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, the same combination of passive modalities on nearly every visit would rarely, if ever, be appropriate for any patient.

75.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various modalities, should be individualized depending on the patient's unique circumstances and response to treatment.

76.     Treatment plans, once implemented, should be periodically reassessed and modified based upon the progress of the patient, or lack thereof.  Treatment plans should also evaluate and integrate diagnostic results.

77.     If patients are disabled due to their injury, a licensed professional must make an individualized evaluation of the patient's diagnosed disabilities,

expected length of treatment, and what specific accommodations are necessary in light of the patient's work status, medical history, and daily activities.

78.     Patients should be discharged from treatment when they have reached maximum medical improvement, such that no further treatment is likely to benefit the patient.

79.     As described next, Defendants do not legitimately examine, diagnose, or treat patients for their individual conditions.  Instead, patients are subjected to the Predetermined Protocol in which the Defendants examine patients to support predetermined diagnoses and treatment plans, which are the same for all patients. The Predetermined Protocol was not designed for the medical benefit of the patients, but to:  (a) enrich Defendants by maximizing their collection of the patients' No-Fault Benefits; and (b) inflate the value of personal injury claims in order to develop and maintain apparent cross-referral relationships with personal injury attorneys.

### F.     Defendants' Scheme And The Fraudulent Predetermined Protocol
####      1.     Patient Solicitation

80.     To procure patients for their scheme, Defendants: (a) employ and use runners, cappers, and steerers (collectively "Solicitors") with the intent to obtain patients and to fraudulently obtain their No-Fault Benefits from State Farm Mutual, in violation of MCL § 500.4503(h) and (i); (b) receive referrals from

personal injury attorneys pursuant to their apparent cross-referral relationships with them; and (c) call patients directly to get them to treat at the Elite Entities.  This is an important first step because patients are the lifeblood of the scheme, both for Defendants and for the personal injury attorneys with whom Defendants have critically important cross-referral relationships.

81.    Some patients were referred to the Elite Entities by Solicitors who identified auto accident victims, including through the purchase of police reports, and contacted them by phone and/or in person to purportedly advise the individuals of their "rights" and discuss the "need for treatment."  Solicitors then steered patients to the Elite Entities for treatment and to personal injury attorneys, including the PI Attorney, for legal representation, and arranged for transportation to pick up patients at their homes and take them directly to the Elite Entities.

82.    One Solicitor was Fred Schwarze ("Schwarze").  Schwarze has testified in a July 23, 2013 deposition that he: (a) worked for transportation companies FS Complete Transportation Services, LLC ("FS Complete") and Barron Transportation, LLC ("Barron"), which provided transportation services to many of the Elite Entities' patients; (b) was introduced through one of the owners of FS Complete and Barron to MI Pro Consultants, a "marketing company" that would "contact people who have been in accidents"; (c) went to work for MI Pro Consultants and, in that capacity, was provided with names of recent auto accident

victims and would meet with them to try to get them to "sign up with [a specified] attorney" from a list of 20 attorneys he was provided; and (d) was paid by MI Pro Consultants for each individual he contacted an amount that varied depending on whether the individual signed up with the recommended attorney, namely "[$]125 if we got them, [$]50 if we didn't."

83.     Patient JS testified in a July 23, 2013 deposition that he was solicited by "Fred" and subsequently treated at the Elite Entities even though he was not injured:

> Friday I got a call from . . . one lawyer . . . .  I say I don't need nothing. And another guy, he called me, his name is Fred.  That was on Friday, February 9th.  I got the accident on 8th and February 9th he called me. . . . He says, "You have an accident and we're going to come pick you up and take you to the hospital."  I told him, "I don't need no doctor.  I don't feel nothing, I'm fine.  I'm going to wait." . . . . Monday he called me again.  He said, "We have to come down and pick you up to take you to the hospital." I thought, my imagination, I don't know.  I thought those guys – who knows my number and who knows why this guy calling me, how he know about my accident.  . . . Almost the same day, Fred and [a personal injury attorney], on the same day they called me.  I don't know how they find out. I don't know.

84.     This patient also received two fliers from the PI Attorney.  The first "urg[ed]" him not to talk to insurance companies, but to call the PI Attorney's office, advertising that (a) the "insurance companies are not your friends," (b) that the PI Attorney has collected over $250 million in client settlements over the last five years, and (c) "**This could be hundreds of thousands of dollars a year**

**worth of benefits in your pocket!**".  The second flier stated:  "We have your police report!  Call us <u>now</u> for your free copy and free consultation."

85.    Patient JS testified that after he received these fliers and rejected initial solicitation attempts, Fred called again and told JS, "We're going to . . . send you a car and pick you up, take you to the clinic."  Although JS told Fred that he had a car and could drive, he was advised by Fred not to drive.  FS Complete then transported JS to Elite Chiro, where he was purportedly examined by Bittner.  Ex. 13.  Although JS testified that he was "fine," felt "nothing," and did not need a doctor, Bittner stated in his initial evaluation that JS's pain was 7/10 for the left neck and trapezius, and that he was experiencing numbness throughout the back, elbow, wrist, and hand, muscle spasms, and impaired ranges of motion in the neck and trapezius.  *See* Ex. 14.

86.    Another patient, JA, advised State Farm Mutual that she was contacted shortly after her accident by someone named "Mike" who misrepresented that he "was with State Farm Mutual" and that "they needed her to go for a follow-up test for injuries from the accident," and that they arranged for "Fred" to pick her up and take her to Elite.

87.    Similarly, patient ME testified in a June 12, 2014 deposition that after his accident, he received an unsolicited call from a stranger who met with him and

connected him with the PI Attorney, who referred him to Elite Chiro.  ME testified as follows:

> I actually met with the guy . . . it was about money. . . .  And I said this isn't about money, this is about my future if I ever have long-term problems here.  This isn't about the dollar sign.  He said it is for me, that's why I'm in business . . . .

88.     According to ME, that PI Attorney was "working with [Bittner], he has to be.  There's something not right there."   ME further testified that the providers he saw at the PI Attorney's direction, including Bittner, "did absolutely nothing to help me . . . it was all about the dollar sign and [to] soak as much [money] as they can soak . . . it was like these guys are all crooks.  These guys were all working together and it's scary."

89.     Another patient, KR, testified in an October 10, 2014 deposition that he was referred to Bittner through the PI Attorney and that Bittner was "associated" with the PI Attorney.

90.     Several other patients have also testified they were referred to the Elite Entities by that same PI Attorney.

91.     Moreover, although Bittner denied under oath that anyone at his office contacts accident victims to get them to treat at the Elite Entities, patients have testified that they received unsolicited calls from Elite asking them to come in for treatment.  One patient, TL, told State Farm Mutual that she was not injured and never sought treatment until she was solicited by the Elite Entities.   Another

patient, RR, testified in an August 14, 2013 deposition that Elite Health contacted her shortly after her accident, sent R&R Transportation, LLC ("R&R") to pick her up, and then referred her to the PI Attorney.  Similarly, another patient, CC, testified in a February 3, 2015 deposition that "Elite Midwest Medical" called him the day after his accident, asked if CC and his fiancée were in an accident, and when CC said yes, the person from Elite told CC that Elite would send somebody to pick up both patients.  Indeed, Lukowski testified in a January 16, 2014 deposition that there was "a guy named Al" who "made the calls" on behalf of the Elite Entities to auto accident victims to get them to come treat there.  He has also testified that he did not like "being in that environment" at Elite because there were patients who he knew were receiving treatment to "bullshit the system."

### 2. Overview Of The Elite Entities' Fraudulent Referral Cycle

92.    Treatment at the Elite Entities typically begins at Elite Chiro with an initial evaluation by one of the Elite Chiropractors, pursuant to which the Elite Chiropractor typically recommends chiropractic treatment three times per week for 12 weeks.  During the course of their chiropractic treatment, patients are sent to Elite Health or its successor, Midwest Medical, for an evaluation by Upfall, Juska or another Elite Doctor, who conduct their own fraudulent examinations and prescribe physical therapy at Elite Rehab and its successor, Pure Rehab, enabling Bittner and Radom to profit both from medical and physical therapy services for

which they could not otherwise bill. Specifically, Upfall, Juska, and the Elite Doctors make predetermined findings that patients: (a) require physical therapy and/or (b) should see particular specialists, including a pain management doctor, spinal surgeon, neurologist, and/or orthopedist for further testing or treatment, from which the Elite Entities profit; and (c) should continue chiropractic treatment. Patients are then steered to Elite Rehab and its successor, Pure Rehab, or one of the Rosett PT Entities. In addition, the Elite Chiropractors and Elite Doctors order unnecessary MRIs for the patients, which are performed at either Horizon or Superior.

93.    Patient ME described the fraudulent referral cycle at the Elite Entities when he was asked in a June 12, 2014 deposition to name the doctors with whom he treated:

> I can't, because I didn't know none of these. I didn't know none of these people. It started off with one doctor and then it kind of went south from there. They were sending me here, here, here . . . . [T]o me, these guys are out to get every dime from [State Farm Mutual]. They are not treating me, they are not doing what they are supposed to do. I said I swear something is not right with these doctors that are all in cahoots together here. It was like a thing that they had going on. There was a chiropractor, this doctor in Detroit, it was every place they were sending me . . . I can't remember now how I even – it ended up being a chiropractor and then went from there. I did not – I felt so uncomfortable, I had to stop. . . . Something just wasn't right with all those people.

94.    The same patient testified that Bittner told him to falsely tell the neurologist to whom Elite referred him that his lower back problems were caused by the accident, even though they were not, so "insurance will pay for it."

41

### 3. Elite Chiropractors' Fraudulent Initial Examinations And Diagnoses

95.    The first step in the Predetermined Protocol is an initial examination by Bittner or one of the Elite Chiropractors, at which they purport to conduct an examination and take the patient's history and, typically, order x-rays of at least two to three regions of the spine.  The purported examination inevitably results in a laundry list of predetermined "findings" and diagnoses of subluxations to two or more regions of the spine without any individualized assessment of patients' injuries, preexisting conditions, or true medical needs.  Based upon the findings and diagnoses from the initial examinations, Bittner and the Elite Chiropractors initiate a treatment plan consisting of chiropractic manipulations and primarily passive modalities, typically three times a week for up to 12 weeks, after which the patient is reevaluated and further chiropractic treatment is recommended.

96.    The documentation of the initial examinations, findings, and treatment plans Defendants submit to State Farm Mutual is comprised of a four-page report ("Chiropractic Initial Report") designed by Bittner that allows Elite Chiropractors to fill-in blanks and check boxes in sections titled, among others: (a) "History of Present Condition(s)"; (b) "Primary/Associated Complaint(s)"; (c) "Personal Injury Questions"; (d) "Physical Examination"; (e) "Radiology"; (f) "Treatment"; (g) "Prognosis"; and (h) "Refer To."  Representative examples of Chiropractic Initial Reports and corresponding bills are attached as Exhibit 15.

97.     The Chiropractic Initial Reports contain pervasive patterns that are not credible.  For example, the Elite Chiropractors do not adequately document the patients' conditions under "History of Present Condition(s)."  Rather, the Elite Chiropractors document that patients either were involved in an auto accident for which they were not at-fault and/or are suffering from headaches or hit their head in the accident.  *See* Ex. 15.  In some instances, this section is left blank or substantially blank (e.g. noting only the date of the auto accident).  *See* Ex. 15.

98.     In the section titled "Primary Associated Complaint(s)," the Elite Chiropractor is able to designate on a pre-printed form the areas of the body where the patient has complaints and indicate the level of pain on a scale of 1 to 10.  *See* Ex. 15.  In this section, the Elite Chiropractors indicate that most patients: (a) suffer from headaches, back pain, and neck pain; (b) have complaints in at least five different areas of their body; (c) have radicular symptoms, including radiating pain and tingling; and (d) have reduced range of motion in multiple planes, which is typically documented with a down arrow only, without any indication of the degree of reduction, which would be important to document in order to evaluate patients' progress, or lack thereof, over the course of treatment.  *See* Ex. 15; *see also* Exs. 1 and 2.

