# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-13040 |
| | ) | Hon. Sean F. Cox |
| Elite Health Centers Inc., | ) | |
| Elite Chiropractic, P.C., | ) | |
| Elite Rehabilitation, Inc., | ) | |
| Midwest Medical Associates, Inc., | ) | |
| Pure Rehabilitation, Inc., | ) | |
| Derek L Bittner D.C., P.C., | ) | |
| Mark A. Radom, | ) | |
| Derek Lawrence Bittner, D.C., | ) | |
| Ryan Matthew Lukowski, D.C., | ) | |
| Michael P. Draplin, D.C., | ) | |
| Noel H. Upfall, D.O., | ) | |
| Mark J. Juska, M.D., | ) | |
| Superior Diagnostic, Inc., | ) | |
| Chintan Desai, M.D., | ) | |
| Michael J. Paley, M.D., | ) | |
| Dearborn Center for Physical Therapy, LLC, | ) | |
| Michigan Center for Physical Therapy, Inc., and | ) | |
| Jayson Rosett, | ) | |
| | ) | |
| Defendants. | ) | |

## NON-PARTIES KENNETH JACKSON AND K JACKS INVESTIGATIVE CONSULTING'S MOTION TO QUASH AND FOR PROTECTIVE ORDER REGARDING STATE FARM'S SUBPOENAS ISSUED TO BANK OF AMERICA AND CITIZENS BANK

NOW COMES Non-Parties Kenneth Jackson and K Jacks Investigative Consulting ("Jackson"), by and through their attorneys, Haas & Goldstein, P.C., pursuant to Fed. R. Civ. P. 26(c) and 45(c)(3)(A), and for their Motion to Quash and for Protective Order Regarding State Farm's Subpoenas directed to Bank of America and Citizens Bank states as follows:

1.      On or about April 23, 2018, State Farm Mutual Automobile Insurance Company ("Plaintiff" or "State Farm") generated subpoenas demanding banking records from Bank of America and Citizens Bank regarding Jackson. (Exhibit A, Subpoenas).

2.      State Farm did not initially serve Jackson with the Subpoenas.

3.      Upon request to be put on notice of any subpoenas that were issued that may involve records of Jackson, State Farm, through counsel, did subsequently forward a copy of the subpoenas (Exhibit A) to counsel for Jackson.

4.      Upon receipt of the subpoenas counsel for Jackson contacted the departments at each institution responsible for processing subpoenas and was advised no subpoenas were yet received; however, upon receipt Jackson would be sent a notification letter advising when the subpoenas are received and when the records would be sent out absent a pending motion to quash, or a court order quashing the subpoena.

5.      Counsel for Jackson was in the process of preparing a motion to quash and motion for protective order in anticipation of the subpoenas being served upon the banking institutions.

6.      Counsel for Jackson was recently informed by counsel for State Farm that Citizens Bank had already produced records to Plaintiff.

7.      Upon request, Plaintiff extended a courtesy of agreeing not to further review or disseminate the produced documents until Non-party Jackson could have this motion ruled on by this Court.

8.      The Subpoenas seek all records relative to certain Jackson accounts from January 1, 2010, onward. (See Exhibit A, Subpoena Riders).

9.      The requests for Jacksons' financial information are completely inappropriate given that Plaintiff does not allege any claims against Jackson and the entire case appears to involve claims of medical fraud involving a discrete population of patients who allegedly treated with the named Defendant medical providers. Simply stated, Plaintiff has made no allegations against Jackson and Jackson's sensitive financial information is not relevant to the claims made in Plaintiff's Complaint, nor are such records arguably even discoverable.

10.     Non-party Kenneth Jackson is a private investigator with diverse clients and ongoing cases through his LLC, Non-party K Jacks Investigative Consulting.

11.    The broad and untailored demands in State Farms subpoenas would violate the privacy of not only Jackson, but their many current and former clients as well.

12.    Jacksons' financial information is not relevant or discoverable pursuant to Fed. R. Civ. P. 26.

13.    Fed. R. Civ. P. 26(b)(1) provides that the parties to a case may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense . . . [r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."

14.    Under Fed. R. Civ. P. 45(c)(3)(A)(iii) and (iv), the Court shall, on timely motion, quash or modify a subpoena if it "requires disclosure of privileged or other protected matter and no exception or waiver applies," or if the subpoena "subjects a person to undue burden."

15.    "The only basis upon which a party could have standing to quash a non-party subpoena would be a claim or personal right or privilege. Such rights or privileges have been recognized with respect to personal bank records, information in a personnel file, corporate bank records, or Indian tribal records." See *Waite v Davis*, 2013 U.S. Dist. LEXIS 5253, at *14-15 (SD Ohio, Jan. 14, 2013) (internal citations omitted).; see also *Blumberg v Ambrose*, 2014 U.S. Dist. LEXIS 142781,

4

at *8 (E.D. Mich., Oct. 7, 2014).

16.     While there may be no singular investigator-client privilege in Federal common law, the attorney-client privilege can extend to the investigator-client relationship where the investigator is under the control of the attorney and thus acting as the attorney's agent. *In re Grand Jury Subpoena Dated March 20, 2013*, 2014 U.S. Dist. LEXIS 91901 (S.D.N.Y 2014).

17.     A party may move for a protective order pursuant to Fed. R. Civ. P. 26(c), which provides that the Court may issue a protective order to protect a party from "annoyance, embarrassment, oppression, or undue burden or expense."

18.     The reach of discovery in Federal Court is not without limit.  Rule 26 provides, "the court must limit the frequency or extent of discovery otherwise allowed by these rules … if it determines that… the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C). Similarly, Rule 45 provides that, on a timely motion, "the court for the district where compliance is required must quash or modify a subpoena that: (i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(i-iv).

19.     When determining whether a motion to quash should be granted, the Court must "weigh the likely relevance of the requested material to the investigation against the burden…of producing the material." *E.E.O.C. v. Ford Motor Credit Co.*, 26 F.3d 44, 47 (6th Cir. 1994). Courts have declined to enforce subpoenas that do not strike the proper balance. *Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Twp.*, 2014 WL 10319321, at *3 (E.D. Mich. July 2, 2014).   See *United States v. Gammo*, 428 F. Supp. 2d 705, 708 (E.D. Mich. 2006) (quoting *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir.1973)) ("where it appears that the purpose of the summons is 'a rambling exploration' of a third party's files, it will not be enforced.")

20.     This district has already limited State Farm's attempt to obtain non-party bank records in a case which is directly on point to the case at bar. See *MedCity Rehab Servs., LLC v. State Farm Mut. Auto Ins. Co.*, 2013 U.S. Dist. LEXIS 64670 (E.D. Mich., May 7, 2013).

21.     Plaintiff's subpoenas are not only designed to harass Jackson, but amount to a fishing expedition looking for the possibility of new claims against non-parties and other parties.

22.     "Plaintiff cannot issue discovery to determine whether he could add a claim. The court can order discovery relevant to the subject matter of the case, but since the 2000 amendments of Rule 26, " 'fishing expeditions' for new claims are

no longer permitted." *Energy Intelligence Grp., Inc. v. Wells Fargo Sec., LLC,* No. 11-cv-01961-REB-KMT, 2012 WL 370252, at *1 (D. Colo. Feb. 3, 2012). *See* Fed. R. Civ. P. 26, Advisory Committee Note to 2000 Amendments ("signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings.")." *Scherbarth v. Woods*, 2018 WL 851344, at *7 (D. Colo. Feb13, 2018).

23.    If the subpoena is not quashed, State Farm will have access to financial information related to Jackson, who is not party to this case and whose information is not relevant to any of the claims or defenses in this case.

24.    State Farm does not have any valid reason for invading Jackson's privacy and have unfettered access to his current and/or former clients and their personal financial information.

25.    Jackson's banking records for the last 8 years are not reasonably calculated to lead to the discovery of admissible or relevant information but is merely meant to harass and intimidate non-parties and invade the privacy of Jackson's past and current clients.

26.    Pursuant to the provisions of ED Mi LR 7.1(a), the undersigned counsel sought the consent of counsel for the parties to the relief requested here.

27.    Pursuant to the provisions of ED Mi LR 26.4(b), a proposed order stating that the information requested is privileged or otherwise protected and

describing the type of information to be produced is attached as Exhibit 3. (Proposed Order, Exhibit B.)

WHEREFORE, for all the foregoing reasons, Non-Parties Jackson, request that this Honorable Court grant this Motion and enter an Order:

a. Quashing State Farm's subpoenas served or being served on Bank of America and Citizens Bank and destruction of any documents received by State Farm;

b. Alternatively, if the Court believes that there may be relevant documents falling within the broad context of State Farm's Subpoenas, an Order setting forth the specific documents to be produced to State Farm and the criteria to be used for such determination of relevance;

c. Ordering that any documents produced by Bank of America or Citizens Bank be forwarded to the office of attorney for Jackson to be reviewed per the criteria set by the Court, with relevant documents thereafter produced to Plaintiff;

d. Including appropriate protective language for any documents produced that limits their use to this case only; and

e. Such other and further relief as is consistent with equity and good conscience.

8

Respectfully submitted,

/s/JUSTIN HAAS
JUSTIN HAAS (P53153)
HAAS & GOLDSTEIN, P.C.
Attorney for Non-Party(s)
31275 Northwestern Hwy., Ste. 225
Farmington Hills, MI 48334
(248) 702-6550

Dated:  June 8, 2018

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

State Farm Mutual Automobile Insurance
Company,

        Plaintiff,

        v.

Elite Health Centers Inc.,
Elite Chiropractic, P.C.,
Elite Rehabilitation, Inc.,
Midwest Medical Associates, Inc.,
Pure Rehabilitation, Inc.,
Derek L Bittner D.C., P.C.,
Mark A. Radom,
Derek Lawrence Bittner, D.C.,
Ryan Matthew Lukowski, D.C.,
Michael P. Draplin, D.C.,
Noel H. Upfall, D.O.,
Mark J. Juska, M.D.,
Superior Diagnostic, Inc.,
Chintan Desai, M.D.,
Michael J. Paley, M.D.,
Dearborn Center for Physical Therapy, LLC,
Michigan Center for Physical Therapy, Inc., and
Jayson Rosett,

        Defendants.

Case No. 16-cv-13040
Hon. Sean F. Cox

## BRIEF IN SUPPORT OF NON-PARTIES KENNETH JACKSON AND K JACKS INVESTIGATIVE CONSULTING'S MOTION TO QUASH AND FOR PROTECTIVE ORDER REGARDING STATE FARM'S SUBPOENAS TO BANK OF AMERICA AND CITIZENS BANK

1

# **TABLE OF CONTENTS**

STATEMENT OF ISSUES PRESENTED ............................................................ ii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ........................... iii

I.     STATEMENT OF FACTS ............................................................1

II.    ANALYSIS ...............................................................................2

III.   CONCLUSION AND REQUEST FOR RELIEF ....................................... 11

## STATEMENT OF ISSUES PRESENTED

I.      Whether State Farm's subpoenas to Bank of America and Citizens Bank are overly broad, seek information that is not relevant pursuant to Fed. R. Civ. P. 26(b)(1) and meant to harass?

Non-Parties Jackson Answer:    Yes.

# CONTROLLING OR MOST APPROPRIATE AUTHORITIES

## _Court Rules:_

Fed. R. Civ. P. 26

Fed. R. Civ. P. 45

## _Michigan Compiled Laws:_

MCL 338.840(2)

## _Cases:_

_Blumberg v Ambrose_, 2014 U.S. Dist. LEXIS 142781 (E.D. Mich., Oct. 7, 2014)……………………………………………………………………*4

_E.E.O.C. v. Ford Motor Credit Co._, 26 F.3d 44 (6th Cir. 1994)…………………*6

_Gucci Am., Inc. v. Guess?, Inc._, 271 F.R.D 58 (S.D.N.Y 2010)………………...6

_In re Grand Jury Subpoena Dated March 20, 2013_, 2014 U.S. Dist. LEXIS 91901 (S.D.N.Y 2014)……………………………………………………………*5, 6

_McCurdy v Wedgewood Capital Mgmt Co_, 1998 US Dist LEXIS 18875 (ED PA 1998)…………………………………………………………………… …3, 4

_MedCity Rehab Servs., LLC v. State Farm Mut. Auto Ins. Co._, 2013 U.S. Dist. LEXIS 64670 (E.D. Mich., May 7, 2013)……………………...…………..*6, 1,2,3

_Muslim Cmty. Ass'n of Ann Arbor v. Pittsfield Twp._, 2014 WL 10319321 (E.D. Mich. July 2, 2014)……………………………………………………............*6

_People of the State of Michigan v. Artis White_, 662 N.W.2d 69 (Mich. Ct. App. 2003)………………………………………………………………………..7

_Ravary v. Reed_, 415 N.W.2d 240 (Mich. Ct. App. 1987)…………………………9

_Roberts v Shawnee Mission Ford,_ Inc, 352 F3d 358, 361-62 (8th Cir 2003)……….3

*Scherbarth v. Woods*, 2018 WL 851344, at *7 (D. Colo. Feb13, 2018)……….*7, 4

*State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.*, 2013 U.S. Dist. LEXIS 189832 (E.D. Mich 2013)…………………………………………………..2

*United States v. Kovel*, 296 F. 2d 918 (2d Cir. 1961)………………………….6

*Waite v Davis*, 2013 U.S. Dist. LEXIS 5253 (S.D. Ohio, Jan. 14, 2013)…………*4

(* refer to Motion)

## I.    STATEMENT OF FACTS

Plaintiff State Farm Mutual Automobile Insurance Company ("Plaintiff" or "State Farm"), through its counsel, issued subpoenas dated April 23, 2018, to Bank of America and Citizens Bank demanding records from accounts allegedly belonging to Non-Parties Kenneth Jackson and K Jacks Consulting ("Jackson").[1] The requests are apparently open-ended, from January 1, 2010, onward. (Exhibit A, Subpoenas) Kenneth Jackson is a licensed private investigator and K Jacks Investigative Consulting is his LLC. (Exhibit C, Investigators License) Jackson has diverse clients with past and ongoing investigations. The privacy of former and current clients would be severely compromised by State Farm's broad document demands.

State Farm has presented no need for this information that would permit its discovery or that any such interest would outweigh the privacy interests of Jackson and his clients. This Court should follow the direction applied in the *MedCity Rehab Servs* case and reject State Farm's subpoenas as overly broad, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

_____

[1] While the subpoenaed banking entities have informed counsel for Jackson they do not have record of receipt of either subpoena, or record that documents were produced in response to the subpoenas, counsel for Plaintiff recently informed counsel for Jackson that they were in receipt of a response with records from Citizens Bank.

## II.    ANALYSIS

State Farm's Complaint, as pled, involves a discrete population of patients who allegedly treated at the named Defendant medical providers.  State Farm did not name Jackson as Defendants in this case, nor did State Farm allege that Jackson was a knowing participant in any alleged "conspiracy."  As a result, Jackson's financial information is not relevant to the treatment of the patients named in the Complaint and is not arguably even discoverable.

### A. The *MedCity Rehab* Case

This very issue was addressed by the Court in another RICO case filed by State Farm by its present counsel in *MedCity Rehab Servs., LLC v. State Farm Mut. Auto Ins. Co.*, 2013 U.S. Dist. LEXIS 64670 (E.D. Mich., May 7, 2013) (Exhibit D) In *MedCity*, State Farm subpoenaed bank records for MedCity Rehab Services, an entity, Dr. Teklehaimanot, a doctor, and Carl Collins, III, an attorney, who apparently owned MedCity Rehab.   The Court granted MedCity's motion to quash the non-party bank records sought and ruled that "to the extent the subpoenas seek financial information regarding Collins's and Dr. Teklehaimanot's personal bank accounts, such a request is overly broad. Therefore, the Court quashes this aspect of the bank subpoenas." *Id.* at *22.

State Farm's allegations in *MedCity* are nearly identical to those made in this case, namely that State Farm was fraudulently induced to pay no-fault benefits. State Farm's Complaint [Dkt. #1] does not allege any other act that would implicate Non-Parties' financial information. Accordingly, Jacksons' financial information is not relevant or discoverable pursuant to Fed. R. Civ. P. 26 and, in this case, as in *MedCity*, State Farm's subpoenas are overly broad, seek production of irrelevant materials, are not reasonably calculated to lead to the discovery of admissible evidence and should be quashed.

It is important to note that Dr. Teklehaimanot was in fact a party to that case. State Farm made specific allegations against him in its complaint, unlike Jackson, who is not even mentioned in the complaint in this case.  Even so, the court held Dr. Teklehaimanot's personal accounts to be off limits.  There can be no argument that State Farm's subpoena in this case is not overbroad.  Accordingly, it should be quashed.

### B. State Farm's Attempt to Misuse the Discovery Process to Investigate Other Possible Claims

It cannot be disputed that State Farm may not use discovery to determine whether it has a potential claim against Jackson or any other non-parties to this case.  See e.g. *Roberts v Shawnee Mission Ford,* Inc, 352 F3d 358, 361-62 (8th Cir 2003) (rejecting "investigatory/prosecutorial" basis for subpoena to nonparties and affirming quashing of subpoena as to them); *McCurdy v Wedgewood Capital Mgmt*

*Co*, 1998 US Dist LEXIS 18875 (ED PA 1998) (Exhibit E).  In *McCurdy*, the Court, in rejecting an effort to investigate a nonparty there, collected the law that prohibits such discovery:

> A complaint is not "a hunting license to discover whether, in fact, a viable claim may be alleged . . . The discovery rules are designed to support a properly pleaded cause of action and to prepare defenses to charges made - not to discover whether a claim exists." *American Communications Ass'n.  Local 10, I.B.T. v. Retirement Plan for Employees of RCA Corp. and Subsidiary Cos.,* 488 F. Supp. 479, 484 (S.D.N.Y., aff'd without opinion, 646 F.2d 559 (2d Cir.  1980); *McLaughlin v. Copeland*, 455 F. Supp. 749, 753  (D.Del. 1978), aff'd, 595 F.2d 1213 (3d Cir. 1979)(table) (… plaintiff is not entitled to discovery for the purpose of determining whether or not there may be a factual basis for a claim he has not made"); *See also Cardio-Medical Ass'n v. Crozer Chester Medical Center*, 536 F. Supp. 1065, 1071 (E.D. Pa. 1982) (citing American Communications with approval). Consequently, Plaintiff is not entitled to discovery merely to determine whether or not additional, unasserted claims might exist.

State Farm may not take discovery regarding Jackson to investigate or determine whether it has a claim against Jackson, any of his clients and/or any other individuals or entities that are not parties to this matter.

Furthermore, the revisions to Rule 26 have the effect of limiting fishing expeditions such as that being attempted by Plaintiff.  From *Scherbarth v. Woods*, 2018 WL 851344, at *7 (D. Colo. Feb13, 2018) (Exhibit F):

> Plaintiff cannot issue discovery to determine whether he could add a claim. The court can order discovery relevant to the subject matter of the case, but since the 2000 amendments of Rule 26, "

'fishing expeditions' for new claims are no longer permitted." *Energy Intelligence Grp., Inc. v. Wells Fargo Sec., LLC,* No. 11-cv-01961-REB-KMT, 2012 WL 370252, at *1 (D. Colo. Feb. 3, 2012). *See* Fed. R. Civ. P. 26, Advisory Committee Note to 2000 Amendments ("signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."). *See also XTO Energy, Inc. v. ATD, LLC,* No. Civ. 14-1021 JB/SCY, 2016 WL 1730171, at *14 (D.N.M. Apr. 1, 2016).

When he filed the *pro se* Amended Complaint, Plaintiff moved to stay *Monell* claims. Judge Lewis T. Babcock denied the motion. Doc. 20 (Order of Jan. 11, 2017) at p. 4. Judge Babcock noted "Plaintiff may request leave of court to amend his pleading at a later time if he discovers facts that will support a claim for relief based on municipal liability." *Id.* The court understands this sentence as recognizing that in the course of discovery *relevant to his claims against the individual officers* Plaintiff might find facts pertinent to whether he has a basis to bring a *Monell* claim. Judge Babcock did not thereby authorize Plaintiff to issue discovery whose sole purpose is to determine whether Plaintiff could seek to add a *Monell* claim. Plaintiff must first have a *Monell* claim before he can conduct discovery that would be relevant only to that type of claim.

The subpoenas are clearly intended not only to harass, but mainly to fish for the possibility of new claims against Jackson and other individuals or entities. Plaintiff should not be allowed to use this case to discover the possibility of other claims not yet pled, especially against persons not included in its current claims. Thus, the subpoenas should be quashed.

### C. State Farm Is Not Entitled to Documents Containing Privileged Information

### 1. To the Extent that Jackson Was Hired by or Acting under the Control of an Attorney, the Information in the Documents Is Covered by Attorney-Client Privilege

Even if this Court is not fully persuaded by Jacksons' previous arguments, any records that reflect dealings with clients in which Jackson which was hired or under the control of an attorney are protected by attorney-client privilege. *In re Grand Jury Subpoena Dated March 20, 2013*, 2014 U.S. Dist. LEXIS 91901 (S.D.N.Y 2014) (Exhibit G). This is true even where the client pays the investigator directly. *Id*.

The reason for this is that investigator is acting on behalf of or as an agent of the attorney. Indeed, certain professions may fit into this role, such as interpreters and accountants. *United States v. Kovel*, 296 F. 2d 918 (2d Cir. 1961). Private investigators also fit into these types of professions that are necessary for the attorney to do work for the client. *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D 58 at 71 (S.D.N.Y 2010).

Thus, if any documents are to be produced pursuant to the broad and untailored demands of Plaintiff's subpoenas, they must first be reviewed for attorney-client privilege beforehand. This would be an onerous task, and the Court should apply a balancing test to prevent undue burden being placed on non-party Jackson as well as the corresponding legal fees that this would entail, especially in

light of the absence of clear relevance of Jackson's banking records to Plaintiff's existing claims.

### 2. To the Extent that Plaintiff's Claims Sound in Michigan Law, Michigan's Law on Investigator-Client Privilege Should Be Enforced

At the outset, Jackson notes that there is argument that investigator-client privilege does not apply in federal law. However, this privilege should still apply under the circumstances. State Farm claims the requested information is relevant to violations of Michigan law, but simultaneously claims that Michigan privilege does not attach. State Farm does not dispute that Jackson is a licensed private investigator under Michigan law. The banking records that State Farm seeks will inevitably reflect transactions between Jackson and current and former clients. Michigan law expressly creates a privilege in that context:

> **Any communications, oral or written, furnished by a professional man or client to a licensee, or any information secured in connection with an assignment for a client, shall be deemed privileged with the same authority and dignity as are other privileged communications recognized by the courts of this state.** MCL 338.840(2) (emphasis added).

In *People of the State of Michigan v. Artis White*, 662 N.W.2d 69, 74-75 (Mich. Ct. App. 2003), the Court of Appeals reversed the trial court's decision requiring the production of documents obtained by a private investigator as part of an assignment for his client. The defendant in that case was a Michigan State

7

Police detective on trial for the murder of his wife.  Prior to the murder, the defendant hired a private investigator to investigate whether his wife was having an affair.  During discovery, the prosecutor sought information regarding the investigation, as it would likely provide valuable insight into the murder.  Despite the significant need for and value of the information combined with the severe crime, the court did not allow the investigative subpoena to issue.

After a thorough analysis of MCL 338.840, the court found that the sought-after documents were, in fact, protected by the investigator-client privilege and were not to be produced.  The court also found that the "investigator-client privilege encompasses **both the communications between the investigator and his client and any information obtained in connection with or in furtherance of the assignment by the client.**" *Id*, at 74-75 (emphasis added).  As part of the analysis, the Court of Appeals applied the principles of statutory construction and determined that MCL 338.840 was clear and unambiguous and should be enforced as written.  *Id.*, at 73.   As such, the court found the statute to apply to "any information 'acquired' by the investigator 'during his employment' regarding 'any of the work to which he shall have been assigned . . . .'" *Id.*, at 74.  Accordingly, "the investigator is **forbidden** from disclosing information to anyone but his employer, except as his employer may direct or as authorized by law." *Id.* (emphasis added).

Similarly, in *Ravary v. Reed*, 415 N.W.2d 240, 242 (Mich. Ct. App. 1987), the Court of Appeals found a private detective-client relationship to enjoy the same scope of privilege as that enjoyed by an attorney and his client.  The court opined that "[b]road protection is to be accorded the private detective-client relationship. **Any communication by a client to a licensee and any information secured in connection with an assignment for a client is privileged**." *Id*, at 242 (emphasis added).  The court concluded that, "[a]ny communications, oral or written, furnished by a professional man or client to a licensee, or any information secured in connection with an assignment for a client, shall be deemed privileged with the same authority and dignity as are other privileged communications recognized by the courts of this state." *Id*.  As such, banking records that contain not only the identities of, but also reflect the transactions involving Jackson's clients must be protected.

### D. State Farm's Subpoenas Are Designed to Harass and Embarrass Jackson and/or His Current and Former Clients and May be Detrimental to Jackson's Business

As mentioned above, Jackson is a licensed private investigator.  The privacy of his clients is paramount to his business.  Jackson has diverse clients that have nothing to do with State Farm's lawsuit.  The extreme breadth of State Farm's demands, which go well beyond records concerning the Defendants in this case, shows that State Farm's true intent is to harass and intimidate Jackson and his

clients regardless of their lack of connection to this lawsuit.  It is obvious that State Farm made no attempt to limit or narrowly tailor the requests to the banking institutions.

It goes against any logical intuition that State Farm will glean any admissible evidence from unfettered access to Jackson's banking records.  State Farm's request are so overbroad and untailored that they betray State Farm's total disregard for the relevance of the information for which State Farm is abusing the power of this Court to subpoena.  Counsel for Jackson cannot imagine a scenario where documents relating to any other non-parties or clients having nothing to do with Defendants could be relevant to State Farm's claim against Defendants.

Even if this Court sets a limit to State Farm's demands based on a relevance or privilege criteria the banking institutions may not take the time to properly apply it.  Therefore, if State Farm is granted anything remotely akin to the unfettered access to Jackson's bank records that it is demanding, those records should first go to the office of Jackson's counsel to be reviewed per a relevance and privilege criteria set forth by this Court.

### E. The Insufficient Existing Protective Order

Additionally, the current protective order is insufficient.  Under the existing protective order, State Farm may use any information that Jackson produces in response to the subpoenas in *other* cases and can share that information with *others*

(unless Non-Parties can prove the information is confidential).  (Exhibit H, pp. 6-7.)

In fact, under this insufficient protective order, State Farm may at any time declare any document not to be confidential and the onus would be on Jackson to file a motion to challenge State Farm's "declassification."    Thus, non-party Jackson would have ongoing legal expenses to monitor for State Farm's declassifications and to proceed with an appropriate motion in response each time. This does not protect Jackson (or his clients) against State Farm's improper use of documents, including documents that do not meet the threshold for confidentiality under the protective order.    To the extent Jackson or his banking entities are required to produce any documents, there should be an absolute protective order that prohibits State Farm from using any information in any other case and that prohibits State Farm from sharing any information with any other person or entity and destroy and/or return the documents at the conclusion of this case.

## III.    CONCLUSION AND REQUEST FOR RELIEF

Non-Parties hereby object to the subpoenas issued to Bank of America and Citizens Bank by State Farm, and move this Honorable Court to grant their Motion to Quash Subpoenas and/or for Protective Order, and rely upon the provisions of Fed. R. Civ. P. 26(c) and 45(a)(4), and 45(c)(3)(A), and the reasoning set forth in the Motion above.  Jackson's proposed order is attached as Exhibit B.

WHEREFORE, for all the foregoing reasons, Non-Parties Jackson, request that this Honorable Court grant this Motion and enter an Order:

a.   Quashing State Farm's subpoenas served or being served on Bank of America and Citizens Bank and destruction of any documents received by State Farm;

b.   Alternatively, if the Court believes that there may be relevant documents falling within the broad context of State Farm's Subpoenas, an Order setting forth the specific documents to be produced to State Farm and the criteria to be used for such determination of relevance;

c.   Ordering that any documents produced by Bank of America or Citizens Bank be forwarded to the office of attorney for Jackson to be reviewed per the criteria set by the Court, with relevant documents thereafter produced to Plaintiff;

d.   Including appropriate protective language for any documents produced that limits their use to this case only; and

e.   Such other and further relief as is consistent with equity and good conscience.

