UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| State Farm Mutual Automobile Insurance Company,           ) <br> )<br> )<br>                                    Plaintiff,           )<br> )<br>                           v.                         )<br> )<br> Elite Health Centers Inc.,                              )<br> Elite Chiropractic, P.C.,                               )<br> Elite Rehabilitation, Inc.,                             )<br> Midwest Medical Associates, Inc.,                       )<br> Pure Rehabilitation, Inc.,                              )<br> Derek L Bittner D.C., P.C.,                             )<br> Mark A. Radom,                                          )<br> Derek Lawrence Bittner, D.C.,                           )<br> Ryan Matthew Lukowski, D.C.,                            )<br> Michael P. Draplin, D.C.,                               )<br> Noel H. Upfall, D.O.,                                   )<br> Mark J. Juska, M.D.,                                    )<br> Superior Diagnostic, Inc.,                              )<br> Chintan Desai, M.D.,                                    )<br> Michael J. Paley, M.D.,                                 )<br> Dearborn Center for Physical Therapy, LLC,              )<br> Michigan Center for Physical Therapy, Inc., and         )<br> Jayson Rosett,                                          )<br> )<br>                                    Defendants.         ) | Case No. 16-13040 <br> Hon. Sean F. Cox |

**STATE FARM MUTUAL'S REPLY IN SUPPORT OF
MOTION TO COMPEL MICHAEL MORSE TO PRODUCE
DOCUMENTS RESPONSIVE TO STATE FARM MUTUAL'S SUBPOENA**

## TABLE OF CONTENTS

A.   The Subpoena Was Served for a Proper Purpose. ...............................7

B.   The Subpoena Is Proportional to the Needs of the Case, and Any Confidentiality Concerns Are Addressed by the Protective Order.....10

C.   The Protective Order Offers Appropriate Protection..........................12


# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Doe v. United States*,
   253 F.3d 256 (6th Cir. 2001) ................................................................11

*Fed. Deposit Ins. Corp. v. Ark-La-Tex Fin. Servs., LLC*,
   2016 WL 3460236 (N.D. Ohio June 24, 2016) ....................................11

*Hennigan v. Gen. Elec. Co.*,
   2012 WL 13005370 (E.D. Mich. Apr. 2, 2012) ....................................12

*In re Modern Plastic Corp.*,
   890 F.3d 244 (6th Cir. 2018) ................................................................11

*McCurdy v. Wedgewood Capital Mgmt. Co.*,
   1998 WL 964185 (E.D. Pa. Nov. 16, 1998) ...........................................8

*Med City Rehab. Serv., LLC v. SFMAIC*,
   2012 WL 12929897 (E.D. Mich. Dec. 10, 2012) ...................................7

*Roberts v. Shawnee Mission Ford, Inc.*,
   352 F.3d 358 (8th Cir. 2003) ..................................................................8

*Rodriguez v. Vizio, Inc.*,
   2015 WL 11439029 at *4 (S.D. Cal. Jan. 6, 2015) ..............................12

*SFMAIC v. Fayda*,
   2015 WL 7871037 (S.D.N.Y. Dec. 3, 2015) ........................................12

*SFMAIC v. Physiomatrix, Inc.*,
   2013 WL 10936871 (E.D. Mich. Nov. 26, 2013) ................................1, 8, 10, 11

*SFMAIC v. Physiomatrix, Inc.*,
   2014 WL 10295400 (E.D. Mich. Mar. 17, 2014) ...............................1, 8

*SFMAIC v. Pointe Physical Therapy*,
   LLC, 255 F. Supp. 3d 700 (E.D. Mich. 2017) ...............................10, 11

*SFMAIC v. Policherla*,
   2009 WL 2170183 (E.D. Mich. July 20, 2009) ....................................10

*SFMAIC v. Warren Chiropractic & Rehab Clinic, P.C.*,
   315 F.R.D. 220 (E.D. Mich. 2016) ..................................................................8, 11

*Visteon v. Nat'l Fire Ins. Co.*,
   2008 WL 2026131 (E.D. Mich. 2008)..............................................................10

**Rules**

Fed. R. Civ. P. 26(c)(1)(G) ...................................................................................12

Fed. R. Civ. P. 45 ..................................................................................................11

