UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,                                         Case No. 2:16-cv-13040
                                                 District Judge Avern Cohn
            Plaintiff,                           Magistrate Judge Anthony P. Patti

v.

ELITE HEALTH CENTERS, INC.,
ELITE CHIROPRACTIC, P.C.,
ELITE REHABILITATION, INC.,
MIDWEST MEDICAL
ASSOCIATES, INC., PURE
REHABILITATION, INC., DEREK
L. BITTNER, D.C., P.C., MARK A.
RADOM, DEREK LAWRENCE
BITTNER, D.C., RYAN MATTHEW
LUKOWSKI, D.C., MICHAEL P.
DRAPLIN, D.C., NOEL H. UPFALL,
D.O., MARK J. JUSKA, M.D.,
SUPERIOR DIAGNOSTICS, INC.,
CHINTAN DESAI, M.D., MICHAEL
J. PALEY, M.D., DEARBORN
CENTER FOR PHYSICAL
THERAPY, L.L.C., MICHIGAN
CENTER FOR PHYSICAL
THERAPY, INC., and JAYSON
ROSETT

            Defendants.
_____/

**<u>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
STATE FARM MUTUAL'S MOTION TO COMPEL MICHAEL MORSE
TO PRODUCE DOCUMENTS RESPONSIVE TO STATE FARM</u>**

**MUTUAL'S SUBPOENA (DE 384) AND STRIKING DE 483 FROM THE DOCKET**

## I.    Introduction

This matter is before the Court for consideration of Plaintiff State Farm Mutual Automobile Insurance Company's ("State Farm's") Motion to Compel Michael Morse to Produce Documents Responsive to State Farm's Subpoena (DE 384), non-party Michael Morse's response in opposition (DE 403), State Farm's reply brief (DE 409), and the joint statement of resolved and unresolved issues (DE 455).  All discovery matters have been referred to me for hearing and determination (DE 229), and a hearing was held on this motion on May 10, 2019, at which time the Court took this matter under advisement.  (DE 474.)

## II.   Background

### A.    Factual Allegations

On August 22, 2016, Plaintiff State Farm brought this action against 18 defendants – doctors, chiropractors, physical therapy, health care and chiropractic clinics, and other individual defendants—all of whom are alleged to have played a role in a scheme to defraud State Farm:

> by submitting or causing to be submitted, bills and supporting documentation for services that are purportedly rendered to individuals ("patients") who have been in automobile accidents and are eligible for personal injury protection benefits ("No-Fault Benefits") under State Farm Mutual policies when, in fact, the services are either not rendered or are not medically necessary.

(DE 1, ¶ 1.)[1]  State Farm alleges claims for fraud, civil conspiracy and unjust

enrichment.  (*Id.* ¶¶ 222-265.)

State Farm's 116-page Complaint, with 32 exhibits, and its 40-page brief in

support of its motion to compel here, with 114 exhibits, provide a detailed and

exhaustive discussion of the facts, allegations, and documentary evidence

supporting its claims against Defendants regarding the 221 State Farm insureds

whose claims are at issue in this case, and State Farm's allegations regarding non-

party attorney Michael Morse's involvement in the alleged fraudulent scheme.  In

addition, State Farm's counsel provided an extensive, detailed summary and

chronology of the alleged fraudulent scheme at a prior hearing held on March 22,

2019, the bulk of which focused on Morse's contributions to and benefit from the

alleged fraudulent medical billing scheme at issue here.  (DE 432 at 25-56.)  Based

---

[1] The Complaint also describes "apparent cross-referral relationships with personal injury attorneys who represent patients in connection with [bodily injury claims] and [uninsured motorist claims] and who are referral sources for Defendants," and states that the "vast majority" of the Elite Entities' patients identified who are represented by an attorney are represented by one particular personal injury attorney, the "PI Attorney."  (DE 1, ¶¶ 66-67.)  Although the Complaint does not specifically name Michael Morse, footnote 3 of the Complaint states: "Plaintiff Investment Funding, LLC operates out of the former office of one particular personal injury attorney (the "PI Attorney") who, as set forth below, represents a significant number of Elite Entities' patients."  (See DE 1 at 23.)  Clearly, in light of the record as now presented by State Farm, the "PI Attorney" referenced in the Complaint, as what can best be characterized as an "unnamed co-conspirator" in the alleged fraudulent scheme, is Morse.

on all of that, the following is a broad summary of the alleged fraudulent scheme, as supported by this very extensive record:

### 1. Solicitation of clients

According to State Farm, the first step in Defendants' alleged fraudulent scheme was the unlawful solicitation of accident victims, using "runners, cappers, and steerers (collectively "Solicitors")" to obtain patients, as well as through the purchase of unapproved police reports, and also "receiv[ing] referrals from personal injury attorneys pursuant to their apparent cross-referral relationships with them." (DE 1, ¶¶ 80-81.) State Farm alleges that "[t]his is an important first step because patients are the lifeblood of the scheme, both for Defendants and for the personal injury attorneys with whom Defendants have critically important cross-referral relationships." (*Id.* ¶ 80.) As discussed in more detail below, State Farm has shown that Morse was involved in the solicitation of accident victims, both for representation by him and for treatment at Defendants' clinics, through *quid pro quo* cross-referral relationships.

### 2. The "Predetermined Protocol"

State Farm alleges that the Defendants next proceed pursuant to a predetermined treatment protocol (the "Predetermined Protocol") whereby the contacted patients are typically evaluated initially by an Elite chiropractor, who makes a list of predetermined findings and diagnoses and then recommends a

predetermined chiropractic treatment protocol (which is not individually tailored to the particular patient), typically consisting of treatment three times per week for up to 12 weeks. During that treatment, patients are sent to one of the Defendant Elite clinics for evaluation by a physician who in turn conducts a fraudulent examination and prescribes physical therapy pursuant to the Predetermined Protocol at one of the Defendant physical therapy clinics, while continuing (often duplicative) chiropractic treatment. Defendant chiropractors and doctors also order unnecessary MRIs for patients, performed at one the MRI facilities in which Defendants (and Morse) have an ownership or other financial interest – either Horizon Imaging, LLC ("Horizon") or Defendant Superior Diagnostics, Inc. ("Superior"). This cycle continues until either the patient voluntarily stops treatment or State Farm stops paying, based on the result of an independent medical examination ("IME").

The three defendants who owned and controlled the clinics and MRI facilities at issue are: (1) Derek Bittner, D.C.; (2) Mark Radom (Morse's former brother-in-law); and (3) Jayson Rosett.

### 3. Morse, Radom, PIF and Bio-Magnetic

According to State Farm, and as set forth in detail in its motion, although not a named defendant in this case, attorney Michael Morse is an integral part of the alleged scheme to defraud State Farm. By way of background, State Farm states

that Morse was instrumental in Defendant Radom (Morse's then brother-in-law) being hired in 2009 by Plaintiff Investment Funding, LLC ("PIF"), a Michigan company that makes cash advances at very high interest rates to individuals with personal injury claims. Morse was responsible for about 40% of PIF's referrals, and PIF operated out of Morse's former office and paid more than $450,000 in rent to entities owned by Morse.

Morse also played a key role in Radom being hired as a "marketer" in late 2009 or early 2010 by Bio-Magnetic, an MRI facility owned by Dr. Ram Gunabalan that did MRI reads for many of Morse's clients. State Farm contends that Morse pressured Bio-Magnetic for abnormal MRI reads, complaining that, "We are seeing a lot of negatives" and that normal MRI interpretations were "killing [him]" and would "put [him] out of business." (DE 384 at 14, citing 384-4 to 384-6.) According to State Farm, Morse required Bio-Magnetic to pay $80,000 in salary to Radom in exchange for Morse's continued referrals to Bio-Magnetic.