99.     In the "Physical Examination" section, the Elite Chiropractors document predetermined findings of muscle spasms, tenderness, and trigger points

in the lumbar, thoracic, and/or cervical regions of the spine, and decreased range of motion in the neck and back with pain.

100.   Under "Radiology," the Elite Chiropractors almost always order x-rays of at least two to three regions of the spine.  Elite Chiro performs x-rays even when the patient has had x-rays at the emergency room just days earlier. Regardless of the results of the x-rays, the treatment plan at Elite Chiro is the same. *See* Exs. 1 and 2.

101.   Specifically, under "Treatment," the Elite Chiropractors almost always recommend: (a) spinal adjustments; (b) hot or cold packs; (c) manual traction; (d) myofascial release; and (e) neuromuscular re-education.  In addition, from approximately March 2011 through October 2011and February 2013 to the present, they recommended strengthening and/or stretching exercises.  Moreover, when there was a massage therapist working at an Elite Chiro location, the Elite Chiropractors at that location also recommended massage.

102.   The Elite Chiropractors typically reported the patient's "Prognosis" as "guarded" or "poor."  *See* Ex. 15.  The documented goals of treatment are almost always the same, namely to decrease pain, inflammation, and spasm, to strengthen, and to increase range of motion.

103.   Notably, the Elite Chiropractors do not document any diagnoses in the Chiropractic Initial Reports.  Indeed, multiple patients have testified that the Elite

Chiropractors never advised them of any diagnosis.  Nevertheless, Elite Chiro submits bills to State Farm Mutual, which contain diagnostic codes representing that most patients suffer from subluxations to two or more regions of the spine and/or other non-specific conditions in the spine, including pain and spasm, which could result from a myriad of unspecified diagnoses.  *See* Ex. 15.  These diagnoses are not the product of an appropriate and individually-tailored initial examination.  Moreover, regardless of the diagnosis, all patients are then subjected to the same Predetermined Protocol regardless of their unique conditions and needs.  *See* Exs. 1 and 2.  Defendants use these diagnoses to substantiate Elite Chiro's charges for treatment in accordance with the Predetermined Protocol.  *Id.*

104.   In addition, although Bittner purported to perform many of the initial chiropractic examinations, based on the handwriting in the corresponding Chiropractic Initial Reports, the examinations appear to have been performed by at least two different individuals with different handwriting.  *See* Ex. 16 (compared to Ex. 14).

### 4.   Elite Chiropractor's Fraudulent Treatment Plans And Re-Exams

105.  Based upon the fraudulent initial evaluation, Elite Chiropractors prescribe a predetermined treatment plan that includes treatment for at least three times a week for up to 12 weeks.  As described below, patients typically receive the same treatment on every date of service – regardless of whether they are better

or worse – and treat until the patient stops coming on his or her own volition, or State Farm Mutual communicates that it will not pay for further treatment based on an independent medical exam ("IME").

106.   Pursuant to the Predetermined Protocol, patients treated by the Elite Chiropractors typically receive chiropractic manipulations to two or more regions of the spine, traction, hot packs, therapy consisting of sitting on a wobble board with head-weights (billed either as group therapy, neuromuscular re-education and/or therapeutic exercise), and, in some cases, manual therapy and/or massage. The treatment that patients purportedly received on each visit was not guided by the patient's unique symptoms, complaints, and response to treatment (or lack thereof).  *See* Exs. 1 and 2.  Rather, treatment typically remains the same for each patient, and, as described next, any variation is attributable to the time period during which the patient received treatment and the primary treating chiropractor. *Id*.

107.   For example, before late 2013, Elite Chiro typically did not bill for manual therapy and/or massage.  In October 2013, Elite Chiro hired a massage therapist to work at the Detroit location and Elite Chiro starting billing for massage for almost all patients at this location, where Draplin was the primary chiropractor. Notably, the first massage therapist who worked at Elite testified in a September 26, 2014 deposition that she was instructed to provide massage to all of

Draplin's patients, but that some patients did not want one and she would not force patients to receive massage. Another massage therapist testified on September 24, 2014, that it is the patient's choice whether to receive massage. On November 19, 2014, Draplin similarly testified that it is "at [the patient's] discretion if he want[s] a massage on a particular day."

108. Elite Chiro billed for group therapy until approximately April 2012, when it began billing for a combination of neuromuscular re-education and therapeutic exercise, although the treatment actually provided to patients seemingly did not change. At approximately the same time, Elite Chiro also added manual therapy and physical therapy to the Predetermined Protocol at the Sterling Heights location.

109. In 2013, one Elite Chiropractor, Bernard Hughey, D.C. ("Hughey"), ceased billing for hot/cold packs almost entirely.

110. The changes to the Predetermined Protocol described above were not based on the individual needs of each patient, but were applied to all patients regardless of their unique complaints, conditions, and response to treatment (or lack thereof).

111. To support their charges, Elite Chiro submits to State Farm Mutual daily treatment notes with their bills. *See* Ex. 17. The daily treatment notes are

bare-bones forms that provide little detail, if any, about the patient's condition or progress.

112.   For example, before approximately September 2012, there was no mention in the daily treatment notes about what exercises each patient purportedly performed in group therapy, therapeutic exercise, or neuromuscular re-education. After approximately September 2012, a section called "Rehab Exercises" was added to the daily treatment notes under which there were checkboxes as to the general type of exercise performed such as "Lifting/pulling," "Gait Training," or "isometric exercises," among others.  However, in many daily treatment notes after September 2012, none of these categories of exercises is checked.  Moreover, even when one or more of these categories is checked, no information is recorded as to what specific exercise within that category the patient performed, how many repetitions were done, what weight or resistance was used, or how the patient tolerated or responded to treatment.  Elite Chiro's lack of specificity with regard to these services is significant because it appears that, regardless of which service was billed, the purported treatment that the patient received was the same.

113.   When patients have been asked to describe group therapy, therapeutic exercise, or neuromuscular re-education at Elite Chiro, they have given the same answer regardless of which service was billed, namely that they were told to sit on a wobble board and to roll back and forth for 12 minutes with weights strapped to

their heads.  Similarly, when asked to describe therapeutic exercise at Elite Chiro in a November 8, 2012 deposition, Bittner described "[h]ead-weighting," and when asked about neuromuscular re-education, Bittner described the "wobble board." Lukowski similarly confirmed in a March 6, 2014 deposition that he did not oversee any type of exercise at Elite Chiro besides "the head-weighting."  Elite Chiro used the wobble board and head-weighting for almost all patients although such exercises may be contraindicated for patients with severe cervical or lumbar pain who cannot adequately control their muscles, or for patients with acute disc herniation or degenerative changes in the spine, which may be aggravated by repetitive movement.

114.  Moreover, although the Current Procedural Terminology ("CPT") codes for neuromuscular re-education and therapeutic exercise – 97112 and 97110, respectively – require that the "[p]hysician or therapist have direct (one-on-one) patient contact," patients did not receive the required one-on-one contact.  Indeed, Lukowski testified that he was not with patients for these treatments, which were performed in a "group setting" with "[u]p to four or five" patients receiving treatment at once.  Similarly, patients have also testified that they put the weights on their own heads, set a timer for 12 minutes, and performed the "treatment" without any supervision or help.  Accordingly, Elite Chiro's representation that it

performed one-on-one neuromuscular re-education and therapeutic exercise for patients was false.

115. In addition, Elite Chiro routinely double-billed State Farm Mutual for head-weighted wobble-board therapy, misrepresenting on bills and daily treatment notes that two separate treatments were provided to patients on that date of service – neuromuscular re-education and therapeutic exercise – when in fact, according to patients and chiropractors, only one exercise was performed. *See* Ex. 18.

116. Another passive modality that Elite Chiro uses on every visit is traction. Patients have described laying on a roller bed, unsupervised, for their traction treatment. One patient described traction as lying on a bed where "you sleep on it for ten minutes, to warm up your back." A patient has testified to being told that he can not only turn the heat on or off, but he can even turn the rollers off and just lie there on the traction machine for the treatment: "I either take that or the heat. I can just turn on the heat and turn off the rollers and just lay there."

117. The Elite Chiropractors purport to treat a high volume of patients each day and spend little time with each one. For example, Lukowski testified that he would see "100 to 125" patients a week and stated, "I was with each patient anywhere from three to five minutes, maybe ten." Draplin testified that he sees approximately 40-60 patients each day and works a maximum of seven hours, which allows him, at most, seven to 10 minutes per patient.

50

118.   Similarly, one of the massage therapists at the Detroit location testified in a September 26, 2014 deposition that she was pressured by management to treat more patients, but could not keep up with Draplin because he would see approximately 50 patients per day, spending only "about two or three minutes at the max [with each patient]."  The massage therapist further testified that Draplin "was getting [patients] in and out of there so fast, I didn't know who was who."  As a result, she told a colleague at Elite that "something's not right," because she was "doing all these massages and [management said], 'Do more, do more.  You ain't doing enough.'"  In addition, the massage therapist testified that, per the instruction of "Dita" who worked at Elite Chiro, each massage was only ten minutes, but that a ten-minute massage could not help patients.

119.   Patients have also testified that they spent very little time with the Elite Chiropractors and did most of the treatments themselves.  Indeed, after testifying that treatment at Elite Chiro consisted of "roller beds, cushions [for posture] and the head weights," patient VR, upon being asked whether "Dr. Ryan did all three of those things," responded:  "No.  He didn't have to do it.  They just had it there for us.  When we leave Dr. Ryan[,] we had three things to do."  This patient further testified that patients "know what to do" because "when you go in there[,] you just go through it" and that patients even set timers for themselves.

120.   Moreover, many patients, including the following, have testified that their treatment at Elite Chiro was the same on every visit and never changed:

| Patient | Testimony | Length of Treatment at Time of Testimony |
|---|---|---|
| KH (2/20/13 deposition) | Q.   Now, in terms of the treatment you received at Elite Chiropractic, would that remain the same or would it change from visit to visit?<br>A.  It was the same. . . .<br>Q.  Never changed?<br>A.  No. | 10 months |
| JA (1/21/13 deposition) | Q.  Has he changed what he does for you each time you go in?<br>A.  No. | 18 months |
| AF (10/23/12 deposition) | Q.  And would each visit with Dr. Bittner, once you started the three times per week, be the same?<br>A.  Pretty much.<br>Q.  The same as what you just described?<br>A.  Yes.<br>Q.   Were there any changes made to what he would do or variations over the time that you treated with him?<br>A.  For chiropractic care, no. | More than 21 months |

121.   In addition, patients have denied receiving treatments for which the Elite Chiropractors are billing State Farm Mutual.  For example, in an April 16, 2013 deposition, patient BJ denied receiving hot packs at any time during his two years of treatment.  However, Elite Chiro billed more than $6,000 for hot packs for patient BJ on 126 separate occasions.

122.   Furthermore, patients have testified that the treatment at Elite Chiro did not help them.  For example, patient ME testified in a June 12, 2014 deposition that "That was the thing, they did nothing.  They did absolutely nothing to help me. They didn't even listen.  That's why I said it was all about – all I seen was it was

all about the dollar sign and soak as much as they can soak." Patient MD testified in a July 16, 2014 deposition that during the two- to three-month period where she treated at Elite, her injuries did not get better or worse, but rather, "stayed the same." Patient AH testified in a November 30, 2012 examination under oath that despite treating at Elite Chiro for four months, the symptoms from her accident had not gotten better. And patient AP testified in a May 21, 2013 deposition that although he had treated at Elite Chiro for more than a year after his accident, his neck and back pain were not better. Patient KR testified in an October 10, 2014 deposition that some of Bittner's treatments hurt him and that he only started feeling better two weeks after he voluntarily ceased seeing Bittner: "I was glad I stopped seeing Dr. Bittner. I never liked him doing my neck and I asked him several times not to do my neck."