Respectfully submitted,

/s/JUSTIN HAAS
JUSTIN HAAS (P53153)
HAAS & GOLDSTEIN, P.C.
Attorney for Non-Party(s)
31275 Northwestern Hwy., Ste. 225
Farmington Hills, MI 48334
(248) 702-6550

Dated: June 8, 2018

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| State Farm Mutual Automobile Insurance Company, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 16-13040 Hon. Sean F. Cox |
| Elite Health Centers Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Pure Rehabilitation, Inc., Derek L Bittner D.C., P.C., Mark A. Radom, Derek Lawrence Bittner, D.C., Ryan Matthew Lukowski, D.C., Michael P. Draplin, D.C., Noel H. Upfall, D.O., Mark J. Juska, M.D., Superior Diagnostic, Inc., Chintan Desai, M.D., Michael J. Paley, M.D., Dearborn Center for Physical Therapy, LLC, Michigan Center for Physical Therapy, Inc., and Jayson Rosett, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## NOTICE OF NON-PARTY SUBPOENAS

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 45,

Plaintiff State Farm Mutual Automobile Insurance Company will issue subpoenas *duces*

*tecum*, copies of which are attached hereto, to be served on the following entities:

Bank of America, N.A.
Legal Order Processing / Christiana IV
800 Samoset Drive
Mail Code: DE5-024-02-08
Newark, Delaware 19713

Citizens Bank, N.A.
Subpoena Summons Processing
1 Citizens Drive / Mail Code ROP210
Riverside, Rhode Island 02915

130523376

Dated: April 23, 2018

By:   /s/ Justin C. From
Ross O. Silverman
Kathy P. Josephson
Matthew R. Ryan
Michael M. Rosensaft
Justin C. From
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL  60661
(312) 902-5200
ross.silverman@kattenlaw.com
kathy.josephson@kattenlaw.com
matthew.ryan@kattenlaw.com
michael.rosensaft@kattenlaw.com
justin.from@kattenlaw.com

Thomas W. Cranmer (P25252)
David D. O'Brien (P65532)
Jeffrey A. Crapko (P78487)
Miller, Canfield, Paddock and Stone, PLC
840 W. Long Lake Road, Suite 200
Troy, Michigan  48098
(248) 267-3381
cranmer@millercanfield.com

*Attorneys for Plaintiff State Farm Mutual Automobile Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2018, the foregoing was served on the following counsel via electronic mail.

Gary R. Blumberg
15011 Michigan Avenue
Dearborn, MI 48126
313-230-1121
grblumberg@gmail.com

Peter W. Joelson
Ian L. Gross
Joelson Rosenberg
30665 Northwestern Highway, Suite 200
Farmington Hills, MI 48334
248-626-9966
pjoelson@joelsonrosenberg.com

Ziyad I. Hermiz
Butzel Long
150 West Jefferson
Suite 100
Detroit, MI 48226
313-225-5315
Fax: 313-225-7080
Email: hermiz@butzel.com

Paul J. Manion
Rutledge, Manion, Rabaut, Terry & Thomas, P.C.
333 West Fort Street
Suite 1600
Detroit, MI 48226
313-965-6100
Fax: 313-965-6558
Email: csaba@rmrtt.com

Hillary M. Eagen
Rutledge, Manion, Rabaut, Terry & Thomas, P.C.
333 West Fort Street
Suite 1600
Detroit, MI 48226
313-965-6100
Fax: 313-965-6558
Email: heagen@rmrtt.com

Ben M. Gonek
Law Offices of Ben M. Gonek, PLLC
500 Griswold Street
Suite 2450
Detroit, MI 48226
313-963-3377
Fax: 313-963-9310
Email: ben@goneklaw.com

/s/ Justin C. From
Attorney for Plaintiff

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Michigan

| | | |
|---|---|---|
| State Farm Mutual Automobile Insurance Company | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  16-13040 |
| | ) | |
| Elite Health Centers Inc., et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: _____ Bank of America, N.A. _____
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Rider.

| Place: Katten Muchin Rosenman LLP / Attn:  Justin C. From 525 West Monroe Street, Chicago, IL 60661-3693 | Date and Time: Within 14 days of Service |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __April 23, 2018__

*DAVID J. WEAVER, CLERK OF COURT*

OR

_____                          _____
*Signature of Clerk or Deputy Clerk*                          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* State Farm Mutual Automobile Insurance Company _____ , who issues or requests this subpoena, are:

Justin C. From / Katten Muchin Rosenman LLP
525 West Monroe Street, Chicago, Illinois 60661-3693 / justin.from@kattenlaw.com / 312.902.5522

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  16-13040

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SUBPOENA RIDER – BANK OF AMERICA, N.A.

**I.**    **Definitions**

A.    The term "document" or "documents" has the broadest meaning possible consistent with the applicable Federal Rules of Civil Procedure and Local Rules for the Eastern District of Michigan, and it means all tangible things, including every original and every non-original, non-conforming and non-identical copies (whether by reason of subsequent modification, notations, deletions or otherwise) of every writing or recording of every kind or description, whether handwritten, typed, drawn, sketched, printed or recorded by any physical, mechanical, or electronic means.

B.    The term "related to" or "relating to" shall mean directly or indirectly relating to, mentioning or describing, pertaining to, being connected with, referring to, or reflecting upon a stated subject matter.

**II.**    **Preliminary Instructions**

A.    The documents that must be produced pursuant to this subpoena include all responsive documents prepared, sent, dated, received, used or in effect at any time during the period from January 1, 2010 to the date of service of the subpoena.

**III.**    **Document Requests**

1.    Any and all documents or records, in either paper or electronic form, including but not limited to:

- account statements;
- cancelled checks;
- deposit slips;
- withdrawal slips;
- offsets;
- records of wire transfers;
- signature cards;

1

- loans and/or loan applications;
- documents related to the opening and/or closing of any account;
- correspondence;
- signature cards;
- corporate resolutions;
- documents related to any lockboxes and/or lockbox services (including documents relating to the opening and/or closing of any lockbox); and/or
- documents related to any reporting or filing with any governmental agency, including any CTRs and any Form 1099s, but excluding any SARs;

relating to the following individuals/entities and/or account numbers:

| Account Numbers | Names |
|---|---|
| 375007500733 | Horizon Imaging, LLC |
| 4516666935 or 4576666935 | Kenneth Jackson or K Jacks Investigative Consulting, LLC |

2

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company | ) |
| *Plaintiff* | ) |
| v. | ) |
| | ) |
| Elite Health Centers Inc., et al. | ) |
| *Defendant* | ) |

Civil Action No.   16-13040

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  _____
Citizens Bank, N.A.
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

See attached Rider

| Place:  Katten Muchin Rosenman LLP / Attn:  Justin C. From 525 West Monroe Street, Chicago, Illinois 60661-3693 | Date and Time: Within 14 days of Service |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  April 23, 2018

DAVID J. WEAVER, CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*
State Farm Mutual Automobile Insurance Company _____ , who issues or requests this subpoena, are:

Justin C. From / Katten Muchin Rosenman LLP
525 West Monroe Street, Chicago, Illinois 60661-3693 / justin.from@kattenlaw.com / 312-902-5522

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  16-13040

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# SUBPOENA RIDER – CITIZENS BANK, N.A.

**I.**     <u>**Definitions**</u>

    A.     The term "document" or "documents" has the broadest meaning possible consistent with the applicable Federal Rules of Civil Procedure and Local Rules for the Eastern District of Michigan, and it means all tangible things, including every original and every non-original, non-conforming and non-identical copies (whether by reason of subsequent modification, notations, deletions or otherwise) of every writing or recording of every kind or description, whether handwritten, typed, drawn, sketched, printed or recorded by any physical, mechanical, or electronic means.

    B.     The term "related to" or "relating to" shall mean directly or indirectly relating to, mentioning or describing, pertaining to, being connected with, referring to, or reflecting upon a stated subject matter.

**II.**     <u>**Preliminary Instructions**</u>

    A.     The documents that must be produced pursuant to this subpoena include all responsive documents prepared, sent, dated, received, used or in effect at any time during the period from January 1, 2010 to the date of service of the subpoena.

**III.**     <u>**Document Requests**</u>

    1.     Any and all documents or records, in either paper or electronic form, including but not limited to:

- account statements;
- cancelled checks;
- deposit slips;
- withdrawal slips;
- offsets;
- records of wire transfers;
- signature cards;

- loans and/or loan applications;
- documents related to the opening and/or closing of any account;
- correspondence;
- signature cards;
- corporate resolutions;
- documents related to any lockboxes and/or lockbox services (including documents relating to the opening and/or closing of any lockbox); and/or
- documents related to any reporting or filing with any governmental agency, including any CTRs and any Form 1099s, but excluding any SARs;

relating to the following individuals/entities and/or account numbers for accounts at Citizens Bank and/or Charter One Bank:

| Account Numbers | Names |
|---|---|
| 4519287373 or 4549966182 | Michael J. Paley or Dr. Paley Inc. |
| 4516666935 or 4576666935 | Kenneth Jackson or K Jacks Investigative Consulting, LLC |

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

State Farm Mutual Automobile Insurance
Company,

       Plaintiff,

    v.

Elite Health Centers Inc.,
Elite Chiropractic, P.C.,
Elite Rehabilitation, Inc.,
Midwest Medical Associates, Inc.,
Pure Rehabilitation, Inc.,
Derek L Bittner D.C., P.C.,
Mark A. Radom,
Derek Lawrence Bittner, D.C.,
Ryan Matthew Lukowski, D.C.,
Michael P. Draplin, D.C.,
Noel H. Upfall, D.O.,
Mark J. Juska, M.D.,
Superior Diagnostic, Inc.,
Chintan Desai, M.D.,
Michael J. Paley, M.D.,
Dearborn Center for Physical Therapy, LLC,
Michigan Center for Physical Therapy, Inc., and
Jayson Rosett,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 16-13040
Hon. Sean F. Cox

## ORDER GRANTING NON-PARTIES KENNETH JACKSON AND K JACKS INVESTIGATIVE CONSULTING'S MOTION TO QUASH STATE FARM'S SUBPOENAS TO BANK OF AMERICA AND CITIZENS BANK

This matter having come before the Court upon Non-Parties Kenneth

Jackson and K Jacks Investigative Consulting's ("Jackson") Motion to Quash State

Farm's Subpoenas to Bank of America and Citizens Bank, and the Court being duly advised in the premises, it is hereby:

**ORDERED** that Jackson's Motion is **GRANTED**; it is further

**ORDERED** that the subject subpoenas be quashed and State Farm and/or its counsel shall immediately destroy any documents, and any physical or electronic copies thereof, received pursuant to the subpoenas; it is further

**ORDERED** that State Farm shall file certification with this Court within 7 days that all documents received pursuant to the subpoenas, including all physical and electronic copies, have been destroyed.

Date: _____ __, 2018        _____

                                                Sean F. Cox
                                                United States District Judge

# EXHIBIT C

RICK SNYDER
GOVERNOR

STATE OF MICHIGAN                          M961131
DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
CORPORATIONS, SECURITIES & COMMERCIAL LICENSING BUREAU

PROFESSIONAL INVESTIGATOR AGENCY LICENSE

JACKSON, KENNETH EARL
K JACKS INVESTIGATIVE CONSULTING LLC
1291 W STATE FAIR APT 102
HIGHLAND PARK   MI   48203

LICENSE NO.              EXPIRATION DATE        AUDIT NO           THIS DOCUMENT IS DULY ISSUED
3701205985               10/31/2019             3240606            UNDER THE LAWS OF THE STATE
                                                                   OF MICHIGAN

# EXHIBIT D

⚠ Caution
As of: June 7, 2018 5:46 PM Z

# *MedCity Rehab. Servs., LLC v. State Farm Mut. Auto. Ins. Co.*

United States District Court for the Eastern District of Michigan, Southern Division

May 7, 2013, Decided; May 7, 2013, Filed

Case No. 11-cv-14777

**Reporter**
2013 U.S. Dist. LEXIS 64670 *; 2013 WL 1898374

*MEDCITY* REHABILITATION SERVICES, LLC, Plaintiff, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Counter-Defendant v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Counter-Plaintiff, v. *MEDCITY* REHABILITATION SERVICES, LLC DAWIT TEKLEHAIMANOT, D.O., Counter-Counter Defendants.

**Subsequent History:** Reconsideration granted by, in part, Reconsideration denied by, in part, Motion granted by, Request denied by, Without prejudice *MedCity Rehab. Servs., LLC v. State Farm Mut. Auto. Ins. Co., 2013 U.S. Dist. LEXIS 110838 ( E.D. Mich., Aug. 7, 2013)*

**Prior History:** *MedCity Rehab. Servs., LLC v. State Farm Mut. Auto. Ins. Co., 2013 U.S. Dist. LEXIS 45142 ( E.D. Mich., Mar. 29, 2013)*

## Core Terms

documents, subpoena, discovery, Counterclaims, responsive, services, days, interrogatories, allegations, numbers, Transportation, patients, requests, Default, records, motion to compel, bank records, bank account, bills, show cause, participants, lawfully, damages, fraudulent, twenty-one, protocol, motive

## Case Summary

**Overview**
The insurance company alleged that the rehabilitation company and a doctor, acting in concert with an attorney, knowingly submitted hundreds of fraudulent bills and related documentation to the insurance company. The doctor's professional corporation's financial records were relevant to establishing the financial relationships among himself, the rehabilitation

company and the other purported participants in the scheme and were discoverable. However, the insurance company's request for financial documents from the doctor's personal bank accounts was overly broad.

**Outcome**
Motions granted in part and denied in part.

## LexisNexis® Headnotes

Civil Procedure > Discovery & Disclosure > General Overview

*HN1*[🔍] **Civil Procedure, Discovery & Disclosure**

Courts have commonly extended the scope of discovery to a reasonable number of years prior to a defendant's alleged illegal action.

Civil Procedure > Discovery & Disclosure > General Overview

*HN2*[🔍] **Civil Procedure, Discovery & Disclosure**

The Federal Rules of Civil Procedure authorize extremely broad discovery.

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

*HN3*[🔍] **Discovery, Relevance of Discoverable Information**

Discoverable information includes evidence relevant to

the credibility of a party or a key witness. Credibility is an issue and discovery concerning that is relevant.

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Subpoenas

### HN4[⬇] Civil Procedure, Discovery & Disclosure

*Fed. R. Civ. P. 45* governs third-party discovery and permits a party to a federal lawsuit to issue a subpoena compelling the production of documents. *Fed. R. Civ. P. 45(c)(2)(B)(I)*.

Civil Procedure > ... > Discovery > Misconduct During Discovery > Motions to Compel

Civil Procedure > Discovery & Disclosure > Disclosure > Motions to Compel

Civil Procedure > Discovery & Disclosure > Discovery > Subpoenas

### HN5[⬇] Misconduct During Discovery, Motions to Compel

A subpoenaed party must engage in sufficient investigation to uncover as much information as possible, and to produce all responsive documents in their control, not only what is in their possession. If a subpoenaed party fails to sufficiently investigate, the court can compel a complete and proper response.

Civil Procedure > Discovery & Disclosure > Discovery > Subpoenas

### HN6[⬇] Discovery, Subpoenas

Generally, failure to object to a lawfully issued subpoena constitutes waiver of untimely objections.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Undue Burdens in

Discovery

Civil Procedure > Discovery & Disclosure > Discovery > Subpoenas

### HN7[⬇] Discovery, Privileged Communications

See *Fed. R. Civ. P. 45(c)(3)(A)(iii)-(iv)*.

Civil Procedure > Discovery & Disclosure > General Overview

### HN8[⬇] Civil Procedure, Discovery & Disclosure

For purposes of discovery, there is no privacy interest in the financial affairs of an individual.

Civil Procedure > Pleading & Practice > Pleadings > Answers

### HN9[⬇] Pleadings, Answers

See *Fed. R. Civ. P. 12(a)(4)(A)*.

**Counsel:** [*1] For *MedCity* Rehabilitation Services, *MedCity* Rehabilitation Services, consolidated from 11-15054, Plaintiffs: Craig S. Romanzi, Craig S. Romanzi Assoc., Waterford, MI.

For *Medcity* Rehabilitation Services, LLC, consolidated from 12-13945, *MedCity* Rehabilitation Services, consolidated from 12-14363, Plaintiffs: Stephen J. Trahey, LEAD ATTORNEY, TRAHEY LAW OFFICES, Woodhaven, MI; Craig S. Romanzi, Craig S. Romanzi Assoc., Waterford, MI.

For *Medcity* Rehabilitation Services, LLC, consolidated from 12-14499, Plaintiff, Counter Defendant: Joseph R. Lobb, LEAD ATTORNEY, Joseph R. Lobb Assoc., Southfield, MI; Craig S. Romanzi, Craig S. Romanzi Assoc., Waterford, MI.

For State Farm Mutual Automobile Insurance Company, State Farm Mutual Aurtomobile Insurance Company, consolidated from 12-13945, State Farm Mutual Aurtomobile Insurance Company, consolidated from 12-14363, State Farm Mutual Aurtomobile Insurance Company, consolidated from 12-14499, Defendants: Kathy P. Josephson, Kathy L. Kottos, Ross O. Silverman, Katten Muchin Rosenman LLP, Chicago, IL; Michael J. Jolet, Law Offices of Hewson & Van Hellemont, P.C., Oak Park, MI.

For State Farm Mutual Automobile Insurance Company, consolidated from [*2] 11-15054, Defendant, Counter Claimant: Kathy P. Josephson, Ross O. Silverman, Katten Muchin Rosenman LLP, Chicago, IL; Michael J. Jolet, Law Offices of Hewson & Van Hellemont, P.C., Oak Park, MI.

For State Farm Mutual Aurtomobile Insurance Company, consolidated from 12-14363, State Farm Mutual Aurtomobile Insurance Company, consolidated from 12-14499, State Farm Mutual Automobile Insurance Company, Counter Claimants: Kathy P. Josephson, Kathy L. Kottos, Ross O. Silverman, Katten Muchin Rosenman LLP, Chicago, IL; Michael J. Jolet, Law Offices of Hewson & Van Hellemont, P.C., Oak Park, MI.

For Dawit Teklehaimanot, D.O., Counter Defendant, Counter Claimant: Brian Witus, Jaffe, Raitt, Heuer & Weiss, Southfield, MI; Christopher J. Laney, Wachler & Associates, P.C., Royal Oak, MI; Peter M. Alter, Jaffe, Raitt, Heuer & Weiss PC, Southfield, MI.

For Dawit Teklehaimanot, consolidated from 11-15054, Counter Defendant: Brian Witus, Jaffe, Raitt, Heuer & Weiss, Southfield, MI.

For *MedCity* Rehabilitation Services, consolidated from 11-15054, Counter Defendant: Craig S. Romanzi, Craig S. Romanzi Assoc., Waterford, MI.

For D. O. Dawit Teklehaimanot, consolidated from 12-14363, Counter Defendant: Brian [*3] Witus, Jaffe, Raitt, Heuer & Weiss, Southfield, MI; David Z. Adler, Jaffe, Raitt, Southfield, MI.

For *MedCity* Rehabilitation Services, consolidated from 12-14363, Counter Defendant: Stephen J. Trahey, LEAD ATTORNEY, TRAHEY LAW OFFICES, Woodhaven, MI; Craig S. Romanzi, Craig S. Romanzi Assoc., Waterford, MI.

For D. O. Dawit Teklehaimanot, consolidated from 12-14499, Counter Defendant: Craig S. Romanzi Assoc., Waterford, MI.

For Law Offices of Carl Collins, AlphaLiving, LLC, Carl L Collins, III, Objectors: Craig S. Romanzi, Craig S. Romanzi Assoc., Waterford, MI.

For State Farm Mutual Automobile Insurance Company, Counter Claimant, Counter Defendant: Kathy P. Josephson, Ross O. Silverman, Katten Muchin Rosenman LLP, Chicago, IL; Michael J. Jolet, Law Offices of Hewson & Van Hellemont, P.C., Oak Park, MI.

For State Farm Mutual Automobile Insurance Company,

Counter Defendant: Kathy P. Josephson, Kathy L. Kottos, Ross O. Silverman, Katten Muchin Rosenman LLP, Chicago, IL; Michael J. Jolet, Law Offices of Hewson & Van Hellemont, P.C., Oak Park, MI.

For *MedCity* Rehabilitation Services, Counter Defendant: Craig S. Romanzi, Craig S. Romanzi Assoc., Waterford, MI.

For Dawit Teklehaimanot, [*4] D.O., Counter Defendant: Brian Witus, Jaffe, Raitt, Heuer & Weiss, P.C., Southfield, MI; Christopher J. Laney, Wachler & Associates, P.C., Royal Oak, MI; Peter M. Alter, Jaffe, Raitt, Heuer & Weiss PC, Southfield, MI.

**Judges:** Hon. GERSHWIN A DRAIN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GERSHWIN A DRAIN

# Opinion

**ORDER DENYING DR. TEKLEHAIMANOT'S MOTION TO COMPEL [#120], GRANTING IN PART AND DENYING IN PART STATE FARM'S AMENDED MOTION TO COMPEL[#123], GRANTING STATE FARM'S MOTION FOR ORDER TO SHOW CAUSE [#149], GRANTING IN PART AND DENYING IN PART *MEDCITY*'S MOTION TO QUASH SUBPOENAS [#150], GRANTING STATE FARM'S EMERGENCY MOTION [#172] AND REQUIRING THE CLERK OF THE COURT TO STRIKE DR. TEKLEHAIMANOT'S REQUEST FOR CLERK'S ENTRY OF DEFAULT [#171]**

## I. INTRODUCTION

Presently before the Court are various pretrial motions. A hearing was held on May 6, 2013. The Court notes at the outset that many, if not most, of the issues raised herein should have been resolved with an "adult conversation among counsel without the need for the Court's intervention." *See* Dkt. No. 177. While this statement is taken from one of the numerous briefs submitted by State Farm, the Court in no way seeks to imply that all of the parties herein [*5] are not equally culpable, because all are, by their failure to abide by the letter and sprit of the Federal Rules of Civil Procedure and the local rules of this Court. Going forward, the Court hereby prohibits the parties from filing any motion without complying with *Local Rule 7.1(a)*. Any motion

filed without certifying such compliance will be automatically stricken. Furthermore, any future briefing filed in support of a pretrial motion, except for a dispositive motion, shall not be filed in excess of seven (7) pages. Any briefs supporting a pretrial motion that do not meet this page limitation shall likewise be automatically stricken.

## II. FACTUAL BACKGROUND

This matter arises out of a dispute between State Farm Mutual Automobile Insurance Company ("State Farm"), Dawit Teklehaimanot, D.O. and *MedCity* Rehabilitation Services, LLC ("*MedCity*") concerning payment for No Fault benefits. *MedCity* initiated the lawsuit seeking to recover its claims for No-Fault benefits improperly denied by State Farm. State Farm filed counterclaims against *MedCity* and Dr. Teklehaimanot, the treating physician at *MedCity*, for common law fraud, racketeering activity, racketeering conspiracy and unjust enrichment. [*6] [1]

State Farm alleges that from approximately April of 2010 through the present, *MedCity* and Dr. Teklehaimanot, acting in concert with attorney Carl Collins, III, knowingly submitted hundreds of fraudulent bills and related documentation to State Farm. State Farm asserts that Dr. Teklehaimanot, pursuant to what State Farm refers to as a "predetermined protocol," examines patients at *MedCity* and virtually always: (a) diagnoses patients with sprains or strains of the neck and back and other conditions; and (b) prescribes physical therapy at *MedCity* for as long as possible, whether the patient needs it or not. State Farm maintains that each bill submitted was fraudulent because the services were either not performed or were performed pursuant to a predetermined protocol, resulting in services that were medically unnecessary.

Dr. Teklehaimanot has also filed counterclaims against State Farm seeking reimbursement for unpaid bills he submitted to State Farm for 190 different patients. Dr. Teklehaimanot also alleges State Farm engaged in a fraudulent scheme to "delay, [*7] defend, deny" otherwise valid No-Fault benefit claims. Dr. Teklehaimanot asserts that State Farm operates its scheme through its claims handling practices, where State Farm: (1) deliberately misrepresents the status of claims and corresponding legal requirements, standards and limitations; (2) delays the processing and adjustment and payment of claims; and (3) improperly manipulates the litigation process and uses its virtually unlimited financial resources to intimidate and destroy legitimate medical service providers.

The Court entered a Scheduling Order in this matter on December 19, 2012. The Court's Scheduling Order sets a discovery cutoff of August 29, 2013, a dispositive motion cutoff of September 30, 2013 and a trial date of February 14, 2014.

## III. LAW & ANALYSIS

### A. Dr. Teklehaimanot's Motion to Compel Discovery from State Farm and for Sanctions

This is Dr. Teklehaimanot's second Motion to Compel Discovery. Dr. Teklehaimanot asserts that State Farm has failed to produce virtually any substantive information regarding its internal claims handling definitions, codes, policies, guidelines, training and educational materials, organization and practices. Dr. Teklehaimanot argues that [*8] he cannot meaningfully prepare his case without access to State Farm's claims handling documents. He claims that "[c]onsistent with its well-documented integrated business and litigation scheme to 'delay, deny, and defend' otherwise valid [No Fault] benefit claims, State Farm has embarked upon its standard practice playing games with the discovery process." Mot. at 8.

In response, State Farm maintains that it has produced all of the responsive claims handling documents and production is complete with regard to Dr. Teklehaimanot's request. Specifically, State Farm has produced more than 300,000 pages of documents, including documents responsive to Dr. Teklehaimanot's request numbers 38-39, 42, 49, 52, 69-71, 73-76, 88, 90, 93. Further, State Farm has produced four privilege logs corresponding to the documents produced.

Based on State Farm's Response and Dr. Teklehaimanot's failure to file a reply brief supporting his position, the Court will deny his present Motion to Compel.

### B. State Farm's Amended Motion to Compel Interrogatory Responses and Document Production from Dr. Teklehaimanot

---

[1] This Court granted State Farm's Motion for Leave to File Second Amended Counterclaims on December 19, 2012. *See* Dkt. Nos. 111, 114.

State Farm moves the Court to compel Dr. Teklehaimanot to produce: (1) information and documents from **[*9]** 2008 to the present, (2) answers to interrogatory numbers 7,10-13 of State Farm's First Set of Interrogatories, (3) produce all responsive documents in his possession, custody, or control that are responsive to document requests numbers 3-4, 7-8, 10, 13-14, 16, 19 and 21 of State Farm's First Set of Document Requests, (4) submit a declaration certifying that all responsive documents have been produced and setting forth his efforts to produce the responsive documents and (5) produce a privilege log detailing all documents withheld from production in response to any request based upon the attorney-client privilege, work-product doctrine, or any other applicable privilege.

As an initial matter, State Farm's request for documents from 2008 through the present is reasonable. Dr. Teklehaimanot has objected to State Farm's request for documents from 2008 as "overly broad, unduly burdensome, and seeking information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." *See* Mot., Ex. 3.The relevant time period, from 2008 to present, is reasonable here. State Farm is entitled to the information regarding the formation of ***MedCity*** and the participants' **[*10]** planning of and participation in the alleged fraud scheme. *HN1*[⬆] "Courts have commonly extended the scope of discovery to a reasonable number of years prior to the defendant's alleged illegal action." *Robbins v. Camden City Bd. of Educ., 105 F.R.D. 49, 63 (D.N.J. 1985)*; *Dahl v. Wells Fargo Advisors, LLC, No. 10-4696, 2012 U.S. Dist. LEXIS 4827, 2012 WL 124986, *3 (D. Minn. Jan. 17, 2012)* ("information regarding employment decisions before, during, and after" relationship at issue "is relevant, likely to lead to admissible evidence, and encompasses a reasonable time period.").