Fed. R. Civ. P. 45(d)(2)(B)(ii) ...............................................................................11

**Other Authorities**

Chad Livengood, *The Health Care Crack Up: How Michigan's Auto
   Insurance Premiums Became the Highest in the Country*, Crain's
   Detroit Business (Oct. 22, 2017) .......................................................................11

In *Physiomatrix*, Judge Grand held Morse's "*quid pro quo*" relationship with provider–defendants who treated Morse's clients was discoverable because "a jury 'is entitled to know the "setting" of a case. It cannot be expected to make the decision in a void – without knowledge of the time, place and circumstances of the acts which form the basis of the charge.'" *SFMAIC v. Physiomatrix, Inc.*, 2013 WL 10936871 at *7, 9 (E.D. Mich. Nov. 26, 2013). For this reason, Judge Grand also held the use of "unethical or illegal means to obtain crash reports . . . would be an important part of [the] case's 'setting.'" *SFMAIC v. Physiomatrix, Inc.*, 2014 WL 10295400, at *3 (E.D. Mich. Mar. 17, 2014). As described next, these rulings apply here because Morse had both *quid pro quo* and direct financial relationships with Defendants, and worked with them to unlawfully obtain police reports they collectively used to solicit patients for Defendants and clients for Morse, who Morse steered to Defendants.

After SFMAIC filed its Motion, Rosett produced emails which explain the illegal solicitation methods used by Defendants and Morse to facilitate the scheme. Rosett formed Accident Information Bureau in December 2009. Beginning in at least early 2010, AIB started purchasing "unapproved" police reports – before they were publicly available to law enforcement, attorneys or insurers – from individuals who appear to be Detroit police officers, which Morse knowingly used to solicit auto accident victims to become his clients. Initially, Rosett called auto accident victims using the alias "Lou" to solicit them for Morse, and then emailed

1

their information to Morse's marketing director, Janet Rosenberg, who would call them.[1] There was, however, a lag time between when Rosett sent Rosenberg the potential clients' information and when she called them, which sometimes resulted in the potential client hiring a different lawyer.[2] To remedy this situation, Rosenberg and Rosett figured out a way for Rosett to patch his calls with potential clients directly into Morse's office while he had them on the phone.[3]

Throughout 2010, Rosett obtained unapproved police reports from Antonio Spratt, who paid a police officer, Robert Coleman, and his wife, Javay Coleman, for the reports.[4] By late 2010, Rosett and his father, Robert Rosett, who was also

---

[1] *See, e.g.*, Ex. 1 (8/17/2010 emails between Rosett and Rosenberg); Ex. 2 (8/30/2010 email from Rosenberg to Rosett, stating "Everyone I talked to today..I mention Lou, next thing they ask me is 'yeah but how did LOU get my number??" I've been talking my wa[y] through that but just a heads up in case there is anything else you can say. The first one was dicey!"); Ex. 3 (8/30/10 emails between Rosenberg and Rosett with subject "I'm on fire!"); Ex. 4 (9/8/10 email between Rosenberg and Rosett, stating "Lou just talked to her").
[2] *See, e.g.*, Ex. 5 (9/9/10 email from Rosenberg to Rosett stating potential client "told me he has a lawyer already!! Wtf? No clue what happened, but he was called promptly!"); Ex. 6 (9/13/10 email from Rosenberg to Rosett stating potential client "hung up from Lou and called another lawyer and has chosen that firm!!!!").
[3] *See* Ex. 7 (9/14/2010 email from Rosenberg to Rosett explaining they could "connect you right to our office with your own direct dial number so our name won't come up on caller ID"); Ex. 8 (9/14/10 email from Rosett to Rosenberg responding, "I think a phone that can patch you guys right in will work perfectly and help convert more cases."); Ex 9 (9/14/10 email from Rosenberg to Rosett discussing auto accident victim who signed with attorney Carl Collins after speaking to "Lou" and exclaiming "WE NEED TO GET THAT PHONE SET UP!!"); Ex. 10 (10/21/10 email from Rosenberg to Rosett with phone instructions and stating "let's hope this makes a huge difference!").
[4] *See, e.g.*, Ex. 11 (2/4/10 email from "Javay" to Spratt forwarded to Rosett); Ex. 12 (7/28/2010 from Javay to Rosett, copying Spratt and Coleman and attaching