State Farm further contends that Radom did not appear to have provided any services to PIF or Bio-Magnetic beyond guaranteeing referrals to those entities from Morse, and that this arrangement was consistent with Morse's practice of demanding kickbacks from providers in exchange for referring his clients to them.[2]

---

[2] In fact, Radom's ex-wife, Amy Rosenberg, stated in her affidavit that although she read in the newspaper a year ago that her former husband had been employed

State Farm states that this arrangement with Bio-Magnetic ended when Radom, potentially as a straw owner or partner of Morse, acquired an interest in Horizon Imaging, LLC, another MRI facility that State Farm contends provided fraudulent MRIs to 84 of the State Farm 221 insureds at issue (65 of whom were represented by Morse).

### 4. Morse, Radom and Horizon

According to State Farm, Morse decided to form Horizon Imaging, LLC in the fall of 2010, through which he could profit directly from his clients' MRIs by virtue of an undisclosed majority ownership interest. Starting in September 2010 and through December 2010, Morse began negotiating to acquire a majority ownership interest in Horizon, but at the last minute arranged for Radom to acquire the majority interest instead, seemingly as a straw man. (DE 384 at 18-19.) While an earlier draft operating agreement for Horizon was to be between Morse and Scott Zack and Cory Mann (or entities they owned), a draft operating agreement dated on or around October 18, 2010 was revised to be between Mann's and Zack's companies, and a third party, referenced in the first paragraph as "_____ ('other')." (*Id.* at 19, citing DE 384-20.) This blank was for Morse's entity and replaced an explicit reference in the earlier draft operating agreement to Morse as Horizon's third member. (*Id.*) In an October 28, 2010 email to the attorney setting

by Bio-Magnetic, she did not know this and had never even heard of that company or of Gunabalan. (DE 505-1, ¶ 14.)

up the corporation, Morse stated he had "read the agreement" and asked if the confidentiality agreement was strong enough because he did not "want them to be able to mention my name to anyone, anytime about anything short of a court order or with [his] written permission." (DE 384 at 20, citing DE 384-21.) Subsequent emails show that the parties replaced Morse's name with Radom's on the operating agreement, but that Morse, through his attorney, continued to be involved in negotiating the final operating agreement. (DE 384 at 20-22, citing DEs 384-21 to 384-27.)

Radom (and his then-wife Amy) formed HI Investor, LLC and HI Group, LLC in December 2010 to acquire a membership interest in Horizon.[3] The final Horizon operating agreement, dated January 11, 2011, makes no reference to Morse or any entity owned by him, but instead to HI Investor (Radom) and three other members: Mann Global (Cory Mann), Zack Global (Scott Zack), and Professional Holdings Unlimited (Vincent Celetano). (DE 504-1.)

---

[3] However, Amy Rosenberg stated that she did not know she was an owner of Horizon, and that she had not heard the names "HI Group" or "HI Investor" until her subsequent divorce proceedings from Radom. (DE 505-1, ¶¶ 16-17.) She similarly was unaware until recently that she had been named as a Director of Elite Rehab. (*Id.* ¶ 46 (stating that she "do[es] not understand what a 'director' of a business is or does" and that she "never attended any meetings for Elite Rehab or made any decisions related to the business").) After her divorce from Radom, and after Rosenberg received a subpoena from State Farm in this case, she met with Radom, and according to Rosenberg, Radom told her if she "produced documents, 'especially the ones from Michael,' then 'everyone was going to go down,' and that it would be all [her] fault," and that "if [she] 'talked' and produced the documents 'the FBI will come knocking on [her] door.'" (*Id.* ¶ 53.)

8

State Farm contends that between January 2011 and June 2015, Horizon paid HI Investor at least $5.8 million pursuant to HI Investor's 38% membership interest in Horizon, and that Radom then transferred at least $1.6 million of this money from HI Investor to or on behalf of Morse.  (DE 384 at 23-25, citing DEs 384-30 to 384-36, 386-24.)  During that time period, Morse continued to receive financial statements from the other members of Horizon LLC, was closely tracking patient referrals, and was requiring his clients get their MRIs at Horizon.  (DEs 384 at 27-28, 388 at 28-29, citing DEs 504-3 to 504-8, 504-11.)  Radom further directed the other owners of Horizon to conceal *his* ownership interest in Horizon, stating, "I am the Director of Marketing at Horizon and that is it.  No one is ever to know that I own a percentage of the practice.  People are sniffing around and assuming things and asking questions.  In our agreement, no one is to mention that I own anything.  Let's all be consistent with that message no matter what you are asked or faced with."  (DEs 384 at 28-29, 388 at 29-30, citing DE 504-12.)  Radom then forwarded this email to Morse.  (*Id.*)

**5.    Morse, Radom/HI Investor, Bittner and the Elite Entities**

On January 3, 2011, eight days before the Final Horizon Operating Agreement was signed, Morse met with Bittner to discuss a business deal.  (DEs 384 at 29, 388 at 30, citing DEs 504-13 to 504-14.)  Five months later, in the summer of 2011, Bittner and Radom, through HI Investor, formed the three

Defendant Elite Entities (Elite Health Centers, Inc. ("Elite Health"), Elite

Chiropractic, P.C. ("Elite Chiro"), and Elite Rehabilitation, Inc. ("Elite Rehab")

(with Elite Health and Elite Rehab set up as non-profits)). According to State

Farm, through March 2014, these clinics treated 112 of the 221 insureds at issue, at

least 63 of whom were represented by Morse.

In March 2014, Radom, through HI Investor, and Bittner formed as non-

profit corporations Defendants Pure Rehabilitation, Inc. ("Pure Rehab") and

Midwest Medical Associates, Inc. ("Midwest"), to replace the Elite Entities. Pure

Rehab and Midwest continued with the same Predetermined Protocol and operated

from the same locations and with the same staff and same patients as the Elite

entities.

### 6.     Morse, Radom/HI Investor, Bittner and Superior

Also in March 2014, around the same time as Defendants created Pure

Rehab and Midwest, Radom through HI Investor, and Bittner formed Superior *as a*

*non-profit corporation,* to serve as the primary MRI provider for patients treating

at Pure Rehab and Midwest. Around that same time, HI Investor pulled out of

Horizon following a business dispute and subsequent arbitration. State Farm

contends that Morse had a similar role in Superior as Horizon. As with Horizon,

Morse continued to receive reports and financial statements from Radom for

Superior. (DEs 384 at 32-33, 388 at 33-34, citing DEs 504-14 to 504-16.) For

example, Radom sent Morse Superior's profit and loss statement on August 13, 2015, and Morse responded that he "want[ed] to be able to log in and click and see what is up. Real time. Up to date. Whenever I want. Make it happen!" (DE 504-16.)

In sum, Morse's clients who treated at Defendants' clinics had MRIs: (1) at Horizon from 2011 to February 2014; (2) at M1 Imaging (co-owned by Joshua Katke and Defendant Chintan Desai) from February to July 2014; and, (3) at Superior from July 2014 to present. (DE 385-27.)

### 7. Radom, Bittner and D&M Management LLC

State Farm contends that, because Radom and Bittner could not lawfully profit from the non-profit clinics, and Radom (as a layperson) could not lawfully profit from Elite Chiro, they used a purported management company they co-owned, D&M Management LLC ("D&M"), to siphon off more than $4 million from the Elite Entities under the guise of "management fees" – paying more than $3.2 million to Radom and more than $2.2 million to Bittner. (DE 384 at 33.)