123. Periodically, the Defendants submitted bare-bones documentation of the Elite Chiropractors' purported re-examinations of the patients ("Chiro Re-Exam Reports") and corresponding bills to State Farm Mutual. From 2011 through approximately November 2012, each Chiro Re-Exam Report consisted of a two-page form on which the Elite Chiropractors typically purported to record patient complaints of constant or frequent pain, as well as non-specific decreased range of motion, and muscle spasms (often in the cervical, thoracic, and lumbar regions of the spine). *See* Ex. 19. In addition, although the Elite Chiropractors purport to

conduct and document the results of vertebral palpation, which the Chiro Re-Exam Reports stated were designed "to check a vertebra for misalignment, tenderness, swelling and motion," the Elite Chiropractors merely checked boxes for vertebral levels where there was supposedly a positive finding, but failed to document whether there was misalignment, tenderness, swelling, and/or a problem with motion at each level. During this time, the Elite Chiropractors also failed to address the plan of care for each patient in the Chiro Re-Exam Reports, let alone to make modifications to the plan according to either the physical examination or whether the patient describes his or her problem as "Better," "Worse," or "Unchanged." *Id*.

124. In approximately November 2012, the Elite Chiropractors began submitting documentation of their purported re-examinations on a new form, examples of which are attached as Exhibit 20. These new forms are substantially the same as the earlier version. However, the new Chiro Re-Exam Reports added a section titled "Frequency of Care & Treatment Goals," in which the Elite Chiropractors inevitably recommended continued chiropractic treatment and failed to find that patients had reached maximum medical improvement ("MMI"), although there is a box to check for MMI in this section. *Id*.

125. The Elite Chiropractors do not review other medical records – even other medical records of any of the other Elite Entities purportedly treating the

same patients – that would be pertinent to the patient's condition or treatment.  For example, for one patient, Draplin testified that he did not even review the chiropractic records of the other Elite Chiropractor, Lukowski, before Draplin began providing treatment to that patient.  Draplin also stated he did not look at the physical therapy chart at all when the patient was receiving concurrent physical therapy: "Q.  That's of no relevance to you?  A.  No, I don't look at those."

126.   Patients continue with the Predetermined Protocol at Elite Chiro and are typically treated as long as possible until either, the patient voluntarily stops treatment or an IME is scheduled.  In fact, the vast majority of patients were still on treatment plans calling for visits of one to three times a week on their last recorded visit with Elite before the patient voluntarily stopped coming.  In short, the Predetermined Protocol is not based on a legitimate patient evaluation and was not tailored to the unique needs of each patient but was applied to all patients in order to maximize billings for the Defendants.

### 5.   Disability Certificates

127.   In addition, the Elite Chiropractors also sign a disability certificate as part of the Predetermined Protocol stating that patients are unable to work, drive, and/or perform household tasks.  *See* Ex. 9.  In doing so, the Elite Chiropractors do not perform a legitimate, individualized evaluation of the patient's actual limitations nor indicate that any such limitations are due to a condition with which

the patient was diagnosed. For example, there is no discussion in the progress notes about the patient's specific home activities, driving abilities, work activities, or any other information that would allow the Elite Chiropractor to assess the patient and what, if any, accommodations may be medically necessary. In fact, some Elite patients are determined to be "disabled" from driving when they do not even have a driver's license. Others are found to be "disabled" from working when they have no job.

128. Defendant Draplin has admitted that he does not even sign all the disability certificates that have his signature on them, but that a signature stamp is used. Indeed, when asked about the stamp during a June 3, 2014 deposition, Draplin testified that he did not know the circumstances under which his stamp was used, or who had access to or possession of it. Nor does Draplin personally complete the portion of the disability certificates that sets forth the activities from which patients are allegedly disabled. To that end, when presented with a handwritten disability certificate stamped with his signature, Draplin testified that the handwriting on the certificate was not his, and that he did not know whose it was.

129. Among other things, the disability certificates are used to support claims for wage loss benefits, transportation, replacement services, and to a lesser extent, attendant care. Indeed, State Farm Mutual has paid more than $500,000 in

replacement services, lost wages, transportation services, and attendant care for the patients identified on Exhibits 1 and 2 whom Elite purports to treat.

130. The disability findings also support an "objective manifestation" of injury to satisfy the threshold for bringing a BI Claim or UM Claim, which is critical to the success of the scheme, because it enables the Defendants to curry favor with personal injury attorneys who are a vital referral source.

131. By disabling patients from driving, the Elite Chiropractors enable patients to receive transportation to and from Elite, at no cost to the patients, but at a significant cost to State Farm Mutual. By providing transportation at no cost to the patients, the Elite Entities are able to maximize the likelihood that patients will attend their scheduled visits and continue treatment. Notably, patients have testified that they were provided transportation to Elite Chiro by a transportation company before they were even evaluated by an Elite Chiropractor.

132. The two transportation companies that the Elite Entities use the most are Barron, which became FS Complete, and R&R, which also appears to be related to FS Complete. Indeed, patient JM testified that she was driven to Elite at first by R&R, which then "change[d its] name to Complete Transportation." Another Elite patient, KH, testified in a February 20, 2013 deposition that the vans that picked her up had signage stating "R&R Transportation," but Barron submitted the transportation bills to State Farm Mutual for that patient. Patients

have testified that these transportation companies either "worked with Elite" or that Elite set up their transportation with these companies.

### 6.    Fraudulent Examinations, Diagnoses, And Treatment Plans By Upfall And Juska

133.    Following approximately one to three months of treatment by the Elite Chiropractors, patients are evaluated by Upfall, Juska, or another Elite Doctor, whose evaluations, diagnoses, and treatment plans were fraudulent and intended to support:  (a) physical therapy at Elite Rehab and its successor, Pure Rehab, or the Rosett PT Entities; (b) evaluations and treatment by other Elite Doctors to whom patients are subsequently referred; (c) the Elite Chiropractors' fraudulent diagnoses and treatment plans; and (d) MRIs at Horizon, in which Radom has a financial interest, or Superior, which is owned and controlled by Bittner and Radom either directly or through Midwest Medical.  In addition, some patients who do not treat at Elite Chiro are referred to the Elite Doctors to receive predetermined prescriptions for physical therapy at the Rosett PT Entities.

134.    Upfall began working at Elite Health in early 2012, around the same time that Elite Rehab started providing physical therapy services at the Sterling Heights and Detroit locations.  Upfall's role was essential to the scheme because under Michigan law, until January 2015, physical therapy services could only be performed if a licensed health care provider, such as a medical doctor, prescribed the services, and even after January 2015, a prescription is necessary after the

initial 10 visits.   See Mich. Pub. Health Code § 333.178201(1).   Moreover,
physical therapy prescriptions expire after a maximum of 90 days, so if therapy is
to continue beyond that point, a new prescription is required.   As such, Elite relies
on Upfall and other Elite Doctors to prescribe physical therapy services.   Without
these prescriptions, the Defendants would not be able to profit from physical
therapy.

135.   Accordingly, the next step in the Predetermined Protocol is an
examination by Upfall or another Elite Doctor.   As a result of these examinations,
physical therapy, continued chiropractic care, and MRIs are inevitably
recommended.   *See* Ex. 3.   Upfall also refers the majority of patients to one or
more specialists whose services are also billed by Elite.   *See* Ex. 3.   When asked in
a March 17, 2014 deposition why he did not treat patients himself, Upfall testified
that "I don't treat spine injuries.   I refer spine injuries."

136.   Specifically, when Upfall prescribes physical therapy, patients are
steered to Elite Rehab and its successor, Pure Rehab, or, depending on the patient's
location, to another physical therapy facility with which the Defendants have a
cross-referral relationship, where they receive physical therapy concurrently with
chiropractic treatment for a significant period of time.   When Upfall refers patients:
(a) to a spinal surgeon, they are typically seen by Grain, whose services were billed
by Elite Health, Prime Neurosurgery, and Midwest Medical; (b) to a neurologist,

they are typically seen by Norman Burns, whose services were billed by Elite Health, Pioneer Neurology Group, and Midwest Medical; (c) to a pain management doctor, they are often seen by James, whose services are billed by Elite Health and Elite Rehab; and (d) for electrodiagnostic testing, they are typically seen by Benjamin Krpichak, whose services are billed by Elite Health.

137.  The documentation of evaluations that Upfall submits to State Farm Mutual consists of a one-page report ("Upfall Evaluation Report"), which, except for the description of the auto accident, is almost identical for most patients.  *See* Ex. 21.  Upfall's examinations are fraudulent because he fails to properly examine the patients, and the documentation and bills submitted are not credible.

138.  Specifically, based on Upfall's initial examination findings, he diagnoses each patient with "myositis/sprain" to the cervical, thoracic, and lumbar regions of each patient's spine.  Ex. 3.  Other pervasive patterns include:  (a) chief complaints of pain in the upper, middle, and lower back that are general and non-specific, along with radicular symptoms; (b) "unexplained weight changes" noted in the "Review of Systems"; (c) physical exam findings of "bilateral paravertebral muscle spasm" and "decreased range of motion in flexion, extension, lateral side bending" in the cervical and "thoracolumbar" regions of the spine; and (d) instructions that the patient "is not to return to employment" and/or is "not to perform household chores."  Ex. 3.  Importantly, Upfall also recommends

continued chiropractic treatment at Elite Chiro, physical therapy at Elite Rehab, Pure Rehab, or the Rosett PT Entities, and MRIs at Horizon, and refers patients to one or more specialists whose services are also billed by Elite Health or its successor, Midwest Medical. *Id.*

139.   Despite Upfall's predetermined recommendations for physical therapy and chiropractic treatment, he testified in depositions on July 22, 2013, and June 9, 2014, that he "couldn't comment" on the benefits of chiropractic treatment versus physical therapy.   However, according to Upfall, patients should not "have physical therapy and chiropractor on the same-day" "[b]ecause there's some overlap."   Nevertheless, pursuant to Upfall's recommendations, his patients frequently received both chiropractic treatment and physical therapy, sometimes on the same day. *See* Ex. 3.

140.   Moreover, although Upfall purports to re-evaluate patients every four to six weeks, he does not properly examine them, but rather makes the same physical examination finding, renders the same predetermined diagnoses, and invariably sends the patients back to Elite for more chiropractic treatment and physical therapy.   Indeed, although Upfall documents decreased range of motion in his re-evaluation reports, he has testified that he does not actually measure range of motion.   In addition, although Upfall documents blood pressure in his re-evaluation reports, the blood pressure purportedly remains the same for many patients over

the course of their treatment. Upfall testified that the dictation system he used would supposedly "drop [the blood pressure] in [the report] . . . without [Upfall] even having to do anything."

141. Upfall's cursory examinations, as well as the pervasive patterns in his findings, diagnoses, and recommendations, are designed to enable: (a) Elite to bill for medical services and chiropractic services that are not performed or are performed pursuant to the Predetermined Protocol; (b) Elite Rehab, Pure Rehab, and the Rosett PT Entities to bill for physical therapy services that are not performed or are performed pursuant to the Predetermined Protocol; (c) Horizon to bill for unnecessary MRIs; and (d) personal injury attorneys with whom the Defendants have apparent cross-referral relationships to inflate the value of BI Claims and UM Claims.