The Court rejects Dr. Teklehaimanot's position that discovery should be limited only to the damages period. *HN2*[⬆] "The Federal Rules of Civil Procedure authorize extremely broad discovery." *Guinn v. Mount Carmel Health Systems, 2010 U.S. Dist. LEXIS 85152, 2010 WL 2927254, *3 (S.D. Ohio July 23, 2010)* (citing *United States v. Leggett & Platt, Inc., 542 F.2d 655 (6th Cir. 1976)*. Additionally, the case relied on by Dr. Teklehaimanot, *JAT, Inc. v. Nat'l City Bank of Midwest, No. 06-11937, 2007 U.S. Dist. LEXIS 47235, 2007 WL 1880389, *2 (E.D. Mich. June 29, 2007)* also rejects such a limited view of the relevant time period for discovery purposes. *See JAT, Inc., 2007 U.S. Dist. LEXIS 47235, 2007 WL 1880389, at *2* ("The Court

agrees that Plaintiffs **[*11]** are entitled to discovery of data for some period of time pre-dating their allegations . . . ."). State Farm's allegations assert that Dr. Teklehaimanot's fraud scheme began as far back as 2003. Moreover, State Farm started receiving bills in April of 2010, however those bills relate to services performed as early as January of 2009.

As to State Farm's interrogatories 10 and 11, the Court finds that State Farm is entitled to identification of the specific bills upon which Dr. Teklehaimanot is suing and the amount of damages he seeks from State Farm. Dr. Teklehaimanot filed counterclaims against State Farm "for delays, withholdings and/or denials of payments . . . ." Dr. Teklehaimanot is obligated to identify the particular bills upon which he is suing and the damages he seeks to recover. Dr. Teklehaimanot shall respond to State Farm's interrogatories 10 and 11 within twenty one (21) days from the date of this Order.

As to State Farm's request number 3, which seeks documents relating to claims Dr. Teklehaimanot made to other insurers for services provided at ***MedCity***, the Court finds that Dr. Teklehaimanot's objection to this request is warranted and denies this portion of State Farm's **[*12]** motion. Dr. Teklehaimanot's medical records and financial documents related to his patients insured by another insurance company have no bearing on the claims at issue herein. Such a request is unduly burdensome and is not reasonably calculated to lead to the discovery of admissible evidence. The purported scheme between ***MedCity*** and Teklehaimanot is circumscribed by their relationship and the lease arrangement between Dr. Teklehaimanot and ***MedCity***. The case relied on by State Farm, *United States v. Gross, 84 Fed. Appx. 531, 2003 WL 22976583 (6th Cir. 2003)* is inapposite and inapplicable to the circumstances herein. Therefore, the Court will sustain Dr. Teklehaimanot's objection to State Farm's Document Request No. 3.

As to State Farm's interrogatory number 12 and requests to produce numbers 13-14, 16 and 19, the Court will overrule Dr. Teklehaimanot's objections to these discovery requests in part. Contrary to Dr. Teklehaimanot's arguments, his professional corporation's financial records are relevant to establishing the financial relationships among himself, ***MedCity*** and the other purported participants in the scheme. Further, the financial records will demonstrate how these participants **[*13]** divvied up the proceeds of their fraud, who they employed in furtherance of their scheme, and how the relationship was structured to

further and conceal the fraud. *See State Farm Mut. Ins. Co. v. Policheria, No. 08-13939, 2009 U.S. Dist. LEXIS 62135, 2009 WL 2170183, *2 (E.D. Mich. July 20, 2009)* (granting discovery of financial information to assess the financial relationship among the defendants, the structure of the enterprise, measure the scope and extent of defendants' fraud, prove motive, identify other witnesses who may have participated in the scheme and to prove damages); *see also State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., 375 F.Supp. 2d 141, 156 (E.D.N.Y. 2005)* (ordering production of doctor's tax returns, general ledgers and bank records in RICO action as relevant to the issue of profits and motive where State Farm had alleged medical services were not performed pursuant to medical necessity, but for the defendants' financial gain). Further, Dr. Teklehaimanot's objection that these documents are confidential lacks merit because the parties entered a stipulated protective order on July 23, 2012 which provides for confidential treatment of "personal financial documents" including "tax returns **[*14]** and financial/accounting books and records."

However, the Court finds that as to document request number 14, Dr. Teklehaimanot should not be compelled to produce all of his documents relating to his personal financial accounts, rather the Court finds that State Farm is entitled to any financial documents concerning his professional corporation bank accounts, but State Farm's request for financial documents from his personal bank accounts is overly broad. Thus, as to State Farm's request to produce number 14, Dr. Teklehaimanot shall be required to respond to this request with any financial documentation associated with his professional corporation bank accounts only.

Therefore, the Court orders Dr. Teklehaimanot to produce responses to State Farm's interrogatory number 12, and requests to produce numbers 13-14, 16 and 19, consistent with this Order, within twenty-one (21) days from the date of this Order.

As to State Farm's interrogatories numbers 7 and 13, and document request number 21, the Court finds that State Farm is entitled to the information sought by these discovery requests. **HN3** [🔒] "[D]iscoverable **[*15]** information includes evidence relevant to the credibility of a party or a key witness." *Thong v. Andre Chreky Salon, 247 F.R.D. 193, 196 (D.D.C. 2008)*; *see also Lubber, Inc. v. Optari LLC*, No. 11-0042, 2012 WL 899631, *4 (M.D. Tenn. Mar. 15, 2012)*("Credibility is an issue . . . and discovery concerning that is relevant."). Here, State Farm has alleged that Dr. Teklehaimanot

committed fraud, engaged in racketeering activity and provided services to patients that were not medically necessary for his financial gain. Thus, State Farm is entitled to documents and information relevant to Dr. Teklehaimanot's credibility as a witness, including training and education for the EDX Tests, criminal, disciplinary or civil investigations or proceedings against him. Dr. Teklehaimanot shall respond to State Farm's interrogatories numbers 7 and 13, and document request number 21 within twenty-one (21) days from the date of this Order.

Additionally, the Court concludes that State Farm is entitled to the information sought by document requests numbers 4, 7, 8, and 10 which seek information related to, or outlining protocols or procedures that Dr. Teklehaimanot followed in providing medical services to **[*16]** his patients, information regarding the corporate formalities of Dr. Teklehaimanot's corporation, Physical Medicine & Rehabilitation Consultant & Pain Management, P.C. , and all documents reflecting communications between Dr. Teklehaimanot and the other participants in the alleged scheme, including but not limited to, the Law Offices of Carl Collins, III, Alpha Living LLC, and In & Out Transportation Services, LLC. This information is likely to lead to the discovery of admissible evidence related to State Farm's allegations that Dr. Teklehaimanot provided medical treatment pursuant to a predetermined protocol. Thus, Dr. Teklehaimanot shall respond to State Farm's document requests numbers 4, 7, 8, and 10 within twenty-one (21) days from the date of this Order.

For the foregoing reasons, State Farm's Amended Motion to Compel is granted in part and denied in part.

### C. State Farm's Motion for Order to Show Cause, or Alternatively, Motion to Compel In & Out Transportation Services, LLC to Comply with Lawfully Issued Subpoena

State Farm moves the Court for an Order requiring In & Out Transportation LLC ("In & Out"), an entity State Farm suggests was created as part of *MedCity* and Dr.Teklehaimanot's **[*17]** fraudulent scheme, to show cause why it should not be held in contempt for its refusal to comply with a lawfully issued subpoena, served on January 21, 2013. In & Out is a transportation company that transports patients to and from *MedCity*. State Farm argues that at least 80% of the transportation payments made on behalf of insureds treating at *MedCity* were made to In & Out, furthermore all of these insureds are patients of Dr. Teklehaimanot.

Justin Haas

_HN4_[⬆] _Rule 45_ governs third-party discovery and permits a party to a federal lawsuit to issue a subpoena compelling the production of documents. _See Fed. R. Civ. P. 45(c)(2)(B)(I)._ _HN5_[⬆] A subpoenaed party must engage in sufficient investigation to uncover as much information as possible, and to produce all responsive documents in their "control," not only what is in their "possession." _See Searock v. Stripling, 736 F.2d 650, 653 (11th Cir. 1984)._ If a subpoenaed party fails to sufficiently investigate, the court can compel a complete and proper response. _See Joyner v. Rex Corp., 2007 U.S. Dist. LEXIS 26364, 2007 WL 10999106, at *5-6 (M.D. Fla. April 10, 2007)._

In & Out has failed to respond to the subpoena. _HN6_[⬆] Generally, failure to object to a lawfully issued subpoena constitutes waiver **[*18]** of untimely objections. _See Olivia Marie, Inc. v. Travelers Cas. Ins. Co. of Am., 2011 U.S. Dist. LEXIS 147061, 2011 WL 6739400, at *2 (E.D. Mich. Dec. 22, 2011)._ Moreover, the subpoena appears to be narrowly tailored to seek information related to State Farm's Second Amended Counterclaims, thus it is not overbroad on its face nor does it exceed the bounds of discovery under the Federal Rules. Thus, In & Out is hereby ordered to show cause in writing, no later than May 21, 2013, why it should not be held in contempt for failure to abide by a lawfully issued subpoena. In & Out is also ordered to appear for a hearing on this matter on May 28, 2013 at 2:30 p.m.

## D. _MedCity_'s Motion to Quash Subpoenas Served Upon Non-Party Banking Institutions

On January 18, 2013, State Farm served subpoenas _duces tecum_ on Comerica Bank, First Place Bank and RBS Citizens, N.A. The bank subpoenas sought the following documents:

> All documents and/or records, in either paper or electronic form, including but not limited to account statements, signature cards, canceled checks, deposit slips, withdrawal slips, records of wire transfers, documents relating to the opening and/or closing of any account, and documents relating to any lockboxes **[*19]** and/or lockbox services . . . relating to:
>
> > • Bank accounts in the name of _**MedCity**_, Collins, and/or Dr. Teklehaimanot
> >
> > • Bank accounts with specifically enumerated account numbers believed to be associated with _**MedCity**_, Collins, and Dr. Teklehaimanot

> > • Bank accounts with addresses associated with _**MedCity**_, Collins, and/or Dr. Teklehaimanot.

On February 7, 2013, _**MedCity**_ filed a Motion to Quash Subpoenas for Banking Records Pursuant to _Fed. R. Civ. P. 45(c)(3)_. _**MedCity**_ argues that the subpoenas served on the banking institutions seek proprietary, private and irrelevant information regarding accounts of In & Out, _**MedCity**_, _**MedCity Rehab**_ Physical Therapy Clinic and Carl L. Collins, III.

_HN7_[⬆] _Federal Rules of Civil Procedure 45(c)(3)_ states in relevant part:

> **(3) Quashing or Modifying a Subpoena.**
>
> (A) _When Required._ On timely motion, the issuing court must quash or modify a subpoena that:
> * * *
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
> (iv) subjects a person to undue burden.

_Fed. R. Civ. P. 45(c)(3)(A)(iii)-(iv)._ The gist of _**MedCity**_'s argument is that an individual has a privacy right in his or her bank and employment records, and this right is sufficient **[*20]** to confer standing to move to quash a subpoena seeking such information. _See Crispin v. Christian Audigier, Inc., 717 F. Supp. 2d 965 (C.D. Cal. 2010)._ _**MedCity**_ maintains that there is simply no reason that State Farm should be permitted to obtain proprietary and private banking records for In & Out, _**MedCity**_, _**MedCity Rehab**_ Physical Therapy Clinic and Carl L. Collins, III.

The case law relied on by _**MedCity**_ is not controlling on this Court, nor does it represent the law of this circuit. _See Crispin v. Christian Audigier, Inc., 717 F. Supp. 2d 965 (C.D. Cal. 2010)._ The United States Court of Appeals for the Sixth Circuit has consistently held that _HN8_[⬆] "there is no privacy interest in the financial affairs of an individual." _See State Farm Mut. Ins. Co. v. Policheria, No. 08-13939, 2009 U.S. Dist. LEXIS 62135, 2009 WL 2170183, *3 (E.D. Mich. July 20, 2009)._ _**MedCity**_ thus has no privacy interest in the subpoenaed bank records.

Further, contrary to _**MedCity**_'s argument, the bank records sought by the subpoenas are relevant to State Farm's Second Amended Counterclaims. State Farm's Second Amended Counterclaims include allegations

that *MedCity* and Dr. Teklehaimanot —acting in concert with attorney Carl Collins, III—submitted fraudulent [*21] bills and documentation to State Farm for physical therapy services that either were not performed at all, or were performed pursuant to a predetermined protocol that was designed to enrich *MedCity*, Dr. Teklehaimanot and Collins. In *Policherla*, the court granted State Farm's motion to compel under factually indistinguishable circumstances, finding that the bank records were relevant to: (1) assess the financial relationship among the defendants, (2) the structure of the enterprise, (3) measure the scope and extent of the defendant's fraud, (4) prove motive, (5) identify other witnesses who may have participated in, or have knowledge concerning the purported scheme and to (6) prove damages. *Policherla, 2009 U.S. Dist. LEXIS 62135, 2009 WL 2170183, at *2* (compelling physician to produce bank records, tax returns, and general ledgers for his business); *see also State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., 375 F.Supp. 2d 141, 156 (E.D.N.Y. 2005)* (ordering production of doctor's tax returns, general ledgers and bank records in RICO action as relevant to the issue of profits and motive where State Farm alleged medical services were not performed pursuant to medical necessity, but for the defendants' financial [*22] gain).

Similar to *Policherla*, the bank records of *MedCity* and Dr. Teklehaimanot's and Collins's professional corporations are relevant to establishing the financial relationships among Dr. Teklehaimanot, *MedCity*, Collins, and In & Out, among others. The bank records will also show the parties' financial motive in perpetuating the fraud scheme, as well as will assist State Farm in calculating its total damages. However, to the extent the subpoenas seek financial information regarding Collins's and Dr. Teklehaimanot's personal bank accounts, such a request is overly broad. Therefore, the Court quashes this aspect of the bank subpoenas. Therefore, the Court grants in part and denies in part *MedCity*'s Motion to Quash the subpoenas served on Comerica Bank, First Place Bank and RBS Citizens, N.A.

## E. State Farm's Emergency Motion to Strike Request for Clerk's Entry of Default

State Farm moves the Court to strike Dr. Teklehaimanot's Request for Clerk's Entry of Default and order Dr. Teklehaimanot to amend his First Amended Counterclaims within twenty-one (21) days or dismiss his claims for want of prosecution. Alternatively,

to the extent the Court disagrees with State Farm's position, State [*23] Farm requests it be granted five (5) business days to file an Answer to Dr. Tek's First Amended Counterclaims.

On April 23, 2013, Dr. Teklehaimanot filed a Request for Clerk's Entry of Default based on State Farm's failure to respond to his First Amended Counterclaims. On March 29, 2013, this Court granted in part and denied in part State Farm's Motion to Dismiss Dr. Teklehaimanot's First Amended Counterclaims. Therefore, Dr. Teklehaimanot maintains that entry of default is warranted based on State Farm's failure to file a responsive pleading within fourteen days from entry of the Court's March 29, 2013 Order. *HN9*[⬆] *See Rule 12(a)(4)(A)* (providing that "if the court denies [a] motion [to dismiss] . . ., the responsive pleading must be served within 14 days after notice of the court's action . . . .")

State Farm maintains that Dr. Teklehaimanot should have filed an amended pleading consistent with this Court's Order prior to State Farm filing a responsive pleading. State Farm insists that it cannot adequately respond to Dr. Teklehaimanot's First Amended Counterclaims because substantial portions of his claims are no longer operative; the EOR allegations supporting the fraud claim have been [*24] eliminated and the estoppel claim has been entirely dismissed. As such, State Farm has not been dilatory in responding to Dr. Teklehaimanot's allegations because it was waiting for Dr. Teklehaimanot to file an amendment.

While the Court agrees that the extreme remedy of default is inappropriate under the circumstances and would ultimately prove wasteful, the Court declines to require Dr. Teklehaimanot to amend his First Amended Counterclaims. The cases relied on by State Farm are distinguishable from the present matter, nor do they suggest that requiring a party to amend his pleading after partially surviving a *Rule 12(b)(6)* is an advisable case management approach utilized by the courts in this circuit. *See Liming v. Stryker Corp., No. 11-00788, 2012 U.S. Dist. LEXIS 75509, 2012 WL 1957287, *5 (S.D. Ohio May 31, 2012)*; *see also Lambdin v. Aerotek Commercial Staffing, No. 10-280, 2011 U.S. Dist. LEXIS 95779, 2011 WL 3794040, *8 (E.D. Tenn. Aug. 25, 2011)*. Contrary to State Farm's assertions, it is not expected to respond to the EOR allegations and promissory estoppel allegations in the First Amended Counterclaims, which have been dismissed by this Court's March 29, 2013 Order. Furthermore, the Court discerns no legitimate difficulty imposed [*25] on State Farm in requiring a response to the First Amended

Counterclaims as currently drafted. Accordingly, the Court will order the Clerk of the Court to strike Dr. Teklehaimanot's Request for Clerk's Entry of Default, and order State Farm to file an answer to Dr. Teklehaimanot's First Amended Counterclaims within seven (7) days from the date of this Order.

## IV. CONCLUSION

For the reasons state above, Dr. Teklehaimanot's Motion to Compel Discovery from State Farm and for Sanctions [#120] is DENIED.

State Farm's Amended Motion to Compel Interrogatory Responses and Document Production from Dr. Teklehaimanot [#123] is GRANTED IN PART and DENIED IN PART. Dr. Teklehaimanot SHALL serve his discovery responses consistent with this Order within twenty-one (21) days of the date of the Order.

State Farm's Motion for Order to Show Cause, or Alternatively, Motion to Compel In & Out Transportation to Comply with Lawfully Issued Subpoena [#149] is GRANTED. In & Out Transportation Services, LLC SHALL SHOW CAUSE IN WRITING , NO LATER THAN MAY 21, 2013 ,WHY IT SHOULD NOT BE HELD IN CONTEMPT FOR ITS FAILURE TO COMPLY WITH A LAWFULLY ISSUED SUBPOENA. IN & OUT TRANSPORTATION SERVICES SHALL ALSO HAVE A REPRESENTATIVE [*26] APPEAR FOR A HEARING ON TUESDAY, MAY 28, 2013 AT 2:30 P.M.

*MedCity*'s Motion to Quash Subpoenas Served Upon Non-Party Banking Institutions [#150] is GRANTED IN PART and DENIED IN PART.

State Farm's Emergency Motion to Strike Request for Clerk's Entry of Default [#172] is GRANTED. The Clerk of the Court is hereby directed to strike Dr. Teklehaimanot's Request for Clerk's Entry of Default [#171]. State Farm SHALL file a responsive pleading to Dr. Teklehaimanot's First Amended Counterclaims within seven (7) days from the date of this Order.

SO ORDERED.

Dated: May 7, 2013

/s/ Gershwhin A Drain

GERSHWIN A DRAIN

UNITED STATES DISTRICT JUDGE

End of Document

# EXHIBIT E

⚠ Caution
As of: June 7, 2018 6:05 PM Z

# _McCurdy v. Wedgewood Capital Mgmt. Co._

United States District Court for the Eastern District of Pennsylvania

November 16, 1998, Decided ; November 16, 1998, Filed

CIVIL ACTION No. 97-4304

**Reporter**
1998 U.S. Dist. LEXIS 18875 *

Richard McCurdy, Trustee, Laborers' Industrial Pension Plan, Plaintiff, v. Wedgewood Capital Management Co., Inc., Defendant.

**Disposition:** [*1] Defendant's Motion for Protective Order GRANTED in part and DENIED in part. Plaintiff and Defendant's Motions for sanctions DENIED.

## Core Terms

discovery, subpoena, documents, protective order, parties, disclosure, limited partnership, notice, servicing, Mortgage, provides, prior notice, partnership, relevance, sanctions, inspection, redacted, records, rights, pension fund, entities, investments, fiduciary, expenses, matters, production of documents, limited partner, breaches, withheld, days

## Case Summary

### Procedural Posture

Plaintiff pension fund (fund), instituted an action in the district court (Pennsylvania) under the Employee Retirement Income Security Act, _29 U.S.C.S. § 1001 et seq._, claiming that respondent manager breached its fiduciary duty by investing the fund's money in a limited partnership. The manager filed a motion for protective order and for sanctions. The fund filed a counter motion to compel discovery and for sanctions.

### Overview

The manager alleged misuse of subpoenas because the fund failed to provide notice to the manager until approximately two weeks after the subpoena was issued and served. Therefore, the court held that the fund violated _Fed. R. Civ. P. 45(b)(1)_ by giving the manager late notice of the subpoena. However, the court held that the manager suffered little, if any, actual prejudice as a result of the fund's violation of the notice requirement because the parties appeared to concede that much of the information covered by the challenged subpoena could have been obtained pursuant to state statute, and since the manager did not demonstrate that they would be entitled to entry of a protective order even if they had been given proper notice. Therefore, this court did not impose sanctions on the manager. The court also held that the fund was not entitled to access to compel discovery of facts concerning the manager's financial status to determine the manager's ability to satisfy a judgment. The court also determined that the parties must have provided prior notice to opposing counsel on all future subpoenas.

### Outcome

The manager's motion for protective order was granted, in part, and denied, in part. The fund and the manager's motions for sanctions were denied. The manager was ordered to produce those documents identified by the fund that the manager conceded to have been subject to discovery.

## LexisNexis® Headnotes

Pensions & Benefits
Law > ... > Fiduciaries > Fiduciary
Responsibilities > General Overview

_HN1_[⬚] **Fiduciaries, Fiduciary Responsibilities**

See _29 U.S.C.S. § 1104(a)_.

Pensions & Benefits Law > ... > Civil
Litigation > Causes of Action > Breach of Fiduciary
Duty

Pensions & Benefits
Law > ... > Fiduciaries > Fiduciary
Responsibilities > General Overview

*HN2*[⬇] **Causes of Action, Breach of Fiduciary Duty**

See *29 U.S.C.S. § 1109(a)*.

Civil Procedure > Discovery &
Disclosure > Discovery > Protective Orders

Civil Procedure > Pleading &
Practice > Pleadings > Rule Application &
Interpretation

*HN3*[⬇] **Discovery, Protective Orders**

*Fed. R. Civ. P. 26(c)* provides that a person or party from whom discovery is sought may move the court, for good cause shown, to issue an order protecting the person or party from annoyance, embarrassment, oppression, or undue burden or expense. *Fed. R. Civ. P. 26(c)*. This rule authorizes the court to order that certain matter not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters. The court is authorized to issue a protective order only after a showing that good cause exists for the protection of the material. The party requesting the protective order has the burden of demonstrating good cause. "Good cause" is established when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury. In determining whether "good cause" exists for the issuance of a protective order, courts apply a balancing of interests standard.

Civil Procedure > Discovery &
Disclosure > Discovery > Protective Orders

*HN4*[⬇] **Discovery, Protective Orders**

*Fed. R. Civ. P. 26(c)* provides that upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.

Civil Procedure > Discovery &
Disclosure > Discovery > Subpoenas

*HN5*[⬇] **Discovery, Subpoenas**

*Fed. R. Civ. P. 45(b)(1)* provides that, service of a subpoena upon a person named therein shall be made by delivering a copy thereof to such person. Prior notice of any commanded production of documents and things or inspection of premises before trial shall be served on each party in the manner prescribed by *Fed. R. Civ. P. 5(b)*.

Civil Procedure > ... > Discovery > Methods of
Discovery > Inspection & Production Requests

*HN6*[⬇] **Methods of Discovery, Inspection & Production Requests**

*Fed. R. Civ. P. 34(b)* requires that a request for documents must describe each item and category with reasonable particularity. Moreover, a party seeking discovery must demonstrate a real, practical need for the information.

Civil Procedure > ... > Discovery > Privileged
Communications > General Overview

Civil Procedure > Discovery & Disclosure > General
Overview

Civil Procedure > Discovery &
Disclosure > Discovery > Relevance of
Discoverable Information

*HN7*[⬇] **Discovery, Privileged Communications**

Fed. R. 26(b)(1) provides that parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, the information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

1998 U.S. Dist. LEXIS 18875, *1

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

Civil Procedure > Discovery & Disclosure > General Overview

## HN8[⬇] Discovery, Relevance of Discoverable Information

Relevancy is to be broadly construed and is not limited to the precise issues set out in the pleadings or to the merits of the case. Instead, discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action. The relevance standard will depend on the context of the particular action, and the determination of relevance is within the district court's discretion.

Civil Procedure > Attorneys > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Subpoenas

## HN9[⬇] Civil Procedure, Attorneys

When opposing counsel have notice and sufficient time to object, they are not prejudiced by a violation of *Fed. R. Civ. P. 45* notice requirement.

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

## HN10[⬇] Discovery, Methods of Discovery

Under *Fed. R. Civ. P. 26(b)(1)*, parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of

any other party. Under *Fed. R, Civ. P. 26(b)(1)* the information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

Civil Procedure > ... > Discovery > Privileged Communications > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

## HN11[⬇] Discovery, Privileged Communications

*Fed. R. Civ. P. 26(b)(1)* sets forth a two step process in determining the scope of discovery; first, whether the information sought is relevant and, if so, whether the information is privileged.

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

## HN12[⬇] Discovery, Relevance of Discoverable Information

Relevancy is to be broadly construed and is not limited to the precise issues set out in the pleadings. Relevancy has been defined, for purposes of discovery, as encompassing any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. However, practical considerations dictate that the parties should not be permitted to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so.

Civil Procedure > ... > Discovery > Methods of Discovery > Inspection & Production Requests

Civil Procedure > Discovery & Disclosure > General Overview

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview

Civil Procedure > Discovery & Disclosure > Discovery > Protective Orders

1998 U.S. Dist. LEXIS 18875, *1

Civil Procedure > Discovery & Disclosure > Discovery > Relevance of Discoverable Information

**_HN13_[⬇]  Methods  of  Discovery,  Inspection  & Production Requests**

A party seeking a protective order on the ground that the documents sought are irrelevant must demonstrate to the court that the requested documents either do not come within the broad scope of relevance defined pursuant to _Fed. R. Civ. P. 26(b)(1)_ or else are of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure. Thus, the party resisting production of discovery ordinarily bears the burden of establishing lack of relevancy. Since the precise boundaries of the _Fed. R. Civ. P. 26_ relevance standard will depend on the context of the particular action, the determination of relevance is within the district court's discretion.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

**_HN14_[⬇]  Disclosure, Mandatory Disclosures**

_Fed. R. Civ. P. 26_ will not permit the discovery of facts concerning a defendant's financial status, or ability to satisfy a judgment, since such matters are not relevant, and cannot lead to the discovery of admissible evidence.

**Counsel:** For RICHARD MCCURDY, TRUSTEE, LABORERS' INDUSTRIAL PENSION PLAN, PLAINTIFF: RICHARD KIRSCHNER, M. KAY GARTRELL, KIRSCHNER AND GARTRELL, P.C., WASHINGTON, DC USA.

For WEDGEWOOD CAPITAL MANAGEMENT CO., INC., DEFENDANT: DOUGLAS N. CANDEUB, ADELMAN, LAVINE, GOLD AND LEVINE, PHILA, PA USA.

For WEDGEWOOD CAPITAL MANAGEMENT CO., INC., DEFENDANT: MARK S. MILLER, POWELL, GOLDSTEIN, FRAZER & MURPHY, ATLANTA, GA USA.

For WEDGEWOOD CAPITAL MANAGEMENT CO., INC., DEFENDANT: MARK J. FOLEY, KLETT LIEBER ROONEY & SCHORLING, PHILADELPHIA, PA USA.

For POWELL, GOLDSTEIN, FRAZER & MURPHY LLP,

MOVANT: W. SCOTT SORRELS, POWELL, GOLDSTEIN, FRAZER & MURPHY, ATLANTA, GA USA.

**Judges:** PETER B. SCUDERI, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** PETER B. SCUDERI

# Opinion

### _MEMORANDUM AND ORDER_

PETER B. SCUDERI

UNITED STATES MAGISTRATE JUDGE

November 16, 1998

Before the court is Defendant, Wedgewood **[*2]** Capital Management Co., Inc.'s ("Defendant") Motion for Protective Order and For Sanctions for alleged misuse of subpoenas (Doc. 19); Plaintiff, Richard McCurdy, Trustee, Laborers' Industrial Pension Plan's ("Fund" or "Plaintiff") Memorandum in Opposition thereto and Counter Motion to Compel Discovery and for Sanctions pursuant to _Fed. R. Civ. P. 26(c)_ (Doc. 20); Defendant's Reply (Doc. 21); Plaintiff's Reply (Doc. 24); and Defendant's Sur-Reply thereto. (Doc. 27).