2

involved in obtaining police reports, stopped using Spratt as a middleman and were paying the Colemans directly for police reports.[5]

Between June and August 2011, Radom and Rosett formed Elite Chiro, Elite Rehab and Elite Health. During that time, on August 12, 2011, Morse wrote to Rosett, "***Let's do the police report thing. Just get them to me and I will get you more active treating patients. It will work[.]***" Ex. 14 (emphasis added). Rosett then started to hand deliver unapproved police reports to Morse.[6] In addition, at about this same time, Bittner and Radom sent Rosett names of towns from which to buy police reports to solicit patients for the newly formed Elite Entities.[7]

---

accident reports).

[5] *See* Ex. 13 (12/6/2010 email from Spratt to "officer Robert Coleman" copying the Rosetts and telling Coleman that "we have made a lot of money together this year, u have made double than what I have made between hala & bob & jay rosett," specifically "u have made 104,00 $ this year alone cash money & I have made 58,000," and complaining that Coleman and the Rosetts "cut [him] out" of the deal, as the Rosetts were now getting police reports directly from Coleman).

[6] *See* Ex. 15 (8/12/2011 email from Rosett to Morse agreeing to deliver police reports); Ex. 16 (9/14/11 emails between Morse and Rosett with Morse asking, "Reports today? Are you starting to order more? I am spending a shit load on new mailers so keep them coming!"; Rosett responding "they are [on their way] to you know. I'm also spending a ton," and asking "Do you want me to drop off reports tomorrow and Friday [when you are in Las Vegas with Radom]? If so please make sure that they fill into the right hands"); and Morse stating "Yes. Bring them over."); Ex. 17 (11/18/11 email from Morse to Rosett complaining "last week we averaged 40 a day. This week we averaged 26 a day."); Ex. 18 (11/28/2011 emails between Morse and Rosett with Morse asking "Are we opening a branch in Saginaw??" and after Rosett responded "YES!!!!" directing Rosett to "order 100 or so, let's see how it works," and Rosett telling Morse he "dropped off a ton today, most ever.").

[7] *See* Ex. 19 (9/7/2011 email from Bittner to Rosett sending a list of towns for which to obtain police reports based on distance from Elite Entities); Ex. 20

3

By early 2012, Anthony Chapman – an attorney at Morse's firm – was updating Rosett and Radom together regarding the success of police report leads.[8] During this same time, Elite Defendants were playing a substantial role in trying to grow AIB into a formal "call center" to solicit clients for Morse and patients for Defendants.[9] As part of Elite Defendants' apparent *quid pro quo* arrangement with Rosett, they agreed to refer patients to his physical therapy clinics.[10] From June 2012 to May 2014, Elite Health and Rehab also made 99 payments to AIB, totaling $199,800.[11] From December 2012 through July 2017, Rosett obtained thousands

---

(11/15/2011 email from Rosett to Radom and Bittner advising that for Port Huron location, the only nearby towns for which he could obtain police reports were Port Huron and Maryville); Ex. 21 (10/14/2011 email from Nicole Bittner, Bittner's sister and a chiropractor at Elite, to Bittner, listing distances from various towns to Brighton location, which was forwarded by Radom to Rosett).

[8] Ex. 22 (2/3/2012 email from Chapman to Rosett and Radom with a "list of clients signed/referred from police reports" identifying the chiropractor to whom the patient was "sent," including Bittner).

[9] *See* Ex. 23 (5/7/2012 email from Radom to attorney Keith Soltis copying Bittner, asking him for "the law that talks about steerers, cappers," and forwarding Soltis's response to Rosett); Ex. 24 (5/31/201 email from Bittner to Radom with "Call center send to jay," recapping their meeting about how to script their calls from AIB and including the following "notes": "Non-profit company," "Accident information bureau," "sign up guys," and "Scripts"); Ex. 25 (10/30/2012 email from Radom to Rosett attaching a "patient call script" to be used by solicitors working for AIB containing false representations that AIB was a "non-profit here to help you" that offered "transportation to and from any and all doctor office visits . . . at no cost to you," and would "arrange an appointment at the closest doctor's office to you that participates in the program").