### 8. Jayson Rosett, AIB and the illegal purchase of unauthorized police reports, and solicitation of clients

According to State Farm, Defendant Jayson Rosett, the owner of Defendants Michigan Center for Physical Therapy, Dearborn Center for Physical Therapy and Oak Park Center for Physical Therapy, started illegally purchasing unapproved police reports regarding automobile accidents from Detroit police officers in late

2009 or early 2010 – before they were publicly available to law enforcement, attorneys, or insurers – in order to solicit auto accident victims and refer them to personal injury attorneys. Rosett first solicited clients for his college friend, attorney Ron Applebaum, and by June 2010, after he formed the first of his physical therapy clinics, for Morse. In exchange, Morse's marketing director, Janet Rosenberg, directed chiropractors who treated Morse's clients to refer them to Rosett's physical therapy clinics. (See DEs 385-33 to 385-36.)

These *quid pro quo*, cross-referral relationships between Morse and the healthcare providers continued. By September 2010, Janet Rosenberg, Morse's marketing director, figured out a way to connect Rosett's calls with potential clients directly to Morse's office. (DE 385-39.) In 2011, Rosett began obtaining unapproved police reports from Detroit Police Officers Karen Miller and Carol Almeranti, and delivering them to Morse's firm, where they were used to solicit auto accident victims. Those "converted" auto accident victims were then referred to one of two chiropractors, who in turn would refer them to Rosett's physical therapy clinic. In an August 12, 2011 email, Morse told Rosett, "Let's do the police report thing. Just get them to me and I will get you more active treating patients. It will work." (DE 384 at 35, citing DE 386.) State Farm contends that Rosett started to hand-deliver unapproved police reports to Morse daily. (DEs 386-1, 386-2.) In a September 14, 2011 email, Morse inquired "Reports today?

Are you starting to order more?  I am spending a s\*\*t load on new mailers so keep them coming!" − to which Rosett responded, "Yes, they are o[u]t to you now.  I'm also spending a ton. I can't wait for the first one to hit.  Do you want me to drop off reports tomorrow and Friday?  If so, please make sure that they fall into the right hands."  (DE 386-1.)  Morse then replied, "Yes.  Bring them over."  (*Id.*) According to State Farm, obtaining these unapproved police reports gave Morse, Rosett and the Elite Defendants a competitive edge because they then had access to this accident information and potential clients before it was available to anyone else.

This cross-referral practice continued in mid-2012, at which time Rosett formed an entity called Accident Information Bureau ("AIB").  AIB was used as a "call center" to solicit clients for Morse and patients for Defendants − taking the names from the unapproved police reports, which had been put into spreadsheets, to solicit the auto accident victims to treat at Elite Health and Elite Chiro, who would then refer them to Morse, and who were then referred to physical therapy at either the Rosett clinics or the Elite clinics.[4]  (See DEs 470-3 to 470-5.)  Elite Health paid $2,000.00 per week to AIB for the police reports (resulting in approximately $200,000.00 total), and Bittner documented a protocol to refer the patients to Morse, which included providing a "Morse pamphlet" and "giv[ing]"

---

[4] State Farm contends that AIB was also used to pay Morse's private investigator, Ken Jackson.  (DE 384 at 37-38, citing DEs 386-8.)

them Tony or Jan['s] [presumably Morse law firm attorney Anthony Chapman and marketing director Janet Rosenberg] name. Elite recommended," and noting that the sooner the patient "sign[s] with an attorney that works with us, the more likely they will continue to care with us." (DEs 384 at 36-37, 388 at 37-38, citing DE 504-17.) Bittner followed up by sending an email to Radom a couple of weeks later, attaching a memo which included the "protocol[] for referring out. Attorney," stating to "*let them know you have found injuries related to MVA* and that you recommend them speaking to an attorney to know their rights," giving them a "Morse pamphlet and give them Tony or Jan name," and to "[l]et each staff know that each auto pt [patient] is like a piece of GOLD." (DE 504-18 (emphasis added).)

### 9. 2014 Anti-Solicitation Law

A new law went into effect in Michigan in January 2014, prohibiting solicitation of auto accident victims within 30 days after an accident. *See* MCL 750.410 (prohibiting "solicitation of personal injury claims" by an attorney and/or a non-attorney working on his behalf prior); MCL 750.410b (prohibiting solicitation by any person "until the expiration of 30 days after the date of th[e] motor vehicle accident").[5]

---

[5] In its oral presentation, State Farm further contends that, as a result, in addition to pulling out of Horizon and setting up Superior, Morse started requiring payment in the form of kickbacks from Rosett, in the form of payments to Morse's contractor

14

### 10.    Overview of Morse's involvement

According to State Farm, Defendants' financial success was closely tied to Morse.  Morse represented at least 126 of 178 insureds at issue in this case who treated at Defendants' clinics and who were represented by an attorney.  And, State Farm contends, bank records for those clinics reflect that, from December 2010 to January 2018, more than $6.3 million was deposited into Defendants' bank accounts from Michael J. Morse, PC ("Morse PC").  (DE 384 at 39-40.)  In sum, Morse is alleged to have benefited both coming and going: (1) by being a silent owner in the medical providers which were submitting fraudulent claims; (2) by receiving kickbacks in connection with referrals to providers who submitted fraudulent invoices; and (3) by driving up the value of his clients' personal injury claims with artificially favorable diagnoses and extensive, albeit unnecessary, treatment records.

### B.    The Morse Subpoena

### 1.    The February 6, 2018 Subpoena

On or about February 6, 2018, State Farm issued a document subpoena to Michael Morse (hereinafter "the Subpoena").  (DE 386-17.)[6]  The Subpoena

---

and payment to the company that owns Morse's private jet.  (DE 432 at 53; *see also* DE 384 at 38-39.)

[6] State Farm subsequently issued two additional document subpoenas – one to Michael Morse and one to the Mike Morse law firm – on or about September 14,

consists of 16 document requests, which, according to State Farm, fit within four categories of requests: (1) financial arrangements with or payments made to or received from Defendants and related third-parties (Request Nos. 1, 3, 4, 13, 14, 15, 16); (2) communications with Defendants or related third parties (Request Nos. 2, 5, 6, 7); (3) documents related to the patients at issue (Request Nos. 8, 9, 12); and, (4) documents related to MRI entities (Request Nos. 10, 11). (*Id.*)

## 2. Morse's general objections

Morse did not object or otherwise respond to the 16 <u>specific</u> document requests in the Subpoena, and refused to produce <u>any</u> responsive documents. Instead, on March 21, 2018, Morse served general, blanket objections to the Subpoena, in which he broadly objects that the Subpoena *as a whole* improperly: (1) seeks information to defend actions brought by Morse's law firm's clients against State Farm and its insureds, or to assert a claim against Morse or his law firm, or to share with other person(s) for use in their potential actions; (2) seeks documents that do not relate to the core issues in this case; (3) imposes an undue burden and expense; and, (4) requests documents that can be obtained from other sources and that the Subpoena is only intended to harass him. (*Id.*)

2018. (DEs 386-30, 386-31.) However, State Farm's counsel confirmed at the May 10, 2019 hearing on this motion that it only seeks to compel responses to the February 6, 2018 Subpoena. (DE 474 at 17.)