142. In approximately late 2013, Juska began prescribing physical therapy for Elite patients in addition to or in place of Upfall. Juska's diagnoses and physical therapy prescriptions are also predetermined. For example, Juska begins every plan with the same cut-and-paste language, stating: "I had a very long discussion with the patient regarding the possible etiologies and treatments for the patient's pain complaints," regardless of the complexity of each patient's symptoms or diagnoses. *See* Ex. 4. Juska typically finds that his patients have pain and spasms in at least two regions of the spine, paraspinal muscle tenderness,

and foraminal narrowing. *Id.* Juska diagnoses almost all patients with radiculopathy, muscle spasms, and facet arthropathy. *Id.* Regardless of his purported findings, Juska prescribes a treatment plan that involves starting or continuing chiropractic treatment and/or physical therapy with the same goal, namely "to focus on strengthening, range of motion, increasing function, and using modalities as needed"; recommends EMG testing and/or injections for the patient; typically prescribes every patient flexeril and at least two other medications; and a reassessment in four weeks or less. *Id.*

143. Juska's cursory examinations, as well as the pervasive patterns in his findings, diagnoses, and recommendations, are designed to enable: (a) the Elite Entities to bill for medical services and chiropractic services that are not performed or are performed pursuant to the Predetermined Protocol; (b) Elite Rehab, Pure Rehab, and the Rosett PT Entities to bill for physical therapy services that are not performed or are performed pursuant to the Predetermined Protocol; (c) Horizon and Superior to bill for unnecessary MRIs; and (d) personal injury attorneys with whom the Defendants have apparent cross-referral relationships to inflate the value of BI Claims and UM Claims.

### 7. Fraudulent Physical Therapy Treatment

### a. Elite Rehab and Pure Rehab

144.   After patients receive their physical therapy prescriptions from Upfall, Juska, or another physician at Elite Health or its successor, Midwest Medical, they begin physical therapy.   Patients who receive chiropractic treatment at Elite's Sterling Heights or Detroit locations typically receive physical therapy at Elite Rehab and its successor, Pure Rehab.

145.   At Elite Rehab and its successor, Pure Rehab, the physical therapist conducts an initial physical therapy examination.   To support their charges for the physical therapy evaluations and the subsequent treatment plan, a bare bones document called a Physical Therapy Initial Examination ("PT Initial Report") is created.   The information in the PT Initial Report is predetermined and the forms are fraudulent.   For example, the PT Initial Reports represent that almost all patients: (a) are experiencing pain in both their neck and back; (b) have non-specific decreases in their ranges of motion in both their neck and back; (c) have decreased functionality with respect to activities of daily living; (d) are physical therapy candidates with "Rehab Potential" of "good"; and (e) do not have any contraindications to therapy.   *See* Ex. 22.   In addition, many PT Initial Reports contain boilerplate language stating that the "[p]atient wants to be pain free and return back to prior level of function" and that "[p]alpable tenderness or increased

muscular tone noted" over non-specific cervical and paraspinal regions. *See* Ex.
22.  Regardless of each patient's physical exam findings, Elite Rehab and its
successor, Pure Rehab, typically recommend physical therapy two to three times
per week for at least five weeks, to include therapeutic exercise, therapeutic
activity, gait training, neuromuscular re-education, manual therapy, massage,
patient education, electrical stimulation, ultrasound, and hot/cold packs.  Variance
from this treatment plan depends on the Elite location and time-period, as opposed
to the unique conditions and needs of the patients.  Moreover, after approximately
January 2013, in an effort to substantiate further treatment, the PT Initial Reports
contained certifications of medical necessity by the referring doctor including the
following:  "I certify the need for these services furnished under this plan of
treatment and while under my care." *See* Ex. 22 (certification of medical necessity
by Upfall).

146.  Patients typically begin physical therapy the same day that the initial
evaluations are purportedly performed at Elite, and the physical therapy follows
the Predetermined Protocol, which is not individually tailored to patients' unique
medical needs.  Specifically, although it is well-established that stretching and
physical exercise are the primary forms of rehabilitation for soft tissue injuries of
the neck and back, the Predetermined Protocol is heavily reliant on passive
modalities that permit Elite Rehab and its successor, Pure Rehab, to submit

separate charges for each such modality.  Indeed, patients typically continue to receive a combination of passive modalities including hot packs, electrical stimulation, ultrasound, therapeutic procedures, and, sometimes, manual therapy and/or massage, along with the purported therapeutic exercises and/or neuromuscular re-education on each visit.

147.   To support their fraudulent charges for physical therapy, Defendants submit to State Farm Mutual documents entitled "Daily Note/Billing Sheet" that they generate using a software program.  The Daily Note/Billing Sheets identify the physical therapy services purportedly provided to the patient, but rarely, if ever, document with any specificity how the patient responded to or tolerated the services.  Rather, they typically state little more than that the patient tolerated the treatment well.   The Daily Note/Billing Sheets inevitably conclude by recommending that the patient continue the plan of care and/or progress to the next visit.  *See* Ex. 23.

148.   The extensive use and combination of passive modalities at Elite Rehab and its successor, Pure Rehab, are medically unnecessary given that the physical therapy treatments often do not begin until many months after the acute injury.  Moreover, patients are also receiving concurrent passive modalities and exercise through their chiropractic treatment at Elite Chiro, including manipulations, manual traction, hot/cold packs, sometimes, manual therapy and/or

massage, and a combination of neuromuscular re-education and therapeutic exercise.

149.    Indeed, in some instances, patients receive the same treatment from both Elite Chiro and Elite Rehab or Pure Rehab on the same date of service.  *See* Ex. 24 (patient CH receiving hot packs, traction, exercise, chiropractic manipulation, and neuromuscular re-education from Lukowski on the same day she received hot packs, exercise, and neuromuscular re-education from Elite Rehab); Ex. 25 (patient JJ receiving hot packs, traction, exercise, neuromuscular re-education, and chiropractic manipulation from Draplin on the same day he received hot packs, electrical stimulation, and exercise from Elite Rehab); *see generally* Ex. 1.  Notably, in a March 11, 2014 deposition, Draplin was asked whether he had "an opinion of whether an overlap in treatment [was] necessary" for a patient who received hot/cold packs and manual therapy from both Elite Chiro and one of the Rosett PT Entities on the same day, and admitted as follows: "I don't believe it's necessary."  Similarly, Upfall was asked in a June 23, 2014 deposition whether "there [is] any real benefit to concurrent chiropractic and physical therapy" and responded:  "I mean on the same day?  Probably not a good idea."

150.    Because these types of passive modalities typically are only medically necessary, if at all, during the acute stages of the types of soft tissue injuries

suggested here, to relieve pain or facilitate the patient's ability to engage in active therapy, it is not medically necessary to provide this litany of passive modality treatments on almost every visit over the course of many months, and often more than one year, post-acute injury. Moreover, physical therapy at Elite Rehab and its successor, Pure Rehab, is not individually tailored to treat the patients' needs. Beyond providing the same laundry list of modalities to the patients over time, they do not alter the treatment, even when the patient has failed to show significant improvement over the course of several months, and often even longer. Rather than modify the treatment plan or discontinue treatment altogether, Upfall, Juska, other Elite Doctors, and the physical therapists simply continue the same course of treatment, irrespective of the patients' symptomatology and progress, or lack thereof.

151.  As with the chiropractic treatments, the physical therapists at Elite Rehab and Pure Rehab do not consider or integrate x-ray, MRI, or EDX test results into their treatment plans.

152.  Physical therapy at Elite Rehab and Pure Rehab typically continues for several months and then abruptly stops, often with little or no medical improvement. Indeed, most patients treat at Elite Rehab and Pure Rehab more than 50 times. According to Upfall, "[a]s long as treatment is being paid for they are going to continue to treat." Elite Rehab typically discontinues physical therapy

treatment only where:  (a) State Farm Mutual communicates that it will stop paying for treatment; (b) an IME was conducted; or (c) patients voluntarily stopped coming to Elite.

153.   In instances in which Elite patients do not receive physical therapy at Elite Rehab or Pure Rehab, the vast majority of patients: (a) unilaterally dropped out of treatment prior to a point in time in the Predetermined Protocol in which patients are directed to an Elite Doctor to receive a physical therapy prescription; (b) received a physical therapy prescription but did not proceed to Elite Rehab or Pure Rehab for physical therapy services; (c) treated at Elite Chiro during a period of time in which it did not provide physical therapy at some of its locations; or (d) are receiving physical therapy at other facilities, including the Rosett PT Entities.

### b.    The Rosett PT Entities

154.   As referenced above, some patients who are prescribed physical therapy by Elite Doctors are referred to one of the Rosett PT Entities for physical therapy.   The physical therapy at the Rosett PT Entities is also medically unnecessary and fraudulent.   In addition, in many instances, it is purportedly rendered concurrently with chiropractic treatment at Elite Chiro or by other chiropractors and, like the physical therapy and chiropractic services at Elite, is premised largely on passive modalities and treatment that is not individually tailored for the patients or adjusted over time.

155.   The documentation of the initial examinations by the physical therapists at the Rosett PT Entities that are submitted to State Farm Mutual consist of what is typically a two-page report, samples of which are attached as Exhibit 26 ( "Rosett PT Initial Reports").  The Rosett PT Initial Report is the same form used by Elite Rehab and its successor, Pure Rehab.  *See* Ex. 26.   Based upon the pervasive patterns in the Rosett PT Initial Reports, they are not credible and are fraudulent.   As set forth in Exhibit 26, the pervasive patterns include:   (a) complaints of daily and/or constant pain; (b) diagnosed conditions in the cervical and lumbar spine; (c) muscle strength of "2+" or "2+-3" at Michigan Center for PT, and "3" or "3+" at Dearborn Center for PT; (d) lack of positive findings on orthopedic tests until September 2013, at which time the Rosett PT Entities started documenting positive orthopedic test results for each patient; (e) positive straight leg test for patients at Dearborn Center for PT; and (f) a treatment plan recommending physical therapy at least three times a week for at least four weeks. *See* Ex. 2.

156.   The physical therapy provided at the Rosett PT Entities substantially mirrors the physical therapy at Elite Rehab and its successor, Pure Rehab, in that it is dominated by a litany of passive modalities that are not individually tailored to patients' medical needs and are rendered concurrently with similar chiropractic treatment.  Patients at the Rosett PT Entities receive hot packs, ultrasound, manual

therapy, massage, exercise, and either manual traction or electrical stimulation on almost every visit. *See* Ex. 2. As noted above, the extensive and combined use of multiple passive modalities, such as hot packs, electrical stimulation, ultrasound, massage, and manual therapy, is medically unnecessary, especially given that the physical therapy treatments typically do not begin until at least sixty days after patients begin treatment with the Elite Chiropractors, with some patients only beginning physical therapy at the Rosett PT Entities more than a year after their accident. While any one of these treatments may be medically necessary for a particular patient on a particular day, the comprehensive combination of these treatments is seldom, if ever, medically necessary for any patient on virtually every visit. Just like the treatment at Elite Rehab and Pure Rehab, the same modalities then continue for many months or even more than a year after treatment began regardless of the patient's response to treatment or lack thereof. Indeed, patient MH testified on April 25, 2014, that the treatments at Michigan Center for Physical Therapy were making her worse and increasing her pain.

157. The Rosett PT Entities' physical therapists fill out daily treatment notes that purportedly reflect how the patient is feeling each day and what treatment they were given, but then inevitably conclude that treatment should be continued. The Rosett PT Entities typically discontinue physical therapy treatment only where: (a) State Farm Mutual communicated it would stop paying for

treatment; (b) an IME was conducted; or (c) patients voluntarily stopped coming to the Rosett PT Entities.

### 8. Elite's Fraudulent MRI Self-Referrals to Horizon And Superior

158.   Medical treatment, including the provision of MRIs, should be guided solely by a patient's legitimate medical needs, and the medical judgment of physicians should not be influenced by the potential for financial gain.