### I. _FACTS AND PROCEDURAL HISTORY_

Plaintiff, a pension fund, instituted the present action against defendant, an investment manager of several million dollars of plaintiff's assets, under the Employee Retirement Income Security Act ("ERISA") claiming that Defendant breached its fiduciary duty by investing $ 950,000.00 of plaintiff's funds in a Limited Partnership whose only asset was certain "Purchased Mortgage Servicing Rights," allegedly an "esoteric, unmarketable investment consisting of pools of stripped mortgage rights." _29 U.S.C. §§ 1104(a)(1)(B)_ & _(C)_;  [1] **[*5]** and

---

[1] **_HN1_[⬆]**   _29 U.S.C. § 1104(a)_ is entitled "Prudent man standard of care" and provides,

(1) a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

(A) for the exclusive purpose of:

(I) providing benefits to participants and their

1109(a). [2] In a two count complaint, Plaintiff alleges that the investment, which was made in 1993, was a [*3] clear violation of fiduciary duties imposed by 29 U.S.C. §§ 1104(a)(1)(B) (Count I) and 1104(a)(1)(C) (Count II) because it violated the parties' contract for Investment Services as well as Plaintiff's Investment Guidelines, incorporated therein, that restricted Defendant to investments in "fixed income securities which were highly marketable." (Doc. 20 at 6-7); (Doc. 19 at 2-3). In their brief in support of the instant motion, Plaintiff asserts that Defendant also breached its fiduciary duty when it (1) signed limited partnership agreements, and other partnership documents in plaintiff's name without legal authority; (2) became the General Partner in the very partnership in which it had made Plaintiff a limited partner; (3) issued misleading reports that failed to inform Plaintiff of facts related to its management of Plaintiff's money including the fact that Plaintiff had been made limited partner in two partnerships and that the partnerships were created for the purpose of dealing in highly-speculative investments and to fulfill Plaintiff's own obligation to another corporation, Universal Investment Services, Inc., rather than because they were thought to be a good and appropriate [*4]

---

beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

[2] HN2[↑] 29 U.S.C. § 1109(a) provides:

Liability for breach of fiduciary duty: (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

investment. (Doc. 20 at 7; Doc. 24 at 2-3). According to the Plaintiff, "If [Defendant] harmed the Plaintiff in order to line its own pockets or the individual pockets of its principals, or to benefit other clients, or to satisfy other of its obligations completely unrelated to Plaintiff, then Defendant has violated its duty of loyalty to Plaintiff." (Doc. 20 at 25).

### 1. The Investment

In 1992, Plaintiff, a Taft-Hartley jointly administered pension fund governed by ERISA, retained the services of Defendant as an investment manager of $ 7,500,000.00 of its assets. The parties executed a contract for Investment Management Services incorporating a fee schedule and investment guidelines. (Plaintiff's Ex. E). The investment guidelines were particular to Plaintiff [*6] and limited the type of investments Defendant was permitted to make to "fixed income securities" which were "high quality, marketable securities." (Doc. 20 at 7, 9; Agreement paragraph 9).

On December 28, 1992, Defendant signed a "Letter of Intent" committing Defendant to purchase $ 15 million dollars worth of Purchased Mortgage Servicing Rights ("PMSR") from Universal Investment Services, Inc. ("Universal") that Defendant would then sell to its clients. On February 24, 1993, Universal notified Defendant that it was $ 11 million short on its payments for the PMSR portfolios and indicated that Universal was prepared to sue for the money.

On April 14, 1993, Defendant purchased a 49.5% interest in a Maryland Limited Partnership, known as "Purchased Mortgage Servicing Rights III, Limited Partnership" (PMSR III) with $ 950,000 of Plaintiff's assets. The PMSR III limited partnership purchased PMSRs as its only asset. (Pls. Mem. at 7 & Ex. F). Plaintiff later learned that the PMSR III limited partnership was, itself, a limited partner in a partnership in which the Dovenmuehle Mortgage Co. served as general partner (the "Dovenmuehle limited partnership"). (Doc. 24 at 4). The Dovenmuehle [*7] limited partnership, in turn, acquired "FNMA" mortgage servicing rights. (Doc. 20 at 9). [3]

---

[3] Plaintiff asserts "thus from the very inception of the 1993 investment, and unknown to plaintiff, there was a three-tiered construct or pyramid; the Pension Fund and Pennsylvania State Workers' Insurance Fund limited partnership (PMSR III) which, in turn, had a limited partnership arrangement with Dovenmuehle, which, in turn, acquired FNMA purchased

Plaintiff alleges, further, that Defendant signed the PMSR III limited partnership agreement on behalf of both limited partners of PMSR III, Plaintiff and Pennsylvania State Workers' Insurance Fund ("Pa.SWIF"). (Doc. 20 at 8 n. 8, 16). While Plaintiff paid $ 950,000 for 46.5% of PMSR III its co-limited partner, Pa.SWIF, paid only $ 899,999 for a 49.5% interest in PMSR III; (Doc. 20 at 22). In 1994, Defendant succeeded Universal Equity Funding, Inc. as general partner of PMSR III. (Doc. 20 at 8, n. 8).

In 1996, the PMSR [*8] investment was sold for $ 363,433.16. This action was filed in July, 1997. [4] On June 3, 1998, Plaintiff issued and served a subpoena on the City of Philadelphia and its Board of Pensions and Retirement, a non-party former client of the Defendant, without concurrent notice to Defendant's attorney of record. [5] (Def. Mem at 3). The subpoena commands the City of Philadelphia and its Board of Pensions and Retirement to "produce and permit inspection and copying" of "all records related to investments made, administered, or sold by Defendant Wedgewood Capital Management Company, Inc. pursuant to its investment management contract with either the City of Phila. and/or the Board of Pensions and Retirement, excluding documents protected by attorney-client privilege or as work product." (Doc. 19, Ex. A). The records were to be produced on "June 19, 1998" at "10 a.m." (Doc. 19, Ex. A).

[*9] On June 17, 1998, two days prior to the date set for producing the documents, the Defendant was notified of the subpoena during a telephone conversation with Plaintiff's counsel. (Doc. 19 at 4).

On June 24, 1998, plaintiff's counsel received the requested documents which had been forwarded by the City of Philadelphia on June 23, 1998 in response to the subpoena. (Doc. 19, Ex. C) (Letter from Judith E. Ryan, Esq.).

During the June 17, 1998, telephone conversation notifying Defendant of the subpoena, plaintiff's counsel explained that the failure to provide Defendant with a copy of the subpoena earlier was "inadvertent." (Doc. 19 at 4). In a letter dated June 17, 1998, counsel for Plaintiff Laborers Fund forwarded a copy of the subpoena to Defendant and explained, again, that the

copy had "inadvertently" not been sent to him. (Doc. 19, Ex. B). The letter and copy of the subpoena enclosed therewith was not received by counsel for Defendant until July 23, 1998. Def. Ex. B (notation: "received 7/23/98"). Thus, far, Plaintiff has also issued or will issue subpoenas to the following persons or entities:

(1) Dovenmuehle Mortgage Company, L.P., the limited partnership in which Dovenmuehle [*10] Mortgage Company, Inc., was the General Partner and in which PMSR III was a limited partner. With the Pension Fund's $ 950,000 Wedgewood bought in the Fund's name a 49.5% limited partnership interest in the PMSR III Limited Partnership, which then was itself made a limited partner in the Dovenmuehle Mortgage Company Limited Partnership;

(2) Dovenmuehle Mortgage Co., Inc.;

(3) James Casselberry, former President of Wedgewood, brought in by Wedgewood in part to deal with the "servicing rights" problem investments, including that of PMSR III;

(4) Michael Lucas, former Vice-President of Wedgewood, who expressed grave concerns about the limited partnership investments, including PMSR III;

(5) Nora Bustamonte, former Vice President of Wedgewood, who dealt with "servicing rights" such as those owned by the PMSR III limited partnership in which the Pension Fund was a limited partner;

(6) Universal Equity Funding, Inc., c/o Jeffrey Kosow, which was the General Partner in the PMSR III partnership to which the Fund belonged as a limited partner;

(7) Universal Investment Services, Inc., an affiliate of Universal Equity Funding, Inc., which secured the 1992 "Letter of Intent" from Wedgewood [*11] to buy the mortgage servicing rights, which were subsequently purchased by PMSR III;

(8) Frank Tibbs, Asset Management Advisors, L.C., who was an independent consultant brought in by Wedgewood specifically in regard to the "servicing rights" investments of PMSR III and other limited partnerships which Wedgewood invested in for other, similarly situated, pension funds;

(9) Daryl C. Dennis, former President and Chief Investment Officer of Wedgewood who signed the PMSR III agreement on behalf of the Pension Fund, and also on behalf of the only other limited partner, the Pennsylvania State Workers' Insurance Fund (Pa.SWIF);

---

mortgage servicing rights." (Doc. 20 at 9).

[4] The complaint was amended in December, 1997.

[5] Defendant's attorney of record is Douglas N. Candeub, Esq., of Adelman, Lavine, Gold, and Levin. Def. Mem at 3.

(10) Powell, Goldstein, et al. (Former counsel to Wedgewood) who advised plaintiff's counsel that it was in close contact with defendant Wedgewood and was in fact awaiting Wedgewood's responses so that it could determine which documents it would withhold on the basis of privilege; [6] **[*12]** (Doc. 20, Ex.L) and

(11) Malcolmn Pryor, individually, and as the principal in four financial adviser/broker entities in which he is an owner (in addition to Defendant). (Doc 20 Ex. B). [7]

(Doc. 20 at 5-6). Discovery must be completed by February 8, 1999.

## II. STANDARD OF REVIEW

Defendant has filed the instant Motion for a Protective Order [8] pursuant to *Fed. R. Civ. P. 26(c)* [9] **[*15]** based on Plaintiff's failure to give Defendant prior notice of serving subpoenas as required by *Fed. R. Civ. P. 45*. [10]

---

[6] The subpoena was quashed on July 22, 1998, but the Powell firm produced documents in response to an identical subpoena issued from federal district court in the District of Columbia, where the law firm also has offices. (Doc. 20 at 6).

[7] Defendant was established and owned by Pryor, McClendon, Counts & Co., Inc. ("PMC"), a Philadelphia Brokerage firm/investment banker, and/or by the individual principals of PMC, all of whom served as directors of Defendant and, at various times, officers as well.

[8] Defendant asserts that the June 3, 1998, subpoena was served by Plaintiff "without notice to Defendant's attorney of record" and is "so broad categorically as to encompass everything bearing on [Defendant]" and "stands to interfere detrimentally with their business relations with . . . former or current clients." Def. Mem at 3, 5. Defendant claims that "If [they] had received advance notice of the subpoena served on the City of Philadelphia, they would have moved for a protective order with respect to the discovery sought thereby."

*HN3*[⬆] *Rule 26(c)* provides that a person or party from whom discovery is sought may move the court, for good cause shown, to issue an order protecting the person or

---

[9] *HN4*[⬆] *Fed. R. Civ. P. 26(c)* governing "Protective Orders" provides,

> Upon motion by a party or by the person from whom discovery is sought, accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action, and for good cause shown, the court in which the action is pending . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> (1) that the disclosure or discovery not be had;
>
> (2) that the disclosure or discovery may be had only on specified terms and conditions, including a designation of the time or place;
>
> (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
>
> (4) that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters;
>
> (5) that discovery be conducted with no one present except persons designated by the court;
>
> (6) that a deposition, after being sealed, be opened only by order of the court;
>
> (7) that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way;
>
> (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

[10] *HN5*[⬆] *Fed. R. Civ. P. 45(b)(1)* provides that,

> . . . Service of a subpoena upon a person named therein shall be made by delivering a copy thereof to such person . . . *Prior notice of any commanded production of documents and things or inspection of premises before trial shall be served on each party in the manner prescribed by Rule 5(b)*."

*Fed. R. Civ. P. 5(b)* provides,

> Service shall be made upon the attorney . . . by delivering a copy to the attorney or party or by mailing it to the attorney or party at the attorney's or party's last known address or, if no address is known, by leaving it with the

party from "annoyance, embarrassment, oppression, or undue burden or expense." *Fed.R.Civ. P. 26(c).* This rule authorizes the court to order that certain matter not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters. *Moore's Federal Practice 3d, § 26.105[5]* (1998). The court is authorized to issue a protective order only after a showing that good cause exists for the protection **[*13]** of the material. *Id.* The party requesting the protective order has the burden of demonstrating good cause. *Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995)* (stating party seeking protective order must demonstrate that good cause exists for protection of particular material and holding that parties failed to sustain burden of demonstrating specific injury from public dissemination of privileged documents). "Good cause" is established when it is specifically demonstrated that disclosure will cause a clearly defined and serious injury. *Id.* In determining whether "good cause" exists for the issuance of a protective order, courts apply a balancing of interests standard. *see In re Eli Lilly & Co. Proza Prod. Liab. Lititig., 142 F.R.D. 454, 460 (S.D.Ind. 1992)* (motion by drug manufacturer for entry of protective order redacting names from documents); *Arenson v. Whitehall Convalescent & Nursing Home, Inc., 161 F.R.D. 355, 358 (N.D.Ill. 1995)* (information sought had significant probative value and privacy interests were sufficiently protected by redaction of names). Irrelevancy satisfies the good cause requirement. *Smith v. Dowson, 158 F.R.D. 138, 140 [*14] (D.Minn. 1994)* (granting protective order on ground that actions taken by arresting officers in subsequent investigations, after release of erroneously arrested individual, is wholly irrelevant to plaintiff's claim that his arrest and detainer was without probable cause and in violation of his civil rights); *Hall v. Harleysville Ins. Co., 164 F.R.D. 172, 173 (E.D.Pa. 1995)* (although contents of consumer credit reports were relevant to action, names and other identifying information were not and were subject to redaction).

In the event that a Motion for Protective Order is granted, *Fed. R. Civ. P. 26(c)* provides that sanctions may be imposed in accordance with the provisions of *Fed. R. Civ. P. 37(a)(4)*, which sanctions may include, but are not limited to, reasonable attorney's fees. [11]

*Cuthbertson v. Excel Industries, Inc. 179 F.R.D. 599, 1998 WL 237687* at *6 (D. Kan. 1998).

**[*16]** As a result of the alleged misuse of the subpoena by Plaintiff, Defendant requests that this court enter an order imposing the following sanctions for repeated failure to provide notice to Defendant prior to serving subpoenas on third parties: (1) limiting fund to discovery into matters pertaining to Plaintiff's dealings with Defendant and not matters concerning other current or former clients; (2) directing Plaintiff to give adequate advance notice to Defendant before serving subpoenas on third party witnesses; (3) directing Plaintiff to pay Defendant's reasonable attorney's fees incurred in filing the Motion and that Plaintiff be prohibited from utilizing or disclosing the City of Philadelphia records or any information obtained from them and return any copies received to the custodian of records of the City of Philadelphia.

In the instant Motion, Defendant does not object to all

---

Protective Order filed pursuant to *Fed. R. Civ. P. 26(c)*. *Rule 37(a)(4)(A), (B), & (C)* provides,

> (A) If the Motion [for Order Compelling Disclosure] is granted, or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the Motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing parties non disclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

> (B) If the Motion [for Order Compelling Disclosure] is denied, the court may enter any protective order authorized under *Rule 26(c)* and shall, after affording an opportunity to be heard, require the moving party or the attorney filing the motion or both of them to pay to the party or deponent who opposed the motion, the reasonable expenses incurred in opposing the motion, including attorney's fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

> (C) If the Motion [for Order Compelling Disclosure] is granted in part and denied in part, the court may enter a protective order authorized under 26(c) and may, after affording an opportunity to be heard, apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner.

---

clerk of court.

[11] The provisions of *Fed. R. Civ. P. 37(a)(4)* "Expenses and Sanctions" apply to the award of expenses incurred in relation to a Motion for Order Compelling Disclosure or a Motion for

information sought by the Plaintiff nor does Defendant object, on relevance grounds, to every subpoena issued by the Plaintiff. Instead, Defendant objects only to (1) "third party discovery sought from the City of Philadelphia;" (2) discovery from "other present or former clients;" and (3) "to subpoenas **[*17]** directed to various entities in which [defendant's] director Malcolmn Pryor is involved for purposes of fishing into a 'piercing the corporate veil argument'." (Doc. 27 at 5).

Plaintiff has responded to Defendant's Motion by filing a Counter Motion to Compel Discovery pursuant to *Fed. R. Civ. P. 37(a)(2)(B)*. *Rule 37(a)(2)(B)* provides that "If a party fails to make a disclosure required by *Rule 26(a)*, any other party may move to compel disclosure and for appropriate sanctions . . . The motion must include a certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action." *HN6[↑] Fed. R. Civ. P. 34(b)* requires that a request for documents must "describe each item and category with reasonable particularity." Moreover, "a party seeking discovery must demonstrate a real, practical need for the information." *Consolidated Rail Corp. v. United States, 812 F.2d 1444, 1463 (3d Cir. 1987)*.

Plaintiff argues that this court should dismiss Defendant's Motion for Protective Order because the documents sought and obtained pursuant to the subpoena served on the City of Philadelphia **[*18]** City Employees Pension Fund, a public city agency, were discoverable under either state or city right-to-know laws, *65 P.S. § 66.1 et seq.* [12] and Section 5-1104 [13] **[*20]** of the Philadelphia Home Rule Charter. [14]

Plaintiff also moves to compel discovery pursuant to *Fed.R.Civ.P. 26(a)* [15] **[*21]** and *26(c)* [16] seeking an order that: (1) Defendant produce within seven (7) days, unredacted copies documents already produced and any requested, relevant documents withheld in their entirety or, in the alternative that, Defendant submit any allegedly undiscoverable documents for review by this court *in camera* with written explanations as to why the entire document or portions thereof are protected from discovery and allowing Plaintiff an opportunity to respond thereto; and (2) Defendant reimburse Plaintiff for reasonable attorney's fees expended in filing the Motion to Compel document production pursuant to *Fed. R. Civ. P. 26(c)* which states in relevant part:

> If the motion for protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery. The provisions of *Rule 37(a)(4)* apply to the **[*19]** award of expenses incurred in relation to the motion.

---

[12] Plaintiff claims that "Plaintiff McCurdy and Laborers' Local 57 Industrial Pension Fund [Fund] are clearly citizens within the meaning of the state statute, and documents requested were clearly public records." *PG Pub. Co. v. County of Washington, 638 A.2d 422, 162 Pa. Commw. 196 (1994)*.

[13] Plaintiff also claims that "Sec. 5-1104 of the Philadelphia Home Rule Charter clearly entitled plaintiff to the city's records."

> Section 5-1104. Public right to Inspection. City records, the disclosure of which would invade a person's right to privacy, hinder law enforcement, endanger the public safety, or breach a legally recognized duty of confidence, or the nondisclosure of which is legally privileged, or which have been prepared for or by the Law Department for use in actions or proceedings to which the City is or may be a party, shall not be available for public

inspection. *Except as herein provided, all other City records shall be open for public inspection* but the officer, department, board, or commission or other governmental agency of the City having the care and custody of such records may make reasonable regulations governing the time, place, and manner of their inspection and for the purposes of archival preservation, copies of City records may be substituted in lieu of original records.

[14] Plaintiff also contends that the Defendant's Motion should be dismissed for failure to comply with the requirements of *Rule 26(c)* and Local Rule 26.1(f) providing that all discovery motions include a "Certificate" reciting that counsel made a "reasonable effort" to resolve the discovery dispute. Defendant's Motion [for Protective Order] must be accompanied by a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. *Fed.R. Civ. P. 26(c)*; Local Rule 26.1(f)("No motion or other application pursuant to the Federal Rules of Civil Procedure governing discovery or pursuant to this rule shall be made unless it contains a certification of counsel that the parties, after reasonable effort, are unable to resolve the dispute.").

Federal Rule of Civil Procedure 26(b)(1) [17] provides that the scope of discovery need not be confined to matters of admissible evidence, but may encompass that which appears "reasonably calculated to lead to the discovery of admissible evidence." *Fed.R.Civ.P. 26(b)(1)*. The burden of showing that the requested discovery is not relevant is on the party resisting discovery. see *In re Bell Atlantic Securities Litigation*, 1993 WL 514408 (E.D.Pa. 1993)(unreported).

## [*22] *HN8*[⬆]

Relevancy is to be broadly construed and is not limited to the precise issues set out in the pleadings or to the

---

Because Defendant has attached the proper certification reciting efforts made by counsel to resolve this dispute to his Motion for Protective Order, we reject this argument as meritless.

[15] *Fed.R.Civ.P. 26(a)* provides:

> (1) Initial Disclosures. Except to the extent otherwise stipulated or directed by order or local rule, a party shall, without awaiting a discovery request, provide to the other parties"

> (A) the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings identifying the subjects of the information;

> (B) a copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody or control of the party that are relevant to disputed facts alleged with particularity in the pleadings;

> (C) a computation of any category of damages claimed by the disclosing party making available for inspection and copying as under *Rule 34* the documents or other evidentiary material, not privileged or protected from disclosure on such computation is based, including materials bearing on the nature and extent of injuries suffered; and

> (D) for inspection and copying as under *Rule 34* any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

[16] *Fed.R.Civ.P. 26(c)* provides that

> If the motion for protective order is denied in hole or in part, the court may, on such terms and conditions as are just, order that any party of other person provide or

merits of the case. *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978)*. Instead, discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action. *Id.* The relevance standard will depend on the context of the particular action, and the determination of relevance is within the district court's discretion. *Thompson v. Glenmeade Trust*, 1995 WL 752422, at *2 n.4 (E.D.Pa. 1995) ("district courts are empowered with broad discretion to manage discovery").

## III. DISCUSSION

### 1. THE PHILADELPHIA SUBPOENA: Prior Notice to Parties

Defendant alleges that Plaintiff violated *Fed. R. Civ. P. 45(b)(1)* when it issued and served a subpoena for production of documents on third party, City of Philadelphia and Board of Pensions and Retirement (City Employees Pension Fund), without prior notice to Defense counsel. Under *Rule 45(b)(1)*, prior notice of any demand for production of documents before trial must be served on each party [*23] pursuant to *Rule 5(b)*, the Rule covering service and filing of pleadings and other papers. [18]

---

permit discovery. The provisions of *Rule 37(a)(4)* apply to the award of expenses incurred in relation to the motion.

[17] *HN7*[⬆] Fed. R. 26(b)(1) provides as follows:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, the information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

[18] Before the 1991 amendments to *Fed.R.Civ.P. 45*, the only way to collect documentary evidence from non-parties was through a subpoena duces tecum as authorized by *Rule 45(b)*. But such a subpoena could not be issued independently of a deposition of the custodian of the documentary evidence. In 1991, *Rule 45* was revised to "authorize the issuance of a subpoena to compel a non-party to produce evidence independent of any deposition." 1991 Amendment Notes of Advisory Committee on Rules. As noted, the Rule also adopted a special notice requirement in these circumstances. "Prior notice of any commanded production of documents and things or inspection of premises before trial shall be served on each party in the manner prescribed by *Rule 5(b)*." *Fed.R.Civ.P. 45(b)(1)*.

A party issuing a subpoena to a nonparty for the production of documents during discovery must provide prior notice to all parties to the litigation. *Fed. R. [\*24] Civ. P. 45(b)(1)* ("Prior notice of any commanded production of documents and things . . . shall be served on each party in the manner prescribed by *Rule 5(b)*."); *Spencer v. Steinman, 179 F.R.D. 484, 487 (1998)*. *Rule 5(b)* provides that a party can make service either by delivery or mail to the opposing parties attorney. *Fed.R.Civ.P. 5(b)*. When service is by mail, it is complete upon mailing. *Fed. R. Civ. P. 5(b)*. The term "prior notice" has been interpreted to mean notice prior to service of the subpoena on the nonparty rather than prior to document production. *See e.g. Biocore Medical Technologies, Inc. v. Khosrowshahi, 181 F.R.D. 660, 1998 U.S. Dist. LEXIS 16169, 1998 WL 724003* at \*5 (D.Kan. 1998). The purpose of prior notice is to afford other parties an opportunity to object to the production or inspection and to obtain the materials at the same time as the party who served the subpoena. *Id.* (citing *Fed.R.Civ.P. 45* committee note, 1991 amendments and *Seewald v. IIS Intelligent Information Sys., Ltd., 1996 WL 612497* at \*4 (E.D.N.Y. 1996)).

In the instant case, Fund failed to provide notice to Defendant until June 17, 1998, approximately two weeks after the subpoena was issued and [\*25] served (June 3, 1998), two (2) days prior to the date set for producing the documents (June 19, 1998), and seven (7) days prior to actual receipt of the requested documents (June 24, 1998). Def. Exhibits A & C. [19] Therefore, the Plaintiff violated *Rule 45(b)(1)* by giving Defendant late notice of the subpoena. It also appears to be undisputed that Plaintiff's counsel has served at least seven (7) additional subpoenas on third parties and failed to serve any of the subpoenas on Defendant's counsel prior to the time they were served on third parties. (Doc. 19 at 5; Doc. 21 at 2-3; Doc 27 at 2; Doc. 24 at 7). However, Defendant concedes that, unlike in the case of the Philadelphia subpoena, Defendant "independently learned of [at least] six of these subpoenas soon after they were issued" and no harm resulted from the additional violations of *Rule 45(b)(1)* by the Plaintiff. (Doc. 19 at 5).

[\*26] Courts generally respond to *Rule 45(b)(1)* violations by striking the subpoenas, *Biocore Medical*

*Technologies v. Khosrowshahi, 181 F.R.D. 660, 1998 U.S. Dist. LEXIS 16169, 1998 WL 724003* at \*5 (D.Kan 1998)(citing *Santiago-Lugo, 904 F. Supp. 43, 47 (D.P.R. 1995))*, or allowing opposing counsel an opportunity to object. *Biocore Medical Technologies v. Khosrowshahi, 181 F.R.D. 660, 1998 U.S. Dist. LEXIS 16169, 1998 WL 724003* at \*5 (D.Kan 1998)(citing *Callanan v. Riggers and Erectors, Inc. 149 F.R.D. 519, 519 (D.VI. 1992))*. In this case, such remedies are inadequate because the documents sought by the Philadelphia subpoena have already been obtained by the Plaintiff.

The potential harm arising from such violations was addressed by the court in *Spencer v. Steinman, 179 F.R.D. 484, 489 (E.D.Pa. 1998)*, where the court stated:

> The risks attached to misuse of the subpoena power are great. Under this delegation of public power, an attorney is licenced to access, through a nonparty with no interest to object, the most personal and sensitive information about a party. By failing to receive prior notice of the information sought from the nonparty, a party is deprived of its greatest safeguard under [\*27] the Rule, i.e., the ability to object to the release of the information prior to its disclosure. Therefore, the loss of the opportunity to object prior to the release of the information caused injury to Defendant. Moreover, misuse of the subpoena power is not limited to the harm it inflicts upon the parties, it also compromises the integrity of the court's processes. When the power is misused, public confidence in the integrity of the judicial process is eroded. Therefore, the failure to provide prior notice to Defendant of the subpoenas cause[s] injury to the public. [20]

[\*28] Courts have held, however, that *HN9*[↑] when opposing counsel have notice and sufficient time to object, they are not prejudiced by a violation of *Rule 45* notice requirement. *Seewald v. IIS Intelligent Info. Sys. Ltd., 1998 U.S. Dist. LEXIS 7458, 1996 WL 310763 (E.D. Pa. 1998)*; *Biocore Medical Technologies v. Khosrowshahi, 181 F.R.D. 660, 1998 U.S. Dist. LEXIS*

---

[19] Although the letter and copy of the subpoena enclosed therewith was not received by counsel for Defendant until July 23, 1998, Def. Ex. B (notation: "received 7/23/98"), as noted, when service is by mail, it is complete upon mailing. **Fed. R. Civ. P. 5(b)**.