[10] Ex. 26 (6/25/2012 email from PT coordinator at Elite to Bittner identifying patients referred to Rosett clinics); Ex. 27 (8/22/2012 email from Radom to Akilia Jackson at Elite Health, copying Radom and instructing Jackson to ensure Upfall is referring patients for PT to Rosett's clinics).

[11] Between July 2012 and April 2014, AIB made approximately weekly payments

of additional unapproved police accident reports from Karen Miller and Carol Almeranti, who may be police officers.[12] In 2013, Rosett was making daily deliveries of police reports to Morse's law firm. Ex. 32 (3/14/2013 emails between Rosenberg and Rosett, in which Rosett proclaims, "[R]eports everyday!!").

Morse knew the police reports that Rosett sent and delivered to him were "unapproved." First, the reports were stamped "Unapproved Report." *See* Ex. 33, (5/13/2013 email from Rosett to Rosenberg attaching police reports). Second, Rosenberg sent emails to Rosett saying Morse sent a mailer to potential clients "that says we have your police report, please call us, blah blah blah," but "[f]or the PR's you send us, we can't access them online when people ask us about them" because they were "not on the usual websites." Ex. 34. Third, there was no reason for Morse's office to obtain the police reports from Rosett once they were approved, when all law firms were permitted to access those reports, which would have deprived Morse's firm of its competitive advantage in soliciting clients.

Since SFMAIC filed this case, it has learned that Morse:

(1) represented at least 126 patients at issue out of 178 presently known to

---

to 2875 Maple, an entity owned by Rosett's father, Robert Rosett, totaling $229,500. As explained in SFMAIC's reply in support of the motion for rule to show cause, 2875 Maple has invoked the Fifth Amendment to justify its failure to respond to the subpoena issued to it by SFMAIC, but the Fifth Amendment does not protect against the production of voluntarily created, pre-existing business records. Although 2875 Maple's argument lacks merit, it establishes that its responsive documents are incriminating.

[12] *See, e.g.*, Exs. 28–31 (emails from Miller and Almeranti to Rosett attaching police reports stamped "unapproved").

5

        have had an attorney;
(2) had the idea to form Plaintiff Investment Funding ("PIF"), to which he referred more clients than any other attorney, and which had deals with 84 patients at issue (at least 61 of whom were Morse clients);
(3) got Radom a job at PIF;
(4) collected hundreds of thousands of dollars in rent from PIF and its sister-company, Med Lien;
(5) got Radom a no-show job at Bio-Magnetic;
(6) negotiated a majority ownership interest in Horizon for himself and, at the last minute, put it in Radom's name;
(7) may have come up with the idea to form the Elite Entities as non-profits so Bittner and Radom could control them;
(8) obtained unapproved police reports from Rosett for years that he used to solicit clients, many of whom he referred to Defendants;
(9) secretly shared a phone line with Rosett and AIB to get more clients from the unapproved police reports;
(10) received $35,000 from HI Investor into his entity 436/438 E. Cambourne Street, LLC;
(11) had HI Investor pay $555,925.14 to buy the property next to Morse's house to build an addition;
(12) accepted a $1.1 million loan from HI Investor to be repaid in 45 years;
(13) had Mark and Amy Radom pay $665,000 for a home that was transferred to Morse's ex-wife, Harriet Morse; and
(14) appears to have directed Rosett to pay $88,000 to the contractor building the addition to Morse's home and $100,000 to JEL Aircraft, the entity that owns Morse's private jet.

There is no question that Morse was involved in **and profited from** Defendants' scheme. Morse's role, relationships, communications, and financial arrangements with scheme participants are therefore discoverable. In his Response, Morse attempts to deflect from his substantial hand in virtually every component of the scheme by arguing that the subpoena is for an improper purpose, unduly burdensome, and not proportional to the needs of the case. As set forth below, these and all of the others Morse puts forth are all baseless.