Morse continues that, to the extent his response to the Subpoena is compelled, he requests a protective order prohibiting the use or sharing of the documents in any other action or proceeding. (*Id.* at 4.) He further objects to producing documents: (1) that relate to his dealings with non-parties; (2) that relate to the time period before August 22, 2010; (3) that relate to Horizon or the "Patients" (because State Farm will not provide the names of the 221 Patients at issue until Morse signs the Stipulated Protective Order in this case, and Morse does not want to sign that protective order); and, (4) that are not relevant to the claims or defenses in this action. (*Id.* at 4-5.) He also objects to the definition of "You" as improperly encompassing persons other than Morse, or producing documents protected from disclosure by privilege or work product, that relate to any client of the Mike Morse law firm, without that client's consent. (*Id.* at 5-6.)

### C. The Instant Motion

#### 1. State Farm's Motion to Compel

On January 15, 2019, State Farm filed a Motion to Compel Michael Morse to Produce Documents Responsive to Subpoena (DEs 384, 388 (Sealed).)[7] State

---

[7] State Farm had previously filed a motion to compel Morse on June 4, 2018 (DE 170) that was denied, without prejudice, along with two other pending motions to compel, when the Court entered an order barring all reference to and reliance upon the affidavit of Dr. Ram Gunabalan, or statements made therein. (DE 349.) The Court instructed that State Farm could re-file those motions without the need to seek further leave of Court, but without reliance on the Gunabalan affidavit or

Farm argues that Morse's generalized objections lack merit and that the Subpoena

seeks information highly relevant to the alleged fraud scheme, including the

fraudulent formation of all but one of the Defendant clinics as non-profit clinics,

the unlawful solicitation of auto accident victims, and the transfer of more than

$2.5 million from the Defendant clinics and closely related entities to or for the

benefit of Morse. State Farm further contends that the Subpoena imposes no

undue burden on Morse, that Morse's "substantive" objections lack merit, and that

the existing Stipulated Protective Order (DE 82) provides sufficient protection.

State Farm also seeks to incorporate the argument made in its supplemental brief

concerning its April 17, 2018 subpoena to the entity that owns Morse's private jet,

JEL Aircraft Leasing, LLC (DE 321).

### 2. Morse's response in opposition

Morse filed a response in opposition to State Farm's motion on February 5,

2019, arguing that his response to the Subpoena should not be compelled because:

(1) State Farm may not take discovery to investigate whether it has a potential

claim against a non-party like Morse; (2) State Farm may not obtain discovery

from Morse for use in other matters; (3) the Subpoena improperly seeks discovery

of Morse as State Farm's opposing counsel in violation of *Nationwide Mutual*

*Insurance Co. v. Home Insurance Co.*, 278 F.3d 621 (6th Cir. 2002); (4) the

statements therein. (*Id.*) The case was thereafter briefly stayed. (DE 372.) When
the stay was lifted (DE 374), State Farm re-filed the motion.

discovery sought is not proportional to this case; (5) State Farm is not entitled to discovery on how Morse's law firm obtains clients; and, (6) State Farm's request for "all" documents, unrelated to the 221 insureds at issue in this case, is improper. (DE 403.)

### 3. State Farm's reply

State Farm filed a reply brief on February 15, 2019, arguing that the Subpoena was served for a proper purpose and seeks highly relevant information, and that Morse was involved in and profited from the fraudulent scheme and "played a substantial role motivating Defendants to provide medically unnecessary treatment designed to exploit patients' no-fault benefits for the benefit of Defendants and Morse." (DE 409 at 3.) State Farm contends that "[e]vidence that patients did not seek treatment on their own, but were solicited to treat at Defendants' clinics, is not only relevant to the 'setting' of the case, but also is relevant to whether services they purportedly received were medically necessary." (*Id.* at 6.) Further, the Subpoena is proportional to the needs of this case, does not impose an undue burden on Morse, and the confidentiality concerns are remedied by the Stipulated Protective Order.

### 4. The parties' joint statement

The parties filed a joint statement of resolved and unresolved issues regarding State Farm's motion to compel against Morse, stating that they have not

been able to resolve or narrow the issues raised in the motion, and that they stand on their respective positions as stated in their briefing.  (DE 455.)

**D.     Supplemental Filings**

**1.     State Farm's notice of supplemental exhibits discussed at the hearing**

On May 14, 2019, as instructed by the Court at the May 10, 2019 hearing, State Farm filed a notice of filing exhibits State Farm discussed at the hearing, consisting of five supplemental exhibits: (1) a demonstrative exhibit created by State Farm; (2) a May 1, 2019 superseding criminal indictment against Jayson Rosett; (3) a September 2, 2013 email attaching police reports from Karen Miller to Rosett; (4) a September 3, 2013 email attaching police reports from Rosett to Radom; and, (5) a September 3, 2013 email attaching an AIB Spreadsheet, from Radom to Mike Ryan and Rosett.  (DE 470.)

**2.     State Farm's second notice of supplemental exhibits**

On May 22, 2019, State Farm filed a second notice of filing supplemental exhibits to its motion to compel Morse, consisting of four Rule 11 criminal Plea Agreements for Defendant Jayson Rosett and non-parties Robert Rosett, Carol Almeranti and Karen Miller, all signed May 22, 2019.  (DE 483.)[8]  State Farm

---

[8] The Court takes judicial notice that both Rosetts, Miller and Almeranti each pleaded guilty in case no. 18-20812 to Conspiracy to Defraud the United States for the purpose of impairing, impeding, obstructing or defeating the lawful functions of the Internal Revenue Service and to Conspiracy to Commit Theft from an

contends these Plea Agreements contain admissions that, from 2012 through 2018, the Rosetts, Almeranti and Miller, through AIB (owned by Jayson Rosett) collected unauthorized police reports and, in exchange for fees, solicited crash victims and referred them to personal injury lawyers, chiropractors, and health-care professionals. (*Id.*) State Farm asserts that the facts admitted in the plea agreements are consistent with and support its allegations as laid out in its motion to compel Morse. (*Id.*)

On May 23, 2019, Morse filed an objection to this last set of supplemental exhibits, contending that they should be stricken because State Farm did not have permission to make this supplemental filing and that not one of the exhibits even mentions Morse. (DE 486.) Morse further contends that there is no evidence he knew that his law office received police reports that were improperly obtained by Rosett, there is no pleaded claim in this case about improperly obtained police reports, and he routinely receives police reports stamped "unapproved" from State Farm in response to discovery requests and through Freedom of Information Act (FOIA) requests, and thus there is nothing remarkable about a police report with an "unapproved" stamp. (DE 486.)

_____

Organization Receiving Federal Funds on May 22, 2019 and will be sentenced in October 2019.

The Court agrees that these most recent proposed supplemental exhibits (DE 483) are cumulative and unnecessary for this motion, and accordingly declines to consider them and strikes DE 483 from the docket.

### 3.    Morse's notice of supplemental authority

On May 30, 2019, Morse filed a notice of supplemental authority with respect to State Farm's motion to compel to take notice of a recent decision of the Michigan Court of Appeals, *Richardson v. Allstate Insurance Co.*, No. 341439, 2009 WL 2273415 (Mich. Ct. App. May 28, 2019), which, in pertinent part, states that "[h]ow plaintiff contracted with her attorney is irrelevant to her claim for no-fault benefits" and that wrongful solicitation does not bar a claim for no-fault benefits. *Id.* at *3-4. Morse states this "should be dispositive" and stands for the proposition that "discovery in this case should be limited to whether the treatment provided by the 221 insureds was medically necessary or performed" and not on whether the insureds were improperly solicited. (DE 491.)