159.   However, Radom has a financial interest in and is responsible for "business development" at Horizon – which is simply a mobile MRI truck in the parking lot of an office complex where Horizon has its office – to profit from medically unnecessary MRIs, which are an important additional step in the Predetermined Protocol.  Specifically, Radom is a member and the resident agent of HI Investor, LLC ("HI Investor") – which assumedly stands for "Horizon Imaging Investor."  Ex. 27.  HI Investor was formed in December 2010 and has, at a minimum, at least one written agreement with Horizon entitled "Assignment and Assumption Agreement."  Ex. 28.  From December 2010 (when HI Investor was formed) to the present, Radom has handled business development for Horizon.

160.   Similarly, as set forth above in paragraphs 53-59, beginning in March 2014, Bittner and Radom owned and controlled another MRI facility, Superior, either directly or indirectly through Midwest Medical (which they also own or control), which they formed to profit from medically unnecessary MRIs.  Thus, at

the direction of Bittner and Radom, Bittner, the Elite Chiropractors, the Elite Doctors, and the Elite staff steer patients to obtain multiple MRIs from Horizon and Superior.  As described below, the MRI orders are medically unnecessary and are generated to: (a) enrich Radom, Bittner, and possibly others; (b) substantiate further treatment because they know that Horizon and Superior fraudulently report abnormalities that do not exist and over-read and exaggerate abnormalities that may exist; and (c) inflate the value of personal injury claims in order to develop and maintain apparent cross-referral relationships with personal injury attorneys.

161.  For example, the referrals for MRIs by Elite Doctors and Elite Chiropractors are written on pre-printed forms supplied by Horizon and Superior with the MRI facility's name and address on the letterhead.  *See* Exs. 29 and 30.  In addition, Elite Doctors and Elite Chiropractors – including Norman Burns and Nicole Bittner – have testified that the Elite staff schedules patients' MRIs and directs patients to Horizon.  At least four Elite Doctors and Elite Chiropractors – including Upfall, Draplin, Grain, and Hughey – have testified to specifically referring patients to Horizon.  Indeed, Lukowski testified that he was told by Bittner to send patients to Horizon for MRIs; and when Draplin was asked in a March 11, 2014 deposition to name the MRI facilities to which he made referrals at that time, he answered, "Just Horizon currently."

162.   Moreover, a chiropractor at Universal Health Group, another Michigan multi-disciplinary clinic that purports to treat auto accident victims, testified in a March 25, 2014 deposition that he was directed to send patients who were represented by that particular PI Attorney to Horizon for MRIs.  Indeed, most of the Elite patients who received MRIs at Horizon were represented by that PI Attorney.

163.   At least nine patients, including SC, AF, AH, KH, DK, JM, AN, JS, and HT, have also testified that Elite Doctors and Elite Chiropractors, including Bittner, Draplin, Upfall, Lukowski, and Hughey, sent them to Horizon, specifically for MRIs. Indeed, patient KH testified as follows with regard to Bittner:

> Q.   What did he say when he referred you for the MRI?  Did he say - what was the nature of that conversation?
> A.   He just said I'd like to get an MRI.
> Q.   Did he tell you why?
> A.   No.
> Q.   Where did he tell you to go?
> A.   Horizon Imaging.
> Q.   Did he give you a choice of what MRI facility to go to or did he just say you should go to Horizon Imaging?
> A.   He told me to go to Horizon.
> Q.   Just told you go to Horizon?
> A.   Right.
> Q.   So there wasn't like a list, here, pick a place?
> A.   No.
> Q.   He just said, here's a prescription.  Go to Horizon Imaging, correct?
> A.   Uh-hum.

164.   Notably, since Superior was formed, the Elite Doctors and Elite Chiropractors have almost exclusively sent patients for MRIs to Superior, in which both Radom and Bittner have financial interests.  Indeed, of the 42 new patients for whom bills were submitted to State Farm Mutual since Superior began operating, 33 of those patients have already received MRIs at Superior.

165.   Moreover, patients have testified that they were not informed of the MRI results and that the MRI did not affect their treatment plan.  Specifically, patient AN testified that although he brought the MRI films from Horizon to Elite, no one ever discussed the results with him.  Patient JM testified that she did not have any discussions with Lukowski, or any other doctors or chiropractors about the MRI results and that her treatment did not change after the MRI.

166.   Moreover, as described below, the MRI interpretive reports generated by Horizon and Superior are not credible and are created to support a purported objective manifestation of injury, which serves to curry favor with personal injury attorneys and purports to support Elite's continued treatment.

167.   Elite's fraudulent referrals to Horizon and Superior are highly lucrative because their charges are exorbitant.  Specifically, Horizon and Superior charge over $5,000 for MRIs performed on each spinal region.  Thus, cervical and lumbar MRIs typically lead to charges of more than $10,000 for a single visit.  *See* Ex. 5.

168.   Tellingly, these exorbitant charges are significantly higher than the average charges that Horizon and Superior represented to the State of Michigan in their Certificate of Need applications.   Specifically, Horizon and Superior were each required to apply for a Certificate of Need with the State of Michigan to obtain permission to perform and bill for MRIs.   On Horizon's Certificate of Need application, it lists its projected average charge per scan to be $850 – a charge well below the $5,000 per scan amount it actually charges State Farm Mutual.   On Superior's Certificate of Need application, it lists its projected average charge per scan to be $675 – a charge even further below the $5,000 per scan amount it actually charges State Farm Mutual.

### a.      The Legitimate Use Of MRIs In Treating Soft-Tissue Injuries

169.   MRIs are advanced imaging procedures that only should be performed after an individualized determination is made on each patient that it is medically necessary.   For example, MRIs may be ordered when a patient's diagnostic picture is particularly unclear, response to treatment is atypical or not significant, or there are legitimate concerns about structural damage or internal injuries to the patient. When MRIs are ordered, they should be limited to the targeted area of the body in interest.   It is thus uncommon to order MRIs on all regions of the spine, or even more than one region.

170.   When MRIs are clinically indicated and ordered, medical providers should evaluate the significance of the MRI interpretations and incorporate those findings into diagnoses and ongoing future treatment plans.  Specifically, providers must seek clinical corroboration as to whether any of the identified abnormalities in the MRI interpretations are symptomatic and/or present any clinical significance to the patient.  Indeed, many abnormalities in MRI reads are asymptomatic, are related to patients' normal aging processes, or have no direct correlation with any acute injury or symptoms.  As a result, it is important for the chiropractor or other medical professionals treating a patient for an acute injury to differentially determine which, if any, abnormalities in MRI reads are related to the patients' presenting symptoms and/or any acute injury.

171.   Where abnormalities in MRI findings have clinical significance, chiropractors and other medical professionals should modify their treatment plan in consideration of the MRI findings, as needed.  For example, the presence of significant disc herniations or disc bulges/protrusions impinging on neural structures with reported radicular pain at those levels, particularly bilateral radicular symptoms, may be a contraindication for continued spinal manipulations in that area, or for use of head-weighting and wobble board, as such conditions may be aggravated by repetitive movement.

**b.     Elite's Fraudulent MRI Orders**

172.   In contrast, the MRIs ordered by the Elite Chiropractors and Elite Doctors are not medically necessary because they are not individually tailored to the patients' symptoms or needs.  Rather, almost all patients at Elite receive orders for MRIs, and almost all of the MRIs that were ordered by the Elite Chiropractors and Elite Doctors were done at Horizon and Superior.  Exs. 1 and 2.  The MRIs themselves were not tailored to the patients' individual complaints or conditions. Indeed, virtually every patient receives both cervical and lumbar MRIs.  Moreover, more than half of the Elite patients also receive MRIs of the thoracic region of the spine, brain, and/or other parts of the body.  Ex. 5.

173.   Regardless of the MRI findings, the treatment of patients at Elite did not change, proving that the MRIs were not ordered because they were medically necessary.  After receiving MRIs, patients returned to Elite and continued with the same Predetermined Protocol they were getting before the MRIs were ordered. Neither the Elite Chiropractors nor Elite Doctors evaluate or incorporate the findings of the MRIs they order into the Patients' treatment plans.  For instance, almost all patients have MRI interpretations purportedly showing disc herniation and/or bulges at certain spinal levels.   Yet, the Elite Chiropractors and Elite Doctors almost never mention the results of MRIs in their evaluations or modify their treatment based upon the MRI findings.  Even when Upfall references MRI

results in his reports, he never evaluates how the MRI findings may impact the patient's chiropractic or physical therapy treatments, nor does he modify the treatment plan to account for the MRI findings.

### c. Horizon's And Superior's False MRI Interpretations

174. As described above, neither Horizon nor Superior are independent MRI providers. Radom handles business development for and has a financial interest in Horizon. Radom and Bittner own and control Superior, either directly or through Midwest Medical. The Elite Chiropractors and Elite Doctors steer their patients to Horizon and Superior for unnecessary MRIs. The MRI films are purportedly interpreted remotely by two radiologists, Desai and Paley. Not surprisingly, the "findings" and "impressions" generated by Horizon and Superior in their reports ("Horizon and Superior Reports") are remarkably similar and contain non-credible patterns of findings across patients, including: (a) purported abnormal cervical lordosis (straightening) in one or more areas of the spine; (b) attribution of lordosis to acute injury as opposed to other common and non-pathological reasons, such as posture and body positioning in the MRI machine, among other reasons; (c) absence of other documented findings, such as marrow or ligamentous edema (swelling); (d) typically at least two other abnormal findings for every cervical and lumbar MRI, specifically disc bulges and/or herniation often

"impinging on the thecal sac"; and (e) additional purported abnormal findings in MRIs of other areas of the body, including the shoulder or knee. *See* Ex. 5.

175.   As can be seen on Exhibit 5, almost every patient who had a cervical MRI at Horizon or Superior was said to be suffering from abnormal lordosis. Cervical lordosis refers to the curvature of the spine.  Most individuals' cervical spines have a degree of outward curvature that is considered "normal" for that person, and the degree of "normal" cervical spine curvature varies.  For instance, for some individuals, normal posture may result in very limited, if any, cervical curvature, while for others, normal posture may result in significant cervical curvature.

176.   In addition to an individual's normal posture, another common non-pathological reason for apparent cervical straightening in MRI images is simply the method by which the MRI technician positions the patient in an MRI machine.  If patients are positioned with their necks held in a relative degree of flexion, for instance with a pillow under their head, the resulting MRI images are likely to show artificial "cervical straightening" (*i.e.*, cervical straightening that has nothing to do with injury).  Thus, the way MRI technicians position patients may cause a straightening of the cervical portion of the spine that has nothing to do with any pathology or clinical symptoms.

177.   Horizon's and Superior's MRI interpretations typically include a finding of cervical straightening attributable to acute injury, noting that lordosis is found to be "consistent with cervical muscular spasm" or "possibly related to injury."   However, Horizon's and Superior's interpretations never mention the other common causes of cervical straightening, such as normal posture for the individual or patient positioning in the MRI machine.

178.   Moreover, where lordosis is noted, patients' MRI films often do not show such a curvature or abnormality.   For example, in one case, Paley's report from Superior states that patient CW has "straightening of the cervical lordotic curve[,] which may indicate cervical muscular spasm."   Not only is there no abnormal curvature, but patient CW had a spinal fusion at spinal levels C4/C5 and C5/C6, in which those vertebrae were joined permanently together with titanium plates and screws.   It is highly unlikely that muscle spasms could have caused a curvature of CW's cervical spine when the patient's vertebrae were fused in such a manner.

179.   Horizon's and Superior's attribution of the cause of abnormal lordosis to "muscular spasm" or "injury" is designed to connect cervical straightening to trauma from an auto accident.   However, as described above, these findings are either non-existent on the films themselves or grossly exaggerated.