[20] "Abuse of the subpoena power is not only a violation of the Federal Rules of Civil Procedure, but potentially exposes offending counsel to discipline under the Pennsylvania Rules of Professional Conduct as a violation of the rights of third parties." *Spencer v. Steinman, 179 F.R.D. 484, 489 n. 7 (E.D.Pa. 1998)* (citing Pa. Rules of Professional Conduct 4.4)). "Such abuse may also be actionable as a tort." *Id.* (citing Fed. R.Civ.P. committee note, 1991 amendment; *Santiago-Lugo, 904 F. Supp. at 48*)).

_16169, 1998 WL 724003_ at *5 (D.Kan 1998) (ten days sufficient). Although the instant Defendant did receive actual notice of the subpoena prior to the date set for document production, the Plaintiff does not argue nor can this court conclude that two days constitutes a sufficient opportunity for Defendant to object thereto.

However, I find that Defendant, in this case, suffered little, if any, actual prejudice as a result of Plaintiff's violation of the notice requirement because the parties appear to concede that much of the information covered by the challenged Philadelphia subpoena could have been obtained pursuant to Pennsylvania statute, and since Defendant has not demonstrated that they would be entitled to entry of a protective order even if they had been given proper notice. Therefore, this court will not impose sanctions on Plaintiff at this time. [21] However,

---

[21] Because the parties appear to concede that much of the information covered by the challenged Philadelphia subpoena could have been obtained pursuant to Pennsylvania statute, and since Defendant has not demonstrated that they would be entitled to entry of a protective order even if they had been given proper notice, I find that imposition of sanctions would be out of proportion to the culpability of defendants and the prejudice suffered by plaintiffs.

---

Defendant does not explicitly dispute Plaintiff's claim that they would be entitled to much of the information covered by the subpoena pursuant to the Pennsylvania "Right-to-Know" law, 65 Pa.C.S.A. § 66.1 et seq., or § 5-1104 of the Philadelphia Home Rule Charter. (Doc. 20 at 3-4). Instead, Defendant only conclusorily asserts that the scope of the subpoena is greater than that of the statute and baldly cites _65 P.S. § 66.1_ which defines "public records" of which Pennsylvania citizens have a right to know. (Doc. 21 at 4) (quoting statute). In any event, we can not conclude that Defendant would have been entitled to a protective order precluding Plaintiff from obtaining the documents sought from the City of Philadelphia Municipal Employees Pension Fund. Defendant alleges that they would have successfully sought a protective order in connection with the document request pursuant to _Fed. R. Civ. P. 26(c)_ because (1) the subpoena sought irrelevant information and was unlimited as to (a) time, (b) written investment guidelines similar to those of Plaintiff and (c) type of investment; and (2) would interfere with the business relations between Defendant and its current or former clients, Def. Mem. at 5; (Doc. 19 at 8). Defendant states that their "dealings with the City of Philadelphia, or other former customers is not relevant to the subject matter presented in this action" . . . and will "interfere with the business relations between [Defendant] and its current or former clients." (Doc. 21 at 5); _see In re Bell Atlantic Securities Litigation_, 1993 WL 514408 (E.D.Pa. 1993)(unreported) ("The burden of showing that the requested discovery is not relevant is on the party resisting discovery . . .

[*29] Plaintiff shall be placed on notice that any future failure to comply with the Federal Rules will meet with proof preclusive sanctions or an order directing Plaintiff to pay counsel fees incurred by Defendant in bringing the violation to the attention of the Court.

[*30] II. _RELEVANCY OF OTHER INFORMATION SOUGHT BY THE PLAINTIFF PLAINTIFF'S MOTION TO COMPEL_

Defendant argues that certain additional information to which Plaintiff claims to be entitled is not subject to discovery because it is sought by the Plaintiff for an irrelevant purpose. _Rule 26(c)_ authorizes the court to order that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters. _Fed. R.Civ.P. 26(c)(4)_; _see, e.g._, _Johnson v. Mortham, 164 F.R.D. 571, 572 (N.D.Fla. 1996)_ (protective order may be used to limit the scope of discovery to just those issues that are left to be decided in case); _Chemical Bank v. Dana, 149 F.R.D. 11, 13 (D.Conn. 1993)_ (in action brought on guaranty, court limited discovery to documents containing information relating to defendant's general business affairs, and specified company and property, and excluded inquiries regarding other litigation and business and personal interests). A protective order that limits the scope of discovery, like all _Rule 26(c)_ protective orders, requires a showing of good cause. _Smith v. Dowson, 158 F.R.D. 138, 140 (D. Minn. 1994)_ (protective order in civil [*31] fights litigation). As noted, a showing of irrelevancy of the proposed discovery can satisfy the good cause requirement for a protective order. _Smith v. Dowson, 158 F.R.D. 138, 140 (D.Minn. 1994)_ (granting protective order on ground that actions taken by arresting officers in subsequent investigations,

---

the party objecting to discovery must state with specificity how each request is not relevant or is unduly burdensome, overly broad or oppressive"). There is at least a reasonable possibility that the request for production here, from another client of the Defendant, a pension fund possibly with similar investment guidelines and identical breaches thereof, is relevant to the subject matter involved in the pending action, if not the specific claims themselves. As such, and because Defendant does not appear to have met the burden of demonstrating with specificity that the requests are oppressive or unduly burdensome, _see In re Bell Atlantic Securities Litigation_, 1993 WL 514408 (E.D.Pa.1993)(unreported)("the fact that answering the [requests] will . . . interfere with defendant's business operations . . . is not alone sufficient reason for disallowing them"), we can not conclude that the Defendant's Motion for Protective Order would have been granted.

after release of erroneously arrested individual, is wholly irrelevant to plaintiff's claim that his arrest and detainer was without probable cause and in violation of his civil rights); *Navel Orange Admin. Comm. V. Exeter Orange Co., 722 F.2d 449, 454 (9th Cir. 1983)* (not error for trial court to grant protective order barring defendants from discovering matters related to affirmative defenses that are not cognizable in enforcement proceeding because such discovery is irrelevant).

Accordingly, we must determine whether Plaintiff seeks any information for an irrelevant purpose. *HN10*[⬆] Under *Federal Rule of Civil Procedure 26(b)(1)*, parties may obtain discovery regarding "any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other **[\*32]** party" [22] Under *Rule 26(b)(1)* "the information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

*HN12*[⬆] Relevancy is to be broadly construed and is not limited to the precise issues set out in the pleadings. *Surety Association of America v. Republic Insurance Company, 388 F.2d 412, 414 (2d Cir. 1967)*. Relevancy has been defined, for purposes of discovery, as encompassing "any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund Inc. v.* **[\*33]** *Sanders, 437 U.S. 340, 351, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978)*. However, "practical considerations dictate that the parties should not be permitted to roam in shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." *Surety, 388 F.2d at 414*.

*HN13*[⬆] A party seeking a protective order on the ground that the documents sought are irrelevant "must demonstrate to the court that the requested documents either do not come within the broad scope of relevance defined pursuant to [*Federal Rule of Civil Procedure] 26(b)(1)* or else are of such marginal relevance that the

potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure." *Myrin v. Federal Ins. Co., 1996 U.S. Dist. LEXIS 8560, No. 95-7903, 1996 WL 355347* at \*3 (E.D. Pa. June 19, 1996)(Yohn, J.) (quoting *Musicom Int'l. Inc. v. Serubo, 1994 U.S. Dist. LEXIS 15245*, No. 94-1920, 1994 WL 590619 at \*2 (E.D. Pa. Oct. 27, 1994)(Hutton, J.)). Thus, the party resisting production of discovery ordinarily bears the burden of establishing such relevancy. *Thompson v. Glenmede Trust Co., 1995 U.S. Dist. LEXIS 18780*, No. 92-5233, 1995 WL 752443 at \*2 (E.D. Pa. Dec. 19, 1995). Since the **[\*34]** precise boundaries of the *Rule 26* relevance standard will depend on the context of the particular action, the determination of relevance is within the district court's discretion. *See DeMasi v. Weiss, 669 F.2d 114, 121 (3d Cir. 1982)*.

## 1. PIERCING THE CORPORATE VEIL

To the extent that Defendant objects "to subpoenas directed to various entities in which Malcolmn Pryor, a member of Defendant's Board of Directors, is involved for purposes of fishing into a piercing the corporate veil argument," (Doc. 27 at 5), this court finds the information to be irrelevant and will grant the Motion for Protective order. Plaintiff asserts that such information is relevant to their claim that various corporate entities should be disregarded and treated as a single entity, and that the Defendant corporation is merely an alter ego of the individual owners thereof, Malcolm D. Pryor, Raymond McClendon, Allen Counts, and Daryl Dennis. (Doc. 20 at 22). In support of this allegation, Plaintiff asserts that the same attorney represents Defendant, Malcolmn Pryor, individually, and the following firms in which Pryor is a principal: Pryor, McClendon, Counts & Co., Inc., ("PMC"), Pryor, Counts **[\*35]** Capital Markets, LLC, and PMC Financial Markets, Inc. (Doc. 20 at 22). The mere allegation that corporations were not operated as independent entities and that various entities were represented by the same attorney is insufficient to support discovery of the financial information sought by the Plaintiff. Plaintiff's have not shown any basis for believing that the corporation and the owners thereof are so interrelated that their status as independent entities should be disregarded. In the absence of such a showing, to compel discovery of the information would be to authorize an unwarranted fishing expedition based on pure speculation. *See e.g. Electromatic Ltd. V. Rad-O-Lite of Philadelphia, Inc., 90 F.R.D. 182, 183 (E.D.Pa. 1981)* (allegation that corporations were not operated as independent entities insufficient to support discovery,

---

[22] Thus, *HN11*[⬆] *Fed. R. Civ. P. 26(b)(1)* sets forth a two step process in determining the scope of discovery; first, whether the information sought is relevant and, if so, whether the information is privileged. In the instant case, Defendant does not assert that the undisclosed information sought by the plaintiff is privileged. Rather, Defendant asserts only that the information is irrelevant.

but where a party demonstrates interrelated transactions and other connections, this is "enough to support further discovery on the relationships among the various defendants.").

## 2. *DEFENDANT'S LIABILITY INSURANCE*

Plaintiff seeks information as to the existence and contents of all insurance policies that relate to the relevant time [*36] period. Plaintiff claims that Defendant has not produced any policy that relates to April 13, 1993, the date on which the initial fiduciary breach occurred. *Rule 26(d)* permits discovery of the existence and contents of liability insurance agreements covering any 1993 breach of fiduciary duty by the Defendant. Accordingly, Defendant will be ordered to produce any liability insurance agreement covering April, 1993, within seven (7) days. However, Plaintiff also claims to be entitled to the production of policies that cover "1993 to the present," based on their contention that "the fiduciary breaches and prohibited transactions (occurring at least in 1994) are continuing in their nature and effect." (Doc.24 at 8). Plaintiff has alleged that fiduciary breaches and prohibited transactions occurred in April, 1993, the month in which the challenged investment was made, and in 1994, the year Plaintiff claims that Defendant illegally installed itself as General Partner of the PMSR III partnership. Moreover, Plaintiff has alleged that the breaches involved in this case are of a continuing nature. Because disclosure is required when the insurer "may" be liable on part or all of the judgment and, [*37] consistent with Plaintiff's allegations of "continuing" breaches of fiduciary duties, Defendant may be liable for breaches occurring in 1994, 1995, or 1996, the year in which the challenged investment was sold, Defendant will also be ordered to disclose insurance agreements for those years.

## 3. "*INSOLVENCY OF WEDGEWOOD*"

Plaintiff also moves to compel discovery of facts concerning Defendant's financial status in order to determine Defendant's "ability to satisfy a judgment." (Doc. 20 at 23). However, Plaintiff is not entitled to access to such information. Although discovery of the existence and contents of liability insurance agreements is permitted, *HN14*[⬆] "*Rule 26* will not permit the discovery of facts concerning a defendant's financial status, or ability to satisfy a judgment, since such matters are not relevant, and cannot lead to the discovery of admissible evidence." *See e.g. Ranney-*

*Brown Distributors, Inc. V.E.T. Barwick Industries, Inc. 75 F.R.D. 3, 4 (S.D.Ohio 1977); Renshaw v. Ravert, 82 F.R.D. 361, 363 (E.D.Pa. 1979)* (inquiry into Defendant's personal financial status is not ordinarily permitted)(citing, 8 Wright & Miller, Federal Practice & Procedure § [*38] 2010, at 93 (1970)); *Bogosian v. Gulf Oil Corp., 337 F. Supp. 1228 (E.D.Pa. 1971)*(Deposition questions with respect to antitrust plaintiff's net worth and his ability to satisfy judgment for costs in the event defendants prevailed were not relevant to the subject matter of lawsuit); *Blount v. Wake Electric Membership Corporation, 162 F.R.D. 102, 104 (E.D. N.C. 1993)*(Evidence of defendant's financial condition was not subject to discovery in personal injury case unless plaintiff made factual showing that viable claim for punitive damages existed); *U.S. v. General Electric Company, 158 F.R.D. 161, 163 (D.Oregon 1994)* (corporate tax returns and financial statements of plaintiff, contractor, were not discoverable because financial condition was not relevant to issue of whether contractor was fully compensated for work it performed). Accordingly, such information does not become relevant prior to judgment with execution unsatisfied. [23] [*39] Therefore, plaintiffs are not entitled to Defendant's financial information at this time and Plaintiff's Motion to Compel will be denied. [24]

## 4. *RICO*

Plaintiff also contends that it is seeking material relevant only to an unpleaded claim pursuant to the Racketeer Influenced Corrupt Organizations Act (RICO), *18 U.S.C. §§ 1961-1968*. This court finds that disclosing information relevant only to a prospective claim exceeds the scope of the subject matter of the present action. A complaint is not "a hunting license to discover whether, in fact, a viable claim may be alleged . . . The discovery rules are designed to support a properly pleaded cause of action and to prepare defenses to charges made-not to discover whether a claim exists." *American Communications Ass'n. Local 10, I.B.T. v. Retirement*

---

[23] Moreover, a party seeking discovery must also demonstrate a real and practical need for the information. *Consolidated Rail Corp. v. United States, 812 F.2d 1444, 1463 (3d Cir. 1987)*. We merely note that Plaintiff, in this case, cannot reasonably argue that it has a need for irrelevant financial information.

[24] Although Defendant also objects to discovery from "other present or former clients," this issue is not before the court as Plaintiff has only issued a subpoena for documents from one former client, the City of Philadelphia.

*Plan for Employees of RCA Corp. and Subsidiary Cos., 488 F. Supp. 479, 484* (S.D.N.Y., aff'd without opinion, 646 F.2d 559 (2d Cir. 1980); *McLaughlin v. Copeland, 455 F. Supp. 749, 753 (D.Del. [*40] 1978)*, aff'd, 595 F.2d 1213 (3d Cir. 1979)(table) (dismissing complaint for failure to state a claim stating that "while a plaintiff is entitled to a full opportunity to adduce evidence in support of the cognizable claims set out in his complaint, he is not entitled to discovery for the purpose of determining whether or not there may be a factual basis for a claim he has not made"); *See also Cardio-Medical Ass'n v. Crozer Chester Medical Center, 536 F. Supp. 1065, 1071 (E.D.Pa. 1982)* (citing *American Communications* with approval). Consequently, Plaintiff is not entitled to discovery merely to determine whether or not additional, unasserted claims might exist. Discovery, in this case, will be limited accordingly. Indeed, courts have recognized that the need to reasonably limit the scope of discovery is acute for claims under the RICO statute. *See e.g., PMC v Ferro Corporation, 131 F.R.D. 184, 186 (C.D. Cal. 1990)* ("The Supreme Court has recognized that the breadth of the RICO language encourages attempts to turn business disputes into federal racketeering charges . . . thus the risk that a party will attempt to use discovery to conduct a 'fishing expedition' is a significant [*41] concern").

## 5. *REDACTED AND WITHHELD DOCUMENTS*

This court understands that Plaintiff has produced redacted copies of documents and withheld other documents in their entirety. (Doc. 20 at 11). [25] Plaintiff contends that the improperly withheld and redacted documents include partnership agreements to which they have "a clear legal right as a member of two limited partnerships-the PMSR III limited partnership and the Dovenmuehle Mortgage Co, L.P." (Doc. 20 at 11). The documents sought by the Plaintiff are specifically listed in Document number 20 at pages 11-19.

Defendant, however, does not oppose production of "many" of the documents identified [*42] by the Plaintiff in this submission. (Doc. 21 at 13) (stating that "[Defendant] does not disagree that Plaintiff should be entitled to many of the documents described in Plaintiff's

---

[25] Plaintiff contends that, Defendant has "withheld entire documents, e.g. partnership agreements . . . [to which] plaintiff has a clear legal right as a member of two limited partnerships-the PMSR III limited partnership and the Dovenmuehle Mortgage Co, L.P . . ., and has also produced heavily redacted and expurgated partnership documents." (Doc. 20 at 11).

list of documents allegedly 'withheld in their entirety by Defendant'. . . . But it does disagree as to some"). Defendant states further that:

> There is no dispute that alleged breaches of Defendant's fiduciary duty to Plaintiff are an allowable area of discovery. Indeed, Defendant would further concede that discovery into possible prohibited transactions in connection with the handling of Plaintiff's funds would be permissible, even though it is not alleged in the complaint . . . Defendant [only] objects to the third party discovery which Plaintiff sought from the City of Philadelphia, which Plaintiff suggests it may seek from other present or former clients, . . .[and] to subpoenas directed to various entities in which [Defendant]'s director, Malcolm Pryor is involved, for purposes of fishing into a "piercing the corporate veil" argument.

(Doc. 21 at 7; Doc 27 at 4-5). Accordingly, Defendant will be ordered to produce those documents it concedes to be subject to discovery to Plaintiff [*43] within 10 days.

Moreover, because both parties suggest that the Court review any contested documents in camera, this Motion will be granted in order to determine whether Defendant properly redacted or withheld the documents. Accordingly, Defendant will be ordered to produce one set of the "redacted documents" with an accompanying memorandum setting forth its reasons for each redaction and one set of the "withheld documents" in our chambers by December 4, 1998, for in camera inspection. The supporting memorandum referred to above shall be submitted to Plaintiff no later than November 30, 1998, so that Plaintiff can submit a reply to this court by December 4, 1998. *See e.g., Tetratec Corp. v. E.I. Dupont De Nemours & Co., 1992 U.S. Dist. LEXIS 12101, 1992 WL 202169 (E.D.Pa. 1992)*.

The parties' request for sanctions is denied.

*ORDER* - ENTERED: 11-17-98

PETER B. SCUDERI

UNITED STATES MAGISTRATE JUDGE

AND NOW, this 16th Day of November, 1998, upon consideration of Defendant Wedgewood Capital Management Co.'s Motion for Protective Order and for Sanctions, and Plaintiff's response thereto, and Plaintiff Richard McCurdy, Trustee, Laborers' Industrial Pension Plan's Counter Motion to Compel Discovery, [*44] and

Defendant's response thereto, it is hereby ORDERED as follows:

1. Defendant's Motion for Protective Order is GRANTED, in part, and DENIED, in part.

2. Parties and their counsel must provide prior notice to opposing counsel on all future subpoenas.

3. The Plaintiff and Defendant's Motions for sanctions are DENIED.

4. Defendant is ORDERED to produce those documents identified by the Plaintiff that Defendant concedes to be subject to discovery as well as a copy of any liability insurance policy covering April of 1993, 1994, 1995, and 1996 to Plaintiff within 10 days from the date of this order.

5. Defendant is further ORDERED to produce one set of the redacted or withheld documents with an accompanying memorandum setting forth its reasons for each redaction in my chambers by December 4, 1998 for in camera inspection. The supporting memorandum referred to above shall be submitted to Plaintiff no later than November 30, 1998, so that it can submit a reply by December 4, 1998.

BY THE COURT:

PETER B. SCUDERI

UNITED STATES MAGISTRATE JUDGE

---

End of Document

# EXHIBIT F

No *Shepard's* Signal™
As of: June 7, 2018 6:14 PM Z

## *Scherbarth v. Woods*

United States District Court for the District of Colorado

February 13, 2018, Decided; February 13, 2018, Filed

Civil Action No. 16-CV-2391-KHR

**Reporter**
2018 U.S. Dist. LEXIS 22978 *; 2018 WL 851344

CORY S. SCHERBARTH, Plaintiff, v. OFFICER
WOODS, Aurora City Police Department, OFFICER
VAN CLEAVE, Aurora City Police Department,
Defendants.

## Core Terms

discovery, files, internal investigation, subpoena, arrest,
officer's, training, disclosure, parties, qualified immunity,
personnel, cases, confidential, policies, circumstances,
department's, categories, use force, credibility, privacy
interest, excessive force, requests, right to privacy,
personnel file, discoverability, impeachment,
advisement, materials, practices, motions

**Counsel:** [*1] For Cory S. Scherbarth, Plaintiff: Eric
Lindsay Robertson, Jennifer Lyn Parker, Wheeler Trigg
O'Donnell, LLP, Denver, CO.

For Woods, Officer of Aurora City Police Department,
VanCleave, Officer of Aurora City Police Department,
Defendants: Carrie Lynn Slinkard, Jeremiah James
Boies, Marc F. Colin, Bruno Colin & Lowe, P.C., Denver,
CO.

**Judges:** Kelly H. Rankin, United States Magistrate
Judge.

**Opinion by:** Kelly H. Rankin

## Opinion

### ORDER

Magistrate Judge Kelly H. Rankin

This case is before the court on the motions of
Defendants William Woods and Erik Van Cleave
("Defendants") to quash Plaintiff Cory Scherbarth's
subpoena to the City of Aurora (doc. 46) and to stay

certain discovery pending a determination of qualified
immunity (doc. 52).[1] In the latter motion, Defendants
ask the court to "limit[] discovery in this matter to only
those facts and issues that are necessary to determine
whether Defendants are qualified immune from suit
under the circumstances of this case." The motions are
fully briefed. The court also has before it the parties'
joint motion to amend the schedule. Doc. 55.

### BACKGROUND

Plaintiff's operative pleading is the amended complaint
he filed *pro se*. Doc. 18. Mr. Scherbarth alleges two
claims against Officers [*2] Woods and Van Cleave.
First, Plaintiff alleges the officers used excessive force
in arresting him, violating his *Fourth Amendment* right to
be free of unreasonable seizure and violating *C.R.S. §*
*18-8-803*. Am. Complaint at p. 8 of 17. Second, Plaintiff
alleges the officers falsely arrested and imprisoned him
without probable cause, violating his *Fourth*, *Fifth* and
*Fourteenth Amendment* rights. *Id.* at pp. 9-10 of 17.
Plaintiff seeks damages, punitive or exemplary
damages, medical coverage, and attorneys' fees and
costs. *Id.* at p. 12 of 17.

In his original complaint, Plaintiff also sued the officers
in their official capacities, which the court construed as a
*Monell*[2] claim against the City of Aurora for a policy or
custom that caused the alleged violations of Plaintiff's
constitutional rights. On initial review pursuant to *28
U.S.C. § 1915*, Magistrate Judge Gordon P. Gallagher
found the complaint lacked fact allegations of a policy or
custom causing the alleged violations. Doc. 10 (Order of
October 14, 2016) at p. 3. Judge Gallagher gave
Plaintiff an opportunity to amend his complaint to add

---

[1] While Magistrate Judge Craig B. Shaffer is unavailable, this
case is reassigned to the undersigned magistrate judge.

[2] So named for *Monell v. Dep't of Soc. Servs., 436 U.S. 658,*
*694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*.

2018 U.S. Dist. LEXIS 22978, *2

such allegations, and Plaintiff instead moved to stay *Monell* claims until he could investigate. Judge Lewis T. Babcock denied the motion and to the extent the Amended Complaint still sought to sue the officers [*3] in their official capacities, dismissed those claims. Doc. 20 (Order of Jan. 11, 2017) at p. 4. Mr. Scherbarth thus sues only the officers in their individual capacities.

## ANALYSIS

Defendants' two discovery motions in part overlap each other. Both motions take issue with Plaintiff's subpoena for documents from the non-party City of Aurora. Both motions also argue that most of the documents Plaintiff seeks would only be relevant to a *Monell* claim. The court addresses the motion regarding the subpoena first.

### I. Defendants' Motion to Quash or Modify Subpoena

On a timely motion, the court must quash or modify a subpoena if it "requires the disclosure of privileged or other protected matter, if no exception or waiver applies . . . or (4) requires the disclosure of a trade secret or other confidential research, development, or commercial information." *Charles Schwab & Co. v. Highwater Wealth Mgmt., LLC, No. 17-cv-00803-CMA-NYW, 2017 U.S. Dist. LEXIS 158175, 2017 WL 4278494, at *4 (D. Colo. Sept. 27, 2017)* (citing *Fed. R. Civ. P. 45(d)(3)(A), (d)(3)(B)*). Defendants argue virtually all documents requested in the subpoena are irrelevant, but they have standing to challenge it only as to privilege or privacy. *Windsor v. Martindale, 175 F.R.D. 665, 668 (D. Colo. 1997)*; *Charles Schwab, 2017 U.S. Dist. LEXIS 158175, 2017 WL 4278494, at *4*. Defendants do not assert a privilege and assert a privacy interest only in their personnel files and (if [*4] any exist)[3] internal affairs investigation files. Therefore, the court considers Defendants' arguments only as to the subpoena requests for their personnel or internal investigation files: Doc. 46-1, subpoena categories 1, 2, 14 and 15. Defendants argue the court should use an inherent power to hear their relevance arguments, but under *Windsor* and its progeny, this court declines to do so.

---

[3] Defendants are careful to not indicate whether any internal investigation files actually exist. The court will assume Defendants are not wasting resources on a motion about non-existent documents but instead are asserting even the question of whether they have been internally investigated is private.

Defendants' motion to quash is denied as to subpoena categories 3-13.[4]

It is undisputed that Defendants have some privacy expectation in their personnel and internal investigation files; the question is whether Plaintiff has a need for the information that would outweigh that interest. The U.S. Supreme Court recognizes public officers have a constitutional right of confidentiality — albeit not absolute — in private, personal information such as may be contained within a personnel or investigation file. *Whalen v. Roe, 429 U.S. 589, 599, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977)* ("individual interest in avoiding disclosure of personal matters"); *Nixon v. Admin. of Gen. Servs., 433 U.S. 425, 457, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977)* ("public officials, including the President, are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity"). Defendants argue the court should [*5] determine whether that right of privacy outweighs Plaintiff's need for discovery pursuant to the balancing test that Colorado state courts established in *Martinelli v. District Court, 199 Colo. 163, 612 P.2d 1083 (Colo. 1980)*.

> When the right to confidentiality is invoked to prevent disclosure of personal materials or information, a tri-partite balancing inquiry must be undertaken by the court, as follows:
> (1) does the party seeking to come within the protection of right to confidentiality have a legitimate expectation that the materials or information will not be disclosed? (2) is disclosure nonetheless required to serve a compelling state interest? (3) if so, will the necessary disclosure occur in that manner which is least intrusive with respect to the right to confidentiality?

*Martinelli, 612 P.2d at 1091* (paragraph breaks omitted).

In 2011, the Colorado Supreme Court modified this test such that "the requesting party must prove either that disclosure is required to serve a compelling state interest *or* that there is a compelling need for the information," and either "the information is not available from other sources," or if "available from other sources, . . . that it is using the least intrusive means to obtain the information." *In re District Court, 256 P.3d 687, 691-92*

---

[4] To the extent subpoena categories 9-13 also request documents in the Defendants' personnel files or internal investigation files, those categories are duplicative of categories 1, 2, 14 and 15.

*(Colo. 2011)*.