A. **The Subpoena Was Served for a Proper Purpose.**

Morse argues SFMAIC served the Subpoena to retaliate against him because it "has an enormous business interest in improperly trying to use this lawsuit to investigate Morse and to attempt to improperly harm his public standing." Dkt. 179 at 8664. In support of this baseless assertion, Morse claims the information sought does not pertain to core issues, and SFMAIC is wrong about certain facts.[13]

First, Morse's self-serving contention that the information sought in the Subpoena does not pertain to core issues in the case is wrong. The Complaint contains allegations about the role of personal-injury attorneys, Morse, and solicitation in the scheme.[14] And, as set forth above, *Physiomatrix* holds that both

---

[13] Morse also suggests SFMAIC is retaliating because Morse purportedly "exposed" SFMAIC's "reprehensible ACE Program." *Id*. at 8670 and Ex. D. Morse is grasping for straws. The ACE program, which involved an internal review of closed claim files with values of less than $250,000 to identify ways that Michigan claims handling could be improved, began in 1995 and was completed no later than 1997. Accordingly, Morse's "exposé" in June 2016 of a program that ended almost 20 years earlier and that had already been publicly disclosed does not support his retaliation theory. *See, e.g.*, *Med City Rehab. Serv., LLC v. SFMAIC*, 2012 WL 12929897 at *2–3 (E.D. Mich. Dec. 10, 2012) (denying motion to compel production of ACE documents as irrelevant).

[14] Specifically, the Complaint alleges that: (1) as "the success of Defendants' scheme depends on their access to a high volume of patients who have been in auto accidents, another aspect of their scheme is to develop and maintain apparent cross-referral relationships with personal injury attorneys who represent patients in connection with BI Claims and UM Claims and who are referral sources for Defendants"; (2) "more than 85% of the Elite Entities' patients in Exhibits 1 and 2 were represented by an attorney, with the vast majority represented by a particular personal injury attorney," namely Morse; and (3) patient solicitation, including using police reports to identify and contact auto accident victims was "an important first step because patients are the lifeblood of the scheme, both for

7

Morse's relationship with medical provider defendants who treated his clients, as well as the use police reports in solicitation, are discoverable, relevant, and admissible as "a jury 'is entitled to know the "setting" of a case.'" *Physiomatrix*, 2013 WL 10936871 at *7, 9; *Physiomatrix*, 2014 WL 10295400, at *3.[15]

Second, Morse claims that SFMAIC "has not been straight with this Court" pertaining to his complicated financial transactions with Radom because any amounts Radom or HI Investor paid on behalf of Morse "*were fully repaid*." Dkt. 179 at 8678. According to Morse, with respect to the $1.1 million loan, he "assigned back to HI Investor the very interest in the real estate venture that he acquired with those loan proceeds," and attached as Ex. M an "assignment." This

---

Defendants and for the personal injury attorneys with whom Defendants have critically important cross-referral relationships." Compl. ¶¶ 66–67, 80–81.

[15] Morse's reliance on *Physiomatrix* to support his argument that SFMAIC "cannot investigate" him is misplaced. In *Physiomatrix*, the Court compelled Morse to respond to most of the subpoena. 2013 WL 10936871 at *12. Although the Court did not require Morse to produce documents reflecting his solicitation of clients who had no relationship with Defendants, SFMAIC did not request such documents in this case, where Radom and Rosett were directly involved in soliciting clients for Morse, many of whom Morse then steered to the Defendants for treatment. *See SFMAIC v. Warren Chiropractic & Rehab Clinic, P.C.*, 315 F.R.D. 220, 225 (E.D. Mich. 2016) (declining to apply *Physiomatrix*, because there was evidence that subpoena recipients were "in on the scheme, in that they referred callers directly to the medical care providers allegedly in league with the same law firms to which the patients were referred"). The other cases on which Morse relies are inapposite as they involved discovery requests for documents on topics unrelated to the alleged claims. *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358 (8th Cir. 2003) (quashing subpoenas in case involving odometer-rollback scheme because subpoenas sought only documents related to vehicles not at issue in plaintiff's suit); *McCurdy v. Wedgewood Capital Mgmt. Co.*, 1998 WL 964185 (E.D. Pa. Nov. 16, 1998) (quashing subpoena to a non-party to the extent it sought information only relevant to an unpled RICO claim).