On May 31, 2019, State Farm filed a response to that notice, asserting that Morse "misapplies the holding in *Richardson* to the facts of this case." (DE 495.) State Farm states that *Richardson* found that improper solicitation is not a *defense* to a claim for no-fault benefits under Michigan's no-fault scheme, and thus has no application to *this* case because State Farm does not allege or argue here that an insured's claim for no-fault benefits is automatically barred if the insured was

solicited by an attorney.  State Farm instead has alleged that "Defendants engaged in a widespread scheme to defraud State Farm Mutual by submitting bills to State Farm Mutual for unnecessary treatment and services pursuant to a predetermined protocol designed to financially enrich Defendants, Horizon, and Morse," and that "Morse played a critical role in [the unlawful solicitation] component of that scheme by soliciting auto accident victims he could represent who could also treat at Defendants' clinics."  (*Id.*)

The Court will address this newly-issued caselaw below.

### 4.    State Farms' notice of Amy Rosenberg Affidavit

On June 12, 2019, the Court entered an Order permitting disclosure of statements made by Defendant Mark Radom to his former spouse, Amy Rosenberg, which are set forth in an affidavit signed by Rosenberg.  (DE 503.)  On June 13, 2019, State Farm filed Rosenberg's affidavit, with exhibits, as a supplemental exhibit to the instant motion.  (DE 505.)

Although Radom has recently filed an objection to the Undersigned's ruling with respect to his ex-wife's affidavit on the basis of the Michigan marital communications privilege, Morse has not responded to this notice or otherwise objected to the Court's consideration of this evidence.  In any case, the Court finds no need to rely on this affidavit as a basis for its ruling here, refers to it only parenthetically by way of footnote or to merely supplement other portions of the

record which are already substantially supported, and its absence from this record would not alter the conclusions which appear below.[9]

## III.    Standard

The Court has broad discretion to determine the scope of discovery. *Bush v. Dictaphone Corp.*, 161 F.3d 363, 367 (6th Cir. 1998).  The scope of discovery, which permits a party to obtain "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit," is always subject to being "limited by court order[,]" and thus, within the sound discretion of the Court. Fed. R. Civ. P. 26(b)(1).  Further, discovery is more liberal than even the trial setting, as Rule 26(b) allows information that "need not be admissible in evidence" to be discoverable.  *Id.*  However, the Court must also balance the "right to discovery with the need to prevent 'fishing expeditions.'"  *Conti v. Am. Axle & Mfg., Inc.,* 326 F. App'x 900, 907 (6th Cir. 2009) (quoting *Bush,* 161 F.3d at 367).

---

[9] Notably, even Radom concedes that much of the affidavit could not possibly be protected under the privilege, for example portions which relate communications with people other than Radom, which reflect Rosenberg's personal knowledge or impressions or which reflect communications made after she and Radom were already divorced. (DE 503 at 16, fn.4 (citing DE 472 at 77- 79; DE 352 at 17).)

24

"A subpoena to a third party under Rule 45 is subject to the same discovery limitations as those set out in Rule 26." *Knight Capital Partners Corp. v. Henkel Ag & Co., KGaA*, 290 F.Supp.3d 681, 685 (E.D. Mich. 2017) (citations omitted). "A person withholding subpoenaed information under a claim that it is privileged … must: (i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A); *see also* Fed. R. Civ. P. 26(b)(5)(A). The burden is on the party asserting the privilege. *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983).

## IV. State Farm's Motion to Compel is Granted in Part and Denied in Part

### A. Morse Fails to Establish that the Subpoena was Brought for an Improper Purpose

Morse generally objects that the Subpoena seeks discovery for an improper purpose, such as to defend actions brought by his law firm's clients against State Farm, or to assert a claim against Morse or his law firm, or to share with other persons. (DE 386-18.) At various hearings, he has suggested that State Farm is either gathering this information at the behest of the federal government, or that it intends to share the discovery with the government. However, he fails to offer any evidence in support of these accusations or his general objections, and they are, accordingly, **OVERRULED**. *See also State Farm Mut. Auto. Ins. Co. v.*

*Physiomatrix, Inc.*, No. 12-cv-11500, 2013 WL 10936871, at *11 (E.D. Mich.

Nov. 26, 2013) (rejecting Morse's claim that the subpoena in that case was

harassing, finding the information sought highly relevant and thus discoverable).

Morse also suggests in his response brief that State Farm is retaliating

because Morse "publicly exposed" State Farm's Advancing Claims Excellence

("ACE") program in a 2015 article in the *Michigan Bar Journal*.  (DE 403 at 18-

20.)  State Farm explains that the ACE program involved an internal review of

closed claims valued at less than $250,000 each to identify ways Michigan claims

handling could be improved, began in 1995 and was completed in 1997, and had

been "publicly disclosed" many times in the almost 20 years since the program

ended, and thus does not support a retaliation theory.  (DE 409 at 4, fn. 2, citing

*Med City Rehab. Serv., LLC v. State Farm Auto. Ins. Co.*, No. 11-14777, 2012 WL

12929897, at *2-3 (E.D. Mich. Dec. 10, 2012) (ACE documents irrelevant).)  The

Court agrees that Morse has failed to demonstrate how this supports a claim that

State Farm's Subpoena is retaliatory or served for an improper purpose,

particularly in light of the substantial record evidence developed by State Farm in

this case.

Similarly, Morse has failed to demonstrate how his citation to two out-of-

state cases has any bearing on the Subpoena or discovery issues here.  *See Hale v.

State Farm,* No. 12-cv-00600 (civil RICO case against State Farm that settled), and

*Campbell v. State Farm Mut. Auto. Ins. Co.*, 65 P.3d 1134, 1148 (Utah 2001)

(upholding $145 million punitive damages award based on findings in that case on

claim of bad faith failure to settle for the policy limits), *overruled,* 538 U.S. 408

(2003) (holding punitive damages award violated due process).  Morse essentially

cites these cases simply to put State Farm in a bad light and paint the insurer as a

"bad actor," but the best defense is not always a good offense, and none of this

explains why Morse should be exempt from having to produce the documents at

issue in this specific case.

As discussed below, State Farm's allegations regarding Morse's

involvement in the alleged fraudulent scheme can hardly be described as baseless,

and the Subpoena targets relevant information.  In addition, any confidential

information produced will be adequately protected pursuant to the Stipulated

Protective Order in this case.

### B.     The Subpoena Targets Relevant Information

#### 1.     The core issues

Morse's objection that the Subpoena does not relate to the "core issues" in

this case is not well taken.  As this Court has previously found, State Farm is

"entitled to get information which would set the table and explain how th[e alleged

fraudulent] scheme works from beginning to end, and not just at the moment of

actual billing."  (DE 286 at 199.)  Nor is this Morse's first time around the block

on this or several of the other issues he raises. *See Physiomatrix*, 2013 WL 10936871, at *7 ("[I]t is clear that State Farm is entitled to discovery tending to prove the entirety of the 'scheme' alleged, and that such proof should not be limited solely to the predicate acts which underlie the [conspiracy] charge."). Interestingly, both State Farm and Morse point to Judge Grand's opinion in the *Physiomatrix* case as supporting their respective positions here. The Court also finds it instructive.