81

180.   In addition, although legitimate trauma to muscles, ligaments, and bones can be confirmed through expected MRI findings, the Horizon and Superior Reports do not contain such findings.  For instance, marrow and/or ligamentous edema (by-products of swelling) or contusions (hemorrhage blood products) are seen in MRI images following the types of trauma that Elite purports to diagnose for its patients.  No such findings are mentioned in the Horizon and Superior Reports.  In fact, many Horizon Reports state the opposite, finding "no significant marrow edema."  *See* Ex. 5.  Nor do Horizon and Superior document paraspinous muscle or interspinous process ligament edema, which should be present given diagnoses by the Elite Chiropractors and Elite Doctors of multi-region back and neck sprains.  The absence of these findings indicates that at least many of the purported disc bulges and herniations identified in Horizon's and Superior's Reports are likely the result of long-term degenerative conditions commonly found in the general population that are often asymptomatic and have nothing to do with auto accidents.

181.   The Horizon and Superior Reports also fail to mention scar tissue or past surgeries, calling them disc herniations.  For example, in one patient, GK, the Superior Report for the lumbar spine at L5/S1 clearly shows that the patient had past spinal surgery, which can cause significant scar tissue.  Rather than note this finding, Paley simply reports a herniated disc at L5/S1, which is impossible to

distinguish from the scar tissue unless dye is given to the patient through an IV, which was never done.

182.   Tellingly, the MRI interpretive reports from Horizon and Superior in fact *never* find an actual torn ligament in any patient.  Ex. 5.  This is astounding given that the Elite Chiropractors and Elite Doctors routinely diagnose widespread, multi-region sprains, which are ligament injuries.  *See* Exs. 1 and 2.

183.   Moreover, Paley always states in his reports for Superior that the MRI films include "inversion recovery pulse sequences."  Inversion recovery pulse sequences, or STIR sequences, are MRI sequences that are sensitive for bone marrow edema and can better highlight bone contusions.  Thus, they are particularly appropriate for patients that have undergone acute trauma.  However, while STIR sequences may be appropriate and Paley attests the STIR sequences were performed in his reports, Paley's statements are belied by the MRI films themselves, which do not actually contain STIR sequences.

184.   The Horizon and Superior Reports are also replete with multiple purported "abnormalities" for patients.  *See* Ex. 5.  This pattern of uniform, widespread, and serious abnormalities across such a wide range of patients is not credible, particularly among so many patients under 30 years of age, where disc bulges and herniations are not commonly found.  *Id.*

185.   Indeed, for many patients, the Horizon and Superior Reports document extensive, and often severe, abnormalities across multiple regions of the spine when, in fact, the MRI images are entirely normal.  For instance, patient DS, a 19 year-old male, had cervical, thoracic, lumbar, and brain MRIs ordered by Upfall and purportedly interpreted by Desai for Horizon.  *See* Ex. 31.  As is the case with virtually every MRI reviewed by Horizon, the Horizon Reports document many purported abnormalities across multiple regions of the spine, including:  (a) "[c]ervical lordotic curvature is straightened with mild levoscoliosis – possibly related to injury"; (b) "[d]isc bulge at the C5-C6 level impinging on the thecal sac"; (c) "[d]isc bulges at T6-T7 and T7-T8 levels impinging upon the thecal sac"; (d) "[t]horacic kyphosis [forward rounding of the thoracic spine] is straightened – possibly related to injury"; (e) "[d]isc bulge impinging upon the thecal sac at L3-4 level"; (f) "[d]isc bulge at L4-L5 level impinging upon the thecal sac causing mild bilateral neuroforaminal compromise"; and (g) "[m]ild lumbar levoscoliosis [a lateral curvature of the spine]."

186.   However, the actual MRI films for patient DS show that the cervical, thoracic, and lumbar regions of the spine are completely devoid of any significant abnormalities.  Specifically, the cervical curvature is normal, with no cervical straightening whatsoever, and there is no disc bulge at C5-C6, much less a bulge that impinges on the thecal sac (*i.e.,* the membrane of dura matter surrounding the

spinal cord).  Similarly, there is no evidence of thoracic kyphosis, no disc bulges at T6-T7 or T7-T8, and no impingement upon the thecal sac.  Finally, there is no lumbar levoscoliosis, which would require a curvature in excess of ten degrees, and only minor, insignificant disc bulges at L3-L4 or L4-L5, but no impingement on the thecal sac causing bilateral neurotoraminal compromise (*i.e.*, narrowing of the nerve passageways on the spine).  Thus, the MRI "findings" and "impressions" are outright fabrications to create the misimpression of multiple and significant abnormalities when, in fact, the MRI images for this patient demonstrate an essentially normal study for a 19 year-old man.

187.  Similarly, patient KS had cervical, lumbar, wrist, and knee MRIs, which were purportedly interpreted by Paley for Superior.  *See* Ex. 32.  Superior's MRI reports document many purported abnormalities that were not present and failed to identify abnormalities that were present.  For example, in the lumbar spine, Paley reported retrolisthesis at L2/L3, i.e. one vertebral body having slipped behind the spine, but there is no such slippage.  There is spinal stenosis – a degenerative condition – at L4/L5, but Paley does not report this finding.  Indeed, despite severe degenerative changes throughout, Paley never uses the term degeneration.  Moreover, in the wrist MRI, Paley reports tendinitis, when the wrist shows no such signs.  Finally, Paley states a STIR sequence (inversion recovery pulse sequence) was performed in both the left knee and the cervical spine when

there are no such images, reports having reviewed oblique sagittal sequences in the left knee when such sequences were never performed, and recommends an ultrasound of the left knee for "vascular malformation," when it is evident that the only abnormalities are degenerative.

188.   The Horizon and Superior Reports also purposely avoid any mention of whether purported abnormalities are consistent with long-standing chronic degenerative conditions, rather than the product of acute traumatic injury. They do so because degenerative conditions do not support continued treatment at Elite or injury claims, which are predicated on acute injuries from auto accidents. For instance, although the interpretive reports at times document so-called Modic signals (which are a hallmark symptom of longer-term disc degeneration) as well as disc "desiccation" (which is also an indication of long-term disc degeneration), the MRI interpretive reports from Horizon and Superior never use the terms "degeneration" or "degenerative condition."

189.   The Elite Doctors and Elite Chiropractors typically do not make any attempt to determine whether any of the numerous purported abnormalities mentioned in the Horizon and Superior Reports have any clinical significance for the patient. They do not do so because they know that MRI orders and the resulting MRI "interpretations" are merely part of the Predetermined Protocol and are not ordered for legitimate diagnostic or medical needs of the patients.

190.    Horizon in particular not only over-reads MRIs and creates false findings when no abnormalities exist in an attempt to substantiate greater injury, but the Defendants also attempt to schedule multiple MRIs for each patient, which Horizon then carries out in the shortest amount of time possible (often impairing the quality of the MRI film itself) in order to generate maximum billing.  When an MRI is performed, the MRI technician must calibrate the MRI machine as to the number of pulse sequences to be taken and the thickness of each scan taken.  The greater number of pulse sequences results in the radiologist being able to review that region of the body from multiple angles and views and thus make a better determination of any abnormality.  Likewise, setting the MRI machine to take a thinner scan allows the MRI film to show more details for each image to the reading radiologist.  Using a thicker scan will take less time, but will result in a worse quality image.

191.    In performing the MRIs, Horizon often uses the minimum number of pulse sequences – radio frequency pulses applied to the region of the body in question – and, correspondingly, images slices of the region that are too thick, such that the diagnostic quality of the film for the region of the body in question is poor, minimizing the diagnostic value of Horizon's MRIs.

192.    For example, patient TJ underwent six MRIs – to the left knee, right tibia, left shoulder, lumbar spine, cervical spine, and thoracic spine – all in one day

at Horizon, which were ordered by Upfall.  *See* Ex. 29 (also ordering MRIs of femur, which were never performed).  As with most MRIs from Horizon, Paley, the reading radiologist, greatly over-reads the films that were produced, but due to the low number of pulse sequences and increased thickness of images, certain regions of the body in question were not even present on the films or the images of those regions were of poor quality.  For example, the Horizon Reports indicated that there was a straightening of the lumbar lordotic curve that may indicate spasm, disc displacement at L4-L5, and herniation at L5-S1.  Not only were there no abnormalities in any of these areas, but Horizon used the minimum number of views of the lumbar spine, not including axial views of the top of the lumbar spine.  Similarly, rather than generate a comprehensive set of axial images for the thoracic spine, which could include 100 or more axial images, Horizon captured exactly 12 axial images, one for each level, which limits the diagnostic value, but allows the MRI to be completed much more quickly.  For the tibia, such a low number of images was captured that the top and bottom portions of the tibia were completely missing; and because of the thickness of each of the slices (again, which allows the MRI to be carried out more quickly), the image quality of the films was greatly impaired.  None of the Horizon Reports for patient TJ noted any of these inadequacies.[4]

---

[4] Another patient, BB, underwent a brain MRI and such a low number of images were generated

193.   Moreover, even where the MRI films for patient TJ were readable, the impressions were incorrect.   For example, the Horizon Report for the knee described a meniscus tear, yet the film does not show any such tear.   In addition, Horizon did not note the only real abnormality for this patient, namely a separation of the acromioclavicular joint visible on the shoulder MRI film, which should have been noted for the clinician but was not.

### G.    State Farm Mutual's Justifiable Reliance

194.   Defendants are obligated legally and ethically to act honestly and with integrity.   Yet, the Defendants submitted or caused to be submitted, medical records and bills falsely representing that the services were performed and were medically necessary when, in fact, they were not.

195.  State Farm Mutual is under statutory and contractual duties to promptly pay No-Fault Benefits for medically necessary services.   The bills and supporting documents that the Defendants submitted, and caused to be submitted, to State Farm Mutual in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause State Farm Mutual to justifiably rely on them.

---

by Horizon that both the front and back of BB's brain was completely absent from the films, which Paley did not even note in the Horizon report.

196.   As a result, State Farm Mutual has incurred damages of more than $1 million in No-Fault Benefits that it paid to the Defendants.

197.   Based on Defendants' material misrepresentations and other affirmative acts to conceal their fraud from State Farm Mutual, State Farm Mutual did not discover and should not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## III.   JURISDICTION AND VENUE

198.   Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matters in controversy exceed the sum or value of $75,000, exclusive of interest and costs and are between citizens of different states.

199.   Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because this is the jurisdiction where the Defendants reside, and a substantial part of the events or omissions that gave rise to the claims occurred here.

## IV.   PARTIES

### A.   Plaintiff

200.   State Farm Mutual is a corporation organized under the laws of the State of Illinois, with its principal place of business in Bloomington, Illinois.  It is licensed and engaged in the business of insurance in Michigan.

### B.   Defendants

#### 1.   Bittner And Radom

201.   Derek Lawrence Bittner, D.C. ("Bittner"), resides in and is a citizen of Michigan.  Bittner has been a licensed chiropractor since 1999.  At all relevant times, he owned and/or controlled the Elite Entities and, thus, directed their activities and the activities of those who were employed by and associated with them.   He also provided chiropractic treatment in accordance with the Predetermined Protocol.  In addition, Bittner owns and controls Superior, where many of the patients who purported to treat at the Elite Entities were sent for medically unnecessary MRIs.

202.   Mark Radom ("Radom") resides in and is a citizen of Michigan.  At all relevant times, he owned and/or controlled the Elite Entities and, thus, directed their activities and the activities of those who were employed by and associated with them.  In addition, Radom has a financial interest in Horizon (where he is responsible for business development), and he owns and controls Superior, where many of the patients who purported to treat at the Elite Entities were sent for medically unnecessary MRIs.