Plaintiff argues *Martinelli* and *In re District* [*6] Court may not apply here because discoverability for federal claims is governed by federal rules and law. Plaintiff cites *Everitt v. Brezzel, 750 F. Supp. 1063 (D. Colo. 1990)* and *Cisneros v. Town of Center, No. 08-CV-02661-WYD-MEH, 2009 U.S. Dist. LEXIS 80806, 2009 WL 2568534, at *3 (D. Colo. Aug. 18, 2009)*. In both cases, the plaintiff alleged (as does Mr. Scherbarth) excessive force, and false arrest or false imprisonment. Both cases find *Federal Rule of Civil Procedure 26* — not *Martinelli* — governs the discoverability of police personnel or internal investigation files.

Defendants do not address *Everitt* or *Cisneros*, but point to *Flanagan v. Munger, 890 F.2d 1557, 1570 (10th Cir. 1989)* and *Denver Policemen's Protective Association v. Lichtenstein, 660 F.2d 432, 434-35 (10th Cir. 1981)*. *Flanagan* and *Lichtenstein* applied *Martinelli* to assess claims that disclosures of police personnel or internal investigation files which occurred (or were ordered) outside of federal court violated the federal constitutional right of privacy. Defendants also cite a criminal case, *United States v. Neal, No. 11-cr-00163-WJM, 2011 U.S. Dist. LEXIS 92151, 2011 WL 3648381, at *4-5 (D. Colo. Aug. 18, 2011)*, in which this court applied *Martinelli* to determine the discoverability of police officer's personnel files. None of these cases analyze whether the issue of discoverability for a federal claim action should be decided under state or federal law.[5]

In the end, the court agrees with *Everitt* and *Cisneros'* reasoning that *Rule 26* governs the discoverability of Defendants' personnel and internal [*7] investigation files. However, *In re District Court* and *Rule 26* differ significantly only in the procedure to follow after a court finds officers' files should be produced. *Martinelli* requires *in camera* review in all such cases to ensure no irrelevant or highly personal information is disclosed. *Rule 26* does not require *in camera* review, although the court has discretion to require it case-by-case. This court has found *in camera* review should be reserved to the rare or exceptional instance that the parties cannot resolve a dispute on the issue. *See, e.g., Everitt, 750 F.*

*Supp. at 1067-68; Cisneros, 2009 U.S. Dist. LEXIS 80806, 2009 WL 2568534, at *3-4*.

But other than the question of *in camera* review, the court's analysis would be the same under either *In re District Court* or *Rule 26*. First, *Martinelli* does not purport to create a state law right of privacy; it addresses the federal constitutional right of privacy. *Martinelli, 612 P.2d at 1091-92* (citing *Whalen, 429 U.S. at 599; Nixon, 433 U.S. at 457, 458*). *See also McDonald v. Wise, 769 F.3d 1202, 1217 (10th Cir. 2014)* (discussing *Martinelli* as a case regarding whether the "constitutional right of privacy prevents disclosure . . . during the discovery process," not a case establishing substantive scope for the right of privacy). The court is not aware of any Colorado law that creates a state law right of privacy in police personnel or internal investigation files more expansive than [*8] the federal right of privacy.[6] Defendants for instance cite the protection given to their files in the Colorado Open Records statute, *C.R.S. § 24-72-204(3)(a)* ("The custodian shall deny the right of inspection of [personnel files]. . . unless otherwise provided by law") and the *Colorado Criminal Justice Records Act, C.R.S. § 24-72-305(5)* ("unless otherwise provided by law, the custodian may deny access to" investigatory files). The statutes are consistent with the federal privacy interest, but do not add to it. Both statutes defer to other laws for the scope of privacy. Indeed, the Tenth Circuit rejected firefighters' assertions of a broader privacy right in their internal investigation files. *Mangels v. Pena, 789 F.2d 836, 839-40, n.3 (10th Cir. 1986)* ("Rights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution.").

Second, the state and federal balancing tests are largely the same. *Martinelli's* balancing test was based in part on *Nixon. Martinelli, 612 P.2d at 1091-92* (citing *Nixon, 433 U.S. at 458*). *In re District Court's* balancing of a compelling state interest or need for the information against the privacy interest is analogous to *Rule 26*'s balancing of the need for information with the annoyance, embarrassment or oppression likely [*9] to result from disclosure. *Fed. R. Civ. P. 26(b)(1)* ("importance of the discovery in resolving the issues"); *(b)(2)(C)* (court must limit discovery that "can be

---

[5] The same is true in a peace officer's case under federal and Utah law, in which the Tenth Circuit applied *Martinelli's* balancing test (albeit citing only to *Lichtenstein's* articulation thereof). *Stidham v. Peace Officer Standards & Training, 265 F.3d 1144, 1155 (10th Cir. 2001)*.

[6] *Neal* cites *People v. Spykstra, 234 P.3d 662, 670 (Colo. 2010)* as recognizing a privacy interest in police personnel files, but the case simply cites *Martinelli* regarding the balancing test for discoverability.

obtained from some other source that is more convenient [or] less burdensome"); (c)(1) (authorizing protective orders regarding confidential information). In re District Court's limitation to the "least invasive" means is likewise analogous to Rule 26(c)'s provision for specifying the terms of disclosure for confidential information.

Turning to whether these files should be produced under Rule 26, Plaintiff argues he needs Defendants' personnel and internal investigation files because Defendants' credibility is a critical issue for his excessive force claim and the files may contain impeachment evidence. Plaintiff alleges he did not resist arrest or attempt to flee. Defendants assert to the contrary Plaintiff did resist or attempt to flee, necessitating their use of force. Plaintiff further argues that "it appears that Plaintiff and Defendants were the only witnesses to this event. Without the personnel files. Plaintiff may have no other way to impeach Defendants' credibility or challenge their versions of these events." Doc. 50 (response) at p. 11. Defendants reply [*10] that Plaintiff's brother witnessed the arrest. The parties thus disagree whether the files in question are the only potential source of impeachment.

Plaintiff argues the Tenth Circuit and Colorado courts find officers' privacy interests outweighed by a defendant's need for exculpatory evidence and the right to confront witnesses, relying on Neal, Lichtenstein, and People v. Walker, 666 P.2d 113, 121-22 (Colo. 1983). Defendants distinguish these cases as allowing discovery of officers' files only when the defendant is charged with assaulting an officer, there was no other source of evidence to impeach their credibility, or all of the prosecution's witnesses were police officers. Walker, 666 P.2d at 122; Neal, 2011 U.S. Dist. LEXIS 92151, 2011 WL 3648381; Lichtenstein, 660 F.2d at 436 (holding "[i]nasmuch as the instant case involves a 'swearing match' between the accused and police officers, ascertainment of the truth is of particular importance."). These cases are persuasive that unless a claim involves a police officer's credibility (or the defendant's alleged conduct toward the officer during an arrest), the need for an officer's file is not compelling enough to overcome the officer's privacy interest. However, these cases do not purport to premise discoverability on the absence of other potential sources of impeachment evidence.

The court also finds Everitt [*11] and Cisneros persuasive on this issue. On excessive force and false arrest/imprisonment claims, neither case focuses on

whether there are other potential sources of impeachment evidence. Both cases find officers' personnel files and internal investigation files relevant and order production; a Monell claim was central to that finding but does not appear to be the sole basis. See, e.g., Everitt, 750 F. Supp. at 1066 ("especially since plaintiff has made claims against both the individual officers and the municipality"); Cisneros, 2009 U.S. Dist. LEXIS 80806, 2009 WL 2568534, at *2 ("especially in light of her claims against both the individual officers and the municipality itself"). Both courts restricted access to the parties' attorneys only, and allowed the officers to identify in a log any information within the files they deemed so confidential or private that it warranted withholding even from the plaintiff's attorney. If the plaintiff wished to pursue that information, the court would then conduct an in camera review.

Unlike the above cases, however, with respect to internal investigation files Defendants also assert they received "Garrity advisements," in which the chief of police gave assurance that he or she would resist any request for disclosure of those files [*12] except as required by law. Specifically, Defendants assert

the Aurora Police Department's Garrity Advisement provides that "[t]he information I provide shall remain confidential and no truthful information will be used in any criminal proceeding against me. Any request for this statement, whether criminal or civil, will be analyzed by the Chief of Police and the Department to resist any disclosure not mandated by law."

Doc. 46 (motion) at p. 12. Defendants argue this advisement as an alternative basis for their expectation of "limited confidentiality," citing ACLU v. Whitman, 159 P.3d 707, 711 (Colo. App. 2006). The first difficulty with this argument is the Tenth Circuit found a similar advisement did not give officers a broader privacy interest than the federal Constitution does. Mangels, 789 F.2d at 839-40, n.3. Secondly, even assuming Mangels' holding is inapplicable here, the Chief and Department agree to resist only disclosures that are "not mandated by law." Defendants could not rely on the advisement as protection from a court finding a compelling need or state interest for discovery of the file. The court declines to find the "Garrity advisement" gives Defendants a greater privacy interest in internal investigation files than the federal Constitution provides. [*13]

The court finds that because Defendants' credibility is at

issue in the excessive force claim, Plaintiff has shown sufficient need for potential impeachment evidence from Defendants' personnel and internal investigation files to outweigh Defendants' privacy interest. However, the disclosure should be limited to the parties' attorneys only. The court therefore grants in part and denies in part Defendants' motion to quash as to subpoena categories 1, 2, 14 and 15 to limit the disclosure of Defendants' personnel and internal investigation files as follows.

The parties stipulated to a single-tier protective order governing confidentiality. It should not be too burdensome for counsel to modify it to a two-tier order. *See, e.g., Cisneros, 2009 U.S. Dist. LEXIS 80806, 2009 WL 2568534, at *3.* Counsel should for instance be able to locate exemplars of such two-tier protective orders in other cases in this court. The parties shall promptly file a proposed, amended protective order to define a category of "Attorney's Eyes Only" materials to restrict disclosure of personnel files and internal investigation files (or any other categories of material the parties agree are highly confidential) to the parties' attorneys for use in this case. The proposed order [*14] shall apply to such documents produced by parties or by non-parties who agree to the order's terms. After the court has approved the amended protective order, Defendants[7] shall produce their personnel and internal investigation files as Attorneys' Eyes Only after their counsel reviews for information that Defendants believe in good faith is "so sensitive or confidential that it should be shown to nobody-not even plaintiff's counsel," redacting such information and providing a descriptive log of the redactions to Plaintiff's counsel. If the parties dispute the appropriateness of the redaction, they may request a telephone discovery conference with the court, ahead of which Defendants shall submit the challenged materials for *in camera* review by email to Shaffer_chambers@cod.uscourts.gov .

Although the court allows the foregoing discovery of Defendants' personnel and internal investigation files, the court notes this information "need not be admissible

in evidence." *Fed. R. Civ. P. 26(b)(1)*. The court expresses no opinion whether information from these files will be admissible for any purpose.

*II. Defendants' Motion to Stay or Limit Discovery*

A week after replying in support of their motion to quash, Defendants [*15] moved to stay or limit discovery. Doc. 52. They first request the court to limit discovery to only qualified immunity issues. As this court recently stated,

> "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." ... Stated differently, the affirmative defense of qualified immunity "protects all but the plainly incompetent [government official] or those who knowingly violate the law."

*Estate of Goodwin v. Connell, No. 17-cv-01 124-PAB-MLC, 2017 U.S. Dist. LEXIS 211313, 2017 WL 6561153, at *1 (D. Colo. Dec. 22, 2017)* (citing *inter alia, Messerschmidt v. Millender, 565 U.S. 535, 546, 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012)*; *Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001)*). The defense has two elements:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second ... the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct. With regard to this second [prong], the ... inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented.

*Herrera v. City of Albuquerque, 589 F.3d 1064, 1070 (10th Cir. 2009)* (internal quotation marks and citations omitted).

Defendants argue they have raised qualified [*16] immunity by alleging it in their answer, and on that basis request the court to stay all discovery (including the subpoena to the City) that does not pertain to qualified immunity.[8] Defendants recognize they have not yet filed

---

[7] More precisely, the court orders Defendants to either permit the City as the subpoena recipient to produce those files, after Defendants review and redact in accordance with this order, or produce the files themselves in response to Plaintiff's request for production for the same files (doc. 53-2, request for production no. 7). Plaintiff does not need the same files from both Defendants and the City, and the court permits Defendants to determine with the City who shall produce the files.

---

[8] Because the second prong of qualified immunity is a legal question, fact issues for qualified immunity are limited to the conduct at issue in Plaintiff's claims, *i.e.*, what happened when

a dispositive motion raising qualified immunity for the court's resolution. In order to seek a stay based on the qualified immunity defense, Defendants must first raise the issue in a dispositive motion. *See, e.g., Rome v. Romero, 225 F.R.D. 640, 644 (D. Colo. 2004)* ("Arguably, these requests would be properly answerable by the individual Defendants, notwithstanding their recent motion raising qualified immunity, because the requests were propounded prior to that issue being raised."). The government official who does not raise qualified immunity in a motion to dismiss "cannot be said to be unduly burdened if he foregoes an opportunity to address the issue prior to the commencement of discovery, and instead waits to assert it until some point later in the litigation." *Id.*

For the same reason, the court also finds a stay is not warranted under the five factors required for stays under *String Cheese Incident, LLC v. Stylus Shows, Inc., No. 1:02-cv-01934-LTB-PA, 2006 U.S. Dist. LEXIS 97388, 2006 WL 894955, at *2 (D. Colo. Mar. 30, 2006).* If there is no pending motion to resolve whether [*17] qualified immunity applies, the Plaintiff's interest in proceeding expeditiously and the convenience of the court outweigh the burden to Defendants. The court therefore denies without prejudice Defendants' motion to stay discovery based on their qualified immunity defense. If Defendants file a dispositive motion raising qualified immunity, they may renew their motion to stay discovery pending its resolution.

In the same motion, Defendants also request more broadly that the court should preclude Plaintiff from conducting discovery regarding the police department's policies, standard practices, training and other uses of force as irrelevant to the claims against Defendants. Defendants argue such discovery would only be relevant if Plaintiff were suing the City under *Monell,* which he is not. Defendants point to the scope of several requests in the subpoena to the City, attach the written discovery requests Plaintiff issued to Defendants, and the potential for expansive future discovery regarding other uses of force by the Aurora Police Department.

As for limiting the scope of Plaintiff's subpoena to the City, this is the same relevance argument that Defendants raised in their motion to [*18] quash. Regardless of the title of the motion, Defendants lack

standing to challenge the scope of the subpoena.

As to Plaintiff's written discovery requests to Defendants, Defendants appear to use these only as a general example of "copious discovery." Defendants do not seek a protective order against any particular requests. They have already answered those requests, albeit with objections to many of the requests for production. Doc. 53-2. On the discovery Defendants already provided, there is nothing to stay. Other than Defendants' privacy objection regarding their personnel and internal investigation files,[9] Defendants' objections to the requests for production are not briefed for the court's resolution. Accordingly, the court addresses only the scope of discovery going forward, but the following discussion should also guide the parties in conferring regarding any disputes on existing discovery.

Generally, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *Fed. R. Civ. P. 26(b)(1).*

To aid in determining the scope of relevance for discovery, the court notes the elements of Plaintiff's claims. Plaintiff's [*19] excessive force claim regards whether Defendants' use of force in arresting him was objectively reasonable under the "totality of the circumstances." *Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (U.S. 1989).* The totality of circumstances includes

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. * * * The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

*Id. at 396* (internal quotation marks omitted). "[T]he question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id. at 397.*

Plaintiff's false arrest or false imprisonment claim regards whether Defendants were legally justified in

---

Plaintiff was arrested and whether probable cause existed at the time. *See, e.g., Rome, 225 F.R.D. at 644-45.* Thus the court understands Defendants as requesting discovery be stayed except regarding such facts of Plaintiff's arrest.

[9] As noted above, the court's ruling regarding subpoena categories 1, 2, 14 and 15 applies equally to Plaintiff's *Rule 34* requests for documents in Defendants' personnel or internal investigation files.

arresting and confining him. "In the Tenth Circuit, a constitutional claim for ... false arrest ... originates with the elements of the corresponding state law tort ... and plaintiff must demonstrate, in addition to the elements of the state law tort, that his *Fourth Amendment* right to be free from unreasonable [*20] search and seizure has been violated." *Chambers v. Mosness, No. 13-CV-00393-REB-MEH, 2015 U.S. Dist. LEXIS 24080, 2015 WL 881689, at *4 (D. Colo. Feb. 27, 2015)* (quoting *Trimble v. Park Cty. Bd. of Comm'rs, 2000 U.S. App. LEXIS 30778, 2000 WL 1773239 at *3 (10th Cir. Dec. 4, 2000)).*[10] Under Colorado law, "if legal justification exists for an arrest, there can be no false arrest or false imprisonment;" the existence of probable cause is such legal justification. *Rose v. City & Cty. of Denver, 990 P.2d 1120, 1123 (Colo. App. 1999).* Thus if there was probable cause to arrest Plaintiff, the false arrest/imprisonment claim fails.

"[A]n officer has probable cause to make an arrest if the facts and circumstances within the officer's knowledge or upon which the officer has reasonably trustworthy information indicate that a crime has been committed." *Id. at 1122-23. See also Cortez v. McCauley, 478 F.3d at 1116* (same, "or is about to commit a crime," citing federal cases).

> In determining whether an officer has sufficient, reasonably trustworthy information to establish probable cause, the court looks to the "totality of the circumstances." ... Nevertheless, the *Fourth Amendment* is not offended by mere negligence or innocent mistake in the determination whether probable cause exists.

*Chambers, 2015 U.S. Dist. LEXIS 24080, 2015 WL 881689, at *4.*

In opposing Defendants' motions, Plaintiff recognizes that certain categories of information are relevant only to discovering whether he can seek to add a *Monell* claim: all complaints, reports and investigations against Defendants, all documents [*21] relating to Defendants' use of force, and all complaints, reports and investigations regarding use of force in arrests by any member of the Aurora police department in the last 10 years. Doc. 50 at p. 14 (discussing the "remaining" categories in Plaintiff's subpoena to the City, *i.e.*,

categories 9-13).

Plaintiff cannot issue discovery to determine whether he could add a claim. The court can order discovery relevant to the subject matter of the case, but since the 2000 amendments of *Rule 26*, "'fishing expeditions' for new claims are no longer permitted." *Energy Intelligence Grp., Inc. v. Wells Fargo Sec., LLC, No. 11-cv-01961-REB-KMT, 2012 U.S. Dist. LEXIS 13019, 2012 WL 370252, at *1 (D. Colo. Feb. 3, 2012). See Fed. R. Civ. P. 26,* Advisory Committee Note to 2000 Amendments ("signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."). *See also XTO Energy, Inc. v. ATD, LLC, No. Civ. 14-1021 JB/SCY, 2016 U.S. Dist. LEXIS 57050, 2016 WL 1730171, at *14 (D.N.M. Apr. 1, 2016).*

When he filed the *pro se* Amended Complaint, Plaintiff moved to stay *Monell* claims. Judge Lewis T. Babcock denied the motion. Doc. 20 (Order of Jan. 11, 2017) at p. 4. Judge Babcock noted "Plaintiff may request leave of court to amend his pleading at a later time if he discovers facts that will support a claim for relief based on municipal liability." *Id.* The [*22] court understands this sentence as recognizing that in the course of discovery *relevant to his claims against the individual officers* Plaintiff might find facts pertinent to whether he has a basis to bring a *Monell* claim. Judge Babcock did not thereby authorize Plaintiff to issue discovery whose sole purpose is to determine whether Plaintiff could seek to add a *Monell* claim.[11] Plaintiff must first have a *Monell* claim before he can conduct discovery that would be relevant only to that type of claim.

However, as to the police department's policies, procedures and training that Defendants received, Plaintiff argues this discovery is relevant to his claims against Defendants because

> [1] Whether Defendants acted outside the scope of an official policy, or whether they acted in contravention of their training (or whether they acted without having had any training at all), is

---

[10] Regardless that the pro se amended complaint refers to the **Fourth, Fifth** and **Fourteenth Amendments** for this claim, in his responses to the discovery motions, Plaintiff does not dispute that he brings the claim under the **Fourth Amendment**.

---

[11] In his response brief, Plaintiff argues that unless he is permitted discovery in this case regarding the police department's policies, practices and training, he has no way to determine whether he could state a *Monell* claim and asks the court to clarify whether he may seek to add such a claim without having obtained discovery. The court states herein its understanding of Judge Babcock's order but cannot advise Plaintiff how to investigate the facts or otherwise meet *Rule 11*'s requirements before seeking to add a claim.

2018 U.S. Dist. LEXIS 22978, *22

directly relevant to whether their use of force was "objectively reasonable given the totality of the circumstances." [2] This information is also relevant to Defendants' credibility, which, as described above, will be a critical issue in this case.

Doc. 50 at pp. 13-14. Plaintiff does not cite cases in support of either [*23] theory of relevance.

Defendants argue the department's policies and training are not among the circumstances considered for an excessive force claim, which they describe as "(1) the severity of the crime at issue, (2) whether the plaintiff posed an immediate threat to the safety of the officers, and (3) whether the plaintiff actively resisted or attempted to flee," citing *Osei v. Brooks, 2013 U.S. Dist. LEXIS 38540, *21, 2013 WL 1151619 (D. Colo. 2013)* and *Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*. However, *Graham* identified those factors as a *non-exclusive* list of the circumstances courts must consider, noting that "[b]ecause the test of reasonableness under the *Fourth Amendment* is not capable of precise definition or mechanical application ... its proper application requires careful attention to the facts and circumstances of each particular case." *Id*. Defendants also reiterate that reasonableness is determined from the perspective of a reasonable officer on the scene, not by hindsight, citing *Cortez v. McCauley, 478 F.3d 1108, 1126 (10th Cir. 2007)*. But these cases do not address whether evidence of a police officer's training, or his department's policies and standard practices are relevant to whether force was excessive.

For this question, the Tenth Circuit treats policies and standard operating practices separately from training. For *Section 1983* claims, department policies and standard [*24] practices are not relevant to whether an officer's use of force was objectively reasonable.

> In the exclusionary rule context, the Supreme Court has rejected the use of local police regulations as a standard for evaluating constitutionality of police conduct, on the ground that such a "basis of invalidation would not apply in jurisdictions that had a different practice." ... That logic would seem to apply equally to damage suits under § 1983. This Court has consistently held that the violation of police regulations is insufficient to ground a § 1983 action for excessive force.

*Tanberg v. Sholtis, 401 F.3d 1151, 1162-63 (10th Cir. 2005)* (quoting *Whren v. United States, 517 U.S. 806, 815, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)* and

collecting Tenth Circuit cases).[12]

As to the potential relevance of department policies and standard practices for Defendants' credibility regarding the events at issue, the court has not located cases within the Tenth Circuit addressing this question. Other courts suggest policies and standard operating practices could be relevant to an officer's credibility regarding conduct during an arrest. *See, e.g., Goodwin v. City of Painesville, 781 F.3d 314, 322-23 (6th Cir. 2015)* (evidence that officer failed to activate video camera during arrest in violation of department policy was relevant to officer's credibility regarding use of force in the arrest). At this point, the court will [*25] permit future discovery regarding the police department's policies and standard operating procedures relating to use of force in arrests as relevant only to Defendants' credibility, so long as it is proportional to the case. The court expresses no opinion whether such policies or procedures will ultimately be admissible for any purpose.

Regarding the department's training of Defendants, the Tenth Circuit

> appears to have drawn a distinction between SOPs and training [materials]. ... In the only published Tenth Circuit opinion analyzing whether training materials are admissible as evidence of reasonableness in a *Fourth Amendment* excessive force case, the Tenth Circuit held that the training materials were admissible, stating that "the reasonableness of an officer's actions must be assessed in light of the officer's training."

*United States v. Rodella, No. CR 14-2783 JB, 2015 U.S. Dist. LEXIS 19605, 2015 WL 711949, at *16-17 (D.N.M. Feb. 6, 2015)*, aff'd, *804 F.3d 1317, 1337-38 (10th Cir. 2015)* (internal quotation marks omitted, quoting *inter alia Weigel v. Broad, 544 F.3d 1143, 1155 (10th Cir. 2008)*). *See also Davies v. City of Lakewood, No. 14-CV-01285-RBJ, 2016 U.S. Dist. LEXIS 18355, 2016 WL*

---

[12] "Although plaintiffs frequently wish to use administrative standards, like the Albuquerque SOPs, to support constitutional damages claims, this could disserve the objective of protecting civil liberties. Modern police departments are able—and often willing—to use administrative measures ... to encourage a high standard of public service, in excess of the federal constitutional minima. If courts treated these administrative standards as evidence of constitutional violations in damages actions under § 1983, this would create a disincentive to adopt progressive standards." *Tanberg, 401 F.3d at 1164*.

*615471, at \*3 (D. Colo. Feb. 16, 2016)* ("an officer's training is relevant to the reasonableness of his conduct, and admissible, but ... failure to comply with training is not determinative of whether his conduct [\*26] in a particular context was objectively unreasonable."). Discovery regarding the police department's training of Defendants that relates to the conduct alleged in Plaintiff's claims is thus relevant and so long as it is proportional to the case, the court will permit future discovery on this issue.

In sum, the court grants Defendants' motion to preclude discovery that is solely relevant to whether Plaintiff could bring a *Monell* claim, but denies (without prejudice) the motion to limit discovery to qualified immunity issues, and denies the request to preclude discovery regarding the police department's policies, standard procedures, and training of Defendants that relates to the conduct alleged in Plaintiff's claims against Defendants.

*III. Joint Motion to Amend Schedule*

Finally, the parties jointly request an extension of the discovery cut-off and dispositive motion deadline because discovery necessarily halted in late October 2017 while the parties briefed Defendants' discovery motions and awaited the court's ruling. Doc. 55. The court finds good cause for the requested extension. The fact discovery cutoff is extended to *April 16, 2018*; dispositive motions are due by *May 16, 2018*.

**CONCLUSION [\*27]**

Consistent with the foregoing, the court GRANTS IN PART and DENIES IN PART Defendants' motion to quash or modify subpoena (doc. 46); GRANTS IN PART and DENIES IN PART Defendants' motion to stay or limit discovery (doc. 52); and GRANTS the joint motion for extension (doc. 55).

If any further disputes arise regarding discovery, the parties (or the City of Aurora as a subpoenaed non-party) shall promptly contact Judge Shaffer's chambers to schedule a telephone discovery conference with the undersigned.

DATED: February 13, 2018.

BY THE COURT:

/s/ Kelly H. Rankin

United States Magistrate Judge

End of Document

# EXHIBIT G

Ⓐ Neutral
As of: June 7, 2018 6:11 PM Z

## _In re Grand Jury Subpoena Dated March 20, 2013_

United States District Court for the Southern District of New York

June 24, 2014, Decided; July 2, 2014, Filed

13-Mc-189 (Part I)

**Reporter**
2014 U.S. Dist. LEXIS 91901 *; 2014 WL 2998527

In re: GRAND JURY SUBPOENA DATED MARCH 20, 2013

**Prior History:** _United States v. Hoey, 2014 U.S. Dist. LEXIS 18518 (S.D.N.Y., Feb. 13, 2014)_

## Core Terms

Investigator, communications, interview, disclosure, attorneys, privileged, contacts, warehouse, attorney-client, night, phone, grand jury subpoena, grand jury, abandoned, services, government agent, work product, probable cause, unauthorized, documents, voicemail, subpoena, waiving, taking place, concludes, materials, applies, hired, hotel, woman

**Counsel:** [*1] For John Doe, Plaintiff: Catherine L. Redlich, Christin Jill Masimore, Driscoll & Redlich, New York, NY; Dominic F. Amorosa, Dominic Amorosa, New York, NY.

For United States Of America, Defendant: Ian Patrick McGinley, United States Attorney Office, SDNY, New York, NY; Margaret Garnett, U.S. Attorney's Office, S.D.N.Y. (SA-CR), New York, NY.