document was not produced by Radom or HI Investor. Moreover, any purported "repayment" from Morse to HI Investor is questionable given the facts which suggest that funds HI Investor's account may have been Morse's anyway. The same question applies to Morse's contention that he "repaid" HI Investor for the $555,925 HI Investor used to purchase the property adjacent to Morse's home for Morse's trust. Moreover, the circumstances of this purported repayment, which was deposited on June 4, 2015, are questionable because Radom deposited Morse's check for $555,925 along with four other checks from Morse, some of which were months old, and one of which was post-dated. Ex. 35 (deposit slip totaling $587,026.52 and itemizing checks dated 9/30/2014, 12/21/2014, 3/3/2015 5/19/2015 and 6/30/2015). Morse also argues he repaid the Radoms for their purchase of Harriet Morse's house, but it is not logical that the Radoms – who received a bankruptcy discharge just two years earlier – would loan hundreds of thousands of dollars to Morse, who appears quite wealthy. Likewise, although Morse attempts to explain Rosett's $100,000 payment to "Morse's airplane leasing company," by resorting to so-called "common knowledge that people who own airplanes rent excess time on their plan to others," Morse conspicuously fails to state that Rosett wanted to rent time on Morse's plane (as opposed to be forced to do so); nor does Morse make any effort to explain the Rosett Entities' $88,000 payment to the contractor building the addition on Morse's home. **Accordingly, the Subpoena was served for the proper purpose of discovering highly**

**relevant information regarding the true scope and nature of Morse's involvement with the Defendants and related non-parties.**[16]

      **B.    The Subpoena Is Proportional to the Needs of the Case, and Any Confidentiality Concerns Are Addressed by the Protective Order.**

Morse argues the Subpoena is overbroad and his client-related documents – which he admittedly has not reviewed – and documents regarding the identified third-parties "are likely to be voluminous and require substantial time to review."[17]

---

[16] Morse also contends SFMAIC "knew these facts [regarding Morse's alleged repayments of monies loaned by Defendants] and knowingly concealed them from the Court." Dkt. 179, 8678–79. That is false. The vast majority of the contentions in Morse's Response are unsupported by anything other than his counsel's representations or documents—such as Ex. M—that were not previously produced to SFMAIC. To the extent Morse relies on documents that were produced to SFMAIC, none of the other discovery provided by Defendants or third parties provides any of the context that Morse puts forth for the first time in his Response. Furthermore, the financial transactions do not make sense, which is just another reason why SFMAIC should be able to take discovery pertaining to them. Additionally, Morse mentions Horizon in this section but instead of arguing that SFMAIC got any facts wrong, says only that SFMAIC dismissed Horizon from another lawsuit pursuant to a settlement agreement, and thus, "State Farm's claims with respect to Horizon are now barred." *Id.* at 8678. Setting aside whether Morse's interpretation of the settlement agreement is correct, SFMAIC has not brought claims against Horizon in this case. However, Horizon played a substantial role in the scheme [Dkt. 170, 7495–7508], and thus, information pertaining to it is discoverable. *See SFMAIC v. Pointe Physical Therapy*, LLC, 255 F. Supp. 3d 700, 707 (E.D. Mich. 2017); *see also Physiomatrix*, 2013 WL 10572229, at *3; *SFMAIC v. Policherla*, 2009 WL 2170183, at *2–4 (E.D. Mich. July 20, 2009).

[17] Morse cites *Visteon v. Nat'l Fire Ins. Co.*, 2008 WL 2026131 (E.D. Mich. 2008), to support his argument that any request seeking "all documents" in a specified category is overbroad and unduly burdensome. Bust *Visteon* merely finds one request seeking "all documents" concerning settlement of employment discrimination claims in 1992–93 was overbroad where the Plaintiff's claim involved insurance coverage for a settlement it entered into in 2002. *Id.*, at *1, 3.

10

The Subpoena is proportional to the needs of the case in light of Morse's substantial involvement in various components of the scheme and the public interest in preventing no-fault fraud.[18] [19] SFMAIC has no alternative access to the information to which Defendants have objected. *See Fed. Deposit Ins. Corp. v. Ark-La-Tex Fin. Servs., LLC*, 2016 WL 3460236, at *3 (N.D. Ohio June 24, 2016). In response to Morse's contention that it will take substantial time to review potentially responsive records, Rule 45(d)(2)(B)(ii) protects non-parties from incurring "significant" expense in complying with a subpoena but Rule 45's "protection of a non-party from significant expense" does not necessarily mean

---

Courts routinely require respondents to comply with discovery requests that seek the production of "all documents" from a specified category. *See, e.g.*, *Warren Chiropractic*, 315 F.R.D. at 222 (denying motion to quash subpoena that included requests for "[a]ny and all documents" related to certain topics); *Warren Chiropractic*, 2015 WL 4094115, at *6 (E.D. Mich. July 7, 2015) (ordering the production of "[a]ll documents regarding any investments or ownership interests" possessed by third-party).