As discussed above, State Farm's Complaint and the instant motion to compel contain extensive allegations about and documentation of Morse's connections with and involvement in the Defendants' alleged scheme to submit "fraudulent bills and related documentation … to inflate the value of [personal injury claims]" and that Morse would be "motivated to refer patients to the Defendants because [he] can rely upon the Predetermined Protocol to … inflate the value of the [claims]," which "increases … contingency fees available to [Morse]." (DE 1, ¶¶ 6, 66-67, 80-81; DE 384 at 13-40.) State Farm has convincingly detailed how Morse was substantially involved with Defendants Radom, Bittner and Rosett, as well as the Defendant clinics with respect to the insureds at issue here, and described a seeming "wheel conspiracy," in which Morse, as the "hub" is involved with solicitors and treaters in sophisticated cross-referral *quid pro quo* relationships resulting in fraudulent or fraudulently-inflated personal injury claims

at State Farm's expense. Further, State Farm has offered evidence supporting its claim that Morse had or has an interest in Horizon and Superior, and that he required his clients to receive MRIs at one of these clinics, which in turn, billed State Farm for these services. And, Defendants Bittner, Radom and Rosett were directly involved in soliciting clients for Morse, through AIB and through the use of unapproved police reports, many of whom were then steered to Defendants for treatment.[10]

Thus, as in *Physiomatrix*, information about the *quid pro quo* relationships between Morse and the Defendants, and between the Defendants and their patients, is relevant and discoverable.

### 2. Solicitation

The Court further finds, unlike in *Physiomatrix*, that the manner in which the 221 Patients at issue were solicited is relevant to the claims and defenses in this action, and thus discoverable, as State Farm has sufficiently shown how Morse, through Bittner, Radom, the Rosetts and AIB, was involved in the solicitation of at least some of those Patients, for the benefit of Morse, many of whom Morse then

---

[10] Interestingly, when asked (hypothetically) by the Court if Morse could prevail on a motion for summary judgment on this robust record if he *had been* named as a conspirator in the alleged fraudulent scheme, Morse's counsel chose not to respond substantively, and instead deflected the question, accusing State Farm of using this case to unfairly "taint" Morse, "without giving [him] the opportunity of a defendant to have a sword against State Farm and to clear his name[.]" (DE 474 at 55-56.)

steered to Defendants for treatment.[11]  Specifically, State Farm has alleged that

Jayson and Robert Rosett unlawfully obtained unapproved police reports from

Robert Coleman and Antonio Spratt from 2009 to 2012, and from Detroit police

officers Almeranti and Miller from 2012 through 2014, which they used to solicit

auto accident victims to be represented by Morse and treated at Defendants'

clinics, and that Rosett emailed and hand delivered thousands of unlawfully

obtained police reports to Morse's firm for solicitation as clients and then referral

to Defendants' clinics, and that these unapproved police reports provided

Defendants and Morse with a competitive advantage in trying to sign up clients for

Morse and patients for Defendants' clinics before those clients' names were

publicly available.

---

[11] The Michigan Court of Appeals' recent decision in *Richardson v. Allstate Ins. Co.*, No. 341439, 2019 WL 2273415 (Mich. Ct. App. May 28, 2019), cited by Morse as supplemental authority (DE 491), has no application to this case.  In *Richardson*, the Court of Appeals held that the trial court erred when it granted defendant summary disposition of plaintiff's claims for no-fault benefits on the basis of solicitation in violation of MCL 750.410 and MCL 750.410b.  *Id.* at *4 (holding that improper solicitation is not a defense *to a claim for no-fault benefits*).  Here, State Farm does not allege that an insured's claim for benefits is barred if the insured was solicited by an attorney.  Rather, State Farm has alleged unlawful solicitation as a critical part of the fraudulent scheme alleged to submit bills to it for unnecessary treatment and services pursuant to a predetermined protocol designed to financially benefit Defendants, Horizon and personal injury attorneys, particularly "the PI Attorney" (Morse).  (*See* DE 1, ¶¶ 80-81.)

In *Physiomatrix*, the Court found that "whether or not [the clients'] solicitation was legal or ethical is once-removed *from the case at hand*." 2013 WL 10936871, at *8 (emphasis added). The Court stated that:

> State Farm's complaint alleges a *limited scheme* where the critical relationships are (1) the alleged referral relationships between the firms and Defendants and (2) Defendants' relationships with their patients. Whether the firms properly or improperly solicited their clients is of no consequence to the purpose for which those clients were referred, or treated by Defendants.

*Id.* (emphasis added). As State Farm now admits, in *Physiomatrix*, it had not presented sufficient evidence tying the solicitation of patients *to Morse* as opposed to just the defendants in that case, such as evidence showing the defendants sending unauthorized police reports to Morse to solicit clients. (DE 474 at 25-26.)

Here, on the other hand, the scheme is slightly different, and State Farm has presented evidence supporting its allegations that Morse worked with Rosett, Radom and Bittner to secure clients, and in return Morse agreed to send the patients to their clinics and required that the patients go to Horizon and Superior so that he could benefit from or influence the MRIs at those facilities. He complained when the results were unfavorable to his clients' legal claims (or his ownership interest), thus encouraging positive MRI findings and unnecessary treatment, for which State Farm was billed. (See DEs 384-4 to 384-7 (Morse complaining about "seeing a lot of negatives. A lot," and that the normal MRI interpretations were "killing me" and would "put me out of business"); DE 504-6 (Morse complaining

31

that 33 MRI scans for the week at Horizon "seems really light" and that "[w]e need to be at 80 ourselves then whatever they do. They can't catch up to us. That would be really bad. Work it!").)

State Farm also points to *State Farm Mutual Automobile Insurance Co. v. Warren Chiropractic & Rehab Clinic*, 315 F.R.D. 220 (E.D. Mich. 2016), which distinguished *Physiomatrix* and found solicitation information relevant and discoverable. The *Warren* court explained that "the 'boundary of relevance' [in *Physiomatrix*] extended only to information relevant to an alleged 'quid pro quo' relationship between the defendant medical care providers and the personal injury law firms; there was no real link alleged between the referral services and the scheme." 315 F.R.D. at 225. Conversely, the Court in *Warren* found solicitation information was relevant because "Plaintiff alleges that these other entities are *in on the scheme*, in that they referred callers directly to the medical care providers allegedly in league with the same law firms to which the patients were referred." *Id.* (emphasis added).

Similarly, here, State Farm has offered evidence showing the Defendants were directly soliciting clients *for Morse*, through the use of unauthorized police reports, and in exchange Morse was sending those clients to the Elite Defendants and the Rosett Defendants for treatment, and thus he was alleged to be "in on the scheme." (DE 474 at 25-26.) State Farm alleges that these cross-referral

relationships resulted in inflated bills and claims, yielding higher potential trial or settlement values for Morse. In addition, State Farm has presented evidence showing that Morse had an interest in Horizon and Superior, through Radom and HI Investor, and thus would have received a direct financial benefit from having his clients referred to those entities for unnecessary (or even necessary) MRIs.[12] As State Farm stated in its reply brief, "that patients did not seek treatment on their own, but were solicited to treat at Defendants' clinics, is not only relevant to the 'setting' of the case, but also is relevant to whether services they purportedly received were medically necessary" and "Morse played a critical role in driving Defendants' medically unnecessary treatment." (DE 409 at 6-7.)

Morse argues in his response brief that, "State Farm is not entitled to take discovery from Morse to determine how his Law Firm obtains its clients generally or even as to these particular clients." (DE 403 at 42.) While the Court agrees that State Farm is "not entitled to take discovery from Morse to determine how his Law Firm obtains its clients *generally*," as that would be beyond the bounds of reasonable discovery in this matter, that is not what State Farm seeks here. Rather, the discovery request at issue, Request No. 12, is expressly limited to " the solicitation, marketing, or referral *of any Patient(s) Identified in the Complaint*"

---

[12] *See, e.g.,* (DE 384-23 (email stating "there will be four partners [in Horizon]: 1. Mann Global 2. Zack & Katz Global 3. Professional Holdings Unlimited 4. *Morse (or whoever name he is putting up for him)*") (emphasis added).)