#### 2.   The Elite Entities

203.   Derek L Bittner D.C., P.C. ("Bittner, P.C.") is a citizen of Michigan. It is a Michigan professional corporation formed in 2000 with its principal place of business at 13927 Plumbrook Road, Sterling Heights, Michigan.  Bittner is the

resident agent and president, and his wife, Ryan Bittner, D.C., is the secretary, treasurer, and vice president. Bittner has testified that he and his wife, Ryan Bittner, are the sole owners of Bittner, P.C.. From 2011 to the present, Bittner, P.C. has knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation described, in part, in the charts attached hereto as Exhibits 1 and 2, which are fraudulent in that they represent that chiropractic services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

204. Elite Chiropractic P.C. ("Elite Chiro") is a citizen of Michigan. It is a Michigan professional corporation formed in 2011 with its principal place of business at 13927 Plumbrook Road, Sterling Heights, Michigan. Derek Bittner is the resident agent and sole officer of Elite Chiro. From 2011 to the present, Elite Chiro has knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation described, in part, in the chart attached hereto as Exhibits 1 and 2, which are fraudulent in that they represent that chiropractic services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined

Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

205.   Bittner, P.C. and Elite Chiro submitted bills to State Farm Mutual for chiropractic services purportedly rendered at four locations: Sterling Heights, Detroit, Westland, and Riverview.  Bittner, P.C. and Elite Chiro have employed at least six chiropractors, including Defendants Bittner, Lukowski, and Draplin, as well as Bittner's sister, Nicole Bittner, D.C., Bernard Hughey, D.C., and Richard Jeffrey Stanley, D.C., who similarly falsely purported to legitimately examine, diagnose, and treat patients at Bittner, P.C. and Elite Chiro.

206.   Elite Rehabilitation, Inc. ("Elite Rehab") is a citizen of Michigan.  It is a Michigan domestic non-profit corporation formed in 2011 by Bittner with its principal place of business at 13927 Plumbrook Road, Sterling Heights, Michigan. From approximately 2011 through at least early 2013, Elite Rehab has knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation described, in part, in the chart attached hereto as Exhibit 1, which are fraudulent in that they represent that physical therapy services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

207.   Pure Rehabilitation, Inc. ("Pure Rehab") is a citizen of Michigan.  It is a Michigan domestic non-profit corporation formed in March 2014 to replace Elite Rehab, with its principal place of business at 13927 Plumbrook Road, Sterling Heights, Michigan.  From approximately July 2014 to the present, Pure Rehab has knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation described, in part, in the chart attached hereto as Exhibit 1, which are fraudulent in that they represent that physical therapy services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

208.   Elite Health Centers, Inc. ("Elite Health") is a citizen of Michigan.  It is a Michigan domestic non-profit corporation formed in 2011 by Bittner with its principal place of business at 13927 Plumbrook Road, Sterling Heights, Michigan.  From approximately 2011 through June 2014, Elite Health knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation described, in part, in the chart attached hereto as Exhibits 1 and 2, which are fraudulent in that they represent that medical and physical therapy services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was

designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

209.   In addition, from 2013 through June 2014, Elite Health knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation:  (a) for physical therapy under the assumed names Rehabilitation of Sterling Heights and Rehabilitation of Detroit; (b) for medical exams under the name Pain Specialists of Michigan; (c) for surgery consultations under the name Prime Neurosurgery Group; and (d) for neurological consultations under the name Pioneer Neurology Group.

210.   Midwest Medical Associates, Inc. ("Midwest Medical") is a citizen of Michigan.  It is a Michigan domestic non-profit corporation formed in March 2014 to replace Elite Health, with its principal place of business at 13927 Plumbrook Road, Sterling Heights, Michigan.  From approximately July 2014 to the present, Midwest Medical has knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation described, in part, in the chart attached hereto as Exhibits 1 and 2, which are fraudulent in that they represent that medical services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

95

### 3.      Defendant Chiropractors

211.   Ryan Matthew Lukowski, D.C. ("Lukowski") resides in and is a citizen of Michigan.  Lukowski has been a licensed chiropractor since 2011.  From 2012 through approximately February 2013, Lukowski worked for the Elite Entities full-time at the Detroit location and one day per week at the Sterling Heights location.   During that time, Lukowski falsely purported to provide legitimate chiropractic evaluations and treatment for a significant number of the patients who treated at Elite pursuant to the Predetermined Protocol, referred patients to Upfall and other Elite Doctors for medical exams pursuant to which medically unnecessary physical therapy could be prescribed, and ordered medically unnecessary MRIs.  *See* Exs. 1 and 2.

212.   Michael Patrick Draplin, D.C. ("Draplin") resides in and is a citizen of Michigan.   Draplin has been a licensed chiropractor since 1997.   From 2013 through approximately May 2015, Draplin worked for the Elite Entities at the Detroit location, where he became the primary Elite Chiropractor after Lukowski left.  During this time, Draplin falsely purported to provide legitimate chiropractic evaluations and treatment for a significant number of the patients who treated at Elite pursuant to the Predetermined Protocol, referred patients to Upfall, Juska, and other Elite Doctors for medical exams pursuant to which medically unnecessary

physical therapy could be prescribed, and ordered medically unnecessary MRIs. *See* Exs. 1 and 2.

### 4.   The Elite Doctors

213.   Noel H. Upfall, D.O. ("Upfall") resides in and is a citizen of Michigan.  Upfall has been a licensed doctor of osteopathy since 1988.  In 1999, Upfall was issued a cease and desist order from the Michigan Department of Health and Human Services based on his violation of the Michigan Public Health Code rules for storing, prescribing, and dispensing controlled and non-controlled substances when he attempted to enter the United States from Canada with 161 bottles of a Schedule IV controlled substance with homemade labels.  From 2011 through February 2014, Upfall worked at Elite Health and its successor, Midwest Medical.   During this time, Upfall falsely purported to legitimately examine, diagnose, and prescribe medically unnecessary physical therapy for patients who treated at the Elite Entities and made referrals to other Elite Doctors, and ordered medically unnecessary MRIs.  *See* Exs. 1, 2, and 3.

214.   Mark J. Juska, M.D. ("Juska") resides in and is a citizen of Michigan. Juska has been a licensed medical doctor since 2010.  From late 2013 through early 2015, Juska worked at Elite Health and its successor, Midwest Medical.  Juska has testified that during this time: (a) he was an employee of Michigan Sports and Spine Center, P.C. ("Michigan Sports"); (b) his "boss" was Jeff S. Pierce, D.O.

("Pierce"), who is the president and resident agent of Michigan Sports; (c) Pierce arranged for Juska to work at Elite Health; (d) there was a "relationship or agreement" between Elite Health and Michigan Sports; and (e) he was paid by Michigan Sports, not Elite Health.  During this time, Juska falsely purported to legitimately examine, diagnose, and prescribe medically unnecessary physical therapy for patients who treated at the Elite Entities and made referrals to other Elite Doctors, and ordered medically unnecessary MRIs.  *See* Exs. 1, 2, and 4.

### 5.    The MRI Defendants

215.   Superior Diagnostic, Inc. ("Superior") is a citizen of Michigan.  It is a Michigan non-profit corporation formed on March 25, 2014, with its principal place of business at 13927 Plumbrook Road, Sterling Heights, Michigan.  Superior is owned by Bittner and Radom, either directly or through Midwest Medical, which in turn is owned and controlled by Bittner and Radom.  Radom and Bittner direct chiropractors, doctors, and staff at the Elite Entities to steer patients to Superior for medically unnecessary MRIs to serve Radom's and Bittner's financial interests, and not to benefit the patients.

216.   Chintan Desai, M.D. ("Desai") resides in and is a citizen of Florida. Desai has been a licensed doctor since 2004.  Desai works as an independent contractor with a teleradiology company where he remotely reviews MRIs for Horizon for which he purportedly is paid a flat fee per month.  Desai has testified

that he performs "anywhere from 50 to 60 to 100" reviews each day and that he gives imaging centers like Horizon a protocol that lists what he prefers in imaging sequences that he uses.  Desai has provided fraudulent MRI reports for patients who treated at Elite, which report abnormalities that do not exist and which over-read and exaggerate abnormalities that may exist.  *See* Ex 5.

217.   Michael J. Paley, M.D. ("Paley") resides in and is a citizen of Ohio. Paley has been a licensed doctor since 2004.  Paley remotely reviews MRIs from Horizon and Superior.  Paley has provided fraudulent MRI reports for patients who treated at Elite, which report abnormalities that do not exist and which over-read and exaggerate abnormalities that may exist.  *See* Ex 5.

218.   The chart attached as Exhibit 5 summarizes the MRIs purportedly performed by Horizon and Superior on the Elite Entities' patients and interpreted by radiologists working for Horizon and Superior.  In each instance, Defendants have knowingly submitted, and caused to be submitted, to State Farm Mutual bills and supporting documentation for the MRIs performed by Horizon and Superior that are fraudulent.

### 6.    The Rosett Defendants

219.   Jayson Rosett ("Rosett") resides in and is a citizen of Michigan.  At all relevant times, he owned and/or controlled the Rosett PT Entities and, thus,

directed their activities and the activities of those who were employed by and associated with them.

220.   Dearborn Center for Physical Therapy, LLC ("Dearborn Center") is a citizen of Michigan wholly owned by Jayson Rosett.   It is a Michigan limited liability company formed on June 29, 2012, with its principal place of business at 63613 Schaeffer Road, Dearborn, Michigan.  From approximately January 2012 to the present, Dearborn Center has knowingly submitted, and caused to be submitted, medical records, and supporting documentation described, in part, in the chart attached hereto as Exhibit 2, which are fraudulent in that they represent that physical therapy services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

221.   Michigan Center for Physical Therapy, Inc. ("Michigan Center") is a citizen of Michigan wholly owned by Jayson Rosett.   It is a Michigan corporation formed on February 10, 2010, with its principal place of business at 31876 Northwestern Highway, Farmington Hills, Michigan.  From approximately May 2011 to the present, Michigan Center has knowingly submitted, and caused to be submitted, bills, medical records, and supporting documentation described, in part, in the chart attached hereto as Exhibit 2, which are fraudulent in that they represent

that physical therapy services were actually rendered and were medically necessary when, in fact, they either were not performed or were performed pursuant to the Predetermined Protocol that was designed and carried out to enrich Defendants by maximizing their collection of the patients' No-Fault Benefits.

## V.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### COMMON LAW FRAUD
**(Against Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, And Elite Rehab)**

222.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

223.   Defendants Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, and Elite Rehab intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, thousands of fraudulent bills and related documentation that contained false representations of material fact.

224.   The false statements of material fact include: (a) patients were legitimately examined to determine the true nature and extent of their complaints and injuries, when they were not; (b) patients were legitimately diagnosed with, among other things, sprains and strains of the cervical, thoracic, and/or lumbar

101

regions of the spine, when they were not; (c) each patient's injury was a result of the auto accident, when Defendants did not legitimately reach such a conclusion; (d) patients were legitimately determined to be disabled, when they were not; (e) patients were prescribed and received services that were medically necessary when in fact the services were provided pursuant to the Predetermined Protocol, not because they were medically necessary; and (f) Horizon's and Superior's MRI interpretive reports prepared by Desai and Paley were medically necessary, legitimate, and medically accurate, when they were not, including those set forth in Exhibit 5. Representative examples of the fraudulent reports, documentation, and bills can be found in Exhibits 1, 3-5, 15, 17, and 19-23.