**Judges:** Sidney H. Stein, United States District Judge.

**Opinion by:** Sidney H. Stein

## Opinion

### OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

John Doe, the subject of a grand jury investigation convened by the U.S. Attorney's Office for the Southern District of New York, has moved to intervene in order to quash a grand jury subpoena served on an investigator who had previously assisted in his defense. Doe also seeks the return of a file kept by the investigator that she provided to government agents during an interview conducted at her apartment. Following a three-day fact-finding hearing concerning Doe's motion, Doe's motion to quash is granted in part and denied in part for the reasons set forth below.[1]

### I. BACKGROUND

### A. The Retention of Investigator

Late one night in early 2009, a young woman died of a cocaine overdose [*2] following a tryst at an upscale Manhattan hotel. (Def. Ex. F; Hr'g Tr. 203:14-23.) In the hotel room with that woman, whom the Court will refer to as "Decedent," were two other people—John Doe and Jane Roe. Within a week of Decedent's death, John Doe had retained a veteran criminal defense attorney ("Lawyer") to represent him in the face of any anticipated prosecution. (Def. Ex. A; Hr'g Tr. 35:24-25.) One of the first things Lawyer did was retain a firm of third-party investigators, primarily to interview witnesses. (Def. Ex. A; Hr'g Tr. 10:13-12:3.) That firm prepared a letter confirming that the firm was working for Lawyer "in connection with [Lawyer's] representation of" John Doe. (Def. Ex. A at 1.) The firm gave Lawyer written reports of its progress. (Hr'g Tr. 12:4-7.) However, Lawyer did not himself pay the firm for its services. (_Id._ 11:18-20.)

Two years passed. By early 2011, Lawyer and John Doe were aware that Doe was the target of an ongoing criminal investigation by the U.S. Attorney's office for the Southern District of New York. (_Id._ 40:8-41:6.) Despite the passage of time, there were still witnesses that Lawyer's investigators had not interviewed. (_Id._ 14:7.)

---

[1] The government does not oppose Doe's motion to intervene.

These witnesses [*3] were women, so Lawyer figured that they "might be able to relate better with another woman" rather than Lawyer's stable of male investigators. (*Id.* 14:9-10.)

With these thoughts in mind, Lawyer reached out to a female investigator ("Investigator") with whom Lawyer had been in contact for several months. (Hr'g Tr. 13:19-24; Gov't Ex. 11.) On April 1, 2011, Lawyer and Investigator met at Lawyer's office. (Hr'g Tr. 21:15-16, 57:5-24; Def. Ex. C at 4.) Lawyer "explained the nature of the case to [Investigator], asked her that [he would] like her to participate in the matter, and indicated to her that. . . a meeting with some of the attorneys [was taking place] tomorrow . . . and would like her to attend for the purpose of meeting the client and meeting the other attorneys." (Hr'g Tr. 14:16-21.) Lawyer admits that he did not retain Investigator at the April 1 meeting. (*Id.* 21:19.) Lawyer explained that he wanted to "get everybody's approval" before retaining Investigator. (*Id.* 21:20-21.)

On April 2, 2011, John Doe and his defense team met at an office in Westchester County. (Gov't Ex. 3 ¶ 3 .) Prior to this meeting, Lawyer had informed another of Doe's attorneys—a partner at a large New York [*4] law firm—that Lawyer "had used [Investigator] as an investigator on prior cases and had brought her in to assist him" representing Doe. (*Id.*) Investigator sat in as Doe and his battery of attorneys discussed his legal defense strategy. (Def. Ex. D ¶ 8.)

The April 2 meeting was the first time that Doe and Investigator met. (Hr'g Tr. 58:6-7.) Lawyer testified that he retained Investigator on the day of this meeting. (*Id.* 21:22-23.) Investigator testified that during the meeting, Lawyer told Doe that Investigator's retainer was $5,000, and that Doe paid Investigator approximately $500 cash at that time. (*Id.* 101:8-102:8.)

Approximately six weeks after Investigator began working on the Doe matter, Doe executed a contract, authorizing Investigator's company (of which she was the sole member) "to conduct a full investigation as follows:

Witness location/interviews

Take witness statements and conduct background and criminal history inquiries. Analysis of previously compiled data. Prepare written reports for the Law Offices of [Lawyer], Provide court testimony if required.

I [John Doe] have hereby retained the services of [Investigator's company] under the following terms

and conditions . . . .

(Gov't [*5] Ex. 7 at 1.) Those terms and conditions listed Investigator's retainer as $5,000 and her hourly fee as $100. (*Id.*) John Doe and Investigator each executed this contract on May 13, 2011. (*Id.* at 3.)

## B. Investigator's Work on the Doe Case

After the April 2 meeting, Investigator began working on the Doe matter. (Hr'g Tr. 63:1-3.) Investigator's duties chiefly involved witness interviews. Lawyer testified that he told Investigator whom to interview, including a woman who came to the hotel the night of Decedent's death, another woman who was present, and the limousine driver who took Jane Roe away from the hotel after Decedent had collapsed. (Hr'g Tr. 45:16-46:4.) Investigator also testified that Lawyer, not John Doe, told investigator whom to interview. (*Id.* 98:16-20.) Lawyer testified that Investigator never prepared written reports, memos, nor indeed any written documents for Lawyer. (*Id.* 29:25-30:3, 34:23-25.) This conflicts with Investigator's testimony—that she provided Lawyer with written reports following each of her interviews. (*Id.* 109:20-110:21.) However, Investigator did come to Lawyer's office in person to discuss the case. (*Id.* 34:25-35:8, 60:18-20, 66:24-67:1, 97:10-14, 105:18-21.) [*6] Investigator "told [Lawyer] who she saw, what she did, how difficult it was to see a particular witness or how easy it was." (*Id.* 35:2-3.)

Lawyer did not pay Investigator—apparently Lawyer's "normal practice." (*Id.* 36:4, 64:13-18.) Rather, John Doe paid Investigator in cash. (*Id.* 102:21-25.) Investigator's billing system was erratic at best. (*Id.* 94:9-96:2.) Somehow, Investigator would make known to John Doe the amount he owed and they would meet in person for Doe to pay Investigator in cash. Often, these meetings took place in Doe's car as he drove the streets of Manhattan. (*Id.* 103:3-15.) Sometimes, Investigator would contact John Doe's sister in order to secure payment from Doe. (*Id.* 106:9-107:1.) All told, John Doe paid Investigator approximately $12,000 for her work on the case. (*Id.* 102:14-103:2.)

Investigator was also in a great deal of phone contact with both Doe and Lawyer. Between April and August 2011, Investigator's two phones reported 157 "contacts" with the cell phone registered to John Doe. (*Id.* 321:6-10.) In 2011, Investigator's phones reflected 63 "contacts" with Lawyer. (*Id.* 322:19-323:3.) Investigator's phones also reflected 41 "contacts" with a phone registered to [*7] Doe's sister. (*Id.* 323:4-7.) "Contacts"

encompasses both text messages and voice communications. (*Id.* 319:16-21, 321:24-25.)

### C. Meetings with Jane Roe

Two incidents that took place during Investigator's work on the Doe matter deserve special attention. Each involved Jane Roe—the third person in the hotel room the night of Decedent's death who was a key witness Lawyer wanted Investigator to interview. (*Id.* 57:20-24.)

The first incident took place in early April 2011, just a few days after Investigator began work on the Doe case. Jane Roe had been subpoenaed to testify before a grand jury in the Southern District of New York. (Gov't Ex. 1 at 105-07.) In advance of her testimony, John Doe had hired an attorney to represent Roe. (Hr'g Tr. 206:2-5.) (The Court will refer to this lawyer as "Roe's attorney.") The night before Roe was due to testify, Roe's attorney came to her house to help her prepare. Unbeknownst to him, his conversation with Roe was recorded.

Roe's attorney coached Roe on what to say in order to make the case "go away." (Gov't Ex. 2T at 8.) Following the incident when Decedent died, Roe had given the New York police a detailed statement describing what had happened that night. **[*8]** (Def. Ex. F.) Roe's attorney recommended that Roe contradict this statement: for example, "if they ask you if you saw [John Doe] with drugs, tell 'em you'd been drinking n' you did not see [Doe] with drugs. (UI) not sure what you saw. If [the prosecutors] read you your statement, you say 'well that's not what I saw.' If you say these things, the case will go away." (Gov't Ex. 2T at 13.) Roe's attorney suggested that Roe explain away her statement to police by claiming that she signed it simply in order to go home after 16 hours in custody. (*Id.* at 17.)

In addition to his unethical and criminal coaching, Roe's attorney told Roe that John Doe wanted "to send to his, his lawyer's investigator here to take a statement from ya tonight." (*Id.* at 6.) Roe's attorney asked if Roe had "any objection to being interviewed by [Doe's] lawyer's investigator, having her write down what you just said, and signing it? I don't, there's not ramifications for you. But it, it gives [Doe], um, a lot of peace of mind." (*Id.* at 16.) Roe's attorney described this investigator multiple times—each time as working for Doe's lawyer. (*Id.* at 6, 7, 16, 17, 18, 20.) Roe, however, refused to speak with the investigator. **[*9]** (*Id.* at 22.) Roe's attorney called the investigator and told her not to come to Roe's house. (*Id.* at 23.)

The investigator Roe's attorney spoke of was Investigator, who testified before this Court. Investigator testified that Roe's attorney left a voicemail, asking Investigator "[w]hat time are you coming to take the statement [from Roe]?" (Hr'g Tr. 142:7.) Investigator understood "taking a statement" to mean asking Roe questions, not "prepar[ing] a statement for that person to sign." (*Id.* 81:4-5.)

The second incident of note took place in early May 2011. (*Id.* 134:9.) Once again, Investigator was hoping to "take a statement" from Jane Roe. (*Id.* 134:16-18.) Investigator drove to John Doe's place of business, where she met Doe's sister. (*Id.* 134:16-19.) Together, they drove to an abandoned warehouse. (*Id.* 134:16-21, 135:25-136:7, 145:24-25.) Outside the warehouse, Investigator met Roe's attorney. (*Id.* 136:11-16.) Roe's attorney and Investigator went into the warehouse and waited in a small office. (*Id.* 137:1-12.) Some time later, John Doe entered the office with Jane Roe. (*Id.* 137:20-23.) Investigator testified that she then asked Doe to leave. (*Id.* 138:10-12.)

Roe's attorney presented **[*10]** Roe with a prepared statement and, for the next hour, pressured her to sign it. (*Id.* 138:13-139:7.) As Investigator testified:

> [Roe's attorney] explained to [Roe] that she needed to sign the paperwork. I [Investigator] sat there basically and observed. I noticed that, you know, [Roe] was reluctant to sign the paperwork. [Roe's attorney] was somewhat insistent. And [Roe], as a result of being uneasy about signing anything, she made a phone call. During that phone call, she expressed concern about signing this. Um, and I, you know, asked her, would it be possible for me to talk to her and take another statement as opposed to her signing this. And that wasn't an option for his client, as [Roe's attorney] stated. He wanted her to sign the document that was put in—for her to sign right there.

(*Id.* 138:21-139:7.) Investigator also testified that "obviously [Roe] was under duress" during this meeting. (*Id.* 145:16, 209:22-25.) Eventually, Jane Roe signed the statement. (*Id.* 140:3-4.) Investigator took a copy (Roe's attorney had brought two) and the meeting adjourned. (*Id.* 140:5-16.)

### D. End of Investigator's Work for Doe

In August 2011, Investigator's work for John Doe ended following an argument **[*11]** with Doe in Lawyer's office. (*Id.* 167:14-17.) Lawyer had asked Investigator to

interview Doe's girlfriend. (*Id.* 167:19-22.) Doe's girlfriend happened to be at the meeting in Lawyer's office, along with Doe, Doe's sister, and Lawyer. (*Id.* 168:15-17.) Investigator attempted to interview Doe's girlfriend, but Doe "came over and snatched [Investigator's] papers out of [her] hand and said a few not so flattering expletives to [her] and to" Doe's girlfriend. (*Id.* 168:25-169:2.) Due to this argument, Investigator stopped working on Doe's case. (*Id.* 170:2-10.)

### E. Investigator's Meeting with Government Agents

As a result of her testimony to the grand jury, Jane Roe was arrested, tried, and convicted on two counts of perjury and one count of false statement. Roe's attorney has also been arrested and indicted on one count of conspiracy to suborn perjury, one count of impeding a grand jury, and one count of witness tampering. In January 2014, he pled guilty to the conspiracy count and in April 2014 was sentenced principally to 48 months' imprisonment.

Following Jane Roe's trial a DEA agent, "Agent B," attempted to track down the investigator Roe's lawyer mentioned the night before Roe's grand jury [*12] testimony. (*Id.* 215:14-17.) By early February 2013, Agent B had located Investigator. (Gov't Ex. 3501-A at 1.) The night before Agent B planned on visiting Investigator, he e-mailed the Assistant U.S. Attorney handling this case and asked her to secure a grand jury subpoena. (*Id.*) Agent B noted that "[h]opefully I will not need it but will be great if she is uncooperative." (*Id.*) The AUSA signed a subpoena, compelling Investigator to appear before the grand jury on February 21, 2013 to testify concerning alleged witness tampering and impeding a grand jury. (Gov't Ex. 4.) The subpoena did not require Investigator to produce documents. (*Id.*)

At approximately 5:30 p.m. the next day—February 11, 2013—Agent B went to Investigator's home in the Bronx. (Hr'g Tr. 132:20-23; 217:22-24.) With Agent B were two others, another DEA agent ("Agent F") and a Homeland Security special agent who worked in the same task force as Agent B. (*Id.* 218:10-23.) Agent B knocked on Investigator's door without reply. (*Id.* 133:4-5, 219:8-10.) He then telephoned Investigator, informed her of the agents' presence, and asked to come inside. (*Id.* 133:5-11, 219:1017.) Investigator agreed. (*Id.* 133:18-21, 219:19-23.)

Once [*13] inside, Investigator and the agents spoke for over two hours about Investigator's personal affairs

and about the John Doe case. (*Id.* 231:15-232:11, 335:23-337:7.) At some point during this conversation, Agent B served the grand jury subpoena on Investigator. Agent B and Agent F both testified that the subpoena was served within the first few minutes of their entry. (*Id.* 221:10-22, 336:7-13.) Investigator testified that she was not served until the end of the interview. (*Id.* 70:13-71:6.)

Investigator was unaware that Jane Roe had been convicted for her grand jury testimony and that Roe's attorney had been arrested. (*Id* . 158:15-18.) Once Investigator learned these facts, she became concerned that she could be a target of the government's investigation. (*Id.* 72:24-73:3.) However, Agent B and Agent F both testified that Investigator was explicitly told that she was not a target. (*Id.* 239:13-14, 261:18-262:11, 274:12-275:2, 353:20-354:9.) Nonetheless, Investigator "felt that if [she] didn't cooperate to some extent, then certain matters that were presented to [her] were not going to be cleared up." (*Id.* 72:2-4.) Investigator also testified that she was "on the defense and trying to clear [*14] things up, because [she] felt like [she] and [Lawyer] were being accused of doing something that was not the case." (*Id.* 74:1-3.)

In order to clear the air, Investigator told the agents a great deal about the attempted first meeting with Jane Roe, as well as the meeting in the abandoned warehouse, and other communications with John Doe. Investigator played the voicemail that Roe's attorney left for Investigator the night of the attempted first meeting. (*Id.* 79:14-80:2.) Because of the particularities of her mobile phone's voicemail system, Investigator had needed to manually save that voicemail every 21 days in the two years between when it was left and her meeting with the government agents. (*Id.* 143:3-145:6.)

Agent B also asked Investigator if John Doe had ever paid a witness for favorable testimony. (*Id.* 227:24-228:2.) This question was prompted by an interview Agent B had previously conducted with a different (unnamed) witness. (*Id.* 228:3-6.) Investigator told the agents that during one meeting with John Doe, he suggested paying a reluctant witness "a bag of money." (*Id.* 69:17, 228:9-17.) Investigator testified that she believed Doe was joking, although she told him never to joke [*15] about such matters. (*Id.* 69:19-70:2, 228:18-24.)

At some point during the interview, conversation turned to the file that Investigator had kept concerning the Doe case. Investigator testified that the agents brought up

the subject after seeing the file out on Investigator's table. (*Id.* 75:3-24.) Agent B testified that Investigator brought up the file as she tried to remember particular details about her work. (*Id.* 235:7-22.) In any event, Investigator handed over her file to Agent B, who told her that he would make a copy and return the original. (*Id.* 236:16-237:22, 346:17-347:8.)

Investigator also told the agents that about a year after she stopped working on the Doe matter, Investigator had provided a copy of at least a portion of the file to John Doe's sister so that she could pass it along to a new lawyer or investigator. (*Id.* 233:20-234:13.) Agent B and Agent F testified that Investigator told him that she had given Doe's sister a copy of the entire file. (*Id.* 234:9-13, 345:1-16.) Investigator testified that she gave Doe's sister just two pages of issues for further investigation. (*Id.* 165:3-167:13.) Obviously, Investigator had retained a copy of the Doe file. (*Id.* 111:6-18.)

At **[*16]** the fact hearing, Investigator testified that she was concerned during the February 11 meeting that she was revealing privileged information. (*Id.* 71:16-72:11, 73:19-22.) Investigator stated that Agent B told her "that he had looked into it and [the attorney-client privilege] didn't apply to" Investigator. (*Id.* 74:23-24.) Agent B and Agent F both testified that Investigator never mentioned the issue of privilege. (*Id.* 233:12-18, 239:9-11, 348:19-21, 368:22-369:2.) Investigator did, however, tell agents that she was concerned about her relationship with Lawyer, who gave her a great deal of business. (*Id.* 76:15-25, 233:18-19.)

### F. Post-Interview Steps

The day after this interview, Investigator told Lawyer that she had spoken with government agents and provided them with a copy of her case file. (*Id.* 149:9-12; Def. Ex. B1 ¶ 8.) That same day, Agent B contacted Investigator to arrange another interview, this time at the U.S. Attorney's office. (Hr'g Tr. 149:13-18, 243:22-244:4.) A meeting was scheduled for February 14, 2013, but on February 13, Investigator told Agent B that she would like an attorney to be present. (Gov't Ex. 3501-A at 6.) Investigator had at first wanted Lawyer's daughter, **[*17]** also an attorney, to attend the meeting. (Hr'g Tr. 149:22-150:1.) However, the Assistant U.S. Attorney spoke to Lawyer's daughter and decided that it would be inappropriate for Lawyer's daughter to attend the meeting. (*Id.* 150:2-5.) The meeting was adjourned several times as Investigator tried to secure a lawyer. (Gov't Ex. 3501-A at 10-16.)

Then, on February 28, 2013, Investigator called Agent B and told him that she had spoken with Lawyer "about her liability." (*Id.* at 17.) The next day, March 1, Lawyer contacted the U.S. Attorney's office for the first time concerning the February 11 meeting between Investigator and government agents and Investigator's upcoming meeting, then scheduled for March 4. (Hr'g Tr. 201:6-15.) Lawyer left a voicemail "raising concerns that the planned [March 4] meeting might touch on areas protected by the attorney-client privilege." (*Id.* 201:13-15.) The government cancelled the March 4 meeting in light of Lawyer's concerns. (AUSA Decl. ¶ 6.)

On March 4, the AUSA and Lawyer spoke about his privilege concerns. (*Id.*) The AUSA told Lawyer that she "did not believe the privilege applied but that [she] was willing to allow [Lawyer] a reasonable period of time to **[*18]** determine whether [Lawyer] wished to move to quash the grand jury subpoena, and that in the meantime [the government] would refrain from scheduling any further meetings with [Investigator] or taking any investigative steps based on anything in [Investigator's] file." (*Id.* ¶ 6.) On approximately March 20, Lawyer contacted the AUSA and informed her that new counsel would be bringing a motion to quash on the grounds of privilege. (*Id.* ¶ 7.) The AUSA issued a new subpoena, dated March 20, 2013, compelling Investigator to give testimony to the grand jury on April 9, 2013. (Amarosa Aff. Ex. E.)

A week later, counsel representing John Doe contacted the government, seeking to reach an agreement to narrow the scope of Investigator's testimony to the grand jury. (AUSA Decl. ¶ 7.) The government proposed limiting Investigator's testimony to the circumstances of her retention, the attempted April 2011 meeting with Jane Roe, and the May 2011 abandoned warehouse meeting. (Amarosa Aff. Ex. D.) John Doe provisionally agreed, and Investigator's testimony was postponed until a final agreement could be executed. (AUSA Decl. ¶¶ 7-8.) However, on May 7, 2013, Doe's attorneys informed the government that **[*19]** the agreement was no longer acceptable. (*Id.* ¶ 7.) On May 31, 2013, John Doe filed the instant motion to intervene and to quash the grand jury subpoena.

### II. DISCUSSION

John Doe's motion to quash only deals with privileged communications and protected work product—in other words, Investigator's file and communications between Doe and Investigator. Doe has not advanced a plausible

2014 U.S. Dist. LEXIS 91901, *19

claim to privilege to any other facts or communications, including, for example the events during the abandoned warehouse meeting.

The Court concludes that communications between Investigator and Doe are privileged pursuant to the so-called *Kovel* exception. However, the crime-fraud exception vitiates the privilege as to any communications concerning either the aborted meeting with Jane Roe in April 2011 or the abandoned warehouse meeting in May 2011. The Court further concludes that Doe waived any privilege or protection that might have applied to Investigator's file.

## A. Communications Between John Doe and Investigator Are Covered by the Attorney-Client Privilege

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept [*20] confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011)*. "[C]ourts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable. " *Id.*

"Under certain circumstances . . . the privilege for communication with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client." *United States v. Adlman, 68 F.3d 1495, 1499 (2d Cir. 1995)*. Thus, if a client communicates with a third party hired by the client's lawyer, that communication is privileged, so long as "the communication [is] made in confidence for the purpose of obtaining legal advice from the lawyer." *United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961)*.

The third party must fit within a certain class of professionals whose work "is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." *Id.* The archetypal examples of such professionals are interpreters and accountants. *See id.* Private [*21] investigators also fit within this category of necessary aides to the provision of legal services. *See Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 71 (S.D.N.Y. 2010)*; *see also U.S. Dep't of Educ. v. Nat'l Collegiate Athletic Ass'n., 481 F.3d 936, 938 (7th Cir. 2007)* (quoting *Kovel, 296 F.2d at 922*) ("[T]here is no

private-investigator's privilege. [But] [t]he lawyer-client privilege can embrace a lawyer's agents (including an investigator), for example when the 'client in the first instance consults a lawyer who retains an accountant as a listening post.'"); *In re Grand Jury Proceeding, 79 F. App'x 476, 477 (2d Cir. 2003)* ("Under certain limited circumstances . . . the attorney-client privilege may extend to communications with a third party, such as an accountant or private investigator hired to assist in the rendition of legal services."). A contrary conclusion would force attorneys to forego the services of private investigators, lest their communications with the investigators ultimately be revealed at the business end of a subpoena. As Judge Friendly recognized in *Kovel*, the privilege must extend to encompass the realities of modern legal practice. *See Kovel, 296 F.2d at 920-21*.

But [*22] no matter how necessary a private investigator's services might be, communications between an investigator and a client outside the presence of an attorney can only be privileged if the attorney—not the client—retained the investigator.[2] *See id. at 921*. Thus, in this case, the application of the privilege to communications between John Doe and Investigator depends on who hired Investigator—John Doe or Lawyer. The Court concludes that Doe has established, by a preponderance of the evidence, that Lawyer retained Investigator.[3]

"Establishment of an agency relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent." *Elbit Sys., Ltd. v. Credit Suisse Grp., 917 F. Supp. 2d 217, 225 (S.D.N.Y. 2013)* [*23] (quotation marks, alterations, and citations omitted); *see also Restatement (Second) of Agency § 1*. Control by the principal of the agent is of "paramount" "importance" in determining if an agency relationship exists. *Nuevo Mundo Holdings v. PriceWaterhouseCoopers LLP, No. 03 Civ. 613, 2004 U.S. Dist. LEXIS 780, 2004 WL 112948, at *5 (S.D.N.Y. Jan. 22, 2004)*; *see also Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.,*

---

[2] Communications between attorney and client in the presence of an investigator will remain privileged even if the client retained the investigator. *See Kovel, 296 F.2d at 921.*

[3] The Court holds that the preponderance standard applies to determining whether an agent has been retained by a lawyer or a client. This issue is a "factual predicate[]" to the application of the *Kovel* exception. *United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).*

*347 F.3d 448, 462 (2d Cir. 2003)*. "Control is established when the principal prescribes what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times." *Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc., 665 F. Supp. 2d 239, 258 (S.D.N.Y. 2009)* (quotation marks and alteration omitted).

The facts establish that Investigator was an agent of Lawyer and a subagent of John Doe. Lawyer testified that he—not John Doe—agreed with Investigator that she should act on Lawyer's behalf and subject to Lawyer's control. The government stipulated that a partner at a large New York law firm would testify that Lawyer informed the partner of Lawyer's relationship with Investigator prior to the April 2, 2011 meeting where Investigator first met John Doe. The [*24] Court credits Lawyer's testimony—corroborated by this stipulated testimony and Investigator's statements—that Lawyer was the one who "manifest[ed the] intent to grant authority to the agent." *Elbit, 917 F. Supp. 2d at 225.*

The Court also finds that Investigator acted subject to Lawyer's primary control. The Court credits the testimony of Lawyer, bolstered by Investigator's testimony, that Lawyer told Investigator whom to interview, even when the interview subjects were distasteful to John Doe. The Court also credits Lawyer's testimony that he reaped the benefits of his directions to Investigator in the form of Investigator's reports to him.

The government opposes this conclusion based on three pieces of evidence: first, the contract between John Doe and Investigator's company; second, the fact that Doe paid Investigator directly for her services; and third, the number of contacts between Doe and Investigator. None of these facts alters the Court's holding.

First, the contract between Doe and Investigator simply confirms that Investigator was acting as a subagent, with Lawyer as her immediate principal and Doe as the ultimate principal. The contract makes clear that Lawyer would receive [*25] any work product that Investigator produced. The contract did not order that Investigator interview any specific witnesses—Lawyer gave those directions. The contract merely made clear that John Doe was the ultimate principal, even though Lawyer exercised direct control over Investigator's work. *See Restatement (Third) of Agency § 3.15 illus. 3.* In this way, the contract between Doe and Investigator parallels the *Kovel* letter sent by the firm of investigators

Lawyer hired in 2009. That letter specifies that the firm was working for Lawyer "in connection with [his] representation of" Doe. (Def. Ex. A at 1.) That *Kovel* letter also demonstrates that Doe himself—as the ultimate principal—could exercise control over the investigative firm retained by Lawyer. Further, the letter envisaged communications directly between the investigative firm and Doe. Finally, the contract between Doe and Investigator was executed on May 13, 2011. (Gov't Ex. 7 at 3.) This date came more than a month after Investigator began work on the Doe case, and after both the aborted meeting with Jane Roe and the abandoned warehouse meeting. If Doe were controlling Investigator prior to the execution of this contract, [*26] he was doing so pursuant to an unwritten agreement. But the Court only heard evidence concerning one unwritten agreement—the one between Lawyer and Investigator.

Second, the fact that Doe directly paid Investigator for her services does not alter the fact that Investigator worked directly for Lawyer. "The fact that [Doe] paid [Investigator] does not preclude a finding that [Investigator] acted as [Lawyer's] agent" in her work on the Doe case. *Cabrera v. Jakabovitz, 24 F.3d 372, 388 (2d Cir. 1994)*. Even though Doe paid Investigator directly in cash, the record clearly demonstrates that Lawyer exercised day-to-day control over Investigator's work.

Third, the government focused on the voluminous contacts directly between Doe and Investigator between April and August 2011. Investigator testified that many of these contacts concerned the logistics of payment. She also testified that she would communicate with Doe directly to report on her progress. Once again, communications between Doe and Investigator do not take away from the Court's finding that Lawyer exercised control over Investigator's activities. And the entire point of the *Kovel* exception is to allow a client to communicate with [*27] a lawyer's agent without requiring that the lawyer also be present. *See Kovel, 296 F.2d at 922.*

In sum, the Court finds that Lawyer agreed that Investigator would act subject to his control on the Doe matter and that Lawyer exercised day-to-day control over Investigator's work. As such, Investigator was acting as Lawyer's agent, with John Doe as the ultimate principal. Therefore, the *Kovel* exception applies—communications between John Doe and Investigator for the purpose of obtaining legal advice from Lawyer are privileged.