[18] *See Doe v. United States*, 253 F.3d 256, 267 (6th Cir. 2001) (public importance of combating health-care fraud); *Pointe*, 255 F. Supp. 3d at 706–07; *see also* Chad Livengood, *The Health Care Crack Up: How Michigan's Auto Insurance Premiums Became the Highest in the Country*, Crain's Detroit Business (Oct. 22, 2017) (reporting that "average cost [of medical bills] per auto accident injury claim [in Michigan] topped $75,600 in 2013" and "was more than five times the next highest state").

[19] To the extent Morse seeks to quash the subpoena and have SFMAIC reimburse him for his costs, his burden is even higher, and his argument is, thus, weaker. *Physiomatrix, Inc.*, 2013 WL 10572229, at *2 ("The test for whether or not such a subpoena should be quashed is one of relevance, and the initial burden is placed on the party seeking to quash to show that (1) the information falls into a protected category and (2) disclosure may be harmful."). Furthermore, Morse's reliance on *In re Modern Plastic Corp.*, 890 F.3d 244 (6th Cir. 2018), is misplaced because, unlike the subpoena recipient there, Morse has refused to produce documents or discuss reasonable means to limit his costs in responding to the Subpoena.

11

that the respondent can avoid any cost of compliance.[20] *See Hennigan v. Gen. Elec. Co.*, 2012 WL 13005370 at *2 (E.D. Mich. Apr. 2, 2012). Moreover, Morse is not a completely disinterested party, as he profited from the scheme. And the other third-parties about whom SFMAIC seeks documents are closely related to Defendants and involved in the scheme. *See* Dkt. 170, at pp. 7495–7516.[21]

### C. The Protective Order Offers Appropriate Protection.

Morse claims to have confidentiality concerns that cannot be remedied by the Protective Order, apparently because documents about which he is concerned will not meet the threshold for protection under Rule 26(c)(1)(G). Dkt. 179 at 8685–86. Morse does not and cannot cite any authority to support his suggestion that documents not entitled to protection under the Federal Rules can be governed by a special, stricter Protective Order.[22] And, as set forth in the Motion, Morse's objection that he requires client consent to produce unspecified documents (even those unrelated to clients) was rejected in *Physiomatrix*.

SFMAIC respectfully requests that the Court grant SFMAIC's Motion.

---

[20] The "party resisting discovery has the burden of showing undue burden or expense." *SFMAIC v. Fayda*, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015).
[21] For this reason, Morse's argument that he should not have to produce documents pertaining to non-parties, should be rejected. He should also be ordered to produce all responsive documents in his possession, custody, or control, including those of his law firm, which he admittedly owns. Dkt. 179 at 8667.
[22] *But see Rodriguez v. Vizio, Inc.*, 2015 WL 11439029 at *4 (S.D. Cal. Jan. 6, 2015) (granting motion to compel unredacted agreement and noting that if defendant's objection that protective orders are "not foolproof" "carried the day, Fed. R. Civ. P. 26(c)(1)(G)—which governs protective orders for trade secret or other confidential information—would be useless").

By: /s/ Kathy P. Josephson
Ross O. Silverman
Kathy P. Josephson
Michael M. Rosensaft
Matthew R. Ryan
Justin C. From
Katten Muchin Rosenman LLP
525 W. Monroe St.
Chicago, IL 60661
(312) 902-5200
ross.silverman@kattenlaw.com
kathy.josephson@kattenlaw.com
michael.rosensaft@kattenlaw.com
matthew.ryan@kattenlaw.com
justin.from@kattenlaw.com

Thomas W. Cranmer (P25252)
Miller, Canfield, Paddock and Stone, PLC
840 W. Long Lake Rd., Suite 200
Troy MI 48098
(248) 267-3381
cranmer@millercanfield.com

*Attorneys for Plaintiff State Farm Mutual Insurance Company*

13

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

By: /s/ Kathy P. Josephson
Attorney for Plaintiff