(DE 386-17 at 10 (emphasis added)), *i.e.*, the 221 Patients at issue, not Morse's

clients "generally." Because the Subpoena targets relevant information, and is

sufficiently narrowed to the insureds at issue, it is not improper or harassing. *See*

*Systems Prod. & Solutions, Inc. v. Scramlin*, No. 13-CV-14947, 2014 WL

3894385, at *9 (E.D. Mich. Aug 8, 2014) (stating that a subpoena is not harassing

or improper where it "target[s] relevant information"). However, the Court has

further limited that request, as discussed below.

### C.    Morse's remaining objections

#### 1.    Reasonable time frame: January 1, 2010 to present

The Subpoena requests documents for the January 1, 2010 to present time

period. (DE 386-17 at 7.) As this Court has previously found, the time frame back

to August 22, 2010 is a "well-established time frame on this record" and not

outside the bounds of proper discovery. (DE 286 at 200.) I find here that, based

upon the extensive record evidence supplied by State Farm in its motion, dating

back to 2009, the proposed time frame for this Subpoena from January 1, 2010 to

present is reasonable and not outside the bounds of proper discovery. Accordingly,

any objection to that time period is **OVERRULED**. *See MedCity Rehab. Serv.,*

*LLC v. State Farm Mut. Auto. Ins. Co.*, No. 11-cv-14777, 2013 WL 1898374, at *2

(E.D. Mich. May 7, 2013) ("Courts have commonly extended the scope of

discovery to a reasonable number of years prior to the defendant's alleged illegal action.").

### 2. No undue burden and discovery is proportional

Morse has not adequately supported his objection that the Subpoena is unduly burdensome. As stated above, he fails to address the *specific* discovery requests and explain how a response to any of those *specific* requests is unduly burdensome. And the Court has already found, above, that the information sought in the Subpoena is highly relevant to this action and the fraud scheme alleged, and is thus discoverable. Further, as discussed below, the Court is narrowing those document requests, further limiting any claimed undue burden in responding. *See Physiomatrix*, 2013 WL 10936871, at *11 (firms' unduly burdensome objection is "mooted in part by the fact that the Court has limited the requests of the original subpoena").

As previously explained, "'[i]f an objection is interposed based on an alleged undue burden, the objecting party must make a specific showing, usually … by affidavit, of why the demand is unreasonably burdensome." *State Farm Mut. Auto. Ins. Co. v. Elite Health Ctr.*, 364 F.Supp.3d 758, 766 (E.D. Mich. 2018) (internal quotations and multiple citations omitted). Morse has not made such a specific showing. Rather, he submitted an affidavit with his response brief "*[a]ssuming* that the Law Firm represented the[] 126 insureds [as State Farm

35

contends]," the Law Firm file for those insureds is "*likely* voluminous" and positing that it will take "about 10 hours to review [each] file," and that he thus "*may* incur over 1260 hours in time just to review [client] files … and prepare a privilege log." (DE 403-2, ¶ 10.) Because Morse failed to respond or object to each specific document request, it is not clear to which request or requests this objection applies. Surely this objection does not apply to requests seeking documents or communications between Morse and Defendants related to investments or financial information, but not directed to patients identified in the complaint (*i.e.*, Request Nos. 3-7, 10, 11, 13-16). "[T]he fact that it will be either bothersome or burdensome" for a non-party to comply with the request for discovery "does not necessarily mean that it will be *unduly* so." *Elite Health Ctrs.*, 364 F.Supp.3d at 767 (emphasis added); *see also Physiomatrix*, 2013 WL 10936871, at *11 (finding no undue burden, noting that Morse's "contention that it would take over 500 hours of attorney time to review and produce the requested information from 53 client files" was "challenged by the Court," and citing *EEOC v. Quadl Graphics*, 63 F.3d 642 (7th Cir. 1995) (finding subpoena not unduly burdensome where affidavit asserting burden was deemed inflated and exaggerated)). Morse's objection on the basis of undue burden is **OVERRULED.**

Further, Morse's passing, barebone objections that State Farm fails to establish that its document requests are proportional to this case and that the

request for "all" documents is improper are **OVERRULED**.  Based on State

Farm's allegations and substantial record evidence in this case, and considering the

"importance of the issues at stake" and "the importance of the discovery in

resolving the issues," the Court finds that the discovery sought in the Subpoena, as

limited below, is proportional to the needs of this case. *See* Fed. R. Civ. P.

26(b)(1).

### 3.    Not cumulative

Morse's objection that the documents sought in the Subpoena can be

obtained from other sources has been repeatedly rejected by this Court.  As stated

in its prior orders and bench rulings in this case, and in prior State Farm cases of

this nature, the parties are entitled to seek the same evidence from different sources

within the same case in order to test veracity and completeness and to uncover

contradictory information.  *See, e.g., Physiomatrix*, 2013 WL 10936871, at *11

("[T]here is no absolute rule prohibiting a party from seeking to obtain the same

documents from a non-party as can be obtained from a party, nor is there an

absolute rule providing that the party must first seek those documents from an

opposing party before … a non-party.") (internal citations omitted).  That State

Farm has, since serving this Subpoena on Morse in February 2018, issued

discovery requests or subpoenas to other Defendants or non-parties, does not bar

State Farm from seeking that same or similar evidence from Morse in the first

instance.  "State Farm is entitled to explore that evidence in different ways and with various witnesses."  (DE 506 at 5.)

### 4.    Not prohibited by *Nationwide*

Morse argues that State Farm's Subpoena should be prohibited as discovery of opposing counsel.  Morse asserts that he is opposing counsel to State Farm in 559 current matters and in 6,000 past matters, and that *Nationwide Mutual Insurance Co. v. Home Insurance Co.*, 278 F.3d 621, 628 (6th Cir. 2002), which limits when discovery from opposing counsel is permitted, bars enforcement of State Farm's Subpoena in this case.  However, *Nationwide*, and other similar cases cited by Morse, all involve a party seeking discovery of its opposing counsel or in-house litigation counsel *in the very matter where discovery issued*.  Morse's counsel conceded, as he must, that Morse is <u>not</u> opposing counsel to State Farm in <u>this</u> matter.  (DE 473 at 46.)  Morse has not cited any case applying *Nationwide* other than to an opposing counsel in the case at issue.[13]

As a rule, State Farm is entitled to "discovery regarding any non-privileged matter that is relevant to any [of its] claim[s] or defense[s]."  Fed. R. Civ. P. 26(b)(1).  Any person, including attorneys, with relevant information may be subject to discovery.  Morse has not explained how the discovery sought would

---

[13] *Nationwide* would thus be more on target if State Farm were seeking discovery from, for example, Mr. Joelson, Ms. Eagan, Mr. Blumberg, Mr. Cox, Mr. Hutchinson or Mr. Gonek, all of whom are named counsel *in this case*.

expose his litigation strategy in any cases he currently has pending against State

Farm.  In fact, because Morse has refused to sign the Stipulated Protective Order in

this case, it is not even known if any of the 126 Patients at issue assumed to be

represented by Morse are even a current client of Morse.  And Morse remains free

to assert attorney-client privilege or work-product protection over any discovery

sought.  Accordingly, *Nationwide* is inapplicable and does not bar the Subpoena.

### 5.   Privileged documents and privilege log

Morse very generally objects to producing any documents protected from

disclosure by the work product rule or any applicable federal or state privilege or

privacy law.  Morse did not object to any request specifically and did not produce a

privilege log with respect to any claims of privilege, asserting that he cannot make

that determination until he knows whether he is required to produce documents

and, if so, the categories of such documents.  (DE 386-18.)  Morse is directed to

respond to the specific Subpoena requests as set forth below.

Any objections to producing documents responsive to the requests based on

privilege must be specific and comply with the requirements in Fed. R. Civ. P.

45(e)(2), which provides that:

> A person withholding subpoenaed information under a claim that it is
> privileged … must:
>
> (i)    expressly make the claim; and

> (ii)  describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

Fed. R. Civ. P. 45(e)(2)(A); *see also* Fed. R. Civ. P. 26(b)(5)(A). The burden is on the party asserting the privilege. *In re Grand Jury Investigation No. 83-2-35*, 723 F.2d 447, 450 (6th Cir. 1983); *Physiomatrix*, 2013 WL 10936871, at *11 ("To the extent any of the documents sought … contain privileged information, the firms may assert privilege over them by providing to State Farm a proper privilege log [so] that it can assess and challenge if necessary."). The Court notes that Morse has a duty to make a truthful, good-faith determination of what documents are privileged and to present a proper listing in a proper privilege log. *See* Fed. R. Civ. P. 26(g)(1) (certification requirements).

**6.  The existing Stipulated Protective Order provides sufficient protection to non-parties like Morse, and he is required to sign it to obtain the names of the 221 insureds at issue**

As the Court found previously in this case, "the existing Stipulated Protective Order provides adequate protection to non-parties[.]" (DE 281 at 3.) Accordingly, Morse is not entitled to a separate protective order before obtaining a copy of the names of the 221 insureds at issue and producing documents responsive to the Subpoena.

**7.  State Farm is not prohibited from using documents produced by Gunabalan and Rosett based on the Court's**

40

### October 31, 2018 ruling barring use of Gunabalan's affidavit

Morse contends that State Farm's motion should be dismissed because it relies upon documents referenced in and attached to Gunabalan's affidavit. Morse argues that the Court's October 31, 2018 Order barred State Farm from relying on the Gunabalan affidavit, which referenced these same documents because Gunabalan "took the 5th when asked to authenticate them." (DE 403 at 44-45.) Morse argues that Rosett likewise has been deposed and "took the 5th" on every question relating to his case. (*Id.*)

Morse's request is **DENIED**. As State Farm correctly asserts in its reply brief, the Court expressly stated that its October 31, 2018 ruling with regard to the Gunabalan affidavit was limited to the affidavit and did not bar any of the parties' use of the emails and documents produced by Gunabalan. (DE 409 at 3, fn.1.) Consistent with that ruling, the documents produced by Rosett similarly are not barred simply because he may have refused to answer questions and instead asserted Fifth Amendment protection.

### D.     Order Regarding Responses to Specific Document Requests

Although Morse failed to address the specific document requests in the Subpoena, the Court has carefully reviewed the 16 requests, and, consistent with its rulings above, **ORDERS** Morse to respond to the requests as follows:

**Request Nos. 1 and 2**:  Morse shall respond to these requests, **except** that he does not have to produce any documents or communications related to: (1) Med Lien Solutions, or (2) "any other business relationships or business opportunities." State Farm has failed to demonstrate the relevancy of discovery regarding Med Lien Solutions, only stating in its motion that Med Lien Solutions was the "sister company" to PIF and purportedly had cash advance and lien resolution agreements, along with PIF, with some of the 221 insureds at issue.  State Farm has, for purposes of this motion, failed to sufficiently tie Med Lien Solutions to Morse and the alleged fraudulent scheme in this case.  And, the request for documents or communications related to "any other business relationships or business opportunities" is not sufficiently specific or targeted.

**Request Nos. 3 and 4**:  Morse shall respond to these requests, **except** that he does not have to produce any documents related to Med Lien Solutions, for the reasons stated above.

**Request Nos. 5 and 6**:  Morse shall responds to these requests.

**Request No. 7**:   Morse shall respond to this request, **except** that he does not have to produce any documents related to Med Lien Solutions, for the reasons stated above.

**Request Nos. 8 and 9**:  Morse is not required to respond to these requests, as they do not seek information relevant to State Farm's claims in this case.  Morse

is not a party to this case and, as pointed out by his counsel at oral argument, Plaintiff is not asserting an unjust enrichment claim against him, and accordingly the disbursement of proceeds or financing of personal injury claims is not relevant.

**Request Nos. 10 and 11:**  Morse shall respond to these requests.

**Request No. 12:**  Morse shall respond to this request; **however,** his response is limited to "Documents reflecting payments made to or received from any person and/or entity related to the solicitation of, or referral to *non-attorneys* of, any Patient(s) Identified in the Complaint to be represented by You or Your law firm, or to be treated by any of the Defendants."  Morse is not required to produce documents reflecting payments made or received for general "marketing" (i.e, television or print advertising, pamphlets, etc.) or referrals to other attorneys, as these are not relevant to the issues of this case and referral fees between attorneys are a common and accepted practice.  M.R.P.C. 1.5(e) and "Division of Fee" Comment thereto ("A division of fee facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well, and most often is used when the fee is contingent and the division is between a referring lawyer and a trial specialist.").

**Request Nos. 13 through 16:**  Morse shall respond to these requests.

Morse is directed to produce all responsive documents within his "possession, custody, or control," as required by Fed. R Civ. P. 45(a)(1)(A)(iii),

within **30 days** of this Order, a deadline which he agrees is reasonable.  (DE 455 at 6.)

## V.    Conclusion

It can reasonably be inferred from the evidence put forward by State Farm that the Predetermined Protocol and self-referral scheme – to which this evidence points – resulted in either fraudulent or fraudulently inflated personal injury claims (or both), unnecessary medical treatment, and kickbacks stemming from *quid pro quo*, cross-referral relationships at State Farm's expense.  It can also reasonably be inferred from this evidence that Morse is at the very center of this scheme, *i.e.* the hub of a wheel and spoke conspiracy.  He does appear to be, for all intents and purposes on these pleadings and on this record, the epitome of the "unnamed co-conspirator." *See Fritsch v. First Savings Bank*, No. 01-713 LCS/KBM, 2001 WL 37124823, at *5 (D.N.M. Oct. 24, 2001) (complaint sufficiently alleged a civil conspiracy against named defendants and unnamed co-conspirators); *see also Santana Prods., Inc. v. Sylvester Assocs., Ltd.*, No. 98 CV 6721 (ARR), 2006 WL 7077215, at *11 (E.D.N.Y. Nov. 13, 2006) ("[E]vidence of acts by non-party co-conspirators is admissible to establish a defendant's liability, as long as independent evidence is introduced to establish the existence of the conspiracy."), *aff'd*, 279 F. App'x 42 (2d Cir. 2008).  Unlike many non-parties who are forced to respond to subpoenas, Morse is not a "quintessentially disinterested" person who

would not have "anticipated being brought into this litigation in some fashion." *See Hennigan v. Gen. Elec. Co.*, No. 09-11912, 2012 WL 13005370, at *2 (E.D. Mich. Apr. 2, 2012).

Accordingly, for the reasons set forth above, Morse is ordered to respond to the Subpoena as directed herein. In addition, the Court strikes DE 483 from the docket.

And finally, Morse's oral motion to stay this ruling pending an opportunity for Morse to "bring these matters to the attention of Judge Cohn" (DE 474 at 54), without even knowing how the Court was going to rule, is **DENIED**. The parties will have sufficient time, prior to any obligations in this Order, to file any objections pursuant to Fed. R. Civ. P. 72(a).

**IT IS SO ORDERED.**

Dated: July 2, 2019            s/*Anthony P. Patti*
                               Anthony P. Patti
                               UNITED STATES MAGISTRATE JUDGE