225. The Defendants knew that the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

226. The Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

227. As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $600,000 in benefits paid based upon the fraudulent charges for which it seeks reimbursement.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## SECOND CLAIM FOR RELIEF
## CIVIL CONSPIRACY
**(Against Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, And Elite Rehab)**

228.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

229.   Defendants Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, and Elite Rehab have acted in concert and knowingly and intentionally combined, agreed, and conspired to accomplish through a common plan and design an unlawful and common purpose, namely to defraud State Farm Mutual by submitting, and causing to be submitted, thousands of fraudulent bills and related documentation that contained false representations of material fact that are described, in part, in Exhibits 1, 3-5, 15, 17, and 19-23.

230.   Defendants Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, and Elite Rehab each knew of, agreed to and acted in furtherance of the common and overall objective of the conspiracy to defraud State Farm Mutual

by facilitating the submission to State Farm Mutual of fraudulent bills described, in part, in Exhibits 1, 3-5, 15, 17, and 19-23.

231.   As a direct and proximate result of the actions of Defendants Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, and Elite Rehab, State Farm Mutual has incurred damages of more than $600,000 in benefits paid based upon the fraudulent charges for which it seeks reimbursement.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### THIRD CLAIM FOR RELIEF
### UNJUST ENRICHMENT
**(Against Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, And Elite Rehab)**

232.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

233.   State Farm Mutual conferred a benefit upon Defendants Bittner, Radom, Lukowski, Draplin, Upfall, Juska, Superior, Desai, Paley, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, Pure Rehab, and Elite Rehab by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

234.   Because Defendants knowingly billed for services that were not rendered and were not medically necessary, the circumstances are such that it would be unjust and inequitable to allow them to retain the benefit of the monies paid.

235.   As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Defendants have been unjustly enriched by more than $600,000.

236.   State Farm Mutual seeks payments conferred upon and unjustly retained by the Defendants due to their fraudulent conduct in connection with submitting bills for the examinations, services, treatments, and MRIs described, in part, in Exhibits 1, 3-5.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

### FOURTH CLAIM FOR RELIEF
### COMMON LAW FRAUD
**(Against Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, And Rosett PT Entities)**

237.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

238.   Defendants Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, and the Rosett PT Entities intentionally and knowingly made or caused to be made false and fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, hundreds of fraudulent bills and related documentation that contained false representations of material fact.

239.   The false statements of material fact include: (a) patients were legitimately examined to determine the true nature and extent of their complaints and injuries, when they were not; (b) patients were legitimately diagnosed with, among other things, sprains and strains of the cervical, thoracic, and/or lumbar regions of the spine, when they were not; (c) each patient's injury was a result of the auto accident, when Defendants did not legitimately reach such a conclusion; (d) patients were legitimately determined to be disabled, when they were not; (e) patients were prescribed and received services that were medically necessary when in fact the services were provided pursuant to the Predetermined Protocol, not because they were medically necessary; and (f) Horizon's and Superior's MRI interpretive reports prepared by Desai and Paley were medically necessary, legitimate, and medically accurate, when they were not, including those set forth in Exhibit 5.  Representative examples of the fraudulent reports, documentation, and bills can be found in Exhibits 2-5, 15, 17, 19-21, and 26.

240.   The Defendants knew that the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

241.   The Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual to rely on the misrepresentations.

242.   As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $400,000 in benefits paid based upon the fraudulent charges for which it seeks reimbursement.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

## FIFTH CLAIM FOR RELIEF
## CIVIL CONSPIRACY
**(Against Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, And Rosett PT Entities)**

243.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

244.   Defendants Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, and the Rosett PT Entities have acted in concert and knowingly and intentionally combined, agreed and conspired to accomplish through a common plan and design

an unlawful and common purpose, namely to defraud State Farm Mutual by submitting, and causing to be submitted, thousands of fraudulent bills and related documentation that contained false representations of material fact that are described, in part, in Exhibits 2-5, 15, 17, 19-21, and 26.

245.   Defendants Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, and the Rosett PT Entities each knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy to defraud State Farm Mutual by facilitating the submission to State Farm Mutual of fraudulent bills described, in part, in Exs. 2-5, 15, 17, 19-21, and 26.

246.   As a direct and proximate result of the actions of Defendants Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, and the Rosett PT Entities, State Farm Mutual has incurred damages of more than $400,000 in benefits paid based upon the fraudulent charges for which it seeks reimbursement.  State Farm Mutual seeks payments conferred upon and unjustly retained by the Defendants due to their fraudulent conduct in connection with submitting bills for the examinations, services, treatments, and MRIs described, in part, in Exhibits 2-5, 15, 17, 19-21, and 26 attached hereto.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### SIXTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, And Rosett PT Entities)

247.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

248.   State Farm Mutual conferred a benefit upon Defendants Bittner, Radom, Draplin, Upfall, Juska, Superior, Desai, Paley, Rosett, Elite Chiro, Bittner, P.C., Midwest Medical, Elite Health, and the Rosett PT Entities by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

249.   Because Defendants knowingly billed for services that were not rendered and were not medically necessary, the circumstances are such that it would be unjust and inequitable to allow them to retain the benefit of the monies paid.

250.   As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Defendants have been unjustly enriched by more than $400,000.

251.   State Farm Mutual seeks payments conferred upon and unjustly retained by the Defendants due to their fraudulent conduct in connection with submitting bills for the examinations, services, treatments, and MRIs described, in part, in Exhibits 2-5 attached hereto.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## SEVENTH CLAIM FOR RELIEF
## COMMON LAW FRAUD
### (Against Bittner, Radom, And Superior)

252.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

253.   In at least all of the claims submitted by Superior described in Exhibit 5, Superior, Bittner, and Radom intentionally and knowingly made false and fraudulent statements of material fact to State Farm Mutual by submitting, and causing to be submitted, fraudulent bills and related documentation which falsely represented that MRI services performed by Superior were lawfully rendered and were reimbursable, when in fact they violated the Michigan Public Health Code, which prohibits a licensee, including a chiropractor, from "requir[ing] . . . that an individual purchase or secure a . . . treatment, procedure, or service from another person, place, facility, or business in which the licensee has a financial interest."

*See* MCL § 333.16221(e)(iv)(A); *see also* MCL 333.16221(e)(iii) (prohibiting "[p]romotion for personal gain of an unnecessary drug, device, treatment, procedure, or service"); MCL 333.16221(h) (prohibiting "[a] violation, or aiding or abetting in a violation, of this article or of a rule promulgated under this article"). Bittner, Radom, and Superior knew that the above-described misrepresentations made to State Farm Mutual were false and fraudulent when they were made.

254.   The Defendants made the above-described representations to induce State Farm Mutual to rely on them.

255.   State Farm Mutual relied on the Defendants' representations that the claims and charges submitted to State Farm Mutual were for services that were lawfully rendered when, in fact, they were not.

256.   As a result of its justifiable reliance on these misrepresentations, State Farm Mutual has incurred damages of more than $30,000 in benefits paid based upon the fraudulent charges for which it seeks reimbursement.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### EIGHTH CLAIM FOR RELIEF
### CIVIL CONSPIRACY
### (Against Bittner, Radom, And Superior)

257.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

258.   Defendants Bittner, Radom, and Superior have acted in concert and knowingly and intentionally combined, agreed, and conspired to accomplish through a common plan and design an unlawful and common purpose, namely to defraud State Farm Mutual by submitting, and causing to be submitted fraudulent bills and related documentation that contained false representations of material fact that are described in Count Seven, *supra.*

259.   Defendants Bittner, Radom, and Superior each knew of, agreed to, and acted in furtherance of the common and overall objective of the conspiracy to defraud State Farm Mutual by engaging in the actions described in Count Seven, *supra.*

260.   As a direct and proximate result of the actions of Defendants Bittner, Radom, and Superior, State Farm Mutual has incurred damages of more than $30,000 in benefits paid based upon the fraudulent charges for which it seeks reimbursement.  State Farm Mutual seeks payments conferred upon and unjustly retained by the Defendants due to their fraudulent conduct in connection with submitting bills for the MRIs described, in part, in Exhibit 5 attached hereto.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages, costs, and other such relief as this Court deems equitable, just, and proper.

### NINTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against Bittner, Radom, and Superior)

261.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

262.  State Farm Mutual conferred a benefit upon Defendants Bittner, Radom, and Superior by paying their claims and these Defendants voluntarily accepted and retained the benefit of those payments.

263.   Because Defendants Bittner, Radom, and Superior knowingly billed for services on the basis of the fraudulent representation described in Count Seven, *supra*, the circumstances are such that it would be unjust and inequitable to allow them to retain the benefit of the monies paid.

264.   As a direct and proximate result of the above-described conduct, State Farm Mutual has been damaged and Defendants have been unjustly enriched by more than $30,000.

265.  State Farm Mutual seeks payments conferred upon and unjustly retained by the Defendants due to their fraudulent conduct in connection with submitting bills for the MRIs described, in part, in Exhibit 5 attached hereto.

WHEREFORE, State Farm Mutual demands judgment against Defendants for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

## TENTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
### (Against Elite Entities, Rosett PT Entities, And Superior)

266.   State Farm Mutual incorporates, as though fully set forth herein, each and every allegation in Paragraphs 1 through 221 above.

267.   This action is for declaratory relief pursuant to 28 U.S.C. §2201.

268.   There is an actual case and controversy between State Farm Mutual, on one hand, and the Elite Entities, on the other hand, as to all charges for examinations, services, and treatments performed at any of the Elite Entities that have not been paid.  State Farm Mutual contends that the Elite Entities are not entitled to reimbursement for any of these unpaid charges submitted to date and through the pendency of this litigation.

269.   There is an actual case and controversy between State Farm Mutual, on one hand, and the Rosett PT Entities, on the other hand, as to all charges for physical therapy services that have not been paid for patients who also treated at Elite Chiro and/or whose physical therapy was prescribed by Elite Doctors.  State Farm Mutual contends that the Rosett PT Entities are not entitled to be paid for any

of these unpaid charges submitted to date and through the pendency of this litigation.

270.   There is an actual case and controversy between State Farm Mutual, on one hand, and Superior, on the other hand, as to all charges for MRIs ordered by Elite Chiropractors and Elite Doctors and performed at Superior that have not been paid.  State Farm Mutual contends that Superior is not entitled to be paid for any of these unpaid charges submitted to date and through the pendency of this litigation.

271.   Because the Elite Entities, the Rosett PT Entities, and Superior have knowingly made false and fraudulent statements and otherwise engaged in the above-described fraudulent conduct with the intent to conceal and misrepresent material facts and circumstances regarding each claim that each of them has submitted to State Farm Mutual, they are not entitled to any reimbursement for any of the claims at issue.

WHEREFORE, State Farm Mutual respectfully requests a judgment declaring that: (a) the Elite Entities are not entitled to reimbursement for any of the unpaid charges for examinations, services, and treatments performed at the Elite Entities submitted to date and through the pendency of this litigation; (b) that the Rosett PT Entities are not entitled to reimbursement for any unpaid charges for physical therapy services for patients who also treated at Elite Chiro and/or whose physical therapy was prescribed by Elite Doctors submitted to date and through the

pendency of this litigation; (c) that Superior is not entitled to reimbursement for any of the unpaid charges for MRIs ordered by Elite Chiropractors and Elite Doctors and performed at Superior submitted to date and through the pendency of this litigation; and (d) for supplementary relief, interest, and costs as this Court deems equitable, just, and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual demands a trial by jury.

Dated:   August 19, 2016

KATTEN MUCHIN ROSENMAN, LLP

By:   /s/ Ross O. Silverman
Ross O. Silverman
Kathy P. Josephson
Michael M. Rosensaft
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200
ross.silverman@kattenlaw.com
kathy.josephson@kattenlaw.com
michael.rosensaft@kattenlaw.com

Thomas W. Cranmer (P25252)
Miller, Canfield P.L.C.
840 W. Long Lake Road, Suite 200
Troy, Michigan  48098
(248) 267-3381
cranmer@millercanfield.com

*Attorneys for Plaintiff State Farm Mutual Insurance Company*

116