2014 U.S. Dist. LEXIS 91901, *27

## B. The Crime-Fraud Exception Applies to Some Communications

Neither the attorney-client privilege nor the work product doctrine will shield communications made in furtherance of a crime or fraud. See _Amusement Indus., Inc. v. Stern, 293 F.R.D. 420, 425-26 (S.D.N.Y. 2013)_; _In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d 1032, 1038 (2d Cir. 1984)._ "This rule is aimed at serious misconduct and can be invoked only if [a party] demonstrate[s] that there is probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." _HSH Nordbank AG N.Y. Branch v. Swerdlow, 259 F.R.D. 64, 73 (S.D.N.Y. 2009)_ [*28] (quotation marks and citations omitted). "The crime/fraud exception to the attorney-client privilege cannot be successfully invoked merely upon a showing that the client communicated with counsel while the client was engaged in criminal activity. The exception applies only when there is probable cause to believe that the communications with counsel were intended in some way to facilitate or to conceal the criminal activity." _In re Grand Jury Subpoenas Duces Tecum Dated Sept. 15, 1983, 798 F.2d 32, 34 (2d Cir. 1986)._ It is not necessary that the person communicating with the client have knowledge that he is being used to carry out a crime or fraud. See _Amusement Indus., Inc., 293 F.R.D. at 440_; _In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983, 731 F.2d at 1038._

The Court concludes that nonprivileged information establishes probable cause that John Doe was, at the least, attempting to tamper with the testimony of a witness, Jane Roe, in connection with a grand jury proceeding. See _18 U.S.C. § 1512(b)(1)._ Doe provided Roe with an attorney who then encouraged her to contradict her prior written statement when testifying before the grand jury. (Hr'g Tr. 206:2-5; Gov't Ex. 2T.) [*29] Investigator was twice sent to memorialize Roe's influenced recollection of the night of Decedent's death. Investigator herself believed that her attempted meeting with Roe and the abandoned warehouse meeting were inappropriate, hence her saving the voicemail left by Roe's attorney for nearly two years. (Hr'g Tr. 143:3-145:6.) In sum, there is probable cause to believe that any communications between John Doe and Investigator in connection with these two incidents—the April 2011 attempted meeting with Roe and the May 2011 abandoned warehouse meeting—were made in furtherance of a crime.

However, the Court does not find probable cause to support a broader scheme of witness tampering—one that would encompass Doe's "bag of money" comment. The government agrees that the Court cannot use the "bag of money" comment to establish that the crime-fraud exception applies to this comment. (Gov't Mem. in Opp'n at 9 n.2.) Apart from this fact, the Court has only Agent B's testimony that another witness reported an attempt to influence testimony with cash. (Hr'g Tr. 228:3-6.) This single, vague piece of testimony does not establish probable cause to believe that Doe was engaged in a scheme that extended [*30] past Jane Roe.

## C. Any Protection Covering Investigator's File Has Been Waived

At the February 11, 2013 meeting between Investigator and government agents, Investigator handed over a copy of the file she had kept on the John Doe matter. The parties dispute whether Investigator's disclosure of this file—and Doe's reaction to that disclosure—waived the protection of the work product doctrine. The Court holds that Doe's actions and inaction both before and after the February 11 meeting forfeited his claim that Investigator's file is protected work product or covered by the attorney-client privilege.

Unauthorized disclosure of privileged materials does not automatically constitute a waiver of privilege. (Gov't Mem. in Opp'n at 20.) But the privilege holder's actions before and after an unauthorized disclosure can result in the holder waiving a privilege. The privilege holder—here John Doe—bears the burden of showing that he did not waive work product protection. See _SEC v. NIR Grp., LLC, 283 F.R.D. 127, 132 (E.D.N.Y. 2012)_; _Koch v. Greenberg, No. 07 Civ. 9600, 2012 U.S. Dist. LEXIS 58608, 2012 WL 1449186, at *7 (S.D.N.Y. Apr. 13, 2012)_; _Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 105 (S.D.N.Y. 2007)._

In cases [*31] of inadvertent disclosure (for example, mistakenly including protected documents in a voluntary and authorized production of nonprivileged materials), courts weigh four factors to determine if that disclosure constitutes a waiver. The four factors are: "(1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure at issue; (3) the length of time taken by the producing party to rectify the disclosure; and (4) the overarching issue of

2014 U.S. Dist. LEXIS 91901, *31

fairness." *United States v. Rigas, 281 F. Supp. 2d 733, 738 (S.D.N.Y. 2003)*. Factors one and three have also been codified in *Rule 502(b) of the Federal Rules of Evidence.*

This Court concludes that these four factors should also be applied in cases of unauthorized—as opposed to inadvertent—disclosure. *See United States v. Hatfield, No. 06 Cr. 55, 2010 U.S. Dist. LEXIS 4026,2010 WL 183522, at *9 (E.D.N.Y. Jan. 8. 2010)*. The Court also notes that in cases of unauthorized disclosure, courts especially focus on the privilege-holder's actions after learning of the unauthorized disclosure. *See Koch, 2012 U.S. Dist. LEXIS 58608, 2012 WL 1449186, at *7.*

### 1. Precautions taken prior [*32] to disclosure

Lawyer testified that he instructed Investigator that "she was not to discuss [the case] with anybody, she's not to convey information to anybody." (Hr'g Tr. 47:16-17.) Investigator also testified that she was aware that she was unauthorized to disclose protected information to the government. (*Id.* 76:2-8.) Investigator may have understood the nature of privilege in the abstract, but her testimony belied her fundamental misunderstanding of what privilege requires of an attorney and an attorney's agents. Investigator repeatedly stated that she turned over confidential and privileged information in order to protect herself and Lawyer from a perceived threat of liability. (*Id.* 72:2-7, 73:17-74:4, 75:3-24, 115:8-18, 128:9-20, 156:18-157:6.) But taking the privilege seriously means respecting it, even if doing so means opening oneself up to potential liability. *See People v. Belge, 83 Misc. 2d 186, 372 N.Y.S.2d 798 (N.Y. Cty. Ct. 1975)*, *aff'd, 50 A.D.2d 1088, 376 N.Y.S.2d 771 (4th Dep't 1975).*

More consequentially, though, there was absolutely no evidence that Doe or his agents took any steps to protect Investigator's file after she stopped working on the Doe matter. Neither Investigator nor Lawyer testified that [*33] she was instructed to turn over her file along with any copies. Indeed, Doe knew that Investigator still retained a copy of the file a year later, when Doe's sister was sent to retrieve some or all of that file from Investigator. The Court credits Investigator's testimony that she provided Doe's sister with just two pages of follow-up materials, and not her entire file. (Hr'g Tr. 166:12-19.) But this fact only reinforces Doe's failure to take effective steps prior to protect work product prior to February 2013. In sum, the record does not demonstrate that John Doe, either personally or through

his agents, took meaningful precautions to prevent Investigator's work product from being disclosed.

### 2. Volume of disclosure

Courts are generally hesitant to find waiver if the inadvertently disclosed documents are few in number and part of a much larger production. *See BNP Paribas Mortg. Corp. v. Bank of Am., N.A., No. 09 Civ. 9783, 2013 U.S. Dist. LEXIS 75402, 2013 WL 2322678, at *6 (S.D.N.Y. May 21, 2013)*. Here, by contrast, the entirety of Investigator's file is presumptively protected by work product. Indeed, Doe's attorneys did not specify which portions of that file were not protected until the third day of the fact-finding [*34] hearing, nearly six months after the February 11 meeting. Thus, this factor weighs in favor of finding a waiver.

### 3. Post-disclosure actions

Above all, it is Doe's inaction following Investigator's disclosure that waives the protection covering Investigator's file. Investigator informed Lawyer about her meeting with the government and her disclosure of the file on the day after the meeting. (Hr'g Tr. 149:9-12; Def. Ex. B1 ¶ 8.) Lawyer affirmed that he was "stunned" to learn of Investigator's disclosures. (Def. Ex. B1 ¶ 8.) He also affirmed that "[i]t is impossible to overstate the harm to [John Doe's] defense this incursion into privileged attorney-client communications and attorney work product has caused and/or will cause." (*Id.* ¶ 10.) Despite his shock on February 12, Lawyer waited over two weeks, until March 1, 2013, before contacting the government about this meeting. (Hr'g Tr. 201:6-15.) And after Doe's agreement with the government fell apart in early May 2013, Doe's attorneys waited several weeks before filing the instant motion to quash. (AUSA Decl. ¶ 7.)

These delays are unacceptable given the perceived gravity of Investigator's disclosures. Courts have held that twelve days, [*35] even six days, are too long to wait to avoid waiving privilege. *See Brookdale Univ. Hosp. & Med. Ctr., Inc. v. Health Ins. Plan of Greater N.Y., No. 07 Civ. 1471, 2009 U.S. Dist. LEXIS 11537, 2009 WL 393644, at *3 (E.D.N.Y. Feb. 13, 2009)*; *S.E.C. v. Cassano, 189 F.R.D. 83, 86 (S.D.N.Y. 1999)*. And John Doe's attorneys displayed this dilettantish attitude towards the privilege twice. Doe was not required to file a motion in the first instance—an agreement with the government is sufficient to protect privileged materials.

See <u>United States v. Stewart, 287 F. Supp. 2d 461, 463-64 (S.D.N.Y. 2003)</u>. Once that agreement fell apart, however, Doe's second three-week delay merely compounded his first failure to act promptly.

End of Document

### 4. Fairness

Fairness considerations do not militate in favor or against waiver. John Doe has not asserted that Investigator's file—as opposed to other communications the Investigator revealed to the government—contains key information for Doe's possible defense against criminal charges. See <u>Stewart, 287 F. Supp. 2d at 469</u>. Although Doe now seeks to use Investigator's disclosure to disqualify the prosecution team, that team has always been on notice that Investigator's file was potentially covered by the [*36] work product doctrine. Even if Investigator were Doe's agent, and not Lawyer's, her written materials prepared in anticipation of litigation constitute at least prima facie work product. See Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . .").

Even without considering fairness, however, Doe's actions and inaction constitute a waiver of work product protection over Investigator's file.[4]

### III. Conclusion

For the reasons set forth above, John Doe's motion to quash is granted in part. The government may not inquire into communications between Doe and Investigator, except for any communications concerning the April and May 2011 meetings involving Jane Roe. The government may make use of Investigator's file.

Dated: New York, New York

June 24, 2014

SO ORDERED:

/s/ Sidney H. Stein

Sidney H. Stein, U.S.D.J.

---

[4] The Court, however, does not find a broader waiver reaching communications that Investigator may have spoken about with the government agents.

# EXHIBIT H

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 16-13040 ) Hon. Sean F. Cox |
| Elite Health Centers Inc., Elite Chiropractic, P.C., Elite Rehabilitation, Inc., Midwest Medical Associates, Inc., Pure Rehabilitation, Inc., Derek L Bittner D.C., P.C., Mark A. Radom, Derek Lawrence Bittner, D.C., Ryan Matthew Lukowski, D.C., Michael P. Draplin, D.C., Noel H. Upfall, D.O., Mark J. Juska, M.D., Superior Diagnostic, Inc., Chintan Desai, M.D., Michael J. Paley, M.D., Dearborn Center for Physical Therapy, LLC, Michigan Center for Physical Therapy, Inc., and Jayson Rosett, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## PROTECTIVE ORDER

Pursuant to Federal Rule of Civil Procedure 26(c), and to expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, protect material entitled to be kept confidential, and ensure that protection is afforded only to material so entitled, it is hereby **ORDERED:**

1

1.     This Protective Order shall apply to *State Farm Mutual Automobile Insurance Company v. Elite Health Centers, Inc., et al.*, Civil Action No. 2:16-cv-13040, in the United States District Court for the Eastern District of Michigan (the "Litigation").

### A.    "Confidential" Documents and Information

2.     This Protective Order shall apply to documents or portions thereof, and to information contained therein, which any party, producing person, or entity designates as "Confidential" in the manner described below.  A producing person or entity may designate as "Confidential Material" only information entitled to such protection under applicable law.   Any designation of materials as "Confidential" must be made in good faith and in accordance with applicable law. In addition, the following documents shall be deemed "Confidential" and subject to the provisions of this Protective Order without the requirement of further designation and marking, as set forth below:

   a)   Any document containing Protected Health Information ("PHI") as that term is defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); and]

   b)   All patient files, including file jacket and contents which may include but are not limited to visit notes, photographs/videos/text, operative reports, discharge summaries, radiological films, copies, prints and extracts, medical record abstracts (*e.g.*, history, physical operative reports, consult reports), pathology reports, radiology reports, laboratory reports, entire patient medical records, psychological reports or profiles, diagnostic test results, billing statements,

claim forms, explanation of benefit forms, prescriptions, and referrals.

Notwithstanding the designation of documents or information described above in Paragraph 2(a) and (b) as "Confidential," that designation may be challenged in the same manner as challenges are made to any other documents or information so designated.

3.    Except as set forth above, parties and nonparties shall designate "Confidential" information by marking the word "CONFIDENTIAL" on the face of the relevant documents and on each page containing "Confidential" information.

4.    Any party to this Litigation may designate as "Confidential" documents—or portions thereof—produced by any other party or nonparty. Subject to the provisions of Paragraph 10, the party choosing to make the designation shall give written notice to all other parties as soon as practicable after production is made, but no later than fourteen (14) days after receipt of their production.  Notice by the party choosing to designate as "Confidential" documents or information produced by another party or a nonparty shall identify the specific reasons why the documents or information are entitled to confidential treatment under applicable law and the provisions of this Protective Order.

5.    Except with the prior written consent of (i) the party or other person who originally designated and/or stamped as "Confidential" a document produced in this Litigation; or (ii) the party who originally designated as "Confidential,"

3

pursuant to Paragraph 4, information produced by other parties or nonparties or as hereinafter provided under this Protective Order, no document or information produced and designated as "Confidential" under this Protective Order may be disclosed to any person or entity except as set forth in this Protective Order.

6.     For purposes of this Protective Order, the term "document" means all written, electronic, recorded or graphic material, whether produced or created by a party or another person, whether produced pursuant to subpoena, by agreement, or otherwise and shall include but is not limited to interrogatory answers, transcripts of examinations under oath, depositions, pleadings, exhibits, responses to requests for admission, other discovery taken pursuant to the Federal Rules of Civil Procedure, and all other information exchanged by the parties or by any third party in response to discovery requests or subpoenas that quote, summarize, or contain material entitled to protection.

7.     To the extent that matter stored or recorded in the form of electronic or magnetic media (including information, databases, or programs stored on computers, disks, networks, or tapes) ("Computerized Material") is produced by any person or entity in such form, the producing person or entity may designate such matter as "Confidential" by cover letter referring specifically to such matter. Whenever any person to whom Computerized Material designated as "Confidential" is produced reduces such material to hard-copy form, such person

shall mark "CONFIDENTIAL" on the face of the relevant documents and on each page containing "Confidential" information.

### B. Permissible Disclosures of "Confidential" Documents or Information

8. "Confidential" documents and information may be disclosed to: (i) the parties to this Litigation; (ii) counsel for the parties in this Litigation; (iii) the partners, associates, secretaries, paralegals, assistants, and employees of such counsel; (iv) persons or entities that are clearly identified in the document as an author, addressee, carbon-copy recipient, or blind carbon-copy recipient; (v) court officials, mediators, or arbitrators involved in this Litigation (including court reporters, persons operating video recording equipment at depositions, and any special master appointed by the court); and (vi) any other person mutually agreed upon by the parties. Subject to the provisions of Paragraph 9, such documents may also be disclosed to:

    (a)    any person designated by the Court in the interest of justice, upon such terms as the Court may deem just and proper;

    (b)    witnesses and/or potential witnesses – including but not limited to non-parties to whom subpoenas are directed – to the extent reasonably necessary to obtain testimony, obtain documents, or determine the witness's or potential witness's knowledge as it pertains to this Litigation;

    (c)    consultants, experts and/or others contacted or retained for the purpose of assisting counsel in the Litigation; and

       (d)     entities and employees of entities involved solely in one or more aspects of copying, organizing, filing, coding, converting, storing, or retrieving data.

9.     In all such cases where disclosure is to be made to any person or entity listed in Paragraph 8(a)–(d), such individual or entity must sign the Confidentiality Agreement annexed hereto as Exhibit A prior to reviewing any "Confidential" documents or information.   Any individual or entity listed in Paragraph 9(a)–(d) that refuses to sign Exhibit A shall not be permitted to have access to or view the "Confidential" documents or information.   The attorney making or seeking to make the disclosure shall maintain each executed Confidentiality Agreement in his or her files, and will produce the same upon written demand of any other party.

**C.    Declassification**

10.    Notwithstanding the designation of documents or information described above in Paragraph 2 as "Confidential," any "Confidential" designation may be challenged as set forth herein.   If any party to the Litigation disputes the "Confidential" designation of any documents, portions of documents, or testimony, the declassification procedure shall be as follows:  (a) that party shall give notice to all other parties identifying the reasons concerning why the documents or information are not entitled to "Confidential" treatment (the "Objection"); (b) the parties shall promptly meet and confer in an attempt to resolve their differences by

agreement; and (c) if the parties are unable to agree as to whether the designated items are "Confidential," the party that made the designation, within fourteen (14) days of receiving the Objection (unless the parties otherwise agree), must file an appropriate motion with the Court, seeking an order determining whether the items are "Confidential" and entitled to protection under applicable law and this Protective Order.   Failure to bring such a motion within fourteen (14) days of receiving an Objection (or within any extended time period agreed to by the parties) shall result in waiver of "Confidential" protection of the documents or information in question.  Until resolution of the dispute is achieved either through (a) failure to bring a motion, (b) consent, or (c) Court order, all parties shall treat the documents in question as "Confidential."

### D.   Use of "Confidential" Documents or Information in a Deposition

11.   A deponent may be shown and examined about a "Confidential" document or information during a deposition if the deponent is the author or a named recipient of the document or if the applicable provisions of Paragraph 10 are met.  If a "Confidential" document is entered as an exhibit to the deposition, it shall be kept under seal.  Unless provided in a manner authorized under this Protective Order, deponents shall not retain or copy any "Confidential" document that is provided to them during the course of their deposition.

12.     Subject to the provisions of Paragraph 11, parties and deponents may, within 21 days after receiving the official deposition transcript, designate pages of the transcript (and exhibits thereto) as "Confidential." "Confidential" information within the deposition transcript may be designated by providing written notice to all other parties of the page and line numbers that contain "Confidential" information. If a "Confidential" designation is made, the "Confidential" portions and exhibits shall be subject to the terms of this Protective Order and may only be accessed and reviewed in accordance with the terms contained in this Protective Order.

**E.     Use of "Confidential" Documents or Information at a Hearing or Trial**

13.     Nothing in this Protective Order shall be construed to affect the admissibility of any document, material, or information at any trial or hearing. "Confidential" documents or information may be offered in evidence at trial or any Court hearing, provided that such documents or other information shall be retained under seal by the Court or the trier of fact, if the Court so determines, and be subject to the terms of this Protective Order. Any party may also move the Court for an order that the evidence be received *in camera* or pursuant to any other conditions to prevent unnecessary disclosure. Nothing contained in this Paragraph shall prohibit any party from moving the Court for an order that the party may

deem appropriate regarding the use of "Confidential" documents at a Court hearing or trial.

**F.    Use of "Confidential" Documents and Information in Legal Documents**

14.    A party that seeks to file any pleading, motion, brief, memoranda, or other paper that contains "Confidential" information must comply with Civil Local Rule 5.3, and this Order shall serve as a stipulated order for the purposes of that Rule.  Consistent with Civil Local Rule 5.3, only those portions of Court filings containing "Confidential" information shall be filed under seal.  The public version of the document shall be as complete as possible, but the filing party may redact the "Confidential" material or refer to it in a way that does not reveal the "Confidential" information.   A courtesy copy of the filing containing the "Confidential" material shall be delivered to the Court and a full copy of any such sealed submission shall be served upon counsel for the parties.  Such service may be effected by e-mail.  Nothing contained herein limits a producing party's use or disclosure of its own discovery material.

15.    If any party objects to identified portions of the materials remaining under seal, it shall state its objections in an electronically delivered letter to the appropriate counsel of record.  The interested parties shall promptly meet-and-confer to attempt to resolve those objections and, if they cannot be resolved, shall promptly tender those objections to the Court for resolution.

### G.    Use

16.    Persons obtaining access to "Confidential" documents or information under this Protective Order shall use the "Confidential" information only for purposes of this Litigation (including any and all subsequent proceedings in this Litigation, such as appeal), and shall not use such information for any other purpose.

17.    In the event that any person or entity referred to in Paragraph 8 of this Protective Order is served with legal process purporting to require the disclosure of any "Confidential" information (the "Disclosing Entity") by any person or entity not covered by this Protective Order, including, without limitation, other insurance carriers, state, local, or federal agencies, or litigants in other litigation (the "Requesting Entity"), the Disclosing Entity shall give notice thereof, by telephone, email, and/or facsimile, as soon as practicable prior to the requested disclosure to afford any party who may be adversely affected by the disclosure an opportunity to intervene.  The Disclosing Entity shall not disclose the "Confidential" information for a period of at least ten (10) days in order to allow such party to take the steps necessary to preserve the confidentiality of such information or document.

### H.    Termination

18.    The provisions of this Protective Order shall not terminate at the conclusion of this Litigation.  However, within 120 days after final conclusion of

10

all aspects of this Litigation (including all appeals), "Confidential" documents and all copies (including excerpts) shall be returned to the party or person that produced such documents or, at the option of the producer, be destroyed. Counsel shall be entitled to retain pleadings and the exhibits thereto, affidavits, motions, briefs, or other papers filed with the Court, as well as any memoranda, notes, or other work product, even if they contain "Confidential" information, so long as counsel protects that information consistent with the terms of this Protective Order.

### I.  Modification Permitted

19.  Nothing in this Protective Order shall prevent any party or other person from seeking modification of this Protective Order or from objecting to discovery that it believes to be otherwise improper.

### J.  Responsibility of Attorneys

20.  The attorneys of record are responsible for employing reasonable measures, consistent with this Protective Order, to control duplication of, access to, and distribution of copies of "Confidential" documents.

### K.  No Waiver

21.  Review of the "Confidential" documents and information by counsel, experts, or consultants for the parties in the Litigation shall not waive the confidentiality of the documents or objections to production.

11

22.     The inadvertent, unintentional, or *in camera* disclosure of "Confidential" documents shall not, under any circumstances, be deemed a waiver, in whole or in part, of any party's claims of confidentiality, as to the documents themselves, or as to any other documents or information not disclosed.  Nothing contained in this Paragraph shall prevent a party from moving the Court for an order declaring that a disclosure was inadvertent or unintentional.

23.     The intentional disclosure of a "Confidential" document in a manner in violation of or inconsistent with the terms of this Protective Order shall be submitted to the Court for consideration of appropriate relief.  Nothing contained in this Protective Order and no action taken pursuant to it shall prejudice the right of any party to contest the alleged relevancy, admissibility, or discoverability of the "Confidential" documents sought.

**L.     HIPAA**

24.     The following special treatment is to be provided to any document which contains PHI of any party or non-party:

> (a)     The parties are to exchange any documents covered by HIPAA only after the entry of this Protective Order;
>
> (b)     Pursuant to the provisions of HIPAA, this Order extends to all HIPAA protected content and will operate in place of authorizations by those individuals whose files are the basis of the action at bar;
>
> (c)     The parties are prohibited from using or disclosing the protected PHI for any purpose other than the Litigation; and

12

2:16-cv-13040-SFC-APP   Doc # 82   Filed 06/27/17   Pg 13 of 16   Pg ID 1271

    (d)    The parties shall return to the covered entity or destroy the PHI (including all copies made) at the end of the Litigation. In the event a party elects to destroy the PHI, it shall supply to the covered entity a sworn affidavit verifying the destruction. In no event shall any original, protected PHI be destroyed. All original PHI shall be returned to the covered entity.

25.    The parties agree that, based on the provisions set forth in Paragraph 24(a)–(d), this Protective Order is a "qualified protective order" as defined by HIPAA. 45 CFR 164.512(e)(1)(v).

**M.**    **Third-Party Productions**

26.    The protections under this Protective Order extend to any information or documents produced by any third-parties pursuant to a subpoena served by any party to this litigation.

Dated: June 27, 2017             s/Sean F. Cox
                                  Sean F. Cox
                                  U. S. District Judge

Stipulated and agreed to by:

**KATTEN MUCHIN ROSENMAN, LLP**

By: Kathy P. Josephson
*Attorneys for Plaintiff State Farm Mutual Automobile Insurance Company*
Dated: 6/12/2017

Ross O. Silverman
Kathy P. Josephson
Michael M. Rosensaft
525 West Monroe Street
Chicago IL 60611-3693
(312) 902-5200
ross.silverman@kattenlaw.com
kathy.josephson@kattenlaw.com
michael.rosensaft@kattenlaw.com

**GARY R. BLUMBERG, P.C.**

By: Gary R. Blumberg
*Co-Attorney for Defendants Elite Health Centers, Inc., Elite Chiropractic, PC, Midwest Medical Associates, Inc., Pure Rehabilitation, Inc., Derek L. Bittner, PC, Mark A. Radom, Derek L. Bittner, Michael P. Draplin, Ryan M. Lukowski, Noel H. Upfall, Mark J. Juska, Superior Diagnostic, Inc.*
Dated: 6/12/2017

Gary R. Blumberg
15011 Michigan Avenue
Dearborn, MI 48126
(313) 230-1121
gblumberg@blumbergpc.com

**JOELSON ROSENBERG, PLC**

By: Peter W. Joelson
*Co-Attorneys for Defendants Elite Health Centers, Inc., Elite Chiropractic, PC, Midwest Medical Associates, Inc., Pure Rehabilitation, Inc., Derek L. Bittner, PC, Mark A. Radom, Derek L. Bittner, Michael P. Draplin, Ryan M. Lukowski, Noel H. Upfall, Mark J. Juska, Superior Diagnostic, Inc.*
Dated: 6/12/2017

Peter W. Joelson
Emily R. Warren
30665 Northwestern Highway,
Suite 200
Farmington Hills, MI 48334
(248) 626-9966
pjoelson@joelsonrosenberg.com

**LAW OFFICES OF BEN M. GONEK, PLLC**

By: Ben M. Gonek
*Attorney for Defendants Dearborn Center for Physical Therapy, LLC, Michigan Center for Physical Therapy, Inc., Jayson Rosett*
Dated: 6/12/2017

Ben M. Gonek
500 Griswold Street
Suite 2450
Detroit, MI 48226
(313) 963-3377
ben@goneklaw.com

14

**RUTLEDGE, MANION, RABAUT, TERRY AND THOMAS, PC**

By: Paul J. Manion
*Attorney for Defendant Michael J. Paley*
Dated: 6/12/2017

Paul J. Manion
333 West Fort Street
Suite 1600
Detroit, MI 48226
(313) 965-6100
csaba@rmrtt.com

**BUTZEL LONG, PC**

By: Ziyad I. Hermiz
*Attorney for Defendant Chintan Desai*
Dated: 6/12/2017

Ziyad I. Hermiz
150 West Jefferson Avenue
Suite 100
Detroit, MI 48226
(313) 225-7000
hermiz@butzel.com

## EXHIBIT A

## CONFIDENTIALITY AGREEMENT

I, _____, state the following:

     1.    I have read and understand the attached Protective Order and I attest to my understanding that access to information designated as "Confidential" may be provided to me and that such access shall be pursuant to the terms and conditions and restrictions of the Protective Order.  I agree to be bound by the terms of the Protective Order, both with respect to this Court's powers of supervision of the litigation of the above-captioned case and to the party that produced the protected documents and information.

     2.    I shall not use or disclose to others, except in accordance with the Protective Order, any "Confidential" documents or information.  If I fail to abide by the terms of this Confidentiality Agreement or the Protective Order, I understand that I shall be subject to sanctions by way of contempt of court and to separate legal and equitable recourse by the adversely affected party.  I further consent to the exercise of personal jurisdiction by this Court and waive any objection as to venue in connection with any effort to enforce this Confidentiality Agreement.

Date: _____     _____

                                          